# 14- 4104

## 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 ℭ𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰

### *for the*

## 𝔖𝔢𝔠𝔬𝔫𝔡 ℭ𝔦𝔯𝔠𝔲𝔦𝔱

---

Sakwe Balintulo, as personal representative of SABA BALINTULO, et al.

Plaintiff- Appellants

v.

*(For Continuation of Caption See Following Page)*

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

---

## JOINT APPENDIX
## VOLUME 2 of 4 (A0210-0476)

---

SCHONBRUN, DESIMONE, SEPLOW,
HARRIS & HOFFMAN, LLP
Paul L. Hoffman
723 Ocean Front Walk
Venice, CA 90291
Telephone: (310) 396-0731
Facsimile: (310) 399-7040

Nagel Rice, LLP
Diane E. Sammons, Esq.
Roseland, New Jersey, 07068
(973) 618-0400

HAUSFELD
Michael D. Hausfeld
Kristen M. Ward
1700 K Street, N.W.
Suite 650
Washington, D.C. 20006
Telephone: (202) 540-7200
Facsimile: (202) 540-7201

*Attorneys for Plaintiffs-Appellants*

---

FORD MOTOR CO., INTERNATIONAL BUSINESS MACHINES CORP.

        Defendants- Movants,

GENERAL MOTORS CORP.

        Defendant.

---

Lungisile Ntsebeza, Dorothy Molefi, Tozamile Botha, Mncekeleli Henyn Simangenloko, Samuel Zoyislile Mali, Msitheli Wellington Nonyukela, Mpumelelo Cilibe, William Daniel Peters, James Michael Tamboer, Nonkululeko Sylvia Ngcaka, individually and on behalf of her deceased son, Nothini Betty Dyonashe, individually and on behalf of her deceased son, Mirriam Mzamo, individually and on behalf of her deceased son, Lesiba Kekana, Dennis Vincent Frederi Brutus, Mark Fransch, Elsie Gishi, Thobile Sikani, Reuben Mphela, Catherine Mlangeni, Archington Madondo, Michael Mbele, Thulani Nunu, Mamosadi Mlangeni, Thandiwe Shezi, Sakwe Balintulo,

        Plaintiffs-Appellants

Sigqibo Mpendulo, Nyameka Goniwe, Themba Mequbela, Andile Mfingwana, F. J. Dlevu, unlawfully detained and tortured during period 1964/4, Lwazi Pumelea Kubukeli, unlawfully forced to flee into exil in 1985, Frank Brown, P.J. Olai, Sylvia Brown, H. Durham, M.D., Wellington Baninzi Gamagu, Violations of Pass Laws, unlawful detention 198119983, torture subjected to discriminatory labor practices 1981, Hermina Digwamaje, Sakwe Balintulo Khulumani,

        Plaintiffs,

Hans Langford Phiri,

        ADR Provider- Appellant,

     v.

Suzler AG, Daimler Chrysler North America Holding Corporation, Debeers Corporation, Schindler Holding AG, Novartis AG, Anglos-American Corporation, Banque Indo Suez, Credit Iyonnais, and Unknown officers and directors of Danu International., Standard Chartered Bank PLC, Citigroup AG, J.P. Morgan Securities Inc., as successor to Morgan Guaranty, Manufactures Hannover, Chemical Bank & Chase Manhattan Bank, Corporate Does, Commerzbank AG, Credit Suisse, Citigroup Inc., Deutsche Bank AG, UBS AG, Dresdner Bank

AG, Unisys Corporation, Sperry Corporation, Burrough Corrporation, ICL, Ltd., John Doe Corporation, Amdahl Corp., Computer Companies, Ford Motor Company, Ford Motor Company, Holcin, Ltd., Henry Blodget, Merrill Lynch & Co., Inc., Kirsetn Campbell, Kenneth M. Seymour, Justin Baldauf, Thomas Mazzucco, Virginia Syer Genereux, Sofia Ghachem, John Doe, Defendants 1through 10, Edward McCabe, Deepak Raj, Corporate Does, 1-100, their predecessors, successors and/or assigns, Oerlikon Contraves AG, Exxon Mobil Corporation, Oerlikon Buhrle AG, Shell Oil Company, Shell Petroleum, Inc., Royal Dutch Petroleum Co., Shell Transport & Trading Company, PLC, National Westminster Bank PLC, Minnesota Mining and Manufacturing Company/ 3M Company, Fujitsu Ltd., Barclays National Bank Ltd., Daimler AG, General Motors Corporation, International Business Machines Corporation, Union Bank of Switzerland AG,

Defendants-Appellees,

Rheinmatall Group AG, Barclays Bank PLC,

Defendants.

# TABLE OF CONTENTS

Page

Docket Entries…………………………… A0001-0078

*Ex parte* Declaration of
   Penuell Mpapa Maduna, Minister of
   Justice and Constitutional Development
   (July 11, 2003) Appended to
   2008 Motion to Dismiss. ………………… A0080-0089

Statement of Interest of the United States
   (October 30, 2003) Appended to
   2008 Motion to Dismiss…………………… A0090-0101

Diplomatic Letter of the United Kingdom,
   Joined by Germany, Sent to the U.S.
   State Department (January 30, 2008)
   Appended to 2008 Motion to Dismiss……… A0102-0106

*Ntsebeza* Complaint, filed
   October 24, 2008, Doc. 94…………………… A0107-209

*Balintulo* Corrected Second
   Amended Complaint, filed May 1, 2009,
   Doc. 162………................................................ A0210-0307

Letter from J.T. Radebe, MP, Minister of
   Justice and Constitutional Development to
   U.S. District Ct. Judge Shira A. Scheindlin,
   Sept. 1, 2009………………………………… A0308-0309

*Balintulo* Mandamus Opinion from U.S.
   Court of Appeals for the Second Circuit,
   decided August 21, 2013, mandate issued
   Nov. 7, 2013, Doc. 250……………………… A0310-0335

Conference Transcript, dated
   October 3, 2013, Doc. 248 [T-1-17]………… A0336-0352

Order in S.D.N.Y. 02-1499, dated
   December 26, 2013 filed
   December 26, 2013, Doc. 256……………… A0353-0360

Opinion and Order in S.D.N.Y. 02-1499,
  dated April 17, 2014 Doc. 268……………… A0361-0389

August 8, 2014 Letter from Kristen M. Ward
  to Judge Shira A. Scheindlin with attached
  *Balintulo* Proposed Amended Complaint,
  Doc. 280………………………………… A0390-0476

August 8, 2014 Letter from Diane E. Sammons
  to Judge Shira A. Scheindlin, with
  attached *Ntsebeza* Proposed Amended
  Complaint, Doc 281………………………… A0477-0564

Redline of *Ntsebeza* Proposed Amended
  Complaint submitted to chambers on
  August 8, 2014……………………………… A0565-0686

Redline of *Balintulo* Proposed Amended
  Complaint submitted to chambers on
  August 8, 2014……………………………… A0687-0773

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **SAKWE BALINTULO as personal representative of SABA BALINTULO, DENNIS VINCENT FREDERICK BRUTUS, MARK FRANSCH as personal representative of ANTON FRANSCH, ELSIE GISHI, LESIBA KEKANA, ARCHINGTON MADONDO as personal representative of MANDLA MADONDO, MPHO ALFRED MASEMOLA, MICHAEL MBELE, MAMOSADI CATHERINE MLANGENI, REUBEN MPHELA, THULANI NUNU, THANDIWE SHEZI, and THOBILE SIKANI,** | **03 Civ. 4524 (SAS)** **02 MDL 1499 (SAS)** **SECOND AMENDED COMPLAINT JURY TRIAL DEMANDED** **CLASS ACTION** |
| **Plaintiffs,** | |
| **v.** | |
| **DAIMLER AG, FORD MOTOR COMPANY, FUJITSU LTD, GENERAL MOTORS CORPORATION, INTERNATIONAL BUSINESS MACHINES CORPORATION, and RHEINMETALL GROUP AG,** | |
| **Defendants.** | |

Plaintiffs, on behalf of themselves and all other individuals similarly situated, for their Second Amended Complaint, filed pursuant to the Court's Opinion and Order of April 8, 2009, state as follows:

## I.    NATURE OF THE CASE

1.    Plaintiffs bring this class action under the Alien Tort Claims Act, 28 U.S.C. § 1350, against corporations that knowingly aided and abetted the South African security forces, as defined herein, or otherwise participated in a joint criminal enterprise in furtherance of the crimes of apartheid; extrajudicial killing; torture; prolonged unlawful detention; and cruel,

inhuman, and degrading treatment in violation of international law. Plaintiffs are the personal representatives of victims of extrajudicial killing, or were themselves direct victims of the aforementioned crimes perpetrated by the security forces of the apartheid regime between 1960 and 1994.

2.     Defendants—companies that supplied armaments, military vehicles, and computerized racial passbook systems to the security forces—provided not only practical assistance to the South African security forces, but material, logistical, and other means of practical support, which had a substantial effect on the commission of said crimes. The abuses that Plaintiffs suffered were a reasonably foreseeable result of Defendants' collaboration with the security forces of South Africa's apartheid regime. In return, Defendants benefited from apartheid and, consequently, the violence and terror that was used to maintain and enforce it at the expense of Plaintiffs and the members of the proposed classes discussed herein.

3.     Defendants knew that the actions of the South African security forces constituted violations of international norms toward Plaintiffs and the classes, but nevertheless provided such assistance with the knowledge and/or purpose of facilitating those crimes. Beginning in 1950, the world community condemned apartheid and the acts of violence and terror committed by the South African security forces to enforce and maintain apartheid as crimes in violation of fundamental, internationally-recognized human rights. The world community specifically identified the manufacturers of armaments and military vehicles, the technology corporations that designed and supported the racial passbook systems, and the banks that funded and collaborated with the security apparatus, as closely connected to the South African security forces and their violent acts. Defendants were on notice that their involvement violated international law and constituted knowing participation in and/or aiding and abetting of the

crimes of apartheid; extrajudicial killing; torture; prolonged unlawful detention; and cruel, inhuman, and degrading treatment.

## II.   JURISDICTION AND VENUE

4.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1350, the Alien Tort Claims Act ("ATCA"), and 28 U.S.C. § 1367 for any additional claims not otherwise covered by the ATCA.

5.     This matter was originally brought in the Eastern District of New York, where venue was proper pursuant to 28 U.S.C. § 1391.

6.     The matter was consolidated for pretrial proceedings by the Judicial Panel on Multidistrict Litigation and was transferred to the Southern District of New York.

## III.  DEFINITIONS

7.     Apartheid literally means "separateness."[1]  Apartheid is defined by the Rome Statute of the International Criminal Court as "inhumane acts . . . committed in the context of an institutionalized regime of systematic oppression and domination by one racial group over any other racial group or groups and committed with the intention of maintaining that regime."[2] Article II of the International Convention on the Suppression and Punishment of the Crime of Apartheid defines apartheid as a system that includes murder; the infliction of serious bodily or mental harm; torture or cruel, inhuman, and degrading treatment; and the institution of measures calculated to prevent a racial group from participation in the political, social, economic and

---

[1]   Robert Ross, *A Concise History of South Africa* 115 (Cambridge University Press: 1999).

[2]   Rome Statute of the International Criminal Court, art. 7(1)(j), July 17, 1998, 2187 U.N.T.S. 90, 37 I.L.M. 999.

cultural life of a country, in particular by denying the group or groups basic human rights or freedoms.[3] Apartheid is a variant of genocide.

8.    "Apartheid regime" refers to the country of South Africa during the period 1948 to 1994, when that country was ruled by the National Party.

9.    "Bantustan" refers to the barren, rural areas where Blacks were restricted or forcibly resettled.  These areas were also called "homelands" or rural reserves.  "Bantustan" comes from the word "Bantu," an isiXhosa and isiZulu word that was co-opted during apartheid and used by some white South Africans as a derogatory term to refer to Black Africans.[4]

10.   "Black" refers to all African, Indian, and "Coloured" South Africans unless otherwise indicated.

11.   "Plaintiffs" includes all named class representatives.

12.   "Coloured" is used as a synonym for "mixed race."

13.   "Genocide" is defined, in part, as "deliberately inflicting on the group conditions of life calculated to bring about its physical destruction in whole or in part."[5]

14.    "SAP" refers to the South African Police.

15.   "SADF" refers to the South African Defense Force.

16.   "Security forces" includes the South African military, paramilitary, police, special operations, intelligence, anti-riot, and other security units.

---

[3]   International Convention on the Suppression and Punishment of the Crime of Apartheid, 1015 U.N.T.S. 243, art. II.

[4]   Kevin Danaher, *In Whose Interest? A Guide to U.S. – South Africa Relations* (Washington, DC:  Institute for Policy Studies, 1985) at 107.

[5]   Convention on the Prevention and Punishment of the Crime of Genocide Art. 2(c), Dec. 9. 1948, 78 U.N.T.S. 277.

## IV.    PARTIES

### A.    Plaintiffs

17.    **Sakwe Balintulo** is the personal representative and brother of **Saba Balintulo**, who was murdered by the SAP on March 15, 1973.  On that day, Mr. Balintulo and fifteen friends were walking in the road, when the SAP opened fire on them. Mr. Balintulo was first shot in the leg and then shot three more times in the torso.  The gun shots killed Mr. Balintulo as well as his fifteen friends.

18.    **Dennis Vincent Frederick Brutus** was detained and shot by the SAP.  The recipient of a doctoral degree and numerous honorary doctorates, in 1961 Dr. Brutus was banned from teaching, publishing poetry, and attending gatherings.  In 1963, Dr. Brutus was arrested in Johannesburg while on his way to attend a meeting of the South African Non-Racial Olympic Committee, of which he was president.  The police transported him to a prison in a security vehicle.  When released on bail, Dr. Brutus fled to Swaziland and Mozambique, was arrested by the Portugese secret police, and was turned over to the SAP.  In September 1963, Dr. Brutus attempted to escape but was shot through his back by the South African Secret Police.  He was hospitalized in Fort Prison Hospital until December 1963.  Dr. Brutus was sentenced to eighteen months hard labor in Leeuwkop Prison in January 1964, was transferred to Robben Island Prison in March 1965, and in July 1965 was placed under house arrest until July 1966.  Dr. Brutus, who has served on the faculties of the University of Denver, Northwestern University, and the University of Pittsburgh, has testified three times before United Nations ("UN") committees on apartheid issues.  He still suffers from his injuries.

19.    **Mark Fransch** is the personal representative and brother of **Anton Fransch**, who was murdered by the SAP and the SADF in September 1989, when he was 20 years old.  Mr. Fransch was a member of the African National Congress ("ANC").  SAP and SADF officers said

that Mr. Fransch was a "dog" and that they would kill him.  When Mr. Fransch was staying at a house on Church Street in Crawford, thirty to forty officers, some of whom arrived in a Casspir vehicle, repeatedly shot into the house, killing Mr. Fransch and leaving flesh and hair on the wall.

20.     **Elsie Gishi** was shot by the SAP on December 26, 1976.  On that day, as Ms. Gishi returned from work, she found a group of youths protesting in her township.  There was a heavy police and military presence.  The officers kicked in the door of her house and one soldier shot Ms. Gishi from a Casspir vehicle.  Multiple bullets entered her back and remain lodged in her chest and arms.  One bullet lodged in her throat.  Another bullet is lodged inside a bone in her left arm and, as a result, she can no longer lift her left arm and the entire left side of her body is lame.  She can no longer bathe herself or do other washing.  The three remaining bullets cause her respiratory dysfunction and kidney problems.  Ms. Gishi is permanently disabled and continues to suffer as a result of the shooting.

21.     **Lesiba Kekana** was tear gassed during numerous student gatherings in 1985 and 1986.  Mr. Kekana was unlawfully arrested by soldiers driving a Casspir vehicle.  He was fingerprinted and detained without trial from June 1986 to February 1987.  During his detention, he was tortured.  Mr. Kekana still suffers from the torture and abuse.

22.     **Archington Madondo** is the personal representative and father of **Mandla Madondo**, who was murdered by the SADF on July 10, 1986.  Mandla Madondo was sent by his father to buy some bread.  While he was standing with friends outside the shop, he was shot to death by South African soldiers who were driving down the street in a Casspir vehicle.  Mandla Madondo was just 16 years old when he died.  His twin brother, Thamsanqa, was arrested shortly after Mandla's murder and was imprisoned for one year without a trial.

23.    **Mpho Alfred Masemola** was arrested and detained without trial for two months in 1982 for not having a passbook.  Between 1982 and 1984, Mr. Masemola was monitored and under 24-hour surveillance because of his involvement organizing boycotts and with a banned organization.  Mr. Masemola was then imprisoned on Robben Island from August 11, 1985 to 1990.  During his time in detention, Mr. Masemola was beaten so badly that his arm was broken and had to be in a plaster cast for one year.  He was also hit with iron bars while in detention for passbook violations.  Mr. Masemola was tear gassed at school, during riots, and in his prison cell.  Mr. Masemola spent one year in solitary confinement without treatment for his broken arm.  The police also shot Mr. Masemola.  He still has bullet fragments lodged in his head that cause severe headaches.  The bullet fragments cannot be removed.  Mr. Masemola still suffers from the torture.

24.    **Michael Mbele**, born on October 31, 1944, was politically active in a union as a shop steward and was also a United Democratic Front member.  Mr. Mbele was arrested twice for passbook violations after moving from the Transkei region of South Africa to KwaZulu Natal in 1973 without appropriate authorization.  Then, in 1986, the Special Security Police detained Mr. Mbele, transported him by a security vehicle to prison, and tortured him on account of his political activities.  For three straight days police beat and shocked Mr. Mbele with electric pipes, then choked him with a rubber tire.  As a result of his torture, Mr. Mbele lost his hearing.  Mr. Mbele's suffering continued for eleven more months as police placed him in solitary confinement.  Mr. Mbele still suffers from the torture.

25.    **Mamosadi Catherine Mlangeni** was arrested, detained, and fined for not having a passbook on as many as eight different occasions.  Each time, she would be transported to prison by a security vehicle, detained for a period of days, and forced to pay 200 rand to be

released. There was never a trial for any of these violations. On many of these occasions Ms. Mlangeni was also beaten by the security forces. Ms. Mlangeni believes she was monitored. The police would stop her and say things that indicated they knew who she was. Sometimes, only a day after she was released from jail, the police would re-arrest her. Sometimes it was the same police officers, while at other times it was their colleagues. Ms. Mlangeni was even stopped and told by the police that they were going to get her or her son, Bheki Mlangeni. In 1984 and again in 1986, Ms. Mlangeni was placed under house arrest for two to three months due to her son's status as an enemy of the state. Ms. Mlangeni was constantly harassed by police, who were trying to capture Bheki Mlangeni. The Security Branch came to her home once, asking for her son, then hit and kicked her and destroyed her property when she told them that Bheki Mlangeni was not there. Bheki Mlangeni was murdered in front of his family by a parcel bomb that was planted in the earphones of a walkman on February 15, 1991. Ms. Mlangeni still suffers from these abuses.

26. **Reuben Mphela** was detained and transported by security vehicle to a prison several times between 1976 and 1982 for failing to produce a passbook. On these occasions, the SAP came to arrest him at work. He was beaten, kicked, and made to jump like a frog. Mr. Mphela's family was traumatized by his imprisonment. He still suffers as the result of his injuries.

27. **Thulani Nunu** was shot by the SAP in 1985 when he was just six years old and living in the Nyanga Bush. It was night time and the SAP was raiding houses and shooting at youth with tear gas and live ammunition from Hippo military vehicles and vans. Panicked by the noise and the tear gas that filled his house, Mr. Nunu ran outside. The police fired at him from a Hippo vehicle and struck him in the head and hand. As a result of his injuries, Mr. Nunu lost

60% of the use of his hand. Because of his head wound, Mr. Nunu has permanent visual and hearing impairment. He still suffers from these injuries.

28. **Thandiwe Shezi** was tortured and raped by the Security Police. On September 8, 1988, the police stormed into Ms. Shezi's home and beat and strangled her in front of her daughter. They then took Ms. Shezi in a security vehicle to the Alexander Police Station where they tortured her further. She was handcuffed and a wet sack was tied over her head. She was then taken to a room where she was electrocuted for twenty minutes. Next she was raped repeatedly by four police officers. In addition to physical torture, the police also psychologically tortured Ms. Shezi. The police forced Ms. Shezi to watch as they smashed another prisoner's penis in a drawer. When the prisoner screamed out in pain they wanted Ms. Shezi to laugh. On one occasion, the police took Ms. Shezi outside, stripped her naked and tied her to a tree. They smeared her legs with butter, opened them wide, and threw ants all over her. The ants crawled into her vagina. On at least one occasion, while Ms. Shezi was being electrocuted, acid was poured over her head. Because of the torture, Ms. Shezi could not eat solid food for almost a month. She still suffers from the physical and mental effects of the torture and sexual assault.

29. **Thobile Sikani** was repeatedly detained, tortured, and shot by the SAP. The police shot Mr. Sikani in 1983, while he was attending a funeral for four of his friends. Without warning, the SAP opened fire on the funeral procession. Mr. Sikani was carrying the coffin of one of his friends when he was shot in the back and the left leg by the SAP. In 1986, the SAP transported Mr. Sikani by a security vehicle and fingerprinted and detained him at the Bishop Lavis Police Station because he was chairperson of the ANC Youth League. The SAP officers beat Mr. Sikani for hours and placed his scrotum and testicles in a machine that caused excruciating pain and made Mr. Sikani pass out. The SAP transferred Mr. Sikani in a security

vehicle to other facilities where the torture continued. At Bellville-South Police Station, an SAP officer inserted needles under Mr. Sikani's finger nails to coerce Mr. Sikani into talking about the ANC, but Mr. Sikani refused. Mr. Sikani was then taken to the hospital and treated for his injuries. After his treatment, the SAP took him back to the Wynberg Police Station where he was detained for five months without trial. In 1987, Mr. Sikani was again detained at the Wynberg Police Station for two months and tortured. At one or more times during his detentions, Mr. Sikani was transported in a Casspir military vehicle. In 1988, Mr. Sikani was attending a welcome home rally for the ANC leadership when the police shot tear gas with a pumpgun into Mr. Sikani's face. Mr. Sikani's stomach swelled up and he was rushed to the hospital. Mr. Sikani still suffers from the torture and abuse.

**B.    Defendants**

30.    Defendant **Daimler AG** ("Daimler") is a company organized and incorporated under the laws of Germany with headquarters in Stuttgart, Germany. Daimler manufacturers and markets a large variety of automobiles and other motor vehicles under the Daimler and Mercedes-Benz names. Daimler does business in New York State and has offices in New York State.

31.    Defendant **Ford Motor Company** ("Ford"), an international automobile giant, is organized and incorporated under the laws of Delaware. Headquartered in Dearborn, Michigan, Ford does business in New York State and has offices in New York State.

32.    Defendant **Fujitsu Ltd.** ("Fujitsu") is the parent company of Fujitsu Services Ltd., the successor company to International Computers Limited ("ICL"). Fujitsu offers infrastructure management, networking, systems integration, information technology outsourcing, and hosting services to a variety of customers. Organized and incorporated under

the laws of Japan with its principal place of business in Tokyo, Japan, Fujitsu does business in New York State and has offices in New York State.

33.     Defendant **General Motors Corporation** ("General Motors"), a leading automobile manufacturer, is organized and incorporated under the laws of Delaware with its principal place of business in Detroit, Michigan.  General Motors does business in New York State and has offices in New York State.

34.     Defendant **International Business Machines Corporation** ("IBM") is a global leader in manufacturing computer systems, software, networking systems, storage devices, and microelectronics. IBM is headquartered in New York State and does business in New York State.

35.     Defendant **Rheinmetall Group AG** ("Rheinmetall") is a holding company organized and incorporated under the laws of Germany with headquarters in Düsseldorf, Germany.  Rheinmetall operates its armaments business through its division or sector known as Rheinmetall Defence, which directs production, marketing, and sales activities of its various subsidiaries.  Rheinmetall and Rheinmetall Defence share the same headquarters, communications and press operations, and, since 2004, Chief Executive Officer ("CEO").  Prior to 2004, the Chair of Rheinmetall Defence's management board concurrently served on Rheinmetall's management board.  Rheinmetall, on its own and through controlled entities (including Rheinmetall Defence) entered into contracts and solicited business and investors in the United States.  Between 1996 and early 2004, Rheinmetall owned and conducted business through Hirschmann Electronics Inc., a civil electronics firm, which did business in New York State through authorized distributors.   Rheinmetall is the parent company of Oerlikon Contraves AG ("Oerlikon"), a Swiss company with its principal place of business in Zurich, Switzerland, and a leader in armaments design and manufacture.  Oerlikon was formed in 1989, upon the

merger of the Werkzeugmaschinenfabrik Oerlikon-Bührle and Contraves. Oerlikon has been a

majority-owned subsidiary or division of Rheinmetall since 1999.

## V.    CLASS ACTION ALLEGATIONS

36.    Plaintiffs bring this action pursuant to Rules 23(a), (b), and (c) of the Federal

Rules of Civil Procedure. Plaintiffs seek certification of the following distinct classes:

      a.    Extrajudicial Killing Class: All persons who are the surviving personal

representatives—including parents, spouses, children, siblings, and dependents—

of persons who were subject to extrajudicial killing by South African security

forces during the period from 1960 to 1994. Class representatives: Sakwe

Balintulo, personal representative of Saba Balintulo; Mark Fransch, personal

representative of Anton Fransch; and Archington Madondo, personal

representative of Mandla Madono;

      b.    Torture Class: All persons who were themselves subject to torture and

rape by South African security forces during the period from 1960 to 1994. Class

representatives: Lesiba Kekana, Mpho Alfred Masemola, Michael Mbele,

Mamosadi Catherine Mlangeni, Thandiwe Shezi, and Thobile Sikani;

      c.    Detention Class: All persons who were themselves subject to prolonged

unlawful detention by South African security forces during the period from 1960

to 1994. Class representatives: Dennis Vincent Frederick Brutus, Lesiba Kekana,

Mpho Alfred Masemola, Michael Mbele, Mamosadi Catherine Mlangeni,

Thandiwe Shezi, and Thobile Sikani;

      d.    Cruel Treatment Class: All persons who were themselves subject to cruel,

inhuman, and degrading treatment by South African security forces during the

period from 1960 to 1994. Class representatives: Elsie Gishi, Lesiba Kekana,

Mpho Alfred Masemola, Michael Mbele, Mamosadi Catherine Mlangeni, Reuben

Mphela, Thulani Nunu, Thandiwe Shezi, and Thobile Sikani.

37.     The members of each of these classes are so numerous that joinder of all members

is impractical.  The exact number and identities of all class members is not currently known, but

Plaintiffs believe that each proposed class numbers in the thousands.  For example, according to

the ANC, the South African security forces were responsible for over 12,000 civilian deaths and

20,000 civilian injuries in the period from 1990 to late 1993 alone.[6]  Between 1960 and 1990,

over 80,000 opponents of apartheid were detained for up to three years without trial, including

approximately 10,000 women and at least 15,000 children under the age of 15.[7]  A 1988 report

noted:

> Anti-apartheid and human rights groups, such as the Detainee Parents
> Support Committee (DPSC), have accused the security forces of
> widespread brutality, including torture of detainees, assaults, killings and
> rape, as well as, on occasion, the wanton destruction of property.  More
> than 3,000 blacks reportedly have died in the violence of the last three
> years, many of them in confrontations with the security forces.  More than
> 20,000 political opponents of the white regime have been imprisoned,
> including several thousand children.[8]

38.     There are questions of law and fact that are common to members of each distinct

class or to members of all classes, including, but not limited to:

(a) whether and to what extent Defendants provided assistance to the South African

security forces;

---

[6]   African National Congress First Submission to the Truth and Reconciliation Commission,
Aug. 1996, at 25 [hereinafter *First Submission*].

[7]   Kenneth Christie, *The South African Truth Commission* 21-22 (St. Martin's Press, Inc., 2000).
Max Coleman (ed.), *A Crime Against Humanity: Analysing the Repression of the Apartheid State*
xi-xii (Mayibube Books, 1998).

[8]   Investor Responsibility Research Center, Inc., Social Issue Service, Proxy Issue Report, *Sales
to Strategic Entities in South Africa* (Feb. 23, 1988), at G-10.

(b) whether and to what extent Defendants substantially assisted the South African security forces in maintaining and enforcing apartheid through campaigns of violence and terror, including committing the crimes of extrajudicial killing; torture; prolonged unlawful detention; and cruel, inhuman, and degrading treatment;

(c) whether and to what extent Defendants knew of the violence and terror perpetrated by the South African security forces, benefited from the system of apartheid and the crimes with and by which it was maintained and enforced, and continued to provide assistance for the purpose of facilitating the commission of those crimes;

(d) whether and to what extent Defendants aided and abetted or otherwise participated in or were liable for the crimes committed by the South African security forces;

(e) whether the system of apartheid enforced by the South African security forces is actionable under the Alien Tort Claims Act as a tort in violation of international law;

(f) whether the conduct of the South African security forces constituted extrajudicial killing, torture, prolonged unlawful detention, and/or cruel, inhuman, and degrading treatment and is actionable under the Alien Tort Claims Act as a violation of international law; and

(g) whether each plaintiff class is entitled to compensatory and/or punitive damages and equitable and/or injunctive relief, and the proper measure thereof.

39.     Plaintiffs' claims are typical of those of their respective class(es) in that they (and/or the decedents they represent) were civilians who suffered extrajudicial killing, torture, prolonged unlawful detention, and/or cruel, inhuman, and degrading treatment by reason of the conduct of the South African security forces during the time period in which Defendants provided assistance to those forces.

40.     Plaintiffs will fairly represent the interests of their respective class(es) because it is in their best interest to prosecute the claims alleged herein to obtain full compensation due to them for the conduct of which they complain.  Plaintiffs have no interests that conflict with or are contrary to the interests of other class members.

41.     Plaintiffs will adequately represent their respective class(es) in that they are represented by counsel with extensive experience in international human rights and class action litigation.

42.     Pursuant to Fed. R. Civ. P. 23(b)(3), questions of law and fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

43.     In the alternative, certification of particular issues pursuant to Fed. R. Civ. P. 23(c)(4) is appropriate with respect to those issues identified in paragraph 38 and/or other significant common issues as resolution of these issues would significantly and materially advance this litigation, reduce the range of issues in dispute, and promote judicial economy.

## VI.     BACKGROUND FACTS APPLICABLE TO ALL COUNTS

44.     In 1948, the National Party won control of the South African government, using apartheid as its primary electoral platform.[9]  After 1948, the electoral vote was taken away from all groups except the white minority.[10]  The National Party then passed a series of laws to implement and institutionalize apartheid.

### A.     Apartheid-Era Laws

---

[9]   Steven Debroey, *South Africa: Under the Curse of Apartheid* 188, 191 (University Press of America, Inc., 1990).

[10]   Christie, *supra* note 7, at 12.

45.     Apartheid is a crime against humanity.[11]  It is a system of "inhumane acts . . .

committed in the context of an institutionalized regime of systematic oppression and domination

by one racial group over any other racial group or groups and committed with the intention of

maintaining that regime."[12]  It is a system that depends on systematic violence and acts of terror,

including murder; the infliction of serious bodily or mental harm; torture; or cruel, inhuman, and

degrading treatment; as well as institutional methods of disenfranchisement and segregation, for

its maintenance and enforcement.[13]

46.     Apartheid-era laws classified all South Africans according to one of four races—

white, "Coloured," Asiatic (Indian), and Native (African)[14]—and then designated specific

residential and business areas for the sole use of particular racial groups.  The majority of the

land was reserved for whites.  As a result, non-whites were forcibly removed from their homes.

47.     The Bantu Authorities Act of 1951 provided for the establishment of separate

rural areas or homelands called "Bantustans" for most Africans to live according to their often

bureaucratically-imposed tribal identity.[15]  "[T]he dilemma of Bantustan policy in the final

analysis was one in which the contradiction of the apartheid attempt to confine black settlement

to rural homelands along with the need to secure black, cheap labour power in the cities, created

---

[11]    Rome Statute of the International Criminal Court, art. 7(1)(j), July 17, 1998, 2187 U.N.T.S. 90, 37 I.L.M. 999.

[12]    *Id.* at art. 7(2)(h).

[13]    International Convention on the Suppression and Punishment of the Crime of Apartheid, 1015 U.N.T.S. 243, art. II.

[14]    Nigel Worden, *The Making of Modern South Africa, Third Edition* 108 (Blackwell Publishers Ltd., 2000).

[15]    Christie, *supra* note 7, at 20.

the repression, the hatred and the patterns which would lead to spiraling violence in later years."[16]

48.     The government required all Africans over the age of 16 to carry passbooks, which included their Population Registration identity card, their fingerprints, and pages for any history of government opposition, labor control, and employer signatures.[17]  These regulations were referred to as "pass laws."  Without the proper documentation, no African could legally enter or remain in an urban area.[18]

49.     These laws restricted the freedom of movement of Africans so as to channel workers where employers need cheap labor, facilitated the policing of workers, allowed the "weeding out" of the unemployed and "troublemakers," and confined and barricaded the "surplus population" in the rural slums of the Bantustans.[19]

50.     The pass laws were an instrument of coercion and control dating to the prior century "to have a hold on the native whom we have brought to the mines … a most excellent law … which should enable us to have complete control of the Kaffirs."[20]

51.     In addition to controlling movement and access to urban areas, the apartheid laws zoned residential and business districts on a racial basis.[21]  Amenities—including cinemas, restaurants, sports facilities, and public vehicles—were also officially segregated.

---

[16]  *Id.* at 25.

[17]  *Id.* at 5 "Natives Act."

[18]  Bentley J. Anderson, *The Restoration of the South African Citizenship Act:  An Exercise in Statutory Obfuscation*, 9 Conn. J. Int'l L. 295, 310.

[19]  Robert Davies, Dan O'Meara and Sipho Dlamini, *The Struggle for South Africa* 171 (Zed Books, 1985).

[20]  African National Congress Submission to Special Truth and Reconciliation Commission on the Role of Business, Nov. 1997, at 2 (quoting the President of the Chamber of Mines at the end of the last century) [hereinafter *Role of Business*].  "Kaffir" is a derogatory term for Africans.

52.     Job reservation laws excluded Africans from better paid, more skilled categories of work.[22]  Master and Servant laws made it a crime—punishable by imprisonment—for Black workers to break an employment contract by, *inter alia*, desertion, insubordination, or refusing to carry out an employer's command.[23]

53.     Laws banned relations between races.[24]  The Immorality Amendment Act, barring intercourse between the races,[25] led to the jailing of over 6,000 people between 1950 and 1966.[26]  The government also prohibited interracial marriages in 1949.

54.     The apartheid government also enacted laws to suppress dissent.  In 1956, the Riotous Assemblies Act was passed, granting the Minister of Justice wide powers to control public gatherings and to prohibit a gathering if he deemed that it posed a threat to the peace.[27]  The Act further allowed the police to disperse with force any gathering that took place in violation of its prohibition.[28]

---

[21]  Davies, et al., *supra* note 19, at 172.

[22]  *Id.* at 174; *see, e.g.* Native Building Workers Act (1951), Industrial Conciliation Act (1956).

[23]  *Role of Business, supra* note 20, at 2.  The laws remained on the books until 1977.

[24]  *See* Worden, *supra* note 14, at 107. An Amendment to the Prohibition of Mixed Marriages Act was passed in 1968 to make void any illegal marriage by a South African, even if it took place outside of South Africa.

[25]  The ban on intercourse between whites and Africans already was in place prior to this Act, which extended the ban to all non-whites. The Act was further tightened in 1967. Brian Bunting, *The Rise of the South African Reich*, Chapter Nine: South Africa's Nuremberg Laws 21 (Penguin Africa Library, 1969).

[26]  *Id.* at 3 (discussing statistics of Minister of Justice in Parliament).

[27]  Other related legislation included the Internal Security Act of 1950, the Gatherings and Demonstrations Act of 1973, and the Dangerous Weapons Act of 1968.  *See* Janine Rauch and David Storey, *Policing of Public Gatherings and Demonstrations in South Africa 1964-1994*.

[28]  *Id.* at 9.

55.     In 1960, the Governor-General gained power under the Unlawful Organizations Act to ban the ANC and the Pan-Africanist Congress.[29] Other African organizations later were banned under the Affected Organizations Act[30] and the Internal Security Act, which also banned all political meetings during April 1, 1986 – March 31, 1987 as part of a State of Emergency.[31]

## B.     The Violence and Terror of Apartheid

56.     "What was involved (in apartheid) was far more than simply the implementation of what the world regarded as a criminal policy.  What was of even greater significance was the use of criminal means to defend apartheid.  The massive powers given to the state to control people's lives and deny them their basic rights were not enough.  They were supplemented by every species of common law crime, including systematic and organized murder, fraud, kidnapping and torture."[32]

57.     "Some 16.5 million South Africans were criminalised and harassed under the pass laws . . . .  Four million people were forcibly removed from their homes and land during the heyday of apartheid social engineering.  Three hundred apartheid laws were put on the statute books to control and disadvantage black South Africans from the cradle to the grave."[33]

---

[29]  Bunting, *supra* note 25, at 14.  The Unlawful Organizations Act also increased the fines and physical punishment under the Riotous Assemblies Act.

[30]  David Webster and Maggie Friedman, *Repression and the State of Emergency: June 1987 – March 1989*. Glenn Moss and I. Obery (eds.), *State and Politics* 26-27 (Ravan Press Ltd., 1989).

[31]  *Id*. at 163.  For a list of banned organizations, *see* Webster and Friedman, *supra* note 30 at 26-27.

[32]  This quote was taken from the foreword to the Idasa "Truth and Reconciliation in South Africa" 1994 conference proceedings.  *See* Christie, *supra* note 7, at 15.

[33]  Paul Connerton, *How Societies Remember* 1-4 (Cambridge University Press, 1989); *see, e.g.,* Christie, *supra* note 7, at 13.

58.     Between 1960 and 1970, almost 2 million people were forcibly moved into the "Bantustans"[34] where they were "reduced to scraping a bare subsistence from eroded, overgrazed land."[35]

59.     "An urbanized black population were subject to the whims of a government who could deport them, arrest them and transport them to places of work.  On top of this system of forced migration and removal, the regime decided to create townships away from areas of employment, forcing labor to travel often long distances just to get to work."[36]

60.     "The Surplus People Project, which . . . produced the most authoritative documentation of the history and scale of forced removals estimated that between 1960 and 1982 over 3.5 million South Africans were moved as part of this policy.  Resistance to forced removals was met with severe repression by the state and resulted in people being killed and jailed."[37]

61.     Hundreds of thousands of people were arrested each year for pass law violations. Failure to produce a passbook on demand was an arrestable offense regardless of how legally and how long one may have been living in an urban area.  In 1976 alone, 250,000 Africans were arrested under the pass laws and related influx control laws, according to the Africa Fund.

62.     According to the apartheid government's own statistics, 2,419,675 people were arrested or prosecuted under the pass laws between 1974 and 1985.[38]

---

[34]  Davies, et al., *supra* note 19, at 208.

[35]  Danaher, *supra* note 4, at 48-9.  Francis Wilson, Chpt. 2: "Farming, 1866-1966" in Monica Wilson and Leonard Thompson's (eds.), *The Oxford History of South Africa* (Oxford: Oxford University Press, 1971).

[36]  Christie, *supra* note 7, at 25.

[37]  *First Submission, supra* note 6, at 6.

[38]  International Defense and Aid Fund for Southern Africa, *Apartheid:  The Facts* 48-49 (1991).

63.     It has been estimated that 12 million Blacks were unlawfully arrested and convicted in summary trials between 1948 and 1985 for pass violations.[39]

64.     Resistance to apartheid reached a turning point in 1960.  On March 21, 1960, a crowd of between 7,000 and 20,000 gathered in Sharpeville to protest against the pass laws.  The demonstrators marched to the municipal police station to turn in their pass books.  The police opened fire on the crowd, using machine guns and automatic weapons.  Sixty-nine people were killed and 186 wounded, many of them women and children and most shot in the back as they ran from the gunfire.[40]

65.     That same day, police fired on a crowd of 10,000 demonstrators in Langa, killing two people and wounding 49 others.[41]

66.     Following Sharpeville, the state called its first State of Emergency.  In the three months following the March 1960 State of Emergency declaration, police detained over 10,000 people and arrested a further 10,000, primarily on the charges of pass violations.[42]

67.     The ANC described the resistance that began in the 1970s as follows:

> The early 1970s witnessed a slowdown in the economy and increased privations among the black population.  Spontaneous as well as organized mass resistance began to surface for the first time in a decade. . . .
>
> Faced with internal mass upsurge, the response of the regime was brute force:  detention, closure of institutions, brutal suppression of demonstrations and strikes; and in 1976, cold-blooded shooting of unarmed pupils.  The actions of the regime on 16 June 1976, and in the 18

---

[39]  Kevin Hopkins, *Assessing The World's Response To Apartheid*, 10 U. Miami Int'l & Comp. L. Rev. 241, 247 (2001-2002).

[40]  Christie, *supra* note 7, at 27-28; Steve Clark (ed.) *Nelson Mandela Speaks: Forging a Democratic, Nonracial South Africa* 275 (Pathfinder, 1993).

[41]  *Id.*

[42]  Webster and Friedman, *supra* note 30, at 141.

months following this eruption, brought out in bold relief the determination of the apartheid regime to deny human rights at all costs.

Notes taken during a Cabinet meeting by Jimmy Kruger, at the time Minister of Police, reveal an extraordinary level of self-delusion, or the deliberate denial of reality in order to justify murder:

> "10.8.76.
> Unrest in Soweto still continues. The children of Soweto are well-trained. (…) The pupils/students have established student councils. The basic danger is a growing black consciousness, and the inability to prevent incidents, what with the military precision with which they act. The Minister proposes that this movement must be broken and thinks that police should perhaps act a bit more drastically and heavy-handedly which will entail more deaths.
> Approved.

As the decade came to a close, there was an attempt on the part of the state to employ a new approach grounded in "total strategy", an explicit commitment to mobilize military, economic, physical and psychological resources in defense of the existing order. It brought senior police, Defense Force and intelligence officers directly into the formulation and implementation of government policy, through the State Security Council and the National Security Management System….[43]

68.     In response to the Sharpeville massacre and the growing trend of government resistance, the SAP instituted Divisional Anti-Riot Units to deal with crowd control.[44] In 1975, the Divisional Anti-Riot Units gave way to new counter-insurgency units, dedicated to crowd and riot control.[45]

---

[43]  African National Congress document, *The National Party and the Anatomy of Repression in South Africa, 1984 – 1994* at 4.6 found at http://www.anc.org.za/ancdocs/misc/trc04.html (last visited Sept. 30, 2008)

[44]  Rauch and Storey, *supra* note 27. Furthermore, in 1964, the Defence Amendment Act provided for the SAP to call upon the Citizen Force and Commandos in the event the police needed support in suppression of civil unrest. As of 1967, all white 17-year olds would serve in the Citizen Force or Commandos.

[45]  *Id.*

69. Before 1984, the SAP were primarily responsible for controlling the resistance. But as the unrest spread from the townships around Johannesburg to the rest of the country, SADF troops were deployed. In July 1985, a State of Emergency was declared in riot torn targeted areas.[46]

70. After 1985, the SADF, supplemented by the SAP, was deployed in most Black townships. The SADF was responsible for enforcing emergency regulations which included a ban on protest gatherings. The SADF was also deployed to force Black students who were boycotting classes back to school.[47]

71. On June 12, 1986 Minister of Law and Order Louis La Grange imposed yet another State of Emergency. By June 1987, 26,000 people had been detained, equaling the total detained under all previous emergencies and legislation for the past 26 years.[48]

72. In 1991, the Internal Stability Division, a division of the SAP mobilized to handle racial unrest, was introduced under the government of President Frederick William de Klerk. By the 1990s, a total of 72 riot units existed, 30 of them dedicated to the homelands.[49]

73. These special Internal Stability Division riot units used offensive tactics and heavy weaponry, such as batons, teargas, automatic weapons, shotguns, and handguns.[50] They relied heavily on armored vehicles for crowd control.[51] According to a report of the TRC, "the training and equipment of riot police, and the deployment ratios of these policemen relative to

---

[46] Investor Responsibility Research Center Inc., *supra* note 5, at G-10.

[47] *Id*.

[48] Webster and Friedman, *supra* note 30, at 142.

[49] Rauch and Storey, *supra* note 27.

[50] Description of Weapons from CSVR, s*ee* Rauch and Storey, *supra* note 27, at 15–17, Exhibit G.

[51] Rauch and Storey, *supra* note 27.

the size of the crowds that they confronted, were all based on the assumption that crowds would be controlled and dispersed through the use of force."[52]

74.     The riot units viewed the use of lethal force as an acceptable and routine means of crowd control, and were responsible for most of the apartheid-era killings.[53]  "As the external environment in which they operated took on the character of a low-intensity civil war, their training, equipment, and methodology became increasingly militarized."[54]  The TRC report noted that the riot policing function "was in direct contrast to reforms being made to public order policing methods elsewhere in the democratic world at this time."[55]

75.     A panel of doctors from the National Medical and Dental Association who treated detainees after their release found that 83 percent of released detainees exhibited signs of physical abuse, and 25 percent of the released detainees alleged sexual abuse.  Of those examined (ranging in age from 14 to 45), 95 percent showed symptoms of post-traumatic stress disorder.  Detention time ranged from 4 hours to 315 days.[56]

76.     Evidence from court records and lawyers indicates that the practice of torture to secure admission of guilt was common.[57]

---

[52]  *Id*.

[53]  *Id*. at 1.

[54]  *Id*.

[55]  *Id*. at 4.

[56]  *See* Webster and Friedman, *supra* note 30, at 167-68. Webster further notes that the DPSC (Detainee Parents Support Commission, which was renamed the Human Rights Committee of South Africa in 1995), the organization that created these reports, distinguishes between police custody and detention. Detention referring to those people held under security or state of emergency legislation, while police custody refers to people held under criminal legislation even if the motive for custody ostensibly is for political arrest.  *Id*. at 168.

[57]  *Controls on Exports to South Africa: Hearings Before the Subcommittees on International Economic Policy and Trade and on Africa of the H. Comm. on Foreign Affairs*, 97th Cong, 2d

77.     The torture of detainees was the result of training and indoctrination, not the work of aberrant individuals.  Many women detainees suffered sexual abuse.  The families and friends of detainees were frequently subjected to sustained harassment and surveillance.[58]

78.     The violent, criminal acts committed by the apartheid regime were intended to cause death or serious bodily injury to civilians and the purpose of such acts was to intimidate and coerce the civilian population.

79.     Systematic violence, including extrajudicial killing, torture, prolonged unlawful detention, and cruel, inhuman, and degrading treatment, was an integral and indispensable element of apartheid employed by the security forces to maintain and enforce the system.

80.     Between 1990 and the end of 1993, over 12,000 civilians were killed and at least 20,000 injured by the security forces of apartheid South Africa.  Many of the victims were women and children.  The numbers of assassinations of anti-apartheid leaders also increased, from 28 in 1990, to 60 in 1991 and 97 in 1993.[59]

81.     In 1993, negotiations led to an agreement on the date for non-racial elections, and Nelson Mandela, as leader of the ANC, called for the lifting of economic sanctions.

82.     Apartheid officially ended in 1994 with the first universal suffrage general election and the election of Nelson Mandela.

C.     **Truth and Reconciliation Commission Findings**

83.     The South African TRC was set up by the Government of National Unity under the Promotion of National Unity and Reconciliation Act to assess and begin to heal the damage

---

Sess. Feb. 9 and Dec. 2, 1982 at 21 (statement of Goler Teal Butcher on Behalf of the Lawyers' Committee for Civil Rights Under Law).

[58] *First Submission, supra* note 6, at 2-3.

[59] *Id.* at 25.

inflicted by apartheid. Led by Archbishop Desmond Tutu, the TRC had a multiracial staff of more than 60, which pursued its mandate through three committees: the Amnesty Committee, the Reparation and Rehabilitation (R&R) Committee, and the Human Rights Violations Committee. The TRC began its hearings on April 15, 1996 and closed in early 2002, although the Amnesty Committee continued to decide cases after that date. The Final Report was released in March 2003.

84.     The TRC specifically found that "Certain businesses were involved in helping to design and implement apartheid policies. Other businesses benefited from cooperating with the security structures of the former state."[60]

85.     The TRC also found that "Business failed in the hearings to take responsibility for its involvement in state security initiatives specifically designed to sustain apartheid rule. This included involvement in the National Security Management System. Several businesses, in turn, benefited directly from their involvement in the complex web that constituted the military industry."[61]

86.     The TRC identified as participants in apartheid "businesses that made their money by engaging directly in activities that promoted state repression,"[62] such as companies that "provided armored vehicles to the police during the mid-1990s,"[63] as would companies in the armaments industry: "the moral case against the armaments industry is essentially that business

---

[60]  Vol. 4, Ch. 2 of TRC "Institutional Hearing: Business and Labor," Findings Arising out of Business Sector Hearings, ¶ 161.

[61]  *Id.* at ¶ 166

[62]  *Id.* at ¶ 26.

[63]  *Id.*

willingly (and for profit) involved itself in manufacturing products that it knew would be used to facilitate human rights abuses. . . ."[64]

## VII.  NOTICE AND KNOWLEDGE

87.     Beginning in 1950, the world community condemned apartheid as a crime against humanity and instituted a variety of sanctions against South Africa.  United Nations resolutions reflected this emerging consensus among civilized societies.  Individual nations passed laws in response to the resolutions and in conformity with their objectives.  Private and transnational organizations took similar steps to implement the objectives of the resolutions.

88.     These actions over a span of 40 years explicitly placed businesses involved in the financial and economic support of the security forces' abuses of the apartheid government on notice that their involvement violated international law and constituted knowing participation in a crime against humanity.

89.     For example, in 1960, the U.N. Security Council issued a Resolution deploring "the situation arising out of the large-scale killings of unarmed and peaceful demonstrators against racial discrimination and segregation in the Union of South Africa," and called upon South Africa to abandon apartheid.[65]

90.     On November 6, 1962, the General Assembly called on member states to refrain from exporting arms and ammunition to South Africa, which would be used to increase "ruthlessness involving violence and bloodshed."[66]

---

[64]  *Id.* at ¶ 75.

[65]  S.C. Res. 134, U.N. Doc. S/RES/134  (Apr. 1, 1960).

[66]  G.A. Res. 1761, U.N. Doc. A/Res/1761(XVII) (Nov. 6, 1962).

91.     Less than one year later, on August 7, 1963, the Security Council adopted

Resolution 181 condemning the arms build-up in South Africa and calling on all States and their

domestic corporations to "cease forthwith the sale and shipment of arms, ammunition of all types

and military vehicles to South Africa."[67]

92.     In 1968, the General Assembly declared apartheid to be a crime against humanity:

> *Reiterates* its condemnation of the policies of apartheid practiced by the
> Government of South Africa as a crime against humanity; ….
> *Expresses its grave concern* over the ruthless persecution of opponents of
> apartheid under arbitrary laws . . . .[68]

93.     The General Assembly specifically "condemn[ed]"

> the main trading partners of South Africa, and the activities of those
> foreign financial and other interests, all of which, through their political,
> economic and *military collaboration* with the Government of South Africa
> and contrary to the relevant General Assembly and Security Council
> resolutions, are encouraging that Government to persist in its racial
> policies.[69]

94.     In 1972, The Security Council passed a Resolution urging Member States to

observe the arms embargo against South Africa.[70]

95.     The International Conference of Experts for the Support of Victims of

Colonialism and Apartheid in South Africa met in Oslo, Norway, in 1973.  The Conference

---

[67]  The Security Council reaffirmed this Resolution in December 1963 and included all
shipments of any materials that might be used to build arms or ammunition. The Resolution
again was strengthened in July 1970.  Security Council Resolution, *Question Relating to the
Policies of Apartheid of the Government of the Republic of South Africa, See* S.C. Res. 181, U.N.
Doc. S/RES/181 (Aug. 7, 1963); S.C. Res.,182 U.N. Doc. S/RES/182 (Dec. 4, 1963); S.C. Res.
282, U.N. Doc. S/RES/282 (July 23, 1970).

[68]  G.A. Res. 2396, U.N. Doc. A/RES/2396 (XXIII) (Dec. 2, 1968).

[69]  *Id.* (emphasis added).

[70]  S.C. Res. 311, U.N. Doc. S/RES/311 (Feb. 4, 1972). Also in 1972, the General Assembly
declared that "the United Nations has a vital interest in securing the speedy elimination of
apartheid."  *See* G.A. Res. 2923, U.N. Doc. A/RES/2923 E (XXVII) (Nov. 15, 1972).

adopted the following program of action:

> (68) The international arms embargo should be fully implemented by all States, and the Security Council should expose those States which violate it, especially France, and secure their compliance. The Security Council should take further action to prevent the importation or arms from South Africa by other States. The Security Council should also examine all other forms of military co-operation with South Africa and take appropriate action.[71]

96.     Following discussions relating to the Conference's findings, the General Assembly adopted the International Convention on the Suppression and Punishment of the Crime of Apartheid.[72]  The Convention declared apartheid a crime against humanity, and all participants in apartheid as criminals, whether they were organizations, institutions, or individuals.  Article II of the Convention defined apartheid as:

> [s]imilar policies and practices of racial segregation and discrimination as practiced in southern Africa, shall apply to the following inhuman acts committed for the purpose of establishing and maintaining domination by one racial group of persons over any other racial group of persons and systematically oppressing them:
>
> a.  Denial to a member or members of a racial group or groups of the right to life and liberty of person:
>
>   1.  By murder of members of a racial group or groups;
>
>   2.  By the infliction upon the members of a racial group or groups of serious bodily or mental harm, by the infringement of their freedom or dignity, or by subjecting them to torture or to cruel, inhuman or degrading treatment or punishment;
>
>   3.  By arbitrary arrest and illegal imprisonment of the members of a racial group or groups; . . .

---

[71]  The Programme of Action Adopted by the International Conference of Experts for the Support of Victims of Colonialism and Apartheid in South Africa (Oslo, April 9-14, 1973), G.A. Res. 9061, U.N. Doc. A/RES/9061 (May 7, 1973).

[72]  International Convention on the Suppression and Punishment of the Crime of Apartheid, 1015 U.N.T.S. 243.

      b.   Persecution of organizations and persons, by depriving them of fundamental rights and freedoms, because they oppose apartheid.

97.    Article III of the Convention described who would be held responsible for committing the acts outlined in Article II.

> International criminal responsibility shall apply, irrespective of the motive involved, to individuals, members of organizations and institutions and representatives of the State, whether residing in the territory of the State in which the acts are perpetrated or in some other State, whenever they:
>
> a.   Commit, participate in, directly incite or conspire in the commission of the acts mentioned in article II of the present Convention;
>
> b.   *Directly abet, encourage or cooperate* in the commission of the crime of apartheid.[73]

98.    Following the submission of the Preliminary Report of July 14, 1976, by the Special Rapporteur to the Special Committee against Apartheid, the General Assembly adopted a Resolution condemning "the collaboration of … those foreign economic interests which maintain and/or continue to increase their collaboration with the racist regimes in southern Africa, especially in the economic, *military* and nuclear fields."[74]

99.    In 1976 and again in 1977, the Security Council by Resolution condemned apartheid and specifically the South African Government for "its resort to massive violence against and killings of the African people, including schoolchildren and students and others

---

[73]  International Convention on the Suppression and Punishment of the Crime of Apartheid, 1015 U.N.T.S. 243, art. III (emphasis added).

[74]  G.A. Res. 31/33, U.N. Doc. A/RES/31/33 (Nov. 30, 1976). (emphasis added)

opposing racial discrimination."[75]  The Security Council demanded an end to the violence against and repression of Black people and to release all political prisoners.[76]

100.    In 1977, the Security Council once again called for an arms embargo against South Africa, but this time made it mandatory by invoking Chapter VII of the U.N. Charter.[77]

101.    In November 1979, the United Nations Special Committee Against Apartheid in South Africa co-sponsored an International Seminar on the Role of Transnational Corporations in South Africa.  The Seminar expressed the view that "transnational corporations bear a major share of responsibility for the maintenance of the system of apartheid, for *strengthening the repressive and military power* of the racist regime and for the undermining of international action to promote freedom and human dignity in South Africa."[78]

102.    Following acts of police violence against student demonstrators, the Security Council adopted a Resolution supporting the arms embargo and condemning the violence in South Africa:

> 1.  *Strongly condemn*[ed] the racist régime of South Africa for further aggravating the situation and its massive repression against all opponents of *apartheid*, for killings of peaceful demonstrators and political detainees and for its defiance of General Assembly and Security Council resolutions . . .

> 3.  *Reaffirm*[ed] that the policy of *apartheid* is a crime against the conscience and dignity of mankind and is incompatible with the rights and dignity of man, the Charter of the United Nations and the Universal Declaration of Human Rights and seriously disturbs international peace and security; . . .

---

[75]  S.C. Res. 392, U.N. Doc. S/RES/392 (June 19, 1976).

[76]  S.C. Res. 417, U.N. Doc. S/RES/417 (Oct. 31, 1977).

[77]  S.C. Res. 418, U.N. Doc. S/RES/418 (Nov. 4, 1977).

[78]  Charles Peter Abrahams, *The Doctrine of Odious Debts* (Rijks Universiteit Leiden, Aug. 2000) at 79 (citing Transnational Corporations in South Africa and Namibia, The Review – International Commission of Jurists, No. 36-39 (1986-87), at 34) (emphasis added).

11.  *Request*[ed] the Security Council Committee . . . to redouble its efforts to secure full implementation of the arms embargo against South Africa by recommending by 15 September 1980 measures to close all loop-holes in the arms embargo, reinforce and make it more comprehensive.[79]

103.    The U.N. General Assembly declared by Resolution that:

*continuing* political economic and *military* collaboration of certain Western states and their transnational corporations with the racist regime of South Africa encourages its persistent intransigence and defiance of the international community and constitutes a major obstacle to the elimination of the inhuman and criminal system of apartheid in South Africa. . . .[80]

104.    The General Assembly adopted a Resolution in December 1983 "reaffirming that apartheid is a crime against humanity" and strongly condemning the apartheid regime for its repression and brutal acts of torture, murder, and terror.  The Resolution specifically criticized "transnational corporations and financial institutions that have increased political, economic and *military collaboration* with the racist minority regime of South Africa despite repeated appeals by the General Assembly. . . ."[81]

105.    In 1984, the General Assembly adopted another Resolution "vigorously" condemning

transnational corporations and other organizations which maintain or continue to increase their *collaboration* with the racist regime of South Africa, especially in the political, economic, *military* and *nuclear* fields, thus encouraging that regime to persist in its inhuman and criminal policy

---

[79]  S.C. Res. 473, U.N. Doc. S/RES/473 (June 13, 1980).

[80]  General Assembly Resolution, *Policies of Apartheid of the Government of South Africa: Situation in South Africa*, G.A. Res. 36/172 A, U.N. Doc. A/RES/36/172 A (Dec. 17, 1981). Further, the United Nations General Assembly proclaimed the year 1982 as International Year of Mobilization for Sanctions Against South Africa.  General Assembly Resolution, *Policies of Apartheid of the Government of South Africa, International Year of Mobilization for Sanctions Against South Africa, see also*  G.A. Res. 36/172 B, U.N. Doc. A/RES/36/172 B (Dec. 17, 1981) (emphasis added).

[81]  G.A. Res, 38/39, U.N. Doc. A/RES/38/39 A (Dec. 5, 1983) (emphasis added).

of brutal oppression of the peoples of southern Africa and denial of their human rights.[82]

106.    The Security Council further condemned apartheid as "a system characterized as a crime against humanity" including the "continued massacres of the oppressed people, as well as the arbitrary arrest and detention of leaders and activists of mass organizations…."[83]

107.    In 1984, the General Assembly again condemned the increasing violence of the Apartheid regime.[84]

108.    In 1985, the Security Council urged states to prohibit "all sales of computer equipment that may be *used by the South African army and police*."[85]

109.    In 1986, the Security Council urged:

> States to take steps to ensure that components of embargoed items do not reach the *South African military establishment and police* through third countries; . . .
>
> all States to prohibit the export to South Africa of items which they *have reason to believe are destined for the military and/or police forces of South Africa*, *have a military capacity and are intended for military purposes*, namely, aircraft, aircraft engines, aircraft parts, electronic and telecommunication equipment, computers and four-wheel drive vehicles.[86]

---

[82]  G.A. Res. 39/15, U.N. Doc.,A/RES/39/15 (Nov. 23, 1984) (emphasis added).

[83]  S.C. Res. 556, U.N. Doc. S/RES/556 (Oct. 23, 1984).

[84]  General Assembly Resolution, *Policies of Apartheid of the Government of South Africa: Comprehensive Sanctions against the apartheid regime and support to the liberation struggle in South Africa*, G.A. Res. 39/72 A, U.N. Doc. A/RES/39/72 A (Dec. 13 1984). These voluntary sanctions were renewed in 1985. General Assembly Resolution, *Policies of Apartheid of the Government of South Africa: Comprehensive Sanctions against the apartheid regime and support to the liberation struggle in South Africa*, G.A. Res. 40/64 A, U.N. Doc. A/RES/40/64 A (Dec. 10, 1985).

[85]  S.C. Res. 569, U.N. Doc. S/RES/569 (July 26, 1985) (emphasis added).

[86]  S.C. Res. 591, U.N. Doc. S/RES/591 (Nov. 28, 1986) (emphasis added).

110.    The General Assembly in 1989 adopted another Resolution regarding the supportive ties of international corporations, including banks, with South Africa, noting that "the maintenance of the *apartheid* economy and *the expansion of military and police expenditures* substantially depend on the supply of further credits and loans by the international financial community . . . ."[87]

111.    These United Nations resolutions as well as the accompanying domestic legislation of individual states singled out the manufacturers of armaments and military vehicles, the technology corporations that designed and supported the passbook systems to enforce racial segregation and the suppression of dissent, and the banks that funded and collaborated with the security apparatus and provided specific forewarnings that their assistance to the security forces of the South African apartheid regime knowingly and intentionally aided and abetted torts in violation of international law.

112.    The United States adopted numerous export regulations to reduce the supply of strategic goods, technologies, and financing to the security forces of the apartheid regime.

113.    In 1963, the United States adopted an arms embargo against South Africa, except for existing contracts.

114.    In 1971, the Department of Commerce enacted regulations stating: "In conformity with the United Nations Security Council Resolution of 1963, the United States has imposed an embargo on shipments to the Republic of South Africa of arms, munitions, military equipment, and materials for their manufacture and maintenance."[88]

---

[87]    G.A. Res. 44/27, U.N. Doc. A/RES/44/27 (Nov. 22, 1989) (emphasis added).

[88]    15 C.F.R. § 385.4 (1971).

115.    This ban remained in effect until 1978, when it was expanded to cover a broader range of goods and technologies destined for use by the apartheid security forces.  The revised regulations stated:

> An embargo is in effect on the export or re-export to the Republic of South Africa or Namibia *of any commodity*, including commodities that may be exported to any destination in Country Group V under a general license, where the exporter or reexporter knows or has reason to know that the commodity will be sold to or used by or for military or police entities in these destinations or used to service equipment owned, controlled or used by or for such military or police entities.[89]

116.    Under the U.S. regulations, "A validated export license [was] required for the export to the Republic of South Africa and Namibia of any instrument and equipment particularly useful in crime control and detection . . . ."[90]

117.    In 1981, the list of commodities subject to the U.S. embargo specifically included

> vehicles specially designed for military purposes, such as military mobile repair shops; all other specially designed military vehicles; engines, including those modified for military use; pneumatic type casings (tires) constructed to be bullet proof or to run when deflated; specially designed components and parts to the foregoing; [and] pressure refuellers.[91]

118.    Likewise, the embargo applied to "Specialized machinery, equipment, gear, and specially designed parts and accessories therefore specially designed for the examination, manufacture, testing, and checking of the arms, ammunition, appliances, machines, and implements of war; components and parts for ammunition; nonmilitary shotguns, barrel length 18 inches and over; [and] nonmilitary arms, discharge type."[92]

---

[89]    15 C.F.R. § 385.4 (1979) (emphasis added).

[90]    15 C.F.R. § 385.4 (1979).

[91]    15 C.F.R. § 379 (1981).

[92]    *Id.*

119.     In the technology sector, the Export Administration Regulations of 1982 provided that

> An embargo is in effect on the export or reexport to the Republic of South Africa or Namibia of technical data . . . where the exporter or reexporter has reason to know that the technical data is for delivery to or use by or for the military or policy entities.  In addition, users in the Republic of South Africa of technical data must be informed in writing at the time of export or reexport that the data may not be sold or otherwise made available, directly or indirectly, to the military or police entities in these destinations.[93]

120.     Export licenses were required under U.S. regulations for any computer exported to government consignees.  Licenses were awarded "on a case by case basis for the export of computers which would not be used to support the South African policy of apartheid."[94]

121.     The United States strongly condemned apartheid and restricted exports that would substantially assist the South African government in maintaining or enforcing apartheid.  As the 1983 Export Administration Regulations succinctly stated: "Authorizations for exports, reexports, sales to or for use by or for military or police entities in the Republic of South Africa will be denied except for medical supplies and similar goods."[95]

122.     To ensure the embargo's efficacy, the Department of Commerce adopted a broad definition of the term "military or police entities."  Commerce declared that "It is the Department's position that the following are police or military entities: ARMSCOR, Department of Prisons, Bureau of State Security, South African Railways Police Force, and certain municipal and provincial law enforcement officials such as traffic inspectors and highway patrolmen."[96]

---

[93]   15 C.F.R. § 385.4 (1982).

[94]   *Id.*

[95]   15 C.F.R. § 385.4 (1983).

[96]   15 C.F.R. § 385 (1981).

123.    The United States maintained broad export restrictions against South Africa until 1994, the year South Africa held its first universal suffrage general elections.

124.    For decades, Defendants were on notice that the security forces of the apartheid regime in South Africa had placed the Black South African population at an unjustifiably high risk of harm.

125.    During the relevant period, Defendants knew or should have known of the danger posed by the security forces of the apartheid regime to the Black South African population.

126.    Defendants acted in conscious disregard of, or with deliberate indifference to, these dangers by providing substantial assistance or encouragement to the security forces of the apartheid regime of South Africa.

## VIII.    AIDING AND ABETTING:  KNOWLEDGE, INTENT, AND SUBSTANTIAL ASSISTANCE

127.    The Nuremberg Tribunals confirmed that those who knowingly aid and abet the commission of crimes in violation of international law are liable for those acts.

128.    The Nuremberg Tribunal held that:

> [t]hose who execute the plan do not avoid responsibility by showing that they acted under the direction of the man who conceived it . . . .  He had to have the cooperation of statesmen, military leaders, diplomats and *businessmen*.  When they, with knowledge of his aims, gave him their cooperation, they made themselves parties to the plan he had initiated. They are not to be deemed innocent . . . if they knew what they were doing.[97]

129.    For example, the Military Tribunal convicted Emil Puhl, one of the leading executive officials of the Reichsbank, for participating as a banker in the disposal of looted assets:

---

[97]  6 F.R.D. 69 at 112 (emphasis added).

What was done was done pursuant to a governmental policy, and the thefts were part of a program of extermination and were one of its objectives. It would be a strange doctrine indeed, if, where part of the plan and one of the objectives of murder was to obtain the property of the victim, even to the extent of using the hair from his head and the gold of his mouth, he who knowingly took part in disposing the loot must be exonerated and held not guilty as a participant in the murder plan. *Without doubt all such acts are crimes against humanity and he who participates or plays a consenting part therein is guilty of a crime against humanity.*[98]

130.    Similarly, Friedrich Flick, the head of a large group of industrial enterprises, was convicted of slave labor based on his employee's decision to increase company production quotas knowing that forced labor would be required to meet the increase.[99] Significantly, the Tribunal held Flick fully responsible although the slave labor program had its origin in and was operated by the Nazi regime, and he did not "exert any influence or [take] any part in the formation, administration or furtherance of the slave-labor program."[100] It was not a requirement for liability that Flick specifically sought to use forced laborers. In fact, Flick testified that it was not his intent to use slave labor, and denied full knowledge of slave labor until very late in the war.[101]

131.    In addition to aiding and abetting liability, international and domestic law impose liability for participation in a criminal enterprise where, inter alia, a party acted in furtherance of a particular system in which the crime is committed by reason of the accused's function, and with knowledge of the nature of that system and intent to further that system.[102] Liability is

---

[98]  Ministries Case, Volume XIV at 611 (emphasis added).

[99]  United States of America v. Friedrich Flick, 6 Trials of War Criminals Before the Nuremberg Military Tribunals Under Control Council Law No. 10 (1952).

[100]  *Id*. at 1198.

[101]  *Id*. at 807.

[102]  *Prosecutor v. Krnojelac*, IT-97-25, Judgment (Mar. 15, 2002).

imposed on all persons who had "the intention to take part in a joint criminal enterprise and to further – individually and jointly – the criminal purposes of that enterprise" and where it is foreseeable that crimes—even crimes that do not constitute the common purpose—will be committed by other members of enterprise.[103]

132. Apartheid, in and of itself, is a *jus cogens* violation of international law, on par with genocide and slavery.

133. Article III of the International Convention on the Suppression and Punishment of the Crime of Apartheid specifically imposed liability on those who "irrespective of the motive involved ... directly abet, encourage or cooperate in the commission of the crime of apartheid."[104]

### A.  Defendants Aided and Abetted and Otherwise Participated in the Commission of International Crimes

134. The security forces of the apartheid regime enlisted the aid of private multinational corporations to provide the means and methods to carry out the violence and terror necessary to maintain and enforce apartheid.

135. Apartheid was "more than the programme of one political party."[105]  Business interests were

> active participants and initiators in constructing a political and economic system which, in the end, was classified in international law as a crime against humanity. . . .  The period of extreme repression, from 1960 onwards, was intended to save the system that protected privilege based on race, thereby continuing to guarantee business its exclusive place in the South African economy and society.[106]

---

[103]  *Prosecutor v. Tadic*, IT-94-I, Judgment (July 15, 1999).

[104] International Convention on the Suppression and Punishment of the Crime of Apartheid, 1015 U.N.T.S. 243, art. III.

[105] *Role of Business*, *supra* note 20, at 1.

[106] *Id.* The ANC noted that several core measures of apartheid were actively promoted by important business groups.

136.    The South African security forces depended on foreign sources for advanced technology, materials, goods, and services in three strategic sectors—armaments, technology, and transportation—that substantially assisted the regime to perpetuate apartheid and commit systematic acts of violence and terror against Plaintiffs and members of the classes, including extrajudicial killing; torture; prolonged unlawful detention; and cruel, inhuman, and degrading treatment.

137.    Certain businesses, including Defendants, played an important role in South Africa's defense of Apartheid from "civil unrest," cooperating closely with and providing logistical and other material support to the security forces of the apartheid regime.

138.    In 1977, P.W. Botha, then Minister of Defense, discussed the National Security Management System in a Defense White Paper:  "The resolution of the conflict in the times in which we now live demands interdependent and coordinated action in all fields: military, psychological, economic, political, sociological, technological, diplomatic, ideological, cultural, etcetera."[107]

139.    In May 1980, South African Prime Minister P.W. Botha appointed business leaders, including officers of Barclays, to a Defense Advisory Board.  Botha told the House of Assembly that the Defense Force had succeeded in obtaining the goodwill and cooperation of business leaders and said:

> [W]e have obtained some of the top business leaders in South Africa to serve on the Defense Advisory Board in order to advise me from the inside, not only about the armaments industry, but also about the best methods to be applied within the Defense Force … *I want to unite the*

---

[107] *First Submission*, *supra* note 6, at 9.

*business leaders of South Africa, representative as they are, behind the South African Defense Force.* I think I have succeeded in doing so.[108]

140. The South African security forces performed the wrongful acts of apartheid; extrajudicial killing; torture; prolonged unlawful detention; and cruel, inhuman, and degrading treatment that caused Plaintiffs' injuries. Defendants knowingly and substantially assisted the South African security forces in these violations of international law. Defendants were aware of their role as part of an overall illegal or tortious activity at the time they provided assistance.

141. From the time of the Sharpeville Massacre in 1960 until the fall of apartheid in 1994, it was common knowledge that the security forces of the regime were engaged in violent, criminal acts; that these acts were intended to cause death or serious bodily injury to civilians; and that the purpose of such acts was to intimidate and coerce the civilian population.

142. Defendants' assistance to, and encouragement of, the apartheid security forces' acts of violence and terror spanned several decades. During this time, Defendants provided various forms of support to the security forces in a consistent and repeated manner—they made regular deliveries of equipment, provided long-term design and maintenance services, and participated in standing defense committees. Defendants persisted in this course of conduct for many years after learning of the violent ends to which their assistance was put, ignoring the well-publicized and universally-condemned atrocities committed by the security forces in South Africa.

## B. The Armaments Sector

143. The increase in militarism and the corresponding increase in arms production in South Africa were reactions in large measure to the internal social and political climate of the

---

[108] Abrahams, note 78, at 65 (emphasis added).

1950s and 1960s, when South Africans intensified their struggle to abolish the apartheid system. In response to the popular struggle, the apartheid regime sought to acquire more modern military weaponry and lobbied heavily to import arms technology to the South African security forces.

144.    The United Nations imposed a mandatory arms embargo against South Africa in 1977 with the express purpose of putting an end to the "massive violence against and wanton killings of the African people" by the apartheid regime, as well as "its acts of repression" and "its defiant continuance of the system of apartheid."[109]

145.    All members of the United Nations—including Switzerland and Germany—were required to abide by the 1977 arms embargo by "ceas[ing] forthwith any provision to South Africa of arms and related material of all types . . . ."[110]

146.    The United States began restricting arms exports to the apartheid regime in 1964. After the mandatory United Nations arms embargo was imposed in 1977, the United States strengthened its export restrictions to prohibit all exports that the exporter knew or had reason to know would be sold to or used by military or police entities in South Africa.[111]

147.    In South Africa, the Armaments Development and Production ("ARMSCOR") state enterprise was developed by the apartheid regime in the late 1960s to "promote and co-ordinate the development, manufacture, standardisation, maintenance, acquisition, or supply of armaments."[112]

148.    Due to the secrecy of these activities, not all facts are presently known. However, it is known that ARMSCOR worked closely with private companies, including Defendant

---

[109]    S.C. Res. 418, U.N. Doc. S/RES/418 (Nov. 4 1977).

[110]    G.A. Res. 1761(XVII), U.N. Doc..A/Res/1761(XVII) (Nov. 6, 1962).

[111]    *See* 15 C.F.R. 385.4 (1979); *see supra* ¶ 115.

[112]    Armaments Development and Production Act 57 of 1968.

**Rheinmetall Group AG** ("Rheinmetall") and its subsidiaries and divisions, including Oerlikon Contraves AG ("Oerlikon"), to ensure that the security forces of the apartheid regime acquired the armaments and military equipment it needed to suppress dissent and control the population despite the international arms embargoes. The businesses linked to ARMSCOR also included Defendants IBM and Daimler, among others.[113]

149.    The ANC noted that many of the companies working with ARMSCOR were foreign: "many of the local private sector corporations were not involved in the genuine development of these war materials. They were more often useful conduits for foreign technologies, helping the apartheid state to evade the UN arms embargo."[114]

150.    The influx of armaments and related equipment, services, and expertise to ARMSCOR and the rest of the apartheid regime substantially assisted the suppression of dissent, the control and manipulation of the African population, and systematic violence against dissidents and non-whites in violation of international law.

151.    Defendant Rheinmetall, a top producer of armaments including the MK 20RH 202 (a component of the armored personnel carrier), the MG3 machine gun, and various weapons systems for battle tanks, exported significant quantities of armaments and related equipment and expertise to South Africa, for use by the security forces.

152.    In the 1970s, Rheinmetall, under fraudulent export declarations, exported a complete ammunition factory to apartheid South Africa to manufacture the 155mm extended range projectiles needed by the South African security forces.

---

[113]  COSATU Submission to the Truth and Reconciliation Commission Hearings on Business and Apartheid at 17.

[114]  *Role of Business*, *supra* note 20, at 8.

153.    Rheinmetall applied for a license to export a plant to Paraguay using a fictitious company name, "Sudamerika Paraguay Exportacion-Importacion." When the exported plant reached port in Brazil, ostensibly bound for Paraguay, the freight was re-loaded onto a ship bound for Durban, South Africa.

154.    The plant was erected in Pretoria and began operations in 1979. The plant made ammunition at the rate of 80 to 100 rounds per hour.

155.    In addition to the munitions plant, Rheinmetall aided the South African security forces in other ways, such as training members of the SADF in the use of certain artillery systems on its Unterlüss test range. Even after a criminal investigation was launched against Rheinmetall in 1980, Rheinmetall continued these trainings.

156.    A German tribunal in the mid-1980s found that Rheinmetall had created fictitious firms in foreign countries in order to disguise their business connections to the security forces of South Africa; handed in false end-user declarations to the authorities; and concluded fictitious contracts.

157.    Oerlikon, a subsidiary to Rheinmetall, is an international purveyor of defense and space technology. In 1989, the Werkzeugmaschinenfabrik Oerlikon-Bührle and Contraves were merged to form the present entity, Oerlikon Contraves. In 1999, this entity was sold to Rheinmetall DeTec AG. Oerlikon is the successor-by-merger of Oerlikon-Bührle, a company that provided strategic arms and military technology to the apartheid regime.

158.    During apartheid, the head of Oerlikon-Bührle, Dieter Bührle, was a member of the Swiss-South African Association, a strong pressure and lobby group with enormous influence on the shape of Swiss policy regarding South Africa. It was noted for inviting

apartheid leaders to Switzerland at a time when they were welcome hardly anywhere in the world.

159.    Bührle complained to the Swiss government in the mid-1960s that the embargo taking shape in Switzerland was hurting his company's business.  When the Swiss government refused to reverse course on the South African embargo, Oerlikon-Bührle sought to find ways around it.

160.    For instance, Oerlikon-Bührle supplied South Africa with arms from its Italian subsidiary.  The company also created military production subsidiaries outside Switzerland to serve that purpose.

161.    Where the supply from such subsidiaries was inadequate to meet the needs of Oerlikon-Bührle's apartheid-regime clients, the company supplied South Africa with goods using the false end-user certificates.  The company secured these false end-user certificates in France and shipped anti-aircraft cannons and ammunition valued at 54 million Swiss francs to South Africa.

162.    This creative supply to the apartheid security forces caused Oerlikon-Bührle trouble in the late 1960s and early 1970s with the Swiss government.  Oerlikon-Bührle was tried and convicted of violating the embargo and its export license was suspended for three months.  Nonetheless, Oerlikon-Bührle continued to supply illegal arms to the South African security forces.

163.    Oerlikon-Bührle's support of South Africa's security operations was so extensive that in 1978 Deiter Bührle and others at Oerlikon-Bührle were honored by the apartheid state and given the highest military honor.

164.     In the 1980s, Oerlikon-Bührle focused on the sale of armaments patents and licenses to South Africa.  Throughout the 1980s, Oerlikon-Bührle applied for numerous patents on arms components with the objective of establishing Swiss-South African co-productions.  This was crucial for South Africa because the apartheid regime sought to create a self-sufficient armaments industry with ARMSCOR and its subsidiaries, eliminating the need to import armaments from abroad.  In 1987, the United States State Department informed the Swiss embassy in Washington that Oerlikon-Bührle had, between 1978 and 1986, applied for the registration of numerous patents on arms components, such as fuses and artillery components.  U.S. intelligence advised the Swiss Foreign Ministry to examine the patents registered by Oerlikon-Bührle in the South African Patent Office.  The Swiss declined.  There was no reason, the director for international organizations wrote in a confidential document, to "wake up this sleeping dog."[115]

165.     The weapons and arms technologies Rheinmetall supplied to the South African security forces were made to kill; they had an inherent capacity for harm and were particularly susceptible to harmful and illegal use under international law.

166.     Rheinmetall knew that the normal market for armaments was the security forces.  Any sales or agreements Rheinmetall entered into with general government entities were done with the understanding that the armaments would ultimately be used by the security forces.  In persisting with voluminous and repetitious sales of weapons and arms technologies to the apartheid regime despite this knowledge, Rheinmetall turned a blind eye to its role in facilitating ongoing atrocities in South Africa.

---

[115]  Mario Poletti and Martin Stoll, *Kooperation mit den Rassisten*, Facts, (June 27, 2002) at 26.

167.    Rheinmetall acquired a stake in the criminal venture of the apartheid regime by making profits which it knew could only come from their encouragement of the security forces' illicit operations through the sale of weapons and arms technologies.

168.    Rheinmetall provided the South African security forces with the armaments and services to commit apartheid; extrajudicial killing; torture; prolonged unlawful detention; and cruel, inhuman, and degrading treatment against Plaintiffs and members of the classes with actual or constructive knowledge that those armaments and services would be (or only could be) used in connection with that purpose.

169.    Rheinmetall knowingly and substantially assisted the South African security forces to commit acts that violate clearly established norms of international law.

### C.    The Technology Sector

170.    Computers played a central role in the regime's ability to maintain and enforce apartheid since the South African population register was automated in 1955.

171.    Rep. Howard Berman, the sponsor of legislation to ban computer sales to South Africa, testified in 1985 that:

> Computers are essential to the South African government's pervasive control over every aspect of existence for every black individual.  From the age of sixteen, all Africans must carry passbooks indicating where they have permission to live and work and whether they are allowed to live with their families . . . .  Computers help in the collection, retrieval and use of this information . . . .  As the South African economy and population grew, political leaders became concerned that a growing white manpower shortage would inhibit the implementation of apartheid.  Computers have helped solve that problem.  Moreover computers have enabled the South African government to strengthen its grip on the population and intensify apartheid enforcement over recent years. Pass law arrests doubled between 1980 and 1982.  Political detentions have increased sharply . . . .  Armed with more thorough and more readily available information on black residents, the government has accelerated forced removals of whole communities from so-called 'black-spots'—areas where black families

have lived for generations, but which the government has declared 'white'.[116]

172.    The South African security forces used computers supplied by Defendants **International Business Machines Corp.** ("IBM") **and Fujitsu Ltd.**[117] ("Fujitsu"), including Fujitsu's subsidiary formerly known as **ICL**, to restrict Black people's movements within the country, to track non-whites and political dissidents, and to target individuals for the purpose of repressing the Black population and perpetuating the apartheid system.

173.    South African law required citizens to carry either a passbook or a Book of Life, depending on the person's racial classification.  These books were used in conjunction with specially-designed, state-of-the-art electronic databases that stored information on the individual's race, employment status, criminal history, and residence.

174.    By the late 1970s, the South Africa National Intelligence Service maintained extensive computer files on government opponents.

175.    Through IBM and ICL systems, these computer files could be accessed instantaneously for research or reference purposes related to government dissidents.

176.    In 1980, the South African Criminal Bureau launched a computerized suspect tracking system.  "Using remote terminal links, police operators at regional centers around the country have immediate access to a secret criminal data bank which stores details about anyone on the government's wanted list.  Within minutes after police round up suspects in a raid, stop them for questioning, or pick them up for a violation of the pass laws, computer operators can tell the line officer whether the detainees are wanted."[118]  This tracking system ran on ICL equipment.

---

[116] *Testimony of U.S. Rep. Howard Berman Before the H. Comm. on Foreign Affairs,* 99th Cong. (reprinted in Cong. Rec. Apr. 18, 1985).

[117] In 1990, Fujitsu Ltd. acquired an 80% stake in ICL and by 1998 it had complete ownership of ICL.  In 2001, ICL changed its name to Fujitsu Services Ltd.

[118] NARMIC/American Friends Service Committee, *Automating Apartheid-U.S. Computer Exports to South Africa and the Arms Embargo* (1982), at 30 (henceforth "*Automating Apartheid*").

177. The electronic databases and equipment supplied by IBM and ICL substantially advanced the government's ability to enforce the pass laws.

178. In the early 1980s, an average of more than 70 people were arrested each day for pass law violations. It was foreseeable that these arrests, directly facilitated by Defendants' computer systems and software, would cause many citizens, including numerous Plaintiffs, to be unlawfully detained, tortured, raped, or subjected to cruel and degrading treatment.

179. The South African government also used computers supplied by the IBM and ICL in defense research and arms manufacture.

180. The South African government used computers supplied by the IBM and ICL to supply ammunition and supplies to military units. For instance, beginning in 1977, the SADF operated an automated military logistics system—using IBM equipment—to supply ammunition and other military supplies to military units.

181. The single largest user of computers in South Africa was the apartheid regime.

182. In 1965, ICL bid for and won the contract to design, implement, and service the computerized South African racial pass system.

183. Pursuant to this contract, ICL developed an automated database of information on South Africa's Black population, including fingerprints, criminal histories, employment information, residency information, and details of political activities against the apartheid government.

184. The automated passbook system that ICL sold or leased to the South African government was not a standard-issue product; it was specially designed for the apartheid government with a specific purpose: to facilitate the government's implementation of the racial pass system, the cornerstone of apartheid.

185. In 1965, the creation of a fast, efficient, and accurate computer system of this magnitude required a significant amount of design and development time. ICL worked closely

with the South African government to design an automated application for the pass information that had previously not been computerized.

186.    To run this state-of-the-art system, ICL supplied the South African government with at least 588 computers used by the police, local authorities, and South Africa's defense industry.

187.    One such ICL computer was installed at the Bantu Reference Bureau in Pretoria in 1967.  The Department of Plural Affairs ("DPA"), formerly known as the Bantu Affairs Department, played a key role in the government's regulation of its African population.  The DPA operated through a network of 14 Bantu Administration Boards and served as an arm of the apartheid government in Black townships.  The DPA's ICL computer network stored fingerprints and personal details on the 16 million South Africans whom the regime classified as "black" and was used to maintain the passbooks that were crucial to "influx control."

188.    Influx control was the method by which Black workers were channeled into the labor force and confined to marginal, desolate reserves called "homelands."   In 1978, the DPA had 15 million sets of prints stored in its central computer and issued 900,000 new passbooks and identity documents to Africans.  As the DPA noted, the computerized fingerprint record was "absolutely essential because it guarantees positive identification and precludes the possibility of foreign blacks infiltrating into the Republic."[119]

189.    ICL's automated passbook system enabled the South African government to control the movement of Black people within the country and to track and target individuals to suppress political dissent.

---

[119] NARMIC/American Friends Service Committee, *supra* note 118, at 17.

190.     ICL's automated passbook system enabled the security forces to centralize and transmit information on Black individuals at a rate and to an extent that would not have been possible without this advanced software and computer equipment.

191.     The ICL system played a crucial role in sustaining the apartheid government by expediting the detention, intimidation, or elimination of political dissidents and by facilitating the government's control of movements into and out of the homelands.

192.     After winning the passbook contract in 1965, ICL continued to improve the design of the automated system and to service the equipment that supported it.  In doing so, ICL engaged in ongoing collaboration with the South African government to facilitate and improve the racial pass system and, ultimately, to assist in sustaining apartheid.

193.     In addition to the automated passbook system, ICL also supplied at least four computers to the Bantu Administration Boards that ran the hostel system that housed African workers and administered the permits and controls that governed the movements of Africans.

194.     ICL further supplied the SAP with a central processor for their automated "criminal investigation" system.  In 1976, ICL delivered a more advanced computer to upgrade the police's system.  When the British press disclosed that the computers would be used to enforce the pass laws, British trade unions, members of the British parliament and anti-apartheid activists urged ICL to withdraw from the sale.  ICL, however, went ahead with the delivery.

195.     Following the November 1977 UN resolution and the 1978 tightening of the U.S. embargo, the sale of computers to South Africa for use by the military or police violated United States export restrictions.  Computers and related technologies were considered a strategic asset along with armaments and military equipment.  Nonetheless, ICL provided computers for use by the South African police force.

196.    In order to facilitate the government's ability to procure strategic equipment for the security forces after the mandatory embargo took effect, the apartheid government resorted to the use of a "dummy" front organization to procure sensitive equipment for the security forces. Infoplan, a Pretoria-based data processing corporation offered hardware, software, computer training and services, acted as such a conduit. ICL had strong links to Infoplan.

197.    In 1978, the United States Commerce Department banned the export of all U.S.-origin products—including computers and other technological equipment—to the South African security forces, including the police, military, ARMSCOR, the Department of Prisons, the Bureau of State Security, the railway police, the traffic police, and in some cases the Bantu affairs agency.

198.    Despite this embargo, ICL (and IBM) continued to supply the South African security forces with high technology.

199.    ICL's finances deteriorated during the late-1970s, leading to the appointment of a new management team and the beginning of a relationship with Fujitsu.[120]

200.    ICL's relationship with Fujitsu began in 1981, with a collaboration between the companies on computer technologies intended to extend over a term of at least twelve years. One feature of the collaboration permitted ICL to have access to Fujitsu emerging technologies, typically one year before general availability. ICL began to rely upon Fujitsu's semiconductor technology which was crucial to ICL's continued supply of computers in South Africa and elsewhere. As a result, ICL became increasingly dependent on Fujitsu, and Fujitsu management played an increasing role in directing ICL's business activities.

---

[120] This paragraph and the following paragraphs contain supplemental allegations regarding Fujitsu.

201. Initially, the collaboration was presented as arm's length, to avoid diluting ICL's credentials as a European and British company. However, this belied the nature of Fujitsu's ever-increasing control over the activities of ICL. Fujitsu's involvement with ICL at both the financial and technical levels increased steadily over two decades, eventually leading to 100% ownership by Fujitsu and then to the full integration of ICL into the Fujitsu company and the dropping of the ICL brand. Fujitsu also implemented elaborate guidelines about procedures to ensure it was knowledgeable about actions taken at ICL.

202. In 1982, the United States fined ICL for selling computers to the SAP containing United States-origin disk drives, in violation of U.S. Export Administration Regulations.

203. In 1990, Fujitsu acquired a controlling stake (80%) of ICL, paying $1.29 billion. This equity stake was largely redundant of the control Fujitsu already exercised due, in part, to ICL's dependence. The other 20% was retained by the parent STC plc, which was then owned by the Canadian company Northern Telecom. In 1998, Fujitsu purchased the remaining stake and, in 2001, changed ICL's name to Fujitsu Services Ltd.

204. Like Fujitsu, Defendant **IBM** and its subsidiary and alter ego, International Business Machines South Africa Limited ("IBM-SA"), were intimately involved in sustaining the apartheid regime through the design, importation, installation, and maintenance of high technology systems for the South African government.

205. IBM is a global leader in manufacturing computer systems, software, networking systems, storage devices, and microelectronics. IBM Corp. is headquartered in New York State and does business in New York State. The South African subsidiary, IBM-SA, operated as the agent and/or alter ego of IBM Corp. at all times relevant to this complaint.

206.    IBM was the largest computer supplier in South Africa, with total annual sales estimated at 300 million rand.  Its relationship with the apartheid regime began in 1952, when IBM-SA received its first order for an "electronic tabulator."  This tabulator was the first step in the automation and expansion of the population control program, which became increasingly sophisticated until the collapse of the apartheid regime.

207.    IBM provided the South African Department of the Interior ("DOI") with a specially-designed, computerized population registry.  IBM supplied the software and database design as well as the hardware to run the system.  Thomas Conrad of the American Friends Service Committee, an authority on corporate involvement in apartheid, testified that

> for several years IBM has knowingly rented a Model 370 computer system to the South African Department of the Interior which is used for the regime's national identity system.  The IBM machine stores files on seven million people the regime has designated as coloreds, Asians, and whites . . . .  Since IBM owns the equipment and leases it to the government, it could withdraw from the arrangement, but has declined to do so.[121]

208.    During the 1970s, new computers and peripheral equipment were added to expand and upgrade the system's capability.  IBM supplied multiple Model 370/158 mainframe computers to the DOI.  The DOI used the IBM system to process and store a vast quantity of information about the designated population, including identity numbers, racial classification, residence, and place of work.  The system also contained a history of government opposition. The same IBM computer served as the basis for the "Book of Life," an identity document issued

---

[121] *Controls on Exports to South Africa: Hearings before the Subcomms. on International Economic Policy and Trade and on Africa of the H. Comm. on Foreign Affairs*, 97th Cong. 72 (1982) (statement of Thomas Conrad, American Friends Service Comm.); *see also Economic Sanctions and their potential Impact on U.S. Corporate Involvement in South Africa: Hearing before the Subcomm. on Africa of the H. Comm. on Foreign Affairs*, 99th Cong. 22 (1985) (statement of Dr. Jean Sindab, Executive Director, Washington Office on Africa) (testifying that an IBM computer was used by the regime to maintain the pass system for the "Colored" population).

to all those covered by the database. The IBM system was used to track racial classifications and movement for security purposes.

209.     The IBM computerized population registry was specially designed for the South African government. Its function was to assist the government in implementing and enforcing the racial pass laws and other structural underpinnings of the apartheid system, such as the suppression of political dissent. IBM custom-tailored this product to perform that function at the highest level for the apartheid regime.

210.     As of 1976, at least one third of IBM business in South Africa was done directly with the South African government. IBM computers were used by the Department of Defense, the Department of the Interior, and the Bantu Administration Boards, the local administrators of apartheid. The apartheid government was IBM's largest single customer in South Africa.[122]

211.     IBM's 370 computer was used by many South African government agencies, including the Department of the Prime Minister, the Department of Statistics, and the Department of Prisons, which was widely known to hold and torture political prisoners without trial. These agencies, which were a significant component of the apartheid state apparatus, relied on IBM computers for their administration.

212.     After the imposition of the mandatory embargoes in 1977 and 1978, IBM shifted much of its business with the South African government to Infoplan (*see supra* ¶ 196). While IBM supplied Infoplan with parts, services, education and technical data which were not covered by the U.S. embargo, Infoplan in turn transferred this equipment and expertise to the SADF.

---

[122] *Automating Apartheid*, at 6.

213.    Directly and indirectly, IBM was a top supplier for the SADF.  The SADF inventory of IBM computers included model 360s (for instance, a model 360 was installed at the Simontown Naval Installation) and model 370s.

214.    IBM rented at least seven computers to Leyland-South Africa, a firm that produced Land Rovers for the security forces and the police.  IBM also rented several computers to one of Pretoria's top explosives manufacturers, the African Explosives and Chemical Industries, Ltd. ("AECI").  AECI reportedly had specialized in the manufacture of riot control gas, napalm, and nerve gas that were used against Plaintiffs and class members.  At least four AECI installations use IBM hardware.  For instance, AECI employs an IBM computer at its Modderfontein facility, where the company reportedly made the tear gas used against demonstrators at the Soweto massacre.

215.    For much of the equipment leased to the South Africans, IBM provided maintenance and service on the equipment over the term of the lease.  IBM's regular servicing of the apartheid government's computer systems, in addition to its custom design of certain products, demonstrates how closely IBM collaborated with the South African government in implementing and improving the enforcement of the racial pass laws and sustaining the apartheid system.

216.    IBM conceded that the equipment and services it supplied to South Africa may be used for repressive purposes, noting that "It's not really our policy to tell our customers how to conduct themselves."[123]

---

[123] Erin MacLellan, *U.S. Business Debates South Africa Ties Limits on Computer Exports are Difficult to Enforce*, Washington Post, Aug. 25, 1985.

217.    IBM was fully aware of Infoplan's relationship to the South African security forces when it supplied equipment and services to Infoplan after the imposition of the 1978 embargo.

218.    After IBM announced it was leaving South Africa, a letter was sent to customers by the Managing Director of IBM South Africa stating that "there will be no change to the supply of IBM products."[124]

219.    Newspapers reported that "[a] letter leaked from IBM's Johannesburg offices reveals that IBM's pull-out from South Africa is not all it seems.  Users are being reassured that IBM products and services will be freely available from the company established as a result of IBM selling off its subsidiary.  And the letter boasts that the lack of restrictions will leave it free from international pressure . . . .  This has been interpreted as evidence that IBM's withdrawal was aimed at dodging international disapproval and as a means of taking political heat off IBM in the US."[125]

220.    Anti-apartheid activists noted that the IBM's "pull-out" enabled it to expand its market in South Africa:

> While computer firms like IBM are prohibited by U.S. sanctions from supplying the South African government, the company's former South African subsidiary (and sole South African distributor), has recently become partners with Reunert Computers, to form a new company, Technology Systems International (TSI).  TSI, in turn, is part of Barlow Rand, Ltd., a giant South African conglomerate and a key part of South Africa's military industrial complex, which, through another Barlow Rand subsidiary, Reunert Technologies Ltd. supplies cluster bombs, components

---

[124] Letter of J.F. Clarke, Managing Director, IBM South Africa, entitled "Notice to the Customers and Associates of IBM Throughout South Africa."

[125] *IBM Leak Reveals No Change in SA*, Datalink, Jan 29, 1987; Philip Basset, *Unions claim IBM Operations Still Continuing in South Africa*, Financial Times, Jan 14, 1987 (IBM "has in practice not withdrawn from its South African operations, in spite of its decision last October to disinvest in the country").

for armored vehicles, electronic fuses for artillery and rocket shells, and military electronic and communications gear to the South African military and police . . . the new structure further increases the likelihood that IBM products and technology will be used in armaments applications.[126]

221.    In 1978, a year after the UN Resolution imposing a mandatory arms embargo on South Africa, IBM's South African sales jumped 250%.

222.    The computer systems and technologies IBM and ICL supplied to the South African security forces were designed to track and monitor civilians with the purpose of enforcing the racist, oppressive laws of apartheid.  Moreover, this enforcement was often carried out by violent means.  In the hands of their intended user, the apartheid security forces, the equipment and technology supplied by IBM and ICL had an inherent capacity for harm and was particularly susceptible to harmful and illegal use under international law.

223.    IBM and ICL knew that the normal market for these technologies was the security forces.  Any sales or agreements IBM and ICL entered into with general government entities were done with the understanding that all equipment and technology linked to the passbook and Book of Life systems would ultimately be used by the security forces to enforce the oppressive laws of apartheid, often through violent means.  In persisting with voluminous and repetitious sales of computer equipment and technologies linked to the passbook and Book of Life systems to the apartheid regime despite this knowledge, IBM and ICL turned a blind eye to their role in facilitating ongoing atrocities in South Africa.

224.    IBM and ICL made profits which they knew could only come from their encouragement of the security forces' illicit operations through the sale of computer equipment

---

[126] *Testimony of Jennifer Davis and Richard Leonard, American Comm. on Africa, at the Hearings on the Arms Embargo, Security Council Comm. Established by Resolution 421* (1977) Concerning the Question of South Africa, at 3-4.

and technologies designed to implement and enforce the oppressive policies of apartheid. By reaping these profits, IBM and ICL acquired a stake in the criminal venture of the apartheid regime.

225. Defendants IBM and Fujitsu provided the South African security forces with the technology and services to commit apartheid; extrajudicial killing; torture; prolonged unlawful detention; and cruel, inhuman, and degrading treatment against Plaintiffs and members of the classes with actual or constructive knowledge that that technology and those services would be (or only could be) used in connection with that purpose.

226. Defendants IBM and Fujitsu knowingly and substantially assisted the South African security forces to commit acts that violate clearly established norms of international law.

**SUPPLEMENTAL ALLEGATIONS REGARDING IBM**

227. IBM South Africa (Pty) Ltd was incorporated in 1952 in South Africa as a subsidiary of IBM. IBM's largest client in South Africa was the South African government, accounting for about one third of its sales there.

228. At all times relevant to Plaintiffs' allegations, IBM provided computer technology, systems, software, training, and support to facilitate the apartheid governments' control of the majority black population. The maintenance of the complex apartheid system of population control organized by racial classification required sophisticated computer technology and knowledge of the kind provided by IBM.

229. After the U.S. Commerce Department banned the export of all U.S.-origin products to South African security forces, IBM circumvented that embargo by delivering products to South African security forces that were produced outside the United States, and therefore were not subject to the embargo. Given the widespread media coverage of atrocities

committed by apartheid security forces in defense of apartheid, IBM knew that it was substantially assisting the South African government in committing massive human rights violations, as alleged in this complaint, against its people.

230.    In 1987, IBM "sold" its South African subsidiary to a company created for the benefit of white IBM South Africa employees.  However, IBM stated that it would provide a loan allowing local investors to buy the subsidiary.  IBM retained a buy-back option to the new company as a term of the sale.  The new entity was run by the person who was the general manager of IBM South Africa prior to the sale.  IBM continued to sell its products, parts and services through the new company and continued to be the top supplier of computers to South Africa after the "divestiture".  Around 1992, IBM purchased a 24% stake in the local distributor of IBM products.

### D.    The Transportation Sector

231.    Military-style vehicles were a vital tool used by the security forces to perpetrate violence.  The vehicles were used to patrol African townships, homelands, and other areas, and were instrumental in suppressing dissent and targeting Blacks and political dissidents.

232.    Defendants **Ford Motor Company** ("Ford"), **Daimler AG** ("Daimler"), and **General Motors Corporation** ("General Motors") knowingly and intentionally supplied vehicles, parts, and other equipment to the apartheid security forces.  This equipment was specifically designed for the purposes of, and was in fact used for, transporting, arming, and protecting military personnel in offensive actions against Plaintiffs and class members.  The equipment was used to patrol townships to target political opponents, repress the African population, quell public displays of dissent, and brutalize and kill many citizens as described herein.

233.     For instance, Defendant **Daimler** supplied the security forces with essential parts for their personnel carriers and armored vehicles.  Daimler sold chassis, engines, transmissions, and other automotive parts to the security forces for use in military SAMIL[127] trucks and SAMAG trucks; army and police armored vehicles such as the "Unimog," "Casspir," "Hippo," "Buffel," and "Duiker"; and the armored transporter "Blesbok."

234.     Daimler designed and manufactured the military vehicle "Unimog," which was used as a component of many other security-force vehicles.  Daimler Benz advertised its Unimog as a "military vehicle" in a March 1965 Portuguese magazine *Journal do Exercito*.  The military version can be distinguished from the civilian version because the former has mountings for arms—such as the "Valkiri," a 127mm rocket launcher—gloss paint to avoid infrared detection, a 24-volt battery, and bulletproof tires.[128]

235.     According to the *Wehrtechnik*, a monthly defense technology journal, in 1976 "the Unimog [was] regarded as the best, small military transporter in Africa."

236.     Daimler shipped approximately 6,000 Unimogs to South Africa despite the U.N. Security Council's mandatory arms embargo.

237.     The police and security vehicle "Casspir" used the chassis of a Unimog.  Similarly, the "Buffel" used the Unimog as a component.

238.     The Casspir and Buffel were two of the most important vehicles used by the South African security forces.  They were used to patrol townships, disburse civilian assemblies,

---

[127]  The SAMIL 100 truck was designed in 1980 and production began in 1982.

[128]  Anti-Apartheid Bewegung Erwiderung. Antwort auf ein Dementi der Bundesregierung zur militärisch-nuklearen Zusammenarbeit Bundesrepublik Deutschland – Südafrika, Bonn, (1979), at 26.

and raid communities in search of political dissidents. The security forces used both the Casspir and Buffel, along with the Hippo, against Plaintiffs and class members.[129]

239.    The Casspir was designed for extreme durability.  The base model Casspir was designed with a machine gun mount and the capacity to withstand gunfire and explosives.

240.    In addition to the Unimog chassis, Daimler supplied the Casspir's engine—a Mercedes Benz 6-cylinder turbo engine, capable of delivering 124 kilowatts of power at a rotation speed of 2,800 tr/min.  The Mercedes Benz engine enabled the Casspir to travel at 90 miles per hour.

241.    Daimler likewise supplied the Casspir's Mercedes Benz transmission, a five-speed model equipped with two speeds in four-wheel drive.

242.    These military vehicles were heavily armored and equipped with numerous firing ports, machine guns, and cannons, all of which were employed in the control of South African townships.

243.    Beyond the Unimog, Casspir, and Buffel, Daimler supplied other vehicles to the South African security forces, such as the Mercedes Benz minibus used by the security forces against the populace during the late 1980s State of Emergency.

244.    Defendant **Ford** also had a long record of strategic vehicle and parts sales to the South African security forces during apartheid.  Ford's vehicles were used by the South African security forces to patrol African townships, homelands, and other areas, as well as to arrest, detain, and assault suspected dissidents, violators of pass laws, and other civilians.

245.    Ford reported to the U.S. Congress that it sold vehicles containing U.S.-made parts to the South African security forces up until the day, February 16, 1978, when such sales

---

[129]  Anti-Apartheid Bewegung, *"Mit Daimler fährt Apartheid gut",* op. cit., at 10.

were prohibited by the U.S. Department of Commerce. Between 1973 and 1977, Ford sold 8,191 vehicles to the South African government central purchasing agency, police, and homelands. Ford sold at least 1,582 F series U.S.-origin trucks to the police.[130]

246. In February 1978, the United States Department of Commerce issued regulations that prohibited Ford from supplying passenger vehicles to the South African security forces, because some of Ford's passenger vehicles contained U.S.-made parts.[131] Despite the prohibitions, Ford continued to supply vehicles to the South African security forces. Ford denied that its continued sales to the South African security forces ran counter to the U.S. prohibitions, on the basis that the vehicles did not contain parts or technical data of U.S. origin.[132]

247. Ford claims that it lost some sales to certain South African security forces as a result of the February 1978 regulations, but the effects of those losses were minimal.[133] Ford's sales to the South African security forces continued.[134]

248. Occasionally these sales were halted by sanctions imposed by foreign governments. For example:

> In the mid-1960s, Ford bid on a contract to supply four-wheel drive vehicles to the government. But the Canadian government refused to issue an export permit to Ford's Canadian subsidiary, which was to supply the vehicles, on the grounds that the items might violate the then non-mandatory UN arms embargo against South Africa.[135]

---

[130]  *Id.*

[131]  15 C.F.R. § 385.4 (1979); *see supra* ¶ 115.

[132]  Letter from Sidney Kelly to Shareholder (May 8, 1980) ("Kelly Letter") at 1.

[133]  Karen Rothmeyer, *U.S. Motor Industry in South Africa: Ford, General Motors and Chrysler*, The Africa Fund 1979, p. 8.

[134]  Kelly Letter, *supra* note 132, at 1 ("FSA sells a small number of non-US origin civilian vehicles to the Police and Military").

[135]  Rothmeyer, *supra* note 133, at 12.

249.     In 1986, as justification for its continued sales to the South African security forces, Ford explained that if it refused to supply military vehicles to the security forces, it could lose all government sales in South Africa, which could in turn render the company economically unviable in South Africa.[136]  Ford was willing to cater to the security forces' demands in order to protect its other profitable operations with other branches of the apartheid regime.

250.     Ford sold its products to the South African security forces through a central government purchasing authority.  The central authority purchased vehicles for use by the security forces.

251.     Defendant **General Motors** also knowingly and purposefully supplied vehicles and equipment to the apartheid regime for "Defence Force purposes."[137]

252.     General Motors reported that in 1978 it sold 1,500 units annually to the SAP and military.  General Motors also provided police and transport vehicles for the Department of Prisons.  And, for at least 15 years, GMSA had a contract to supply Bedford trucks to the SADF.[138]

253.     The Comprehensive Anti-Apartheid Act of 1986 prohibited any U.S. entity from engaging in any form of cooperation with the South African security forces except for activities that were reasonably designed to facilitate collection of necessary intelligence.[139]

---

[136] Rothmeyer, *supra* note 133, at 13; Richard Knight, "Sanctions, Disinvestment, and U.S. Corporations in South Africa," in *Sanctioning Apartheid* (1990, Robert E. Edgar, ed.).

[137]  GM South African – Contingency Plan, at 4-5, attached to memo from L.H. Wilking of General Motors South Africa, July 20, 1977; *GM Drafts Riot Plan for South Africa*, NY Times, May 19, 1978 at 1, 14.

[138]  Rothmeyer, *supra* note 133, at 8.

[139]  White Wheels of Fortune: *Ford and GM in South Africa*, Interfaith Center on Corporate Responsibility, Vol. 8 No. 6 1989, at 3A.

254.     In May 1986, General Motors stated that it would stop selling cars and trucks to police and military agencies in South Africa.  Chairman Roger Smith indicated that General Motors would not bid for military or police sales any longer.  General Motors also acknowledged that approximately ten percent of the vehicles it sold to the South African government were for police and military use.[140]

255.     Regulations issued by the United States Department of Commerce in February 1978 kept General Motors from supplying passenger cars to the South African security forces, since its passenger cars contained U.S.-made parts.  But General Motors continued to supply commercial vehicles—primarily small trucks—to the security forces.

256.     The regulations, moreover, did not prohibit General Motors from selling to South African security forces via a foreign subsidiary.  For example, General Motors of West Germany was not affected by the ban.  It was also permissible for GM's South African subsidiary to produce General Motors cars in South Africa.  General Motors used its foreign subsidiary, GMSA, to build the trucks and other vehicles that it sold to the South African security forces.

257.     Yet another means for supplying strategic goods to the apartheid security forces was to do so through a seemingly neutral distributor, such as the centralized purchasing agency. In a letter to the Interfaith Center on Corporate Responsibility, Chairman Murphy claimed, "General Motors does not sell directly to any military, para-military or police force in South Africa."  He admitted, however, that General Motors "sells commercial-type vehicles to the centralized purchasing agency of the government." [141]

---

[140]  *G.M. Cuts Its Sales to Pretoria*, N.Y. Times (Business Day) May 24, 1986.

[141]  Letter from Thomas Murphy to Sister Regina Murphy (Jan. 20, 1978) at 1.

258.    In addition to supplying this strategic security-force equipment, Defendants also assisted with its repair and maintenance.

259.    For instance, Daimler took on substantial responsibility for repairing military vehicles and their parts, including vehicles used for "the occupation and control of black urban settlements."  One Mercedes Benz employee of Stuttgart, Germany, Joachim Jungbeck traveled to various Mercedes Benz factories in South Africa and reported to a July 1, 1988 shareholder meeting:

> During a company visit, I was proudly shown aggregates of army vehicles, including huge numbers of axles from armoured vehicles . . . .  Storerooms contained large numbers of engines, axles and transmissions for Unimogs and armoured vehicles of the South African police and army. In between were parts for the armoured vehicle "Buffel". The Buffel was used in the war against Angola and for the occupation and control of black urban settlements.[142]

260.    Mr. Jungbeck also reported that the maintenance work was "strictly confidential":

> Concerning the scale of maintenance services for the army Jungbecks guide, Mr. Hawkey, said that this information was strictly confidential. A large number of army vehicles were being serviced and repaired, but in terms of service promotion the firm would not make use of it.[143]

261.    In 1989, the Daimler Benz board confirmed that the South African Army had a service and repair agreement with MBEUS.[144]  MBEUS serviced and repaired parts for the South African security forces' fleet, including exchange engines, transmissions, axles, turbo chargers, and other truck parts.

---

[142]  Application by Jungbeck for "the non-exoneration of the board of management and the supervisory board" and his speech at the shareholder meeting, Stuttgart, 1988.

[143]  *Id.*

[144]  Stuttgarter Koordinierungskreis der Aktion, Entrüstet Daimler, *Entrüstet Daimler. Ergänzungen zum Geschäftsbericht 1989 der Daimler Benz AG*, Stuttgart (1990) at 8.

262.     Defendants' cooperation with the South African security forces for the servicing of military vehicles demonstrates how closely they collaborated with the apartheid regime to maintain and enforce apartheid.

263.     In addition to vehicles, parts, and maintenance, Defendants supplied the South African security forces with the necessary technology and skills to design and improve security force vehicles.

264.     For example, General Motors continued to supply its technologies and designs for equipment sold to the apartheid security forces even after it sold its South African motor vehicle subsidiary, GMSA, to local management in 1986.

265.     GMSA was renamed Delta Motor Corporation (Pty) Ltd. ("Delta"), but it continued to manufacture General Motors vehicles under license.  Under these licenses, General Motors technologies and designs were made available to the apartheid security forces.

266.     Through lucrative technology and design licenses, General Motors profited from its so-called "disinvestment" from South Africa.  News reports noted that "GM earns licensing fees and Delta is doing better than as a subsidiary because it sells GM cars to the police and military,"[145] something General Motors could no longer afford to do after U.S. export regulations made it illegal.

267.     Defendants continued to cater to the apartheid regime despite knowing, or having reason to know, that their equipment and technology was being used to commit atrocious violations of international law.

---

[145]  Jim Jones, *Aftermath of the Exodus of U.S. Firm's Departure from South Africa hasn't helped Africans*, U.S. News & World Report, May 1, 1989.

268.    For example, two General Motors inter-office memoranda dated May 6, 1977 and July 20, 1977, respectively, outlined a contingency plan for GMSA during times of civil unrest. All the preparatory work regarding the memoranda was intended to be "carried out quietly and discretely" so as to "avoid giving the impression that [GM] expect these things to happen."[146]

269.    Likewise, in a speech before the Daimler shareholder meeting in June 1989 in Berlin, Dr. Beyers Naudé addressed Edzard Reuter, then CEO of Daimler Benz:

> The police shoot demonstrators, they even shoot mourners at funerals, as happened, for example, in Llanga. They shoot from cars driven by Daimler-Benz engines. . . . Mr. Reuter; you asserted that there are moral limits to arms delivery. These are, and I quote you: "If supplies end up in states which are ever so slightly suspected to intend using them in attacks against others states." I can assure you, Mr. Reuter, that these vehicles, for which Daimler-Benz supplies the engines, are being used for aggressive purposes.[147]

270.    Defendants' support for the security forces of the apartheid regime extended into other areas, as well.

271.    For instance, to circumvent the increasingly strict embargoes on the importation of strategic military equipment to South Africa, Daimler assisted the apartheid regime in establishing the ADE factory. The state-owned Industrial Development Corporation served as major shareholder of the factory (51 percent), and Daimler Benz owned 12.45 percent.

272.    Foreign competitors were informed that the South African Army would be one of ADE's main customers, and invited competitors to compete for this contract. Daimler Benz and Perkins won the licensing agreements in late 1978.

---

[146]  July 20, 1977 Memo – Cover Page.

[147]  Dr. C. Beyers Naudé, Shareholder Meeting, Berlin, Germany (June 28, 1989).

273.     Daimler Benz designed the ADE factory in Atlantis, which was completed in 1980 in a town established by the state exclusively for the building of ADE.  Daimler was aware of the substantial strategic value of the factory:  according to DaimlerChrysler Chairman Jürgen Schrempp, Daimler understood that "the authorities established ADE for strategic reasons."[148]

274.     Daimler Benz merged with Messerschmitt-Bölkow-Blohn in 1989, which supplied helicopters to the SAP.  Documentary footage from the 1980s shows the SAP using Messerschmitt-Bölkow-Blohn helicopters to control mass demonstrations and to identify and target political dissidents.

275.     In 1985-86, Daimler Benz bought 56 percent of the capital stock of Allgemeine Elektizitätsgesellschaft ("AEG").  AEG provided strategic technologies to the apartheid security forces, including "short wave transmitters, relay stations, telephone and telex stations and computerised data processing capability."[149]  This equipment was used to assist "the South African government in its internal security by monitoring the identity and movement of [the] black population."[150]

276.     The military vehicles, equipment, and services that Daimler, Ford, and General Motors supplied to the South African security forces were designed to enable the security forces to track and attack civilians, patrol communities, and terrorize the Black population with the purpose of perpetuating the oppressive apartheid regime.  In the hands of the apartheid security forces, the equipment supplied by Daimler, Ford, and General Motors—including armored tanks

---

[148]  Interview with South African journal *Leadership* (1986); Anti-Apartheid Bewegung, *supra* note 129, at 7.

[149]  Ronald W. Walters, "U.S. Policy and Nuclear Proliferation in South Africa."  In: Western Massachusetts Association of Concerned African Scholars, Eds., *U.S. Military Involvement in Southern Africa* (1978) at 182-183.

[150]  *Id.*

equipped with machine gun mounts and other types of military vehicles—had an inherent capacity for harm and was particularly susceptible to harmful and illegal use under international law.

277.   Daimler, Ford, and General Motors knew that the normal market for these vehicles was the security forces.  The vehicles were both pre-equipped with armor and military fixtures and designed for easy modification by the security forces to add additional defensive and offensive features.  Daimler, Ford, and General Motors entered into agreements with the apartheid regime with the knowledge that this equipment would ultimately be used by the security forces to enforce the oppressive laws of apartheid, often through violent means.  The defendant companies persisted with voluminous and repetitive sales of such equipment and service agreements despite this knowledge, turning a blind eye to their role in facilitating ongoing atrocities in South Africa.

278.   By making profits which they knew could only come from their encouragement of the security forces' illicit operations through the sale of vehicles, parts, designs, and services, Daimler, Ford, and General Motors acquired a stake in the criminal venture that was the apartheid regime.

279.   Defendants Ford, Daimler, and General Motors provided the South African security forces with the vehicles and services to commit apartheid; extrajudicial killing; torture; prolonged unlawful detention; and cruel, inhuman, and degrading treatment against Plaintiffs and members of the classes with actual or constructive knowledge that those vehicles and services would be (or only could be) used in connection with that purpose.

280.     Defendants Ford, Daimler, and General Motors knowingly and substantially assisted the South African security forces to commit acts that violate clearly established norms of international law.

**SUPPLEMENTAL ALLEGATIONS REGARDING TRANSPORTATION SECTOR**

281.     In 1954, Daimler opened an office in South Africa.  Beginning in 1958, Daimler, then known as Daimler-Benz AG, contracted with Car Distributors Assembly (CDA), a South African company, to produce Mercedes vehicles in South Africa.  In 1966, CDA became a wholly-owned subsidiary of United Car and Diesel Distributors (UCDD), a South African company.  In 1967, UCDD acquired a site in the West Bank area of East London, South Africa, and, at all relevant times, built Mercedes vehicles in the plant.

282.     In 1984, Daimler acquired majority ownership and control over UCDD, and then renamed the company Daimler South Africa (Pty) Ltd.  During all relevant times, Daimler purposefully and/or knowingly controlled and/or oversaw operations at the Mercedes plant located in the West Bank area of East London, South Africa.  Indeed, Daimler's management in Germany was involved in and aware of the activities material to the allegations in this complaint.

283.     At all relevant times, South African security forces collaborated with Daimler's managers and personnel to suppress peaceful labor and anti-apartheid political activities.

284.     While employed at Daimler, black South Africans were subjected to arbitrary arrest, detention, torture, and other cruel, inhuman and degrading treatment by the security forces acting in close collaboration with Daimler management.  Daimler management provided information about anti-apartheid union activities to the security forces and facilitated the arrest, detention, and ill-treatment of certain employees in order to suppress those activities.  Daimler's

head of security asked employees to spy on fellow employees. Daimler security officials also participated in the interrogation of black South Africans by the Special Branch.

285. Daimler's senior management, including those in human resources and the security department, collaborated with state security forces, including members of the Special Branch, with respect to employees involved in union and anti-apartheid activities.

286. Daimler supported the apartheid regime through the provision of vehicles to the South African security forces. At all relevant times, Daimler manufactured specialized vehicles, in whole or in part, for the South African security forces in its South African plants, including its East London plant. Such vehicles included heavy trucks, designed for military purposes and armored personnel carriers.

287. Daimler created paperwork that identified these vehicles as being intended for the South African security forces. Some vehicles were painted in the plant to meet security forces' specifications. Officials from security forces, sometimes in uniform, visited the plants on a regular basis to inspect the vehicles. At all relevant times, Daimler knew that its products would be used to violently suppress non-violent opponents of apartheid. The use of Daimler's vehicles to violate human rights was widely known.

288. Daimler's vehicles regularly patrolled the townships. Security forces used them to intimidate, suppress, and control both strikers and anti-apartheid activities. The use of Daimler's vehicles by the security forces resulted in injuries and deaths to numerous South Africans. By at least the 1980s, Daimler employees had begun to express opposition to being forced to manufacture the vehicles that were used to suppress anti-apartheid activity in black communities. Daimler management responded by emphasizing that it was a duty of all South Africans to support the security forces.

289. At all relevant times, Daimler knew that the South African security forces violently repressed the rights of blacks in the country, and that the security forces used Daimler vehicles in violating the human rights of black South Africans.

290. In June 1976, a student protest began in Soweto against the use of Afrikaans as the official language of instruction. The protesting school children were met with a violent (and in some cases lethal) response by the security forces, who arrived in Soweto in vehicles produced for them by Ford, GM, and/or Daimler.

291. In May 1985, black South Africans marched to mark the launch of International Youth Year. The march proceeded from East London toward Duncan Village. When they approached the township, security forces were waiting for the marchers. The security forces stood in front of a line of military vehicles ready to fire and asked the marchers to disperse, but they did not. Then, the security forces opened fire without warning. Although marchers had their arms raised in surrender, the security forces still fired at them.

292. In August 1985, the funeral of Mrs. Victoria Mxenge, a human rights attorney whose husband was a slain human rights lawyer, precipitated confrontations in Duncan Village. The security forces' violent response to the anti-apartheid unrest lasted through the month of August and became known as the Duncan Village Massacre. During that time, security forces shot and killed at least nineteen Duncan Village residents, and injured many more. The victims included children.

293. In the early morning during one day of the Duncan Village Massacre, workers arrived at the Daimler plant in East London to find a notice posted saying that the plant was closed for the day. At that time the road into Duncan Village was open. During the massacre,

entrances to the township were sealed off, and, security forces in vehicles manufactured by Daimler, Ford, and/or GM, patrolled the area.

294.    At a mass burial service for the victims of the massacre held later in August, security forces once again opened fire on attendees resulting in additional injuries and death. Security forces continued to perpetrate violence against Duncan Village residents at least through 1986.  Security forces relied on military vehicles manufactured by Daimler, GM, and/or Ford for transport and protection throughout this time period.

295.    In 1985 and 1986, security forces shot and killed young black South Africans from heavily armored military vehicles manufactured, in whole or in part, by Daimler, Ford, and/or GM.

296.    GM ran its South African operations through its agent, GM South Africa (Pty) Ltd (GM).  GM was incorporated in 1926 in South Africa.  Senior management in South Africa included American personnel at all times material to Plaintiffs' allegations.

297.    GM's operations at its factory in Port Elizabeth included the assembly and marketing of vehicles for the government, including thousands annually to the security forces in the mid-1980s.  GM supported the apartheid regime with the provision of these vehicles.  At all relevant times before GM divested, GM manufactured specialized vehicles, in whole or in part, for security forces in its South African plants.  Such vehicles included heavy trucks designed for military purposes and armored personnel carriers.

298.    GM created paperwork identifying these vehicles as intended for the South African security forces.  Some vehicles were painted in the plant to meet security forces' specifications.  Officials from security forces, sometimes in uniform, visited GM's plants on a

regular basis to inspect the vehicles. At all relevant times, GM knew that its products would be used to violently suppress non-violent opponents of apartheid.

299.   GM's vehicles regularly patrolled the townships. Security forces used them to intimidate, suppress, and control both strikers and anti-apartheid activities. The use of GM's vehicles by the South African security forces resulted in injuries and deaths to numerous South Africans. Employees protested at being forced to manufacture the vehicles that were used to suppress anti-apartheid activity in black communities. When this occurred, GM management stated that anyone who protested the production of such vehicles would be assumed to be members of the African National Congress (ANC), even without any other evidence, and that anyone who was an ANC member would be fired.

300.   At all relevant times, GM knew that the South African security forces violently repressed the rights of blacks in the country, and that the security forces used GM vehicles in violating the human rights of thousands of black South Africans. For example, GM was well aware that its vehicles were used in the state violence at Soweto and Duncan Village and many other similar incidents.

301.   GM denied black employees their freedom to assemble and promoted the apartheid regime by relying on the South African security forces to harass and assault its black employees to prevent them from unionizing. Even when black employees did unionize, GM management prohibited salaried employees from participating in union activities that supported anti-apartheid political organizations. GM allowed security forces onto its premises to help suppress lawful union activities. These security forces worked closely with GM management in suppressing union activities. They collaborated in the arrest of black GM employees who participated in union activity. GM human resources employees reported black GM employees

involved with unions to the security forces, who in turn arrested certain GM employees at the GM facilities. Employees were arrested, interrogated, and tortured because of their union and anti-apartheid activities.

302. GM shared information about union leaders at its plants with the security forces, knowing that the security forces would detain and torture such leaders as a direct result.

303. As part of an effort to claim divestiture, around January 1, 1987, GM "sold" its operations to a group of investors headed by local management. This effort at "divestiture" was a sham. The local management included no blacks or persons of mixed race. As part of the deal, GM agreed to pay the subsidiary's creditors and likely agreed to delay payment on the sale for 18 months. The sale terms included a buy-back option. When GM began divesting from South Africa, GM management stated that the company was "changing names only." During the transfer period, GM management prohibited black employees from speaking with reporters. GM was subsequently renamed Delta Motor Corporation. GM licensed use of its trademark to Delta Motor Corporation and continued to sell its product through Delta Motor Corporation. The boxes and all the parts supplied continued to include the GM logo. GM transferred one of its senior management employees, an American with many years of experience at GM, to run Delta. He had been a GM vice president in the United States shortly before assuming his post as head of Delta. Delta refused to sign the Sullivan Principles,[151] although it stated that it would follow nondiscriminatory employments practices and exercise social responsibility. The new ownership also said that it would "not preclude" sales to military and police. GM repurchased Delta in

---

[151] The Sullivan Principles were a voluntary code of corporate conduct developed by African-American preacher Robert Sullivan in 1977 to demand equal treatment for blacks employed by American companies operating in South Africa.

1997. The "divestment" program was a purposeful attempt to evade international sanctions and to allow the maintenance of GM's system of internal apartheid.

304.    Ford's South African operations were conducted through Ford Motor Co. of South Africa (Pty) Ltd (Ford South Africa). Ford South Africa was formed in 1933. It was a wholly-owned subsidiary of Ford Motor Company of Canada, Ltd. ("Ford Canada"), which was itself 76% owned by Ford U.S. Ford South Africa assembled Ford vehicles from parts obtained locally as well as parts shipped from Ford Canada and Ford England. These shipments were intended in part to avoid U.S. sanctions that did not permit supplying U.S.-made parts to South Africa.

305.    Senior top management in Ford in South Africa included American personnel. Senior management in Ford included members of the Broederbond. When workers challenged the employment of these individuals, Ford management ignored these complaints.

306.    In 1985, Ford Motor Co. of South Africa (Pty) Ltd merged with Amcar Motor Holding, the vehicles operations of Anglo American Corporation. The resulting entity was called South African Motor Corporation (SAMCOR). As a result of the merger, Ford became a minority owner of the new company, with roughly a 42% interest. At all relevant times, Ford Motor Co. and SAMCOR acted as agents of Ford.

307.    In its South African plants, Ford manufactured specialized vehicles for security forces, including large military trucks, armored vehicles and specialized sedans for the Special Branch. Ford created paperwork identifying the vehicles as intended for security forces, some of which specifically identified the police or the military as the recipients. Some vehicles were painted in the plant to meet security forces' specifications. High-ranking officials from security forces, sometimes in uniform, visited Ford plants on a regular basis, consulted with Ford

management and inspected the vehicles. At all relevant times, Ford knew that its products would be used to violently suppress blacks and opponents of apartheid. For example, Ford was well aware that its vehicles were used in the state violence such as at Soweto and Duncan Village and many other similar incidents.

308. Ford employees raised concerns with Ford management about Ford's production of security forces' vehicles because they saw these vehicles in black communities on a regular basis. On more than one occasion, Ford management retaliated against black employees who questioned its involvement with the South African security forces, *inter alia*, by shortening the work shifts of black employees.

309. The head of Ford security often rode through black communities with Special Branch officers in Ford company vehicles as well as Special Branch cars. Some of these officers, who were regularly inside the Ford plants speaking with Ford management, were involved in the torture and arbitrary detention of union leaders. Ford facilitated the torture and arbitrary detention of its own workers.

310. Special Branch officers worked with Ford management to coordinate efforts to intimidate workers to not get involved in political or union activities. For example, on one occasion a union leader's brother who worked at Ford had been interrogated and detained overnight, and he was brought to a plant the following morning. Accompanied by Special Branch into the plant, he was paraded in handcuffs to deter workers from involvement in political or union activities.

311. Members of the proposed classes were arrested, detained, and tortured by South African security forces as a result of information provided to these forces by Ford. Ford

employees also knew when black employees had been interrogated, even when that information was not public.

312.     While Ford agreed to sell its interest in SAMCOR in 1987, it continued to supply SAMCOR with vehicles, components, management and technical assistance and continued to license the Ford trademark to SAMCOR.  Ford transferred 57% of its stake to local employees and the remaining 43% of its stake to Anglo American Corporation.  Ford also transferred tens of millions from the payment it received from the sale directly to SAMCOR.  Thus, Ford effectively continued to exercise control over its agent, SAMCOR.

## IX.     COUNTS

### FIRST COUNT

**The Alien Tort Claims Act, 28 U.S.C § 1350, for the crime of apartheid on behalf of Plaintiffs, all members of the proposed Extrajudicial Killing Class, all members of the proposed Torture Class, all members of the proposed Detention Class, and all members of the proposed Cruel Treatment Class against all Defendants**

313.     Plaintiffs reallege each and every paragraph set forth above as if fully set forth herein.

314.     Plaintiffs, all members of the proposed Extrajudicial Killing Class, all members of the proposed Torture Class, all members of the proposed Detention Class, and all members of the proposed Cruel Treatment Class are direct victims of the crime of apartheid.

315.     The acts described herein constitute the crime of apartheid and offenses committed in furtherance of or ancillary to that crime in violation of the Alien Tort Claims Act (28 U.S.C. § 1350), international law, and the common law of the United States.

316.     Defendants provided substantial assistance to the South African security forces through material, logistical, financial, and/or other means of practical support, knowing that those activities constituted violations of international norms toward the Plaintiffs and the classes.

317.     Defendants' practical assistance to the South African security forces had a substantial effect on the perpetration of its criminal and tortious activities and was provided with the purpose of facilitating those activities.

318.     The abuses that Plaintiffs and class members suffered were a reasonably foreseeable result of Defendants' collaboration with South Africa's apartheid regime.

319.     Defendants benefited from apartheid and, consequently, the violence that was used to maintain and enforce it at the expense of Plaintiffs, and the members of the proposed classes discussed herein.

320.     Defendants are liable to Plaintiffs in that they aided and abetted, participated in a joint criminal enterprise with, were reckless in dealing with, participated in a joint venture with, and/or ratified the actions of the Apartheid regime, which committed the alleged crimes. Defendants also acted in the face of an unjustifiably high risk of harm that was either known or so obvious that it should have been known, in conscious disregard of known dangers, and/or with disregard or deliberate indifference to a substantial risk of harm.

321.     Defendants are liable to Plaintiffs for compensatory and punitive damages, as well as appropriate equitable and injunctive relief.

## SECOND COUNT

**The Alien Tort Claims Act, 28 U.S.C § 1350, for the crime of extrajudicial killing on behalf of Sakwe Balintulo, personal representative of Saba Balintulo; Mark Fransch, personal representative of Anton Fransch; Archington Madondo, personal representative of Mandla Madono; and all members of the proposed Extrajudicial Killing Class against Rheinmetall**

322.     Plaintiffs reallege each and every paragraph set forth above as if fully set forth herein.

323.     The deliberate killings, under color of law, of Saba Balintulo, represented by

**Sakwe Balintulo**; Anton Fransch, represented by **Mark Fransch**; Mandla Madono, represented by **Archington Madondo**; and **all members of the proposed Extrajudicial Killing Class** were not authorized by a lawful judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by all civilized peoples.

324.    The acts described herein constitute extrajudicial killing in violation of the Alien Tort Claims Act (28 U.S.C. § 1350), international law, and the common law of the United States.

325.    **Rheinmetall** provided substantial assistance to South African security forces through material, logistical, financial, and/or other means of practical support, knowing that the actions of the South African security forces constituted violations of international norms toward the Plaintiffs and the class.

326.    The practical assistance of Rheinmetall to the South African security forces had a substantial effect on the perpetration of its criminal and tortious activities and was provided with the purpose of facilitating those activities.

327.    The abuses that the Extrajudicial Killing Class and suffered were a reasonably foreseeable result of Rheinmetall's collaboration with South Africa's apartheid regime.

328.    Rheinmetall benefited from apartheid and, consequently, the violence that was used to maintain and enforce it at the expense of the Extrajudicial Killing Class.

329.    Rheinmetall is liable to the Extrajudicial Killing Class in that it aided and abetted, participated in a joint criminal enterprise with, was reckless in dealing with, participated in a joint venture with, and/or ratified the actions of the Apartheid regime which committed the alleged crimes.  Rheinmetall also acted in the face of an unjustifiably high risk of harm that was either known or so obvious that it should have been known, in conscious disregard of known dangers, and/or with disregard or deliberate indifference to a substantial risk of harm.

330.    Rheinmetall is liable to the Extrajudicial Killing Class for compensatory and punitive damages, as well as appropriate equitable and injunctive relief.

### THIRD COUNT

**The Alien Tort Claims Act, 28 U.S.C § 1350, for the crime of extrajudicial killing on behalf of Sakwe Balintulo, personal representative of Saba Balintulo; Mark Fransch, personal representative of Anton Fransch; Archington Madondo, personal representative of Mandla Madono; and all members of the proposed Extrajudicial Killing Class against Daimler, Ford, and General Motors**

331.    Plaintiffs reallege each and every paragraph set forth above as if fully set forth herein.

332.    The deliberate killings, under color of law, of Saba Balintulo, represented by **Sakwe Balintulo**; Anton Fransch, represented by **Mark Fransch**; Mandla Madono, represented by **Archington Madondo**; and **all members of the proposed Extrajudicial Killing Class** were not authorized by a lawful judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by all civilized peoples.

333.    The acts described herein constitute extrajudicial killing in violation of the Alien Tort Claims Act (28 U.S.C. § 1350), international law, and the common law of the United States.

334.    **Daimler, Ford,** and **General Motors** provided substantial assistance to the South African security forces through material, logistical, financial, and/or other means of practical support, knowing that the actions of the South African security forces constituted violations of international norms toward the Plaintiffs and the class.

335.    The practical assistance of Daimler, Ford, and General Motors to the South African security forces had a substantial effect on the perpetration of its criminal and tortious activities and was provided with the purpose of facilitating those activities.

336.   The abuses that the Extrajudicial Killing Class suffered were a reasonably foreseeable result of Daimler, Ford, and General Motors's collaboration with South Africa's apartheid regime.

337.   Daimler, Ford, and General Motors benefited from apartheid and, consequently, the violence that was used to maintain and enforce it at the expense of the Extrajudicial Killing Class.

338.   Daimler, Ford, and General Motors are liable to the Extrajudicial Killing Class in that they aided and abetted, participated in a joint criminal enterprise with, were reckless in dealing with, participated in a joint venture with, and/or ratified the actions of the Apartheid regime which committed the alleged crimes.  Daimler, Ford, and General Motors also acted in the face of an unjustifiably high risk of harm that was either known or so obvious that it should have been known, in conscious disregard of known dangers, and/or with disregard or deliberate indifference to a substantial risk of harm.

339.   Daimler, Ford, and General Motors are liable to the Extrajudicial Killing Class for compensatory and punitive damages, as well as appropriate equitable and injunctive relief.

## FOURTH COUNT

**The Alien Tort Claims Act, 28 U.S.C § 1350, for the crime of extrajudicial killing on behalf of Sakwe Balintulo, personal representative of Saba Balintulo; Mark Fransch, personal representative of Anton Fransch; Archington Madondo, personal representative of Mandla Madono; and all members of the proposed Extrajudicial Killing Class against IBM and Fujitsu**

340.   Plaintiffs reallege each and every paragraph set forth above as if fully set forth herein.

341.   The deliberate killings, under color of law, of Saba Balintulo, represented by **Sakwe Balintulo**; Anton Fransch, represented by **Mark Fransch**; Mandla Madono, represented

by **Archington Madondo**; and **all members of the proposed Extrajudicial Killing Class** were not authorized by a lawful judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by all civilized peoples.

342.    The acts described herein constitute extrajudicial killing in violation of the Alien Tort Claims Act (28 U.S.C. § 1350), international law, and the common law of the United States.

343.    **IBM** and **Fujitsu** provided substantial assistance to the South African security forces through material, logistical, financial, and/or other means of practical support, knowing that the actions of the South African security forces constituted violations of international norms toward the Plaintiffs and the class.

344.    The practical assistance of IBM and Fujitsu to the South African security forces had a substantial effect on the perpetration of its criminal and tortious activities and was provided with the purpose of facilitating those activities.

345.    The abuses that the Extrajudicial Killing Class suffered were a reasonably foreseeable result of IBM and Fujitsu's collaboration with South Africa's apartheid regime.

346.    IBM and Fujitsu benefited from apartheid and, consequently, the violence that was used to maintain and enforce it at the expense of the Extrajudicial Killing Class.

347.    IBM and Fujitsu are liable to the Extrajudicial Killing Class in that they aided and abetted, participated in a joint criminal enterprise with, were reckless in dealing with, participated in a joint venture with, and/or ratified the actions of the Apartheid regime which committed the alleged crimes.  IBM and Fujitsu also acted in the face of an unjustifiably high risk of harm that was either known or so obvious that it should have been known, in conscious disregard of known dangers, and/or with disregard or deliberate indifference to a substantial risk of harm.

348.    IBM and Fujitsu are liable to the Extrajudicial Killing Class for compensatory and punitive damages, as well as appropriate equitable and injunctive relief.

## FIFTH COUNT

**The Alien Tort Claims Act, 28 U.S.C § 1350, for the crime of torture on behalf of Lesiba Kekana, Mpho Alfred Masemola, Michael Mbele, Mamosadi Catherine Mlangeni, Thandiwe Shezi, Thobile Sikani and all members of the proposed Torture Class against Rheinmetall**

349.    Plaintiffs reallege each and every paragraph set forth above as if fully set forth herein.

350.    **Lesiba Kekana, Mpho Alfred Masemola, Michael Mbele, Mamosadi Catherine Mlangeni, Thandiwe Shezi, Thobile Sikani,** and **all members of the proposed Torture Class** are victims of torture.

351.    The acts described herein constitute torture in violation of the Alien Tort Claims Act (28 U.S.C. § 1350), international law, and the common law of the United States.

352.    **Rheinmetall** provided substantial assistance to the South African security forces through material, logistical, financial, and/or other means of practical support, knowing that the actions of the South African security forces constituted violations of international norms toward the Plaintiffs and the class.

353.    The practical assistance of Rheinmetall to the South African security forces had a substantial effect on the perpetration of its criminal and tortious activities and was provided with the purpose of facilitating those activities.

354.    The abuses that the Torture Class suffered were a reasonably foreseeable result of Rheinmetall's collaboration with South Africa's apartheid regime.

355.    Rheinmetall benefited from apartheid and, consequently, the violence that was used to maintain and enforce it at the expense of the Torture Class.

356.    Rheinmetall is liable to the Torture Class in that it aided and abetted, participated in a joint criminal enterprise with, was reckless in dealing with, participated in a joint venture with, and/or ratified the actions of the Apartheid regime which committed the alleged crimes. Rheinmetall also acted in the face of an unjustifiably high risk of harm that was either known or so obvious that it should have been known, in conscious disregard of known dangers, and/or with disregard or deliberate indifference to a substantial risk of harm.

357.    Rheinmetall is liable to the Torture Class for compensatory and punitive damages, as well as appropriate equitable and injunctive relief.

## SIXTH COUNT

**The Alien Tort Claims Act, 28 U.S.C § 1350, for the crime of torture on behalf of Lesiba Kekana, Mpho Alfred Masemola, Michael Mbele, Mamosadi Catherine Mlangeni, Thandiwe Shezi, Thobile Sikani and all members of the proposed Torture Class against IBM and Fujitsu**

358.    Plaintiffs reallege each and every paragraph set forth above as if fully set forth herein.

359.    **Lesiba Kekana, Mpho Alfred Masemola, Michael Mbele, Mamosadi Catherine Mlangeni, Thandiwe Shezi, Thobile Sikani,** and **all members of the proposed Torture Class** are victims of torture.

360.    The acts described herein constitute torture in violation of the Alien Tort Claims Act (28 U.S.C. § 1350), international law, and the common law of the United States.

361.    **IBM** and **Fujitsu** provided substantial assistance to the South African security forces through material, logistical, financial, and/or other means of practical support, knowing that the actions of the South African security forces constituted violations of international norms toward the Plaintiffs and the class.

362.   The practical assistance of IBM and Fujitsu to the South African security forces had a substantial effect on the perpetration of its criminal and tortious activities and was provided with the purpose of facilitating those activities.

363.   The abuses that the Torture Class suffered were a reasonably foreseeable result of IBM and Fujitsu's collaboration with South Africa's apartheid regime.

364.   IBM and Fujitsu benefited from apartheid and, consequently, the violence that was used to maintain and enforce it at the expense of the Torture Class.

365.   IBM and Fujitsu are liable to the Torture Class in that they aided and abetted, participated in a joint criminal enterprise with, were reckless in dealing with, participated in a joint venture with, and/or ratified the actions of the Apartheid regime which committed the alleged crimes.  IBM and Fujitsu also acted in the face of an unjustifiably high risk of harm that was either known or so obvious that it should have been known, in conscious disregard of known dangers, and/or with disregard or deliberate indifference to a substantial risk of harm.

366.   IBM and Fujitsu are liable to the Torture Class for compensatory and punitive damages, as well as appropriate equitable and injunctive relief.

## SEVENTH COUNT

**The Alien Tort Claims Act, 28 U.S.C § 1350, for the crime of prolonged unlawful detention on behalf of Dennis Vincent Frederick Brutus, Lesiba Kekana, Mpho Alfred Masemola, Michael Mbele, Mamosadi Catherine Mlangeni, Thandiwe Shezi, Thobile Sikani, and all members of the proposed Detention Class against Rheinmetall**

367.   Plaintiffs reallege each and every paragraph set forth above as if fully set forth herein.

368.   **Dennis Vincent Frederick Brutus, Lesiba Kekana, Mpho Alfred Masemola, Michael Mbele, Mamosadi Catherine Mlangeni, Thandiwe Shezi, Thobile Sikani,** and **all members of the proposed Detention Class** are victims of prolonged unlawful detention.

369. The acts described herein constitute prolonged unlawful detention in violation of the Alien Tort Claims Act (28 U.S.C. § 1350), international law, and the common law of the United States.

370. **Rheinmetall** provided substantial assistance to the South African security forces through material, logistical, financial, and/or other means of practical support, knowing that the actions of the South African security forces constituted violations of international norms toward the Plaintiffs and the class.

371. The practical assistance of Rheinmetall to the South African security forces had a substantial effect on the perpetration of its criminal and tortious activities and was provided with the purpose of facilitating those activities.

372. The abuses that the Detention Class suffered were a reasonably foreseeable result of Rheinmetall's collaboration with South Africa's apartheid regime.

373. Rheinmetall benefited from apartheid and, consequently, the violence that was used to maintain and enforce it at the expense of the Detention Class.

374. Rheinmetall is liable to the Detention Class in that it aided and abetted, participated in a joint criminal enterprise with, was reckless in dealing with, participated in a joint venture with, and/or ratified the actions of the Apartheid regime which committed the alleged crimes. Rheinmetall also acted in the face of an unjustifiably high risk of harm that was either known or so obvious that it should have been known, in conscious disregard of known dangers, and/or with disregard or deliberate indifference to a substantial risk of harm.

375. Rheinmetall is liable to the Detention Class for compensatory and punitive damages, as well as appropriate equitable and injunctive relief.

## EIGHTH COUNT

**The Alien Tort Claims Act, 28 U.S.C § 1350, for the crime of prolonged unlawful detention on behalf of Dennis Vincent Frederick Brutus, Lesiba Kekana, Mpho Alfred Masemola, Michael Mbele, Mamosadi Catherine Mlangeni, Thandiwe Shezi, Thobile Sikani, and all members of the proposed Detention Class against IBM and Fujitsu**

376. Plaintiffs reallege each and every paragraph set forth above as if fully set forth herein.

377. **Dennis Vincent Frederick Brutus, Lesiba Kekana, Mpho Alfred Masemola, Michael Mbele, Mamosadi Catherine Mlangeni, Thandiwe Shezi, Thobile Sikani,** and **all members of the proposed Detention Class** are victims of prolonged unlawful detention.

378. The acts described herein constitute prolonged unlawful detention in violation of the Alien Tort Claims Act (28 U.S.C. § 1350), international law, and the common law of the United States.

379. **IBM** and **Fujitsu** provided substantial assistance to the South African security forces through material, logistical, financial, and/or other means of practical support, knowing that the actions of the South African security forces constituted violations of international norms toward the Plaintiffs and the class.

380. The practical assistance of IBM and Fujitsu to the South African security forces had a substantial effect on the perpetration of its criminal and tortious activities and was provided with the purpose of facilitating those activities.

381. The abuses that the Detention Class suffered were a reasonably foreseeable result of IBM and Fujitsu's collaboration with South Africa's apartheid regime.

382. IBM and Fujitsu benefited from apartheid and, consequently, the violence that was used to maintain and enforce it at the expense of the Detention Class.

383. IBM and Fujitsu are liable to the Detention Class in that they aided and abetted, participated in a joint criminal enterprise with, were reckless in dealing with, participated in a

joint venture with, and/or ratified the actions of the Apartheid regime which committed the

alleged crimes. IBM and Fujitsu also acted in the face of an unjustifiably high risk of harm that

was either known or so obvious that it should have been known, in conscious disregard of known

dangers, and/or with disregard or deliberate indifference to a substantial risk of harm.

384. IBM and Fujitsu are liable to the Detention Class for compensatory and punitive

damages, as well as appropriate equitable and injunctive relief.

## NINTH COUNT

**The Alien Tort Claims Act, 28 U.S.C § 1350, for the crime of cruel, inhuman and degrading treatment on behalf of Elsie Gishi, Lesiba Kekana, Mpho Alfred Masemola, Michael Mbele, Mamosadi Catherine Mlangeni, Reuben Mphela, Thulani Nunu, Thandiwe Shezi, Thobile Sikani, and all members of the proposed Cruel Treatment Class against Rheinmetall**

385. Plaintiffs reallege each and every paragraph set forth above as if fully set forth

herein.

386. **Elsie Gishi, Lesiba Kekana, Mpho Alfred Masemola, Michael Mbele,**

**Mamosadi Catherine Mlangeni, Reuben Mphela, Thulani Nunu, Thandiwe Shezi**, **Thobile**

**Sikani,** and **all members of the proposed Cruel Treatment Class** are victims of cruel,

inhuman and degrading treatment.

387. **Rheinmetall's** acts caused the Cruel Treatment Class to be placed in fear for their

lives and forced them to suffer severe physical and psychological abuse and agony.

388. The acts described herein constitute cruel, inhuman and degrading treatment in

violation of the Alien Tort Claims Act (28 U.S.C. § 1350), international law, and the common

law of the United States.

389. Rheinmetall provided substantial assistance to the South African security forces

through material, logistical, financial, and/or other means of practical support, knowing that the

actions of the South African security forces constituted violations of international norms toward the Plaintiffs and the class.

390. The practical assistance of Rheinmetall to the South African security forces had a substantial effect on the perpetration of its criminal and tortious activities and was provided with the purpose of facilitating those activities.

391. The abuses that the Cruel Treatment Class suffered were a reasonably foreseeable result of Rheinmetall's collaboration with South Africa's apartheid regime.

392. Rheinmetall benefited from apartheid and, consequently, the violence that was used to maintain and enforce it at the expense of the Cruel Treatment Class.

393. Rheinmetall is liable to the Cruel Treatment Class in that it aided and abetted, participated in a joint criminal enterprise with, was reckless in dealing with, participated in a joint venture with, and/or ratified the actions of the Apartheid regime which committed the alleged crimes. Rheinmetall also acted in the face of an unjustifiably high risk of harm that was either known or so obvious that it should have been known, in conscious disregard of known dangers, and/or with disregard or deliberate indifference to a substantial risk of harm.

394. Rheinmetall is liable to the Cruel Treatment Class for compensatory and punitive damages, as well as appropriate equitable and injunctive relief.

## **TENTH COUNT**

**The Alien Tort Claims Act, 28 U.S.C § 1350, for the crime of cruel, inhuman and degrading treatment on behalf of Elsie Gishi, Lesiba Kekana, Mpho Alfred Masemola, Michael Mbele, Mamosadi Catherine Mlangeni, Reuben Mphela, Thulani Nunu, Thandiwe Shezi, Thobile Sikani, and all members of the proposed Cruel Treatment Class against Daimler, Ford, and General Motors**

395. Plaintiffs reallege each and every paragraph set forth above as if fully set forth herein.

396. **Elsie Gishi, Lesiba Kekana, Mpho Alfred Masemola, Michael Mbele, Mamosadi Catherine Mlangeni, Reuben Mphela, Thulani Nunu, Thandiwe Shezi**, **Thobile Sikani,** and **all members of the proposed Cruel Treatment Class** are victims of cruel, inhuman and degrading treatment.

397. **Daimler, Ford,** and **General Motors's** acts caused the Cruel Treatment Class to be placed in fear for their lives and forced them to suffer severe physical and psychological abuse and agony.

398. The acts described herein constitute cruel, inhuman and degrading treatment in violation of the Alien Tort Claims Act (28 U.S.C. § 1350), international law, and the common law of the United States.

399. Daimler, Ford, and General Motors provided substantial assistance to the South African security forces through material, logistical, financial, and/or other means of practical support, knowing that the actions of the South African security forces constituted violations of international norms toward the Plaintiffs and the class.

400. The practical assistance of Daimler, Ford, and General Motors to the South African security forces had a substantial effect on the perpetration of its criminal and tortious activities and was provided with the purpose of facilitating those activities.

401. The abuses that the Cruel Treatment Class suffered were a reasonably foreseeable result of Daimler, Ford, and General Motors's collaboration with South Africa's apartheid regime.

402. Daimler, Ford, and General Motors benefited from apartheid and, consequently, the violence that was used to maintain and enforce it at the expense of the Cruel Treatment Class.

403. Daimler, Ford, and General Motors are liable to the Cruel Treatment Class in that

they aided and abetted, participated in a joint criminal enterprise with, were reckless in dealing

with, participated in a joint venture with, and/or ratified the actions of the Apartheid regime

which committed the alleged crimes.  Daimler, Ford, and General Motors also acted in the face

of an unjustifiably high risk of harm that was either known or so obvious that it should have been

known, in conscious disregard of known dangers, and/or with disregard or deliberate indifference

to a substantial risk of harm.

404.    Daimler, Ford, and General Motors are liable to the Cruel Treatment Class for

compensatory and punitive damages, as well as appropriate equitable and injunctive relief.

## ELEVENTH COUNT

**The Alien Tort Claims Act, 28 U.S.C § 1350, for the crime of cruel, inhuman and degrading treatment on behalf of Elsie Gishi, Lesiba Kekana, Mpho Alfred Masemola, Michael Mbele, Mamosadi Catherine Mlangeni, Reuben Mphela, Thulani Nunu, Thandiwe Shezi, Thobile Sikani, and all members of the proposed Cruel Treatment Class against IBM and Fujitsu**

405.    Plaintiffs reallege each and every paragraph set forth above as if fully set forth

herein.

406.    **Elsie Gishi, Lesiba Kekana, Mpho Alfred Masemola, Michael Mbele,**

**Mamosadi Catherine Mlangeni, Reuben Mphela, Thulani Nunu, Thandiwe Shezi**, **Thobile**

**Sikani,** and **all members of the proposed Cruel Treatment Class** are victims of cruel,

inhuman and degrading treatment.

407.    **IBM** and **Fujitsu's** acts caused the Cruel Treatment Class to be placed in fear for

their lives and forced them to suffer severe physical and psychological abuse and agony.

408.    The acts described herein constitute cruel, inhuman and degrading treatment in

violation of the Alien Tort Claims Act (28 U.S.C. § 1350), international law, and the common

law of the United States.

409.    IBM and Fujitsu provided substantial assistance to the South African security forces through material, logistical, financial, and/or other means of practical support, knowing that the actions of the South African security forces constituted violations of international norms toward the Plaintiffs and the class.

410.    The practical assistance of IBM and Fujitsu to the South African security forces had a substantial effect on the perpetration of its criminal and tortious activities and was provided with the purpose of facilitating those activities.

411.    The abuses that the Cruel Treatment Class suffered were a reasonably foreseeable result of IBM and Fujitsu's collaboration with South Africa's apartheid regime.

412.    IBM and Fujitsu benefited from apartheid and, consequently, the violence that was used to maintain and enforce it at the expense of the Cruel Treatment Class.

413.    IBM and Fujitsu are liable to the Cruel Treatment Class in that they aided and abetted, participated in a joint criminal enterprise with, were reckless in dealing with, participated in a joint venture with, and/or ratified the actions of the Apartheid regime which committed the alleged crimes. IBM and Fujitsu also acted in the face of an unjustifiably high risk of harm that was either known or so obvious that it should have been known, in conscious disregard of known dangers, and/or with disregard or deliberate indifference to a substantial risk of harm.

414.    IBM and Fujitsu are liable to the Cruel Treatment Class for compensatory and punitive damages, as well as appropriate equitable and injunctive relief.

## X.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that judgment be entered against the Defendants as follows:

(a)    Granting Plaintiffs class action certification;

(b)     Declaring that Defendants knowingly and intentionally aided and abetted the

         commission of a tort in violation of international law enforceable in this court as

         federal common law and the law of nations;

(c)     Awarding Plaintiffs compensatory and punitive damages arising out of the

         unlawful behavior of Defendants;

(d)     Awarding the costs of bringing this action; and

(e)     Granting such other further relief as shall seem just to the Court.

## XI.     JURY DEMAND

Plaintiffs hereby demand a jury trial on all issues so triable.

Dated:  May 1, 2009                          Respectfully submitted:

                                             _____
                                             eig D. 01 :      SO-0414)
                                             HAUSFELD LLP
                                             11 Broadway, Suite 615
                                             New York, NY 10004
                                             Telephone: (646) 278-0877
                                             Facsimile: (212) 480-8560
                                             Email: solson@hausfeldllp.com

                                             Michael D. Hausfeld
                                             HAUSFELD LLP
                                             1700 K Street NW, Suite 650
                                             Washington, DC 20006
                                             Telephone: (202) 540-7200
                                             Facsimile: (202) 540-7201
                                             Email:  mhausfeld@hausfeldllp.com

                                             Charles Peter Abrahams
                                             ABRAHAMS KIEWITZ
                                             Suite 15, Canal Edge Three
                                             Carl Cronje Drive
                                             Tyger, Waterfront
                                             Cape Town
                                             South Africa
                                             +27 (21) 914-4842

95

Robert G. Kerrigan
KERRIGAN, ESTESS, RANKIN &
MCLEOD, LLP
627 East Government Street
Pensacola, FL 32502
(850) 444-4402

Matt Schultz
LEVIN PAPANTONIO THOMAS
MITCHELL ECHSNER & PROCTOR, P.A.
316 South Baylen Street – Suite 600
Pensacola, FL 32502
(850) 435-7140

96

CERTIFICATE OF SERVICE

I hereby certify that on the 1 [st] day of May, 2009, a copy of the foregoing Plaintiffs'

Second Amended Complaint was delivered via hand delivery to the Clerk's Office of the United

States District Court for the Southern District of New York and mailed to each party on the

attached service list.

Steig D. Olson

SERVICE LIST
*In re: South African Apartheid Antitrust Litigation*

| | |
|---|---|
| Jerome S. Hirsch<br>Susan L. Saltzstein<br>SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP<br>Four Times Square<br>New York, NY 10036-6522<br><br>*Defendants Daimler A.G. and Defendant Rheinmetall A.G.* | Mark D. McPherson, Esq.<br>Michael Gerard, Esq.<br>MORRISON & FOERSTER LLP<br>1290 Avenue of the Americas<br>New York, New York 10104<br><br>*Defendant Fujitsu Limited* |
| John H. Beisner, Esq.<br>O'MELVENY & MYERS LLP<br>1625 I Street, NW<br>Washington, DC 20006<br><br>*Defendant Ford Motor Company* | Jayant W. Tambe, Esq.<br>Robert S. Walker, Esq.<br>JONES DAY<br>222 East 41St Street<br>New York, New York 10017<br><br>*Defendant General Motors Corp.* |
| Keith R. Hummel, Esq.<br>CRAVATH, SWAINE & MOORE LLP<br>825 Eighth Avenue<br>New York, New York 10019<br><br>Defendant International Business Machines Corp. | |



**MINISTER**
**JUSTICE AND CONSTITUTIONAL DEVELOPMENT**
**REPUBLIC OF SOUTH AFRICA**

The Honourable Judge Shira A. Scheindlin
United States District Judge
United States District Court
Southern District of New York
United States Court House
500 Pearl Street
New York
New York
10007 – 1581
United States of America

Dear Judge Scheindlin

**IN RE SOUTH AFRICAN APARTHEID LITIGATION (02 MDL 1499) – LUNGISILE NTSEBEZA et al; and KHULUMANI et al.**

On the 8th April 2009, the United States District Court, Southern District of New York, per Shira A Scheindlin U.S.D.J. issued an opinion in part upholding the Plaintiff's motion and in part denying it. The court also dismissed the plaintiffs' motion to re-solicit the views of the Governments (of the Republic of South Africa and the United States of America).

In its conclusion the Court stated that "corporate defendants merely accused of doing business with the apartheid Government of South Africa have been dismissed. Claims that a corporation that aided and abetted particular acts could be liable for the breadth of harms committed under apartheid have been rejected. What survives (in terms of claims) are much narrower cases that this Court hopes will move toward resolution after more than five years spent litigating motions to dismiss".

The remaining claims are based on aiding and abetting very serious crimes, such as torture, extrajudicial killing committed in violation of international law by the apartheid regime.

1

The Court in dismissing the claims based solely on the fact that corporations merely did business with the apartheid government also addressed some of the concerns which the Government of the Republic of South Africa had.

The apartheid issue and the role of business were canvassed by the Truth and Reconciliation Commission during its hearings. Its report and recommendations were acted upon by the Government of the Republic of South Africa in a manner it considered to be appropriate. The Government believes that it would not be prudent to continually have to re-state its position in response to all the motions filed in connection with these claims, pending the final adjudication by the District Court.

The Government of the Republic of South Africa, having considered carefully the judgement of the United States District Court, Southern District of New York is now of the view that this Court is an appropriate forum to hear the remaining claims of aiding and abetting in violation of international law.

The Plaintiffs have, separately, indicated to the Government of the Republic of South Africa their desire to have the matter resolved outside of the court process generally with resolution in the Republic of South Africa, if possible. The Government of the Republic of South Africa welcomes this development and would be willing to offer its counsel to the parties in pursuit of a settlement, if requested to do so by the parties.


Respectfully yours,


*J. Radebe*


**JEFFREY THAMSANQA RADEBE, MP**
**MINISTER OF JUSTICE AND CONSTITUTIONAL DEVELOPMENT**


cc: Clerk United States Court of Appeals for the Second Circuit

2

N.Y.S.D. Case #
02-md-1499(SAS)
03-cv-4524(SAS)
02-cv-4712(SAS)
02-cv-6218(SAS)
03-cv-1024(SAS)

09-2778-cv(L)
*Balintulo v. Daimler AG*

# MANDATE

### UNITED STATES COURT OF APPEALS
### FOR THE SECOND CIRCUIT

August Term, 2009

(Argued: January 11, 2010          Decided: August 21, 2013)

Docket Nos. 09-2778-cv(L), 09-2779-cv,
09-2780-cv, 09-2781-cv, 09-2783-cv, 09-2785-cv,
09-2787-cv, 09-2792-cv, 09-2801-cv, 09-3037-cv



UNITED STATES COURT OF APPEALS
FILED
AUG 21 2013
Catherine O'Hagan Wolfe, Clerk
SECOND CIRCUIT

SAKWE BALINTULO, as personal representative of SABA BALINTULO, DENNIS
VINCENT FREDERICK BRUTUS, MARK FRANSCH, as personal representative of
ANTON FRANSCH, ELSIE GISHI, LESIBA KEKANA, ARCHINGTON MADONDO, as
personal representative of MANDLA MADONDO, MPHO ALFRED MASEMOLA,
MICHAEL MBELE, MAMOSADI CATHERINE MLANGENI, REUBEN MPHELA, THULANI
NUNU, THANDIWE SHEZI, THOBILE SIKANI, LUNGISLIE NTSEBEZA, MANTOA
DOROTHY MOLEFI, individually and on behalf of her deceased son, MNCEKELELI
HENYN SIMANGENTLOKO, TOZAMILE BOTHA, MPUMELELO CILIBE, WILLIAM
DANIEL PETERS, SAMUEL ZOYISILE MALI, MSITHELI WELLINGTON NONYUKELA,
JAMES MICHAEL TAMBOER, NOTHINI BETTY DYONASHE, individually and on behalf
of her deceased son, NONKULULEKO SYLVIA NGCAKA, individually and on behalf of
her deceased son, HANS LANGFORD PHIRI, MIRRIAM MZAMO, individually and on
behalf of her deceased son,

*Plaintiffs-Appellees,*

—v.—

DAIMLER AG, FORD MOTOR COMPANY, and
INTERNATIONAL BUSINESS MACHINES CORPORATION,

*Defendants-Appellants.*

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: November 7, 2013

1

Before: CABRANES, HALL, and LIVINGSTON, Circuit Judges.

The question presented is whether to issue a writ of mandamus to the United States District Court for the Southern District of New York (Shira A. Scheindlin, *Judge*) to resolve in the defendants' favor these proposed class-action suits brought under the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, on behalf of those harmed by the decades-long South African legal regime known as "apartheid." The plaintiffs seek damages for violations of customary international law committed by the South African government, allegedly aided and abetted by the South African subsidiary companies of the named corporate defendants—Daimler, Ford, and IBM. In short, the plaintiffs claim that these subsidiary companies sold cars and computers to the South African government, thus making the defendants, their parent companies, liable for the apartheid regime's innumerable race-based depredations and injustices, including rape, torture, and extrajudicial killings.

Although the plaintiffs did not claim that any of the South African government's alleged violations of the law of nations occurred in the United States, at the time they filed their complaint they assumed (as did most American courts) that no such geographical connection was necessary. Based on the same assumption, the District Court denied the defendants' motion to dismiss, which had asserted various grounds for dismissal, including that claims brought under the ATS cannot be based on "extraterritorial" conduct—i.e., conduct that occurred in the territory of a sovereign other than the United States. The District Court denied a motion to certify an interlocutory appeal, and the defendants thereupon sought immediate appellate review through a writ of mandamus and by invocation of the "collateral order" doctrine.

This putative appeal, held in abeyance pending a decision by the Supreme Court that was not issued until 2013, and now pending for four years, involves challenging and important questions regarding the immediate appealability of certain orders in cases brought under the Alien Tort Statute, where the United States government has informed the district court that the ongoing

2

litigation substantially threatens American foreign policy.  We no longer need to answer those questions, however, because all of the underlying claims are plainly barred by the recent opinion of the Supreme Court in *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013), which held that federal courts may not, under the ATS, recognize common-law causes of action for conduct occurring in the territory of another sovereign. *Id.* at 1668–69.  Because that decision provides a sufficient ground for dismissing all of the remaining claims, we deny mandamus relief.  For the same reason, we conclude that the interests of judicial economy, and of the parties, are best served by holding this putative appeal in abeyance and enabling the District Court to consider a motion to dismiss the plaintiffs' remaining claims.  The parties can then inform this Court, when appropriate, whether this appeal has been rendered moot.

Accordingly, the petition for a writ of mandamus is **DENIED**; the stay on proceedings in the District Court is **VACATED**; and any appellate jurisdiction that this Court may have pursuant to the collateral order doctrine is held in abeyance.

> LISA S. BLATT (Peter L. Zimroth, Ramon P. Marks, Marcus A. Asner, *on the brief*), Arnold & Porter LLP, Washington, DC, and New York, NY; (Jerome S. Hirsch, Joseph N. Sacca, Gary J. Hacker, *on the brief*), Skadden, Arps, Slate, Meagher, & Flom LLP, New York, NY, *for Defendant-Appellant Daimler AG.*
>
> SRI SRINIVASAN (Brian C. Anderson, Irving L. Gornstein, Anton Metlitsky, *on the brief*), O'Melveny & Myers LLP, Washington, DC, *for Defendant-Appellant Ford Motor Company.*
>
> Keith R. Hummel, Teena-Ann Sankoorikal, James E. Canning, John E. Lazar, Cravath, Swaine, & Moore, LLP, New York, NY, *for Defendant-Appellant IBM Corporation.*

3

STEIG OLSON (Michael D. Hausfeld, Ralph J. Bunche, *on the brief*), Hausfeld, LLP, New York, NY, and Washington, DC; (Robert G. Kerrigan, *on the brief*), Kerrigan, Estess, Rankin & McLeod, LLP, Pensacola, FL; (Matt Schultz, *on the brief*), Levin Papantonio Thomas Mitchell Echsner & Proctor, PA, Pensacola, FL; (Charles Peter Abrahams, *on the brief*), Abrahams Kiewitz, Cape Town, South Africa; *for Plaintiffs-Appellees Sakwe Balintulo et al.*

PAUL L. HOFFMAN (Adrienne Quarry, *on the brief*), Schonbrun Desimone Seplow Harrison & Hoffman, Venice, CA; (Jay J. Rice, Diane E. Sammons, *on the brief*), Nagel Rice, LLP, Roseland, NJ; (Tyler R. Giannini, Susan Farbstein, *on the brief*), International Human Rights Clinic, Human Rights Program, Harvard Law School, Cambridge, MA; (Judith Brown Chomsky, *on the brief*), Law Offices of Judith Brown Chomsky, Elkins Park, PA; (Helen I. Zeldes, *on the brief*), Zeldes & Haeggquist, LLP, San Diego, CA; (Dumisa Buhle Ntsebeza, *on the brief*), Duma Nokwe Group of Advocates, Sandton, South Africa; (Michael Francis Osborne, *on the brief*), Cape Town, South Africa; (John Sindiso Ngcebetsha, Gugulethu Oscar Madlanga, *on the brief*), Ngcebetsha Madlanga Attorneys, Randburg, South Africa; (Medi Mokuena, *on the brief*), Mokuena Attorneys, Johannesburg, South Africa); (Dan Stormer, Anne Richardson, *on the brief*), Hadsell Stormer Keeny Richardson & Renick LLP, Pasadena, CA; (Anthony DiCaprio, *on the brief*), Rye, NY; *for Plaintiffs-Appellees Lungisile Ntsebeza et al.*

LEWIS S. YELIN (Ian Heath Gershengorn, Acting Assistant Attorney General, Douglass N. Letter, Robert M. Loeb, Appellate Staff, *on the brief*), Civil Division, U.S. Department of Justice, Washington, DC; (Preet Bharara, U.S. Attorney, and David S. Jones, Assistant U.S. Attorney, *on the brief*), Office of the U.S. Attorney for the Southern District of New York, NY; (Joan E. Donoghue, *on the brief*), U.S. Department of State, Washington, DC; *for Amicus Curiae United States of America, in support of Plaintiffs-Appellees.*

Peter R. Rutledge, Athens, GA; Robin S. Conrad, Amar D. Sarwal, National Chamber Litigation Center, Inc., Washington, DC; *for Amicus Curiae Chamber of Commerce of the United States, in support of Defendants-Appellants.*

4

Klaus Botzet, Embassy of the Federal Republic of Germany,
Washington, DC, *for Amicus Curiae Federal Republic of
Germany, in support of Defendants-Appellants.*

Alan E. Untereiner, Mark T. Stancil, Damon W. Taaffe, Eva
A. Temkin, Ariel N. Lavinbuk, Robbins, Russel,
Englert, Orseck, Untereiner & Sauber LLP,
Washington, DC, *for Amici Curiae Federation of German
Industries, Association of German Chambers of Industry and
Commerce, and German American Chambers of Commerce, in
support of Defendants-Appellants.*

Terry Myers, Jeffrey L. Nagel, Gibbons, P.C., New York, NY,
*for Amici Curiae German Law Professors, in support of
Defendants-Appellants.*

Anthony D. Boccanfuso, Arnold & Porter, LLP, New York,
NY, *for Amici Curiae International Chamber of Commerce,
in support of Defendants-Appellants.*

Terry Myers, Jeffrey L. Nagel, Gibbons, P.C., New York, NY,
*for Amici Curiae International Law Professors, in support of
Defendants-Appellants.*

Jeffrey A. Lamken, Evan A. Young, Baker Botts L.L.P.,
Washington, DC, and Austin, TX, *for Amici Curiae
National Foreign Trade Council, USA*Engage, U.S.
Council for International Business, Organization for
International Investment, and National Association of
Manufacturers, in support of Defendants-Appellants.*

Julian Ku, Hofstra University Law School, Hempstead, NY;
Michael D. Ramsey, University of San Diego Law
School, San Diego, CA; *for Amici Curiae Law Professors
of International Law and U.S. Foreign Relations Law, in
support of Defendants-Appellants.*

Marco B. Simons, Richard L. Herz, Jonathan G. Kaufman,
EarthRights International, Washington, DC, *for
Amicus Curiae EarthRights International, in support of
Plaintiffs-Appellees.*

Steven A. Kanner, Freed Kanner London & Millen LLC,
Bannockburn, IL, *for Amici Curiae Former Commissioners
and Committee Members of South Africa's Truth and
Reconciliation Commission, in support of Plaintiffs-Appellees.*

5

A0314

Piper Hendricks, World Organization for Human Rights USA, Washington, DC, *for Amicus Curiae International Center for Transitional Justice, in support of Plaintiffs-Appellees.*

William J. Aceves, California Western School of Law, San Diego, CA, *for Amici Curiae International Law Scholars, in support of Plaintiffs-Appellees.*

Robert N. Kaplan, Gregory K. Arenson, Kaplan Fox Kilsheimer LLP, New York, NY, *for Amicus Curiae Joseph E. Stiglitz, in support of Plaintiffs-Appellees.*

Maria C. LaHood, Katherine Gallagher, Meena Jagannath, Blinne Ni Ghralaigh, Center for Constitutional Rights, New York, NY, *for Amici Curiae Non-Governmental Organizations Committed to Human Rights, in support of Plaintiffs-Appellees.*

Renae D. Steiner, Heins Mills & Olson, P.L.C., Minneapolis, MN, *for Amici Curiae Professor John Dugard and Advocate Anton Katz, in support of Plaintiffs-Appellees.*

Elizabeth J. Cabraser, Steve M. Swerdlow, Lieff Cabraser, Heimann & Bernstein LLP, San Francisco, CA; Agnieszka M. Fryszman, Maureen E. McOwen, Cohen Milstein Sellers & Toll PLLC, Washington, DC; and Jennifer M. Green, University of Minnesota School of Law, Minneapolis, MN; *for Amici Curiae Professors of Civil Procedure, in support of Plaintiffs-Appellees.*

Bernard Persky, Kellie Lerner, Labaton Sucharow LLP, New York, NY, *for Amici Curiae Professors of Federal Jurisdiction and Legal History, in support of Plaintiffs-Appellees.*

Eugene A. Spector, Spector Roseman Kodroff & Willis, P.C., Philadelphia, PA, *for Amicus Curiae South African Council of Churches, in support of Plaintiffs-Appellees.*

Terry Collingsworth, Conrad & Scherer, LLP, Washington, DC, *for Amicus Curiae Congress of South African Trade Unions, in support of Plaintiffs-Appellees.*

Richard L. Herz, Marco B. Simons, Jonathan G. Kaufman, EarthRights International, Washington, DC, *for Amici Curiae U.S. Diplomats, in support of Plaintiffs-Appellees.*

6

Luis Romero Requena, European Commission, Brussels,
Belgium, *for Amicus Curiae European Commission.*

David B. Goldstein, Rabinowitz, Boudin, Standard, Krinsky
& Lieberman, P.C., New York, NY, *for Amicus Curiae
Republic of South Africa.*

Nigel Sheinwald, British Embassy Washington, Washington,
DC, *for Amicus Curiae United Kingdom of Great Britain
and Northern Ireland.*

JOSÉ A. CABRANES, *Circuit Judge*:

The question presented is whether to issue a writ of mandamus to resolve in favor of the

defendants this long-lived litigation under the Alien Tort Statute ("ATS")—a statute, passed in 1789,

that was rediscovered and revitalized by the courts in recent decades to permit aliens to sue for

alleged serious violations of human rights occurring abroad. The statute was first deployed in 1980

against individual defendants alleged to have perpetrated crimes against humanity, and beginning in

1997, some courts have extended its reach to suits against corporate defendants as well. *See Kiobel v.

Royal Dutch Petroleum Co.*, 621 F.3d 111, 116 (2d Cir. 2010), *aff'd on other grounds*, 133 S. Ct. 1659

(2013). We consider this question in light of the Supreme Court's recent decision that federal courts

may not, under the ATS, recognize common-law causes of action for conduct occurring in another

country.

In these putative class-action suits brought on behalf of those harmed by the decades-long

South African legal regime known as "apartheid," the plaintiffs assert that the South African

subsidiary companies of the named corporate defendants—Daimler, Ford, and IBM (the

"defendants")—aided and abetted violations of customary international law committed by the South

African government.[1] In short, the plaintiffs claim that these subsidiary companies sold cars and

---

[1] The suits were originally brought by two groups of plaintiffs, the *Balintulo* plaintiffs (also referred to as the *Khulumani* plaintiffs) and the *Ntsebeza* plaintiffs, *see* Part I.A, *post*, against a broad and diverse group of corporate defendants, over fifty in number and representing a broad cross-section of the international economy.

7

computers to the South African government, thus facilitating the apartheid regime's innumerable

race-based depredations and injustices, including rape, torture, and extrajudicial killings.

The plaintiffs brought these suits over ten years ago in federal court under the ATS, which

confers federal jurisdiction over "any civil action by an alien for a tort only, committed in violation

of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. Although the plaintiffs did

not claim that any of the South African government's alleged violations of the law of nations[2]

occurred in the United States, at the time they filed their complaint they assumed (as did most

---

The *Balintulo* plaintiffs sued twenty-three named foreign and domestic corporations: AEG Daimler-Benz Industrie, Barclays National Bank Ltd., British Petroleum, PLC, ChevronTexaco Corp., ChevronTexaco Global Energy, Inc., Citigroup, Inc., Commerzbank, Credit Suisse Group, DaimlerChrysler AG, Deutsche Bank AG, Dresdner Bank AG, Exxon Mobil Corp., Fluor Corp., Ford Motor Co., Fujitsu, Ltd., General Motors Corp., IBM Corp., J.P. Morgan Chase, Rheinmetall Group AG, Rio Tinto Group, Shell Oil Co., Total-Fina-Elf, and UBS AG.

The *Ntsebeza* plaintiffs sued fifty-five defendants, including Amdahl Corp., American Isuzu Motors, Inc., Anglo-American Corp., Banque Indo Suez, Bank of America, N.A., Barclays Bank PLC, Citigroup Inc., Bristol-Meyers Squibb Co., Burroughs Corp., Chemical Bank & Chase Manhattan Bank, Chevron Texaco Corp., Citigroup AG, Coca-Cola Co., Colgate Palmolive, Commerzbank AG, Crédit Agricole S.A., Crédit Lyonnais, Credit Suisse Group, Daimler Chrysler Corp., De Beers Corp., Deutsche Bank AG, The Dow Chemical Co., Dresdner Bank AG, E.I. Dupont de Nemours and Co., EMS-Chemie (North America) Inc., Exxon Mobil Corp., Ford Motor Co., General Electric Co., General Motors Corp., Hewlett-Packard Co., Holcim, Inc., Holcim, Ltd., Honeywell International, Inc., ICL, Ltd., J.P. Morgan, IBM Corp., Manufacturers Hanover Corp., Merrill Lynch & Co. Inc., Minnesota Mining and Manufacturing Co. (3M Co.), National Westminster Bank PLC, Nestle USA, Inc., Novartis AG, Oerlikon Bührle AG, Oerlikon Contraves AG, Royal Dutch Petroleum Co., Schindler Holding AG, Securities Inc., Shell Oil Co., Shell Petroleum, Inc., Shell Transport & Trading Co. PLC, Sperry Corp., Standard Chartered, P.L.C., Sulzer AG, UBS AG, Unisys Corp., Xerox Corp., along with unnamed corporations and various named and unnamed corporate officers.

The three defendants in the instant appeal—Daimler, Ford, and IBM—are all that remain.

[2] A violation of the "law of nations," we have consistently explained, is one that violates "customary international law," *Flores v. S. Peru Copper Corp.*, 414 F.3d 233, 237 n.2 (2d Cir. 2003) (internal citations omitted), "composed only of those rules that States universally abide by, or accede to, out of a sense of legal obligation and mutual concern," *id.* at 248, *i.e.*, "the specific and universally accepted rules that the nations of the world treat as binding *in their dealings with one another*," *Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 118 (2d Cir. 2010), *aff'd on other grounds*, 133 S. Ct. 1659 (2013). As Judge Friendly explained long ago, these rules include only "those standards, rules or customs (a) affecting the relationship between states or between an individual and a foreign state, and (b) used by those states for their common good and/or in dealings *inter se*." *IIT v. Vencap, Ltd.*, 519 F.2d 1001, 1015 (2d Cir. 1975), *abrogated on other grounds by Morrison v. Nat'l Austl. Bank Ltd.*, 130 S. Ct. 2869 (2010); *see also Filartiga v. Pena-Irala*, 630 F.2d 876, 888 (2d Cir. 1980) ("It is only where the nations of the world have demonstrated that the wrong is of *mutual*, and not merely *several*, concern, by means of express international accords, that a wrong generally recognized becomes an international law violation within the meaning of the [ATS]." (emphasis supplied)). The wrongs condemned by customary international law include those heinous criminal offenses that fall under the general headings of war crimes and crimes against humanity. *See Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 257 n.7 (2d Cir. 2009); *see also United States v. Yousef*, 327 F.3d 56, 103–04 (2d Cir. 2003) (noting the "strictly limited set of crimes" that are "uniformly recognized by the 'civilized nations' as . . . offense[s] against the 'Law of Nations'"). Certain violations of customary international law, however, can become actionable in *civil* lawsuits by virtue of legislative command. *See Sosa v. Alvarez-Machain*, 542 U.S. 692, 738 n.29 (2004) (noting the distinction between a rule of customary international law and a private right of action); *see also Medellin v. Texas*, 552 U.S. 491, 506 n.3 (2008) (identifying a similar principle with respect to treaty law).

8

American courts at that time[3]) that no such geographical connection was necessary. Based, in part, on that assumption, the United States District Court for the Southern District of New York (Shira A. Scheindlin, *Judge*)[4] denied a motion to dismiss by the defendants, and allowed the suits to proceed. *See In re South African Apartheid Litig.*, 617 F. Supp. 2d 228, 246, 296 (S.D.N.Y. 2009).

Although parties usually cannot appeal while district court proceedings are ongoing, the defendants sought immediate review of the District Court's denial of their motion to dismiss in this Court, first through a motion to certify an interlocutory appeal, which the District Court denied, and thereupon through either a writ of mandamus or under the "collateral order" doctrine[5]—both of which permit immediate appellate review of certain types of particularly important decisions by a district court. In pursuing appellate review, the defendants claimed (1) that the case should be dismissed because it threatened significant United States foreign-policy interests, as explained in a statement of interest filed by the U.S. government; (2) that the jurisdiction conferred by the ATS does not permit suits against corporations or apply to acts committed outside of the United States; and (3) that the District Court erroneously imposed accessorial liability. We then granted the defendants' motion for a stay of all proceedings, putting the District Court proceedings on pause while we considered this case.

Now on appeal for over four years, this case has been overtaken by recent events. Most significantly, the Supreme Court held, as a matter of United States law, that federal courts may not, under the ATS, recognize common-law causes of action for conduct occurring in the territory of

---

[3] *See, e.g., Flomo v. Firestone Nat'l Rubber Co., LLC*, 643 F.3d 1013, 1025 (7th Cir. 2011) ("[N]o court to our knowledge has ever held that [the ATS] doesn't apply extraterritorially.").

[4] The suits were brought in various districts but were transferred to the Southern District of New York by the Judicial Panel on Multidistrict Litigation. *See In re South African Apartheid Litigation*, 238 F. Supp. 2d 1379 (JPML 2002). The cases were originally assigned to Judge John E. Sprizzo, but they were reassigned to Judge Shira A. Scheindlin following the death of Judge Sprizzo in 2008.

[5] *See Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949); *see also Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 106–07 (2009); *Liberty Synergistics Inc. v. Microflo Ltd.*, 718 F.3d 138, 146 (2d Cir. 2013).

9

another sovereign. *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659, 1668–69 (2013).[6] Additionally, the South African government—which had previously opposed the suits because they "interfere[d] with the policy embodied by its Truth and Reconciliation Commission," *Sosa v. Alvarez-Machain*, 542 U.S. 692, 733 n.21 (2004)—reversed its position in September 2009 after a change in governmental leadership. After this series of twists and turns, the parties submitted supplemental briefing, and we have now reached a decision.

The opinion of the Supreme Court in *Kiobel* plainly bars common-law suits, like this one, alleging violations of customary international law based solely on conduct occurring abroad. Because of that unambiguous holding, the defendants will be able to obtain their desired relief (dismissal of all claims) in the District Court through a motion for judgment on the pleadings, without resort to a writ of mandamus. The defendants' request for mandamus relief is therefore denied. For the same reason, we need not consider the defendants' argument under the collateral order doctrine. Instead, we vacate our stay on the District Court proceedings so that the defendants may move for judgment on the pleadings. We reserve the question whether we have jurisdiction under the collateral order doctrine and hold the putative appeal under that doctrine in abeyance pending further notice from the parties.

## I. Background

## A. The Pleadings

These consolidated cases come to us as a continuation of litigation on which the District Court, this Court, and even the Supreme Court, have already spoken at length. *See* Part I.B., *post*. In the latest iteration of pleadings, which have been amended twice, the plaintiffs assert that the South African subsidiaries of the various corporate defendants aided and abetted in violations of

---

[6] This decision followed in time our holdings that "the *mens rea* standard for aiding and abetting liability in ATS actions is purpose rather than knowledge alone," *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 259 (2d Cir. 2009), and that customary international law does not presently recognize corporate liability, *Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 149 (2d Cir. 2010), *reh'g en banc denied*, 642 F.3d 379 (2011).

A0319

customary international law during the repressive "apartheid" legal regime in South Africa. The

District Court summarized these allegations as follows:

> Plaintiffs in the first action, *Ntsebeza v. Daimler A.G.* ("*Ntsebeza* plaintiffs"), allege that they suffered discriminatory employment practices, employment retaliation for political beliefs, geographic segregation, arbitrary arrest and detention, torture, forced exile, arbitrary denationalization, and the extrajudicial killing of family members. The *Ntsebeza* plaintiffs bring a class action on behalf of "themselves and all black South African citizens (and their heirs and beneficiaries) who during the period from 1973 to 1994 suffered injuries" as a result of defendants' direct and secondary violations of the law of nations.
>
> Plaintiffs in the second action, *Khulumani v. Barclays National Bank Ltd.* ("*Khulumani* plaintiffs"), include both Khulumani—a South African organization that "works to assist victims of apartheid-era violence"—and individuals who suffered geographic segregation, arbitrary arrest and detention, rape, torture, and the extrajudicial killing of family members. . . .
>
> . . . .
>
> The *Ntsebeza* plaintiffs allege that the automotive defendants—or their agents or alter egos—committed both direct and secondary violations of the law of nations by engaging in workplace discrimination that mimicked and enhanced apartheid, suppressing union activities, manufacturing military vehicles for the South African security forces in the face of worker protests, and assisting security forces in identifying and torturing anti-apartheid leaders. The *Ntsebeza* plaintiffs additionally allege that defendant IBM—or its agents or alter egos—committed secondary violations of the law of nations by providing the computer hardware, software, maintenance, and support necessary for the South African Government to carry out geographic segregation and denationalization. . . .
>
> The *Khulumani* plaintiffs allege that the automotive defendants aided and abetted violations of the law of nations by supplying vehicles, parts, and other equipment to the apartheid security forces. The *Khulumani* plaintiffs additionally allege that the technology defendants aided and abetted violations of the law of nations by providing the computer systems necessary to restrict black South Africans' movements, track dissidents, and target particular individuals for repressive acts.

*In re South African Apartheid Litig.*, 617 F. Supp. 2d at 241–43.

### B. Procedural History

"The tortuous procedural history of these cases dates back to the filing of complaints in

2002." *In re South African Apartheid Litig.*, 624 F. Supp. 2d 336, 338 (S.D.N.Y. 2009).[7] As relevant

---

[7] *See In re South African Apartheid Litig.*, 346 F. Supp. 2d 538 (S.D.N.Y. 2004), *aff'd in part, vacated in part, Khulumani v. Barclay Nat'l Bank Ltd.*, 504 F.3d 254 (2d Cir. 2007) (per curiam), *aff'd for want of a quorum sub nom., Am. Isuzu Motors, Inc., v.*

here, Judge Sprizzo, then presiding, dismissed the plaintiffs' claims under the ATS for lack of

subject-matter jurisdiction, holding that the plaintiffs had not alleged a violation of "well-accepted

and clearly-defined" norms of customary international law. *In re South African Apartheid Litig.*, 346

F. Supp. 2d 538, 546, 548 (S.D.N.Y. 2004). We reversed that judgment in part, explaining in a *per*

*curiam* opinion that "a plaintiff may plead a theory of aiding and abetting liability" under the ATS,

*Khulumani v. Barclay Nat'l Bank Ltd.*, 504 F.3d 254, 260 (2d Cir. 2007) (per curiam), but we declined to

reach other arguments, and instead permitted the plaintiffs to replead, *id.* at 260–61.[8] After the

defendants sought a writ of certiorari, the Supreme Court affirmed our decision for want of a

quorum. *See Am. Isuzu Motors, Inc., v. Ntsebeza*, 553 U.S. 1028 (2008) (Mem.).

On remand, the plaintiffs filed an amended complaint, this time naming only eight

defendants.[9] With the exception of one defendant that contested personal jurisdiction, the

defendants then filed a joint motion to dismiss on various grounds, including doctrines of case-

specific deference and international comity, lack of jurisdiction over corporations under the ATS,

lack of extraterritorial reach for causes of action under the ATS, and the absence of aiding-and-

abetting liability under the federal common law, as developed pursuant to *Sosa v. Alvarez-Machain*,

542 U.S. 692 (2004). Judge Scheindlin, to whom the case was assigned following the death of Judge

Sprizzo, rejected each of these arguments, and held that the suit could proceed on an agency theory,

under which the corporate defendants could be held liable for the actions of their South African

---

*Ntsebeza*, 553 U.S. 1028 (2008) (Mem.), *on remand, In re South African Apartheid Litig.*, 617 F. Supp. 2d 228 (S.D.N.Y. 2009); *see also Sosa*, 542 U.S. at 733 n.21 (referring, by name, to this particular suit as one that may warrant dismissal, and commenting that "there is a strong argument that federal courts should give serious weight to the Executive Branch's view of the case's impact on foreign policy").

[8] Each of the three judges on the *Khulumani* panel filed a separate opinion. 504 F.3d at 264–84 (Katzmann, J., concurring); *id.* at 284–92 (Hall, J., concurring); *id.* at 292–337 (Korman, J., dissenting).

[9] The *Ntsebeza* plaintiffs named Ford, General Motors Corp., Daimler, IBM, and Barclays Bank PLC. The *Balintulo* plaintiffs named those five companies as well as UBS AG, Fujitsu Ltd., and Rheinmetall AG.

subsidiaries.[10] *See In re South African Apartheid Litig.*, 617 F. Supp. 2d at 274–76. She explained that the South African subsidiary companies could be liable as accessories based on their *knowledge* that their dealings with the South African government facilitated the many evils of apartheid, even if the companies did not *intend* their assistance to have that effect.[11] *Id.* at 259–62. Following the District Court's denial of certification, *see In re South African Apartheid Litig.*, 624 F. Supp. 2d 336 (S.D.N.Y. 2009), the defendants brought this petition for a writ of mandamus, and a putative appeal under the collateral order doctrine, arguing that "the District Court's denial of dismissal should be reversed, and the cases remanded with instructions to dismiss the complaints." Defendants' Br. 59.[12]

We initially heard argument on a variety of preliminary motions on September 1, 2009. Only a day after argument, we received a letter from the South African government reversing its earlier position and declaring that it was "now of the view that [the United States District Court for the Southern District of New York] is an appropriate forum to hear the remaining claims of aiding and abetting in violation of international law." *See* Letter of Jeffrey Thamsanqa Radebe, Minister of Justice and Constitutional Development, Sept. 2, 2009; *see also Sosa*, 542 U.S. at 733 n.21 (explaining

---

[10] Judge Scheindlin dismissed claims made by the *Khulumani* (or *Balintulo*) plaintiffs in the First Amended complaint on the basis of insufficient allegations concerning vicarious liability, *see In re South African Apartheid Litig.*, 617 F. Supp. 2d at 275-76, but she allowed those claims to proceed once the plaintiffs amended the complaint a second time.

[11] Our Court later held that "the *mens rea* standard for aiding and abetting liability in ATS actions is purpose rather than knowledge alone." *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 259 (2d Cir. 2009). Accordingly, "supplying . . . equipment to a local government will not support the imposition of aiding and abetting liability . . . for that government's abuses unless the [defendant] acted *with a purpose* to promote or advance those violations." *Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 158 (2d Cir. 2010) (Leval, J., concurring). The District Court denied certification with respect to this issue, stating that the plaintiffs had, in its view, "advanced numerous allegations evincing specific intent, particularly concerning the automotive defendants," and therefore "[e]ven if the Second Circuit or the Supreme Court were to determine that intent or shared purpose is the proper *mens rea* requirement, plaintiffs would undoubtedly fight on." *See In re South African Apartheid Litig.*, 624 F. Supp. 2d at 343. The defendants, however, also argue that our decision in *Presbyterian Church*—which adopted a rule proposed by Judge Katzmann's concurring opinion in *Khulumani* as the law of the Circuit, *see* 582 F.3d at 258—addresses only the *threshold* question whether, and by what *mens rea* standard, a court has *subject-matter jurisdiction* under the ATS for aiding-and-abetting liability, leaving open the secondary question whether federal courts should "decline to provide a cause of action," as a matter of federal common law, for accessorial liability. *Khulumani*, 504 F.3d at 269 (Katzmann, J., concurring); *see id.* at 267–68, 283 n.18. Because of our disposition of this case, we have no occasion to address that argument.

[12] Because we consider only whether to issue mandamus, and not whether the District Court's order was appealable under the collateral order doctrine, we do not address the plaintiffs' argument that the defendants' notice of appeal was untimely. *See Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 378–79 (2004).

13

the South African government's prior position). We then stayed the District Court proceedings[13]

and ordered a limited remand to that Court "for the sole purpose of permitting defendants to move

to certify an interlocutory appeal" on the question whether the ATS recognizes corporate liability.

Order of Dec. 18, 2009. The District Court denied certification, explaining that although the

question of corporate liability under the ATS was "a controlling issue of law" that "could materially

advance the ultimate termination of this litigation," that question was "long-settled . . . in this

Circuit," with "no substantial ground for disagreement." *In re South African Apartheid Litig.*, 2009 WL

5177981, at *2 (S.D.N.Y. Dec. 31, 2009) (quotation marks omitted).

Less than a year later, this Court (in a separate case) held that "the Alien Tort Statute does

not provide subject matter jurisdiction over claims against corporations" based on asserted

violations of customary international law. *Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 149 (2d

Cir. 2010), *reh'g en banc denied*, 642 F.3d 379 (2011). The Supreme Court granted certiorari and, after

reargument,[14] affirmed our judgment on different grounds, holding that federal courts may not,

under the ATS, recognize common-law causes of action for conduct occurring in the territory of

---

[13] *See Hollingsworth v. Perry*, 558 U.S. 183, 190 (2010) (noting authority to stay proceedings pending mandamus review).

[14] The Supreme Court initially granted the petition for a writ of certiorari on October 17, 2011. *See Kiobel v. Royal Dutch Petroleum Co.*, 132 S. Ct. 472 (2011) (Mem.). The petition raised the following two questions:

> 1. Whether the issue of corporate civil tort liability under the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, is a merits question, as it has been treated by all courts prior to the decision below, or an issue of subject matter jurisdiction, as the court of appeals held for the first time.

> 2. Whether corporations are immune from tort liability for violations of the law of nations such as torture, extrajudicial executions or genocide, as the court of appeals decisions provides, or if corporations may be sued in the same manner as any other private party defendant under the ATS for such egregious violations, as the Eleventh Circuit has explicitly held.

Petition for Writ of Certiorari, *Kiobel v. Royal Dutch Petroleum Co.*, No. 10-1491, 2011 WL 2326721, at *i.

The Court heard argument on February 28, 2012, and then on March 5, 2012, ordered supplemental briefing and reargument to consider the following question:

> Whether and under what circumstances the Alien Tort Statute, 28 U.S.C. § 1350, allows courts to recognize a cause of action for violations of the law of nations occurring within the territory of a sovereign other than the United States.

*Kiobel v. Royal Dutch Petroleum Co.*, 132 S. Ct. 1738 (2012) (Mem.). The Court heard reargument on October 1, 2012, and issued its decision on April 17, 2013. *See Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013).

another sovereign. *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659, 1668–69 (2013).  With respect to the present suit, we then requested, and have now received, supplemental briefing from the parties.

## II. Discussion

The defendants seek a writ of mandamus under the All Writs Act, 28 U.S.C. § 1651,[15] and, in the alternative, argue that we have appellate jurisdiction under the collateral order doctrine, *see Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 106–07 (2009) (citing *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949)).  The defendants further argue that, if we do have jurisdiction under the collateral order doctrine to consider the District Court's decision not to dismiss the suit based on case-specific deference or international comity, *see Sosa*, 542 U.S. at 733 n.21, we may also recognize any defect in subject-matter jurisdiction, *see In re Methyl Tertiary Butyl Ether Prods. Liability Litig.*, 488 F.3d 112, 122 (2d Cir. 2007).  We address these arguments in turn.

### A. Writ of Mandamus

#### i.

As a general matter, denials of a motion to dismiss are not appealable as "final decisions" of the district courts under 28 U.S.C. § 1291.[16]  *See Catlin v. United States*, 324 U.S. 229, 236 (1945).  Nonetheless, federal procedural law provides two "discretionary review mechanisms" that "serve as useful 'safety valve[s]' for promptly correcting serious errors."  *Mohawk Indus.*, 558 U.S. at 111 (quoting *Digital Equipment Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 883 (1994)) (alteration in original).  First,  a district court may certify an appeal pursuant to 28 U.S.C. § 1292(b) when it is "of the opinion that [the relevant] order involves a controlling question of law as to which there is

---

[15] The All Writs Act provides, in relevant part, that federal courts "may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."  28 U.S.C. § 1651.

[16] 28 U.S.C. § 1291 provides, in relevant part, that "[t]he courts of appeals . . . shall have jurisdiction of appeals from all final decisions of the district courts of the United States."

substantial ground for difference of opinion and that an immediate appeal from the order may

materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). When a ruling

satisfies these criteria and "involves a new legal question or is of special consequence," then the

district court "should not hesitate to certify an interlocutory appeal." *Mohawk*, 558 U.S. at 111. The

relevant Court of Appeals may then, "in its discretion, permit an appeal to be taken from such

order."[17] 28 U.S.C. § 1292(b).

If a district court refuses certification, or certification is not otherwise available, however,

then a party may petition for a writ of mandamus—"a drastic and extraordinary remedy reserved for

really extraordinary causes." *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 380 (2004) (internal

quotation marks omitted); *see also Will v. United States*, 389 U.S. 90, 107 (1967) (noting that the writ of

mandamus is one of "the most potent weapons in the judicial arsenal"); note 15, *ante* (common-law

remedy codified in the All Writs Act). Three conditions circumscribe use of the writ:

> First, the party seeking issuance of the writ must have no other adequate means to
> attain the relief he desires—a condition designed to ensure that the writ will not be
> used as a substitute for the regular appeals process. Second, the petitioner must
> satisfy the burden of showing that his right to issuance of the writ is clear and
> indisputable. Third, even if the first two prerequisites have been met, the issuing
> court, in the exercise of its discretion, must be satisfied that the writ is appropriate
> under the circumstances.

*Cheney*, 542 U.S. at 380–81 (alternations, internal quotation marks, and citations omitted).

Mandamus relief is appropriate "in extraordinary circumstances," when, for example, a district

court's order "amounts to a judicial usurpation of power or a clear abuse of discretion, or otherwise

works a manifest injustice." *Mohawk Indus.*, 558 U.S. at 111 (alteration and internal quotation marks

omitted).[18]

---

[17] "Permissive interlocutory appeal," a leading treatise observes, "can reduce the need to develop extraordinary-writ practice to fill the inevitable gaps in provisions for appeal as a matter of right." 16 Charles Alan Wright et al., *Federal Practice and Procedure* § 3929.1 (2d ed. 2013).

[18] It is important to note, however, that mandamus relief does not impeach a judge's competence and "is not a punitive remedy." *Will*, 389 U.S. at 107; *see also In re Chambers Dev. Co.*, 148 F.3d 214, 223 n.7 (3d Cir. 1998) (noting that,

16

Two aspects of ATS jurisprudence, however, urge greater appellate oversight through use of mandamus in appropriate cases. First, ATS suits often create particular "risks of adverse foreign policy consequences," *Sosa*, 542 U.S. at 728, obliging courts to be "particularly wary of impinging on the discretion of the Legislative and Executive Branches in managing foreign affairs," *id.* at 727. This risk of treading into matters within the province of other branches of government, and intruding into delicate areas of intergovernmental relations, warrants closer appellate scrutiny through supervisory mandamus review. *See Cheney*, 542 U.S. at 380–82. Appellate courts have therefore been less hesitant to issue the writ when a lower-court decision threatens to affect the foreign policy of the United States. *See, e.g., Ex parte Republic of Peru*, 318 U.S. 578, 586 (1943); *In re Austrian, German Holocaust Litig.*, 250 F.3d 156, 163–65 (2d Cir. 2001); *Abelesz v. OTP Bank*, 692 F.3d 638, 651 (7th Cir. 2012). Second, and relatedly, the ATS places federal judges in an unusual lawmaking role as creators of federal common law. *See Sosa*, 542 U.S. at 724–25. This exercise of authority by federal courts elevates "the danger of unwarranted judicial interference in the conduct of foreign policy," *Kiobel*, 133 S. Ct. at 1664, again warranting greater appellate oversight, *see Cheney*, 542 U.S. at 380–82. In sum, a ruling that raises substantial questions of judicial power under the

---

following a legislative revision in 1996, district court judges are no longer treated as respondents in mandamus actions). As we recently observed, "[t]he word 'abuse' in the 'abuse of discretion' standard is an unfortunate—and inaccurate—term of art." *In re City of New York*, 607 F.3d 923, 943 n.21 (2d Cir. 2010). A district court "abuses" its discretion if (1) it "makes an error of law," *Fox v. Vice*, 131 S. Ct. 2205, 2216 (2011) (quoting *Koon v. United States*, 518 U.S. 81, 100 (1996)), (2) makes a "clearly erroneous assessment of the evidence," *Cheney*, 542 U.S. at 381, or (3) renders a decision outside the range of permissible decisions, *In re Sims*, 534 F.3d 117, 132 (2d Cir. 2008). An abuse of discretion thus "involves nothing as heinous as *abuse*" in its ordinary connotation. *In re City of New York*, 607 F.3d at 943 n.21.

Accordingly, mandamus relief can be appropriate even when the district court's opinion resolved "novel legal questions that were unsettled" at the time of the district court's decision. *In re City of New York*, 607 F.3d at 947. Indeed, because "the writ [can] serve[ ] a vital corrective and didactic function," *Will*, 389 U.S. at 107, orders are sometimes *more* appropriate candidates for mandamus when they have "raised a legal issue of first impression in this circuit." *Chase Manhattan Bank, N.A. v. Turner & Newall, PLC*, 964 F.2d 159, 163 (2d Cir. 1992); *see also In re Sims*, 534 F.3d at 128–29; *In re United States*, 903 F.2d 88, 89 (2d Cir. 1990). The Supreme Court, for instance, has distinguished "the ordinary situation . . . [where] mandamus is not an appropriate remedy, absent, of course, a clear abuse of discretion," from "special circumstances" where immediately reviewing a question bearing on the lower court's power would "avoid piecemeal litigation and . . . settle new and important problems." *Schlagenhauf v. Holder*, 379 U.S. 104, 111 (1964); *see also In re S.E.C.*, 374 F.3d 184, 188 n.2 (2d Cir. 2004).

17

ATS and threatens to affect significant American foreign policy objectives cannot be insulated from

immediate review simply because a lower court refuses to certify the order for appeal.

Such concerns are present here. In addition to the federal common-law aspect of these ATS

suits, the United States government filed a statement of interest on October 30, 2003, articulating its

position that "continued adjudication of [these] matters risks potentially serious adverse

consequences for significant interests of the United States."[19] Def. App'x 254. The statement of

interest further explains:

> We are also concerned that adjudication of the apartheid cases may deter foreign
> investment where it is most needed. The United States relies, in significant part, on
> economic ties and investment to encourage and promote change in the domestic
> policies of developing countries on issues relevant to U.S. interests, such as respect
> for human rights and reduction of poverty. However, the prospect of costly
> litigation and potential liability in U.S. courts for operating in a country whose
> government implements oppressive policies will discourage U.S. (and other foreign)
> corporations from investment in many areas of the developing world.

*Id.* at 255–56. Such important foreign policy interests as those raised here cannot be vindicated by

waiting until final judgment.

Nonetheless, we need not wade into the merits of the defendants' various arguments,

because we are not persuaded that mandamus is the only "adequate means to attain the relief" that

they desire. For the reasons explained in the following section, *see* Part II.A.ii., and in light of the

Supreme Court's holding in *Kiobel* that federal courts may not, under the ATS, recognize common-

law causes of action for conduct occurring in the territory of another sovereign, *Kiobel*, 133 S. Ct. at

1668–69, defendants can seek the dismissal of all of the plaintiffs' claims, and prevail, prior to

discovery, through a motion for judgment on the pleadings under Rule 12(c) of the Federal Rules of

---

[19] During oral argument on January 11, 2010, the government confirmed that this statement has not been modified or withdrawn.

18

Civil Procedure.[20]  Mandamus with respect to any of the defendants' various claims of error is,

therefore, simply unnecessary in light of the Supreme Court's clear guidance that claims based on

conduct occurring solely abroad cannot be adjudicated under the ATS.[21]

ii.

As we have now made clear, *Kiobel* forecloses the plaintiffs' claims because the plaintiffs have

failed to allege that any relevant conduct occurred in the United States.  The plaintiffs resist this

obvious impact of the *Kiobel* holding on their claims.  The Supreme Court's decision, they argue,

does not preclude suits under the ATS based on foreign conduct when the defendants are American

nationals, or where the defendants' conduct affronts significant American interests identified by the

plaintiffs.  *See* Plaintiffs' Letter Br. at 6–13.  Curiously, this interpretation of *Kiobel* arrives at precisely

the conclusion reached by Justice Breyer, who, writing for himself and three colleagues, only

concurred in the judgment of the Court affirming our decision to dismiss all remaining claims

brought under the ATS.  *See Kiobel*, 133 S. Ct. at 1671 (Breyer, J., concurring).  The plaintiffs'

argument, however, seeks to evade the bright-line clarity of the Court's actual holding—clarity that

ensures that the defendants can obtain their desired relief without resort to mandamus.  We briefly

highlight why the plaintiffs' arguments lack merit.

---

[20] We note that Daimler, Ford, and IBM filed answers in the District Court on June 22, 2009, thus generally barring the filing of a motion to dismiss under Rule 12(b)(6).  *See generally Kalson v. Paterson*, 542 F.3d 281, 288 n.14 (2d Cir. 2008) (explaining the relationship between Rule 12(b)(6) and Rule 12(c)).

[21] In so holding, we are mindful that a decision *denying* mandamus relief is usually, if not always, an inappropriate occasion to address novel questions of law, since the authority to issue mandamus is narrowly circumscribed, and a court considering mandamus generally does not have jurisdiction otherwise.  *But see Stein v. KPMG, LLP*, 486 F.3d 753, 759 (2d Cir. 2007) (noting that circumstances sometimes "justify the exercise of mandamus power without deciding whether we have appellate jurisdiction").  Here, however, we simply identify the clear holding of the Supreme Court's decision in *Kiobel* and explain why it plainly bars the plaintiffs' claims as a matter of law, and thus provides the defendants with an alternative avenue for obtaining their desired relief.  *Cf. Chandler v. Judicial Council of the Tenth Circuit of the U.S.*, 398 U.S. 74, 86 (1970) (denying mandamus by "conclud[ing] that in the present posture of the case other avenues of relief on the merits may yet be open" to the petitioner seeking mandamus).  Nor does the unusual posture of our decision cut off higher appellate review; the plaintiffs, should they so desire, may appeal in the normal course following entry of final judgment by the District Court.

19

a.

The Supreme Court's *Kiobel* decision, the plaintiffs assert, "adopted a new presumption that ATS claims must 'touch and concern' the United States with 'sufficient force' to state a cause of action." Plaintiffs Letter Br. 6 (quoting *Kiobel*, 133 S. Ct. at 1669). The plaintiffs read the opinion of the Court as holding only that "mere corporate presence" in the United States is insufficient for a claim to "touch and concern" the United States, but that corporate citizenship in the United States is enough. *Id.* at 11 ("[I]nternational law violations committed by U.S. citizens on foreign soil 'touch and concern' U.S. territory with 'sufficient force' to displace the *Kiobel* presumption."). Reaching a conclusion similar to that of Justice Breyer and the minority of the Supreme Court in *Kiobel*, the plaintiffs argue that whether the relevant conduct occurred abroad is simply one prong of a multi-factor test, and the ATS still reaches extraterritorial conduct when the defendant is an American national. *Id.* at 8–11.

We disagree. The Supreme Court expressly held that claims under the ATS cannot be brought for violations of the law of nations occurring within the territory of a sovereign other than the United States. *Kiobel*, 133 S. Ct. at 1662, 1668–69. The majority framed the question presented in these terms no fewer than three times[22]; it repeated the same language, focusing solely on the location of the relevant "conduct" or "violation," at least eight more times in other parts of its eight-page opinion[23]; and it affirmed our judgment dismissing the plaintiffs' claims because "all the

---

[22] *See Kiobel*, 133 S. Ct. at 1662 ("The question presented is whether and under what circumstances courts may recognize a cause of action under the Alien Tort Statute, for violations of the law of nations occurring within the territory of a sovereign other than the United States."); *id.* at 1664 ("The question here is . . . whether a claim may reach conduct occurring in the territory of a foreign sovereign."); *id.* at 1665 ("[T]he question is whether a cause of action under the ATS reaches conduct within the territory of another sovereign.").

[23] *See Kiobel*, 133 S. Ct. at 1665 (text of ATS does not support "application to torts committed abroad"); *id.* at 1666 (asking whether Congress "intend[ed] federal law to apply to conduct occurring abroad"); *id.* (no Congressional intent "for those causes of action to reach conduct in the territory of a foreign sovereign"); *id.* (historical background does not "overcome the presumption against application to conduct in the territory of another sovereign"); *id.* at 1667 ("[P]rominent contemporary examples" of ATS cases "provide no support for the proposition that Congress expected causes of action to be brought under the statute for violations of the law of nations occurring abroad."); *id.* (cause of action against pirates not "a sufficient basis for concluding that other causes of action under the ATS reach conduct that

20

relevant conduct took place outside the United States," *id.* at 1669. Lower courts are bound by that

rule and they are without authority to "reinterpret" the Court's binding precedent in light of

irrelevant factual distinctions, such as the citizenship of the defendants.[24] *See Agostini v. Felton*, 521

U.S. 203, 237–38 (1997); *see also Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 66–67 (1996).

Accordingly, if all the relevant conduct occurred abroad, that is simply the end of the matter under

*Kiobel.*

　　In the conclusion of its opinion, the Supreme Court stated in dicta that, even when claims

brought under the ATS "touch and concern the territory of the United States, they must do so with

sufficient force to displace the presumption against extraterritorial application."[25] *Kiobel*, 133 S. Ct.

---

does occur within the territory of another sovereign"); *id.* at 1668-69 ("Nothing about this historical context suggests that Congress also intended federal common law under the ATS to provide a cause of action for conduct occurring in the territory of another sovereign."); *id.* at 1669 ("[P]etitioners' case seeking relief for violations of the law of nations occurring outside the United States is barred.").

[24] Nothing in the Court's reasoning in *Kiobel* suggests that the rule of law it applied somehow depends on a defendant's citizenship. Indeed, the presumption of extraterritoriality traditionally has "focused on the site of the conduct, not the identity of the defendant." *Doe v. Exxon Mobil Corp.*, 654 F.3d 11, 74-76 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) (describing the history and purpose of the presumption against extraterritoriality); *see also Morrison*, 130 S. Ct. at 2884; *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 255 (1991); *Foley Bros. v. Filardo*, 336 U.S. 281, 286 (1949). The sole reference to U.S. citizenship in the Court's opinion arose in the course of discussing a 1795 opinion endorsed by Attorney General William Bradford—a lone historical source that the Court found to be ambiguous, and insufficient "to counter the weighty concerns underlying the presumption against extraterritoriality." *Kiobel*, 133 S. Ct. at 1668. Accordingly, the Court did not suggest that a defendant's citizenship has any relevance to the presumption against extraterritoriality, and it instead stated over and over that the ATS bars suits where the relevant *conduct* occurs abroad. *See* notes 22 & 23, *ante.*

[25] Part IV, which followed the Supreme Court's conclusion in Part III that "petitioner's case seeking relief for violations of the law of nations occurring outside the United States is barred," *Kiobel*, 133 S. Ct. at 1669, reads as follows:

> On these facts, all the relevant conduct took place outside the United States. And even where the claims touch and concern the territory of the United States, they must do so with sufficient force to displace the presumption against extraterritorial application. *See Morrison*, 130 S. Ct. at 2883–88. Corporations are often present in many countries, and it would reach too far to say that mere corporate presence suffices. If Congress were to determine otherwise, a statute more specific than the ATS would be required.

*Id.* Viewing this paragraph in context, the first sentence relates to *this* case, and the second sentence relates to ATS cases not already "barred" because all of the relevant conduct occurred abroad. This dichotomy is evident from (1) the contrast between the opening clauses in these two sentences; (2) the Court's earlier conclusion that "petitioner's case . . . is barred" based solely on the extraterritoriality of the relevant conduct, without consideration of whether other aspects of the claim might "touch and concern" the United States; and (3) the Court's use of the general phrase "they must do so," rather than a case-specific phrase, such as "they do not do so." Consistent with this view, the reference to corporate presence indicates that mere corporate presence in the United States is not "relevant conduct" when deciding whether an ATS claim avoids the presumption against extraterritoriality.

21

at 1669 (citing *Morrison v. Nat'l Austl. Bank Ltd.*, 130 S. Ct. 2869, 2883–88 (2010)). As the Court observed in *Morrison*, "the presumption against extraterritorial application would be a craven watchdog indeed if it retreated to its kennel whenever *some* domestic activity is involved in the case." 130 S. Ct. at 2884. But since *all* the relevant conduct in *Kiobel* occurred outside the United States—a dispositive fact in light of the Supreme Court's holding—the Court had no reason to explore, much less explain, how courts should proceed when *some* of the relevant conduct occurs in the United States.[26]

### b.

The plaintiffs also assert that "the *Kiobel* presumption is displaced here" because of the compelling American interests in supporting the struggle against apartheid in South Africa. Plaintiffs' Letter Br. 11. These case-specific policy arguments miss the mark. The canon against extraterritorial application is "a presumption about *a statute's meaning*." *Morrison*, 130 S. Ct. at 2877 (emphasis supplied). Its "wisdom," the Supreme Court has explained, is that, "[*r*]*ather than guess anew in each case*, we apply the presumption in all cases, preserving a stable background against which Congress can legislate with predictable effects." *Id.* at 2881 (emphasis supplied). For that reason, the presumption against extraterritoriality applies to the *statute*, or at least the part of the ATS that "carries with it an opportunity to develop common law," *Sosa*, 542 U.S. at 731 n.19, and "allows

---

[26] Although joining in the opinion of the Court, Justice Alito, joined by Justice Thomas, indicated a desire to adopt a broader holding, requiring that the "domestic conduct" be "sufficient" to constitute a violation of an appropriate international law norm. *Kiobel*, 133 S. Ct. at 1670 (Alito, J., concurring). The Court did not adopt Justice Alito's broader reasoning, but it did not reject it either; the majority simply left open any questions regarding the permissible reach of causes of action under the ATS when "*some* domestic activity is involved in the case." *Morrison*, 130 S. Ct. at 2884; *see Kiobel*, 133 S. Ct. at 1669; *see also id.* (Kennedy, J., concurring). The Court also did not attempt to answer other questions involved in defining causes of action, including "who may be liable," relevant exhaustion rules, and applicable limitations periods. *See Kiobel*, 133 S. Ct. at 1665. The law of this Circuit already provides answers to some of those questions, including the principle that corporations are not proper defendants under the ATS in light of prevailing customary international law, *see Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 149 (2d Cir. 2010), *reh'g en banc denied*, 642 F.3d 379 (2011), *aff'd on other grounds*, 133 S. Ct. at 1669, though we have stated that other "unresolved issues [are] lurking in our ATS jurisprudence," *id.* at 117; *see also id.* at 117 n.10. Like the Supreme Court, we have no reason to address how much conduct must occur in the United States because all the relevant conduct that purportedly violated the law of nations in this case is alleged to have occurred on the territory of a foreign sovereign.

22

federal courts to recognize certain causes of action," *Kiobel*, 133 S. Ct. at 1664. In order "to rebut the presumption, the ATS [*i.e., the statute*] would need to evince a clear indication of extraterritoriality." *Id.* at 1665 (quotation marks omitted)). Applying this approach in *Kiobel*, the Supreme Court held as a matter of statutory interpretation that the implicit authority to engage in common-law development under the ATS does not include the power to recognize causes of action based solely on conduct occurring within the territory of another sovereign.[27] In *all* cases, therefore the ATS does not permit claims based on illegal conduct that occurred entirely in the territory of another sovereign. In other words, a common-law cause of action brought under the ATS cannot have extraterritorial reach simply because some judges, in some cases, conclude that it should.

### c.

Finally, the plaintiffs argue that the defendants "took affirmative steps in this country to circumvent the sanctions regime, though discovery would be necessary to determine the full scope of such U.S.-based conduct." Plaintiffs' Letter Br. 13. Without additional explanation, the plaintiffs refer to various paragraphs in the complaints asserting that the American defendants continued to supply the South African government with their products, notwithstanding various legal restrictions against trade with South Africa. *See Balintulo* Compl. ¶¶ 246–50 (Ford), App'x 494–95; *id.* ¶¶ 196, 198, 212 (IBM), App'x 483, 486; *Ntsebeza* Compl. ¶ 128 (Ford), App'x 199; *id.* ¶¶ 139–41 (IBM), App'x 202–03.

None of these paragraphs, however, ties the relevant human rights violations to actions taken within the United States. The complaint alleges only vicarious liability of the defendant

---

[27] *See Kiobel*, 133 S. Ct. at 1665 ("[N]othing in the text of *the statute* suggests . . . extraterritorial reach." (emphasis supplied)); *id.* at 1666 ("[N]othing in *the text of the ATS* evinces the requisite clear indication of extraterritoriality." (emphasis supplied)); *id.* at 1669 ("[T]he presumption against extraterritoriality applies to claims under the ATS, and . . . nothing in *the statute* rebuts that presumption." (emphasis supplied)). Concurring only in the judgment, Justice Breyer seems to have understood the Court's opinion as leaving open whether the ATS can provide jurisdiction over "a *statutory* claim"—as opposed to whether federal courts should recognize "common-law causes of action" under the ATS—where Congress evinces sufficient intent to overcome the presumption against extraterritoriality. *Id.* at 1673 (Breyer, J., concurring) (emphasis supplied).

23

corporations based on the actions taken within South Africa by their South African subsidiaries. *See In re South African Apartheid Litig.*, 617 F. Supp. 2d 228, 275 (S.D.N.Y. 2009) ("'[A]llegations [of an agency relationship] are sufficiently plausible to allow this claim to proceed on a theory of vicarious liability.'"). Because the defendants' putative agents did not commit any relevant conduct within the United States giving rise to a violation of customary international law—that is, because the asserted "violation[s] of the law of nations occurr[ed] outside the United States," *Kiobel*, 133 S. Ct. at 1669—the defendants cannot be *vicariously liable* for that conduct under the ATS.[28]

In sum, the Supreme Court's holding in *Kiobel* plainly bars the plaintiffs' claims, and the defendants will therefore be able to obtain relief in the District Court by moving for judgment on the pleadings. Accordingly, mandamus relief is denied.

### B. Collateral Order Doctrine

The defendants also assert that the district court's order denying their motion to dismiss is a "collateral order," subject to immediate appellate review. In contrast to the "discretionary review mechanisms" of certification and mandamus, *Mohawk Indus.*, 558 U.S. at 111, collateral order appeals are taken "as of right," *id.* at 112, and do not depend on an "'individualized jurisdictional inquiry,'" *id.* at 107 (quoting *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 473 (1978)). The parties have presented strong arguments on each side regarding the immediate appealability of the District Court's order under the collateral order doctrine,[29] but we need not confront that question now.

---

[28] To hold otherwise would conflate the extraterritoriality analysis—which asks where the "violation[ ] of the law of nations occur[red]," *Kiobel*, 133 S. Ct. at 1669—with the question of derivative liability. *See generally United States v. Bestfoods*, 524 U.S. 51, 64–65 (1998) (distinguishing "derivative liability cases . . . from those in which the alleged wrong can seemingly be traced to the parent through the conduit of its own personnel and management and the parent is directly a participant in the wrong complained of" (internal quotation marks omitted)). This principle follows from the settled rule that claims of derivative liability depend on the viability of the underlying claim. *See, e.g., S.E.C. v. Obus*, 693 F.3d 276, 292 (2d Cir. 2012); *Homoki v. Conversion Servs., Inc.*, 717 F.3d 388, 402 (5th Cir. 2013); *Rivera v. Centro Medico de Turabo, Inc.*, 575 F.3d 10, 24 (1st Cir. 2009); *David P. Coldesina, D.D.S. v. Estate of Simper*, 407 F.3d 1126, 1138 (10th Cir. 2005). Of course, we need not address at this time whether derivative liability is a valid theory of liability in suits brought under the ATS.

[29] The plaintiffs argue that we lack jurisdiction under the collateral order doctrine because the defendants' arguments based on deference to foreign policy concerns are not equivalent to assertions of immunity from suit. *See*

24

The Supreme Court's decision in *Kiobel*, among other developments in ATS jurisprudence during the past four years, plainly forecloses the plaintiffs' claims as a matter of law.  *See* Part II.A.ii, *ante*.

In these circumstances, the interests of judicial economy, and of the parties, are best served by holding this putative appeal under the collateral order doctrine in abeyance and enabling the District Court to consider a motion for judgment on the pleadings to dismiss the plaintiffs' remaining claims.[30]  *See, e.g., Authors Guild, Inc. v. Google Inc.*, --- F.3d ----, 2013 WL 3286232 (2d Cir. July 1, 2013); *In re Sims*, 534 F.3d at 127.  The parties can then inform this Court, when appropriate, that this matter has been rendered moot.

## CONCLUSION

To summarize:

1.  Before issuing a writ of mandamus, a court must ensure that (1) the party seeking relief has no other adequate means of relief; (2) his right to issuance of the writ is clear; and (3) circumstances justify use of the writ.

2.  In light of the Supreme Court's decision in *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659 (2013), issuance of the writ is unnecessary in this case because the defendants have an adequate means of relief through a motion for judgment on the pleadings.  That is, regardless of the merits of their various arguments in favor of case-specific deference and international comity, the defendants can obtain the dismissal of all claims now that

---

*Abelesz v. OTP Bank*, 692 F.3d 638, 649–50 (7th Cir. 2012); *Doe v. Exxon Mobil Corp.*, 473 F.3d 345, 349–51 (D.C. Cir. 2007).  The defendants, however, argue that collateral review is not limited to assertions of immunity from suit but also applies when "delaying review until the entry of final judgment 'would imperil a substantial public interest' or 'some particular value of a high order.'"  *Mohawk Indus.*, 558 U.S. at 107 (quoting *Will v. Hallock*, 546 U.S. 345, 352–53 (2006)).

[30] It is the frequent practice of this Court to remand a case for a limited purpose while an appeal is held in abeyance.  *See, e.g., Hayden v. Pataki*, 449 F.3d 305, 371 (2d Cir. 2006) (*en banc*) (citing *United States v. Jacobson*, 15 F.3d 19, 21–22 (2d Cir. 1994)).  In effect, we adopt that course here.  Nonetheless, we do not formally "remand" the cause, because, having not yet recognized jurisdiction under the collateral order doctrine, we presume that the District Court "ha[s] jurisdiction to continue with the case in the absence of a stay from this Court" pending resolution of the appeal.  *Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 53 (2d Cir. 2004).  Accordingly, with the stay on the proceedings in the District Court vacated, we perceive no need to remand the cause or issue a formal mandate.

the Supreme Court in *Kiobel* has made clear that federal courts may not, under the ATS, recognize common-law causes of action for conduct occurring in another country.

3.  The plaintiffs' arguments that the Supreme Court's decision in *Kiobel* does not apply where the defendants are American citizens, or where the case involves American interests, are without merit.

4.  Because the Supreme Court's *Kiobel* decision plainly forecloses the plaintiffs' claims as a matter of law, we do not consider whether the defendants have asserted a valid basis for "collateral order" jurisdiction under 28 U.S.C. § 1291.

Because the *Kiobel* decision, combined with the opportunity to move for dismissal in the District Court, provides an adequate ground for dismissing all remaining claims, the defendants' petition for a writ of mandamus is **DENIED**. The stay placed by this Court on proceedings in the District Court is hereby **VACATED**. Proceedings in the District Court may resume forthwith. *See* note 30, *ante*. We reserve the question whether we have jurisdiction under the collateral order doctrine and hold this putative appeal in abeyance pending further notice from the parties, provided in writing to the Clerk of this Court.

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

A0335

D9O7SOUC

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   IN RE SOUTH AFRICAN
     APARTHEID LITIGATION,                    02 MDL 1499
 4
     ------------------------------x
 5
                                              September 24, 2013
 6                                            4:45 p.m.

 7   Before:

 8                    HON. SCHIRA A. SCHEINDLIN

 9                                            District Judge

10                         APPEARANCES

11   HAUSFELD LLP
          Attorneys for Balintulo
12   BY:  MICHAEL HAUSFELD
          WILLIAM BUTTERFIELD
13        JEANNINE KENNEY

14   NAGEL RICE LLP
          Attorneys for Ntsebeza
15   BY:  DIANE SAMMONS
          JUDITH CHOMSKY
16
     CRAVATH SWAINE & MOORE LLP
17        Attorneys for IBM
     BY:  KEITH HUMMEL
18
      O'MELVENY & MYERS LLP
19        Attorneys for Ford Motor Co.
     BY:  BRIAN ANDERSON
20        ANTON METLITSKY

21   ARNOLD & PORTER LLP
          Attorneys for Daimler AG
22   BY:  MATTHEW KEMNER
          RAMON MARKS
23        STEWART AARON

24   SKADDEN ARPT SLATE MEGHER & FLOM LLP
          Attorneys for Rheinmetall AG
25   BY:  ROBERT ZIMET
          SUSAN SALTZSTEIN
```

```
 1            (Case called)

 2            (In open court)

 3            THE COURT:  Let's see.  We have Mr. Hausfeld?

 4            MR. HAUSFELD:  Yes, your Honor.

 5            THE COURT:  Good afternoon.  Mr. Butterfield?

 6            MR. BUTTERFIELD:  Good afternoon, your Honor.

 7            THE COURT:  Ms. Sammons?

 8            MS. SAMMONS:  Yes, your Honor.

 9            THE COURT:  Ms. Chomsky, good afternoon.

10            MS. CHOMSKY:  Good afternoon.

11            THE COURT:  So that leaves the lady in the middle.

12            MS. KENNEY:  Jeannine Kenney.  Good afternoon.

13            THE COURT:  Did you sign?

14            MS. KENNEY:  I did.

15            THE COURT:  I will look around.  Let's see.

16            Oh, there you are, Ms. Kenney.  That's the plaintiff's

17     side.

18            OK.  Now, Mr. Hummel?

19            MR. HUMMEL:  Good afternoon, your Honor.

20            THE COURT:  Good afternoon.  MR. Anderson?

21            MR. ANDERSON:  Good afternoon, your Honor.

22            THE COURT:  Mr. Metlitsky?

23            MR. METLITSKY:  Good afternoon.

24            THE COURT:  Mr. Aaron?

25            MR. AARON:  Good afternoon, your Honor.
```

1           THE COURT:  Mr. Marks?

2           MR. MARKS:  Good afternoon, your Honor.

3           THE COURT:  Mr. Kemner?

4           MR. KEMNER:  Good afternoon.

5           THE COURT:  Mr. Zimet?

6           MR. ZIMET:  Good afternoon.

7           THE COURT:  Good afternoon, Ms. Saltzstein?

8           MS. SATLZSTEIN:  Good afternoon.

9           THE COURT:  That's everybody, at least who signed.

10          Well, I haven't seen you for years.  I think it's been

11  four years since we were here, and the Supreme Court has

12  spoken, the Second Circuit has spoken.  The Second Circuit in

13  fact spoke so definitively that I wonder why we're here, I

14  wonder why they didn't just say we just decided the motion that

15  we proposed, so here is the decision, now appeal that to the

16  Supreme Court if you want to.

17          I honestly can't figure out what they have in mind for

18  me to do when they told me the ruling.

19          Mr. Hausfeld?

20          MR. HAUSFELD:  Hi.  May we make a suggestion?

21          THE COURT:  Yes.

22          MR. HAUSFELD:  At this point the plaintiffs have filed

23  a motion for a suggestion for rehearing en banc.  There are a

24  number of open questions.  By reason of what we believe is the

25  diversity between the Second Circuit's interpretation of the

D9O7SOUC

1    Supreme Court's opinion in Kiobel and the clear language of the

2    majority of justices in Kiobel, that whatever this court does

3    or does not do would be benefited by the disposition of a

4    rehearing en banc, if it's granted.

5              THE COURT:  That may be so if they were kind enough to

6    do a rehearing en banc, but they almost never do in the Second

7    Circuit.  Sadly on occasion, but they almost never do.  So

8    let's just play out for a moment the possibility of, say,

9    turning it down.  Then I have this decision.  This decision

10   seems to tell me exactly how I must rule on the motion to

11   dismiss.  Doesn't it?

12             MR. HAUSFELD:  Yes.

13             THE COURT:  Yes.

14             MR. HAUSFELD:  Without a mandamus, it seems to do

15   that.

16             THE COURT:  Without a mandamus?  They denied mandamus

17   because they said this can be resolved on motion, and then here

18   is how the motion should be decided.

19             MR. HAUSFELD:  Yes.

20             THE COURT:  They dictated the decision.  So, what

21   would we do here, assuming the rehearing is denied?  I mean

22   basically what you would want to do, I would think, is get the

23   quick decision that mimics word for word what they said I

24   should rule, and then take it up and try to get a review that

25   way.

1          MR. HAUSFELD:  With the exception that there is a

2     clear distinction between the bright line that the Second

3     Circuit ruled interpreting Kiobel and what Kiobel said.

4          THE COURT:  Right, that may be.  I may even in a

5     perfect world agree with you, but I'm bound by what the Circuit

6     said to do in this case.  There is really law of the case, and

7     they said this is what has to be done here.  And they are the

8     immediate controlling court that I have to listen to, so I

9     can't ignore the Second Circuit and go off on my own.

10          It seems to me, as I said, that if they won't grant

11     rehearing en banc, the quicker you get this formulaic decision

12     that they dictated, fine, then you can appeal that and maybe

13     get a different panel, or the full circuit, I don't know, and

14     eventually take that back to the Supreme Court if you want to

15     continue to put time and money into this case, and say the way

16     your opinion is being read there are no factors, no

17     circumstances, it's always foreclosed, the Second Circuit's

18     interpretation of your decision has slammed the door

19     completely.

20          MR. HAUSFELD:  My suggestion was going to be to

21     request your Honor to consider allowing us the right to replead

22     the complaint in light of the Supreme Court's decision in

23     Kiobel, and that way if they are going to file a motion to

24     dismiss, at least then it would go up on a complaint which had

25     the benefit of the wisdom of Kiobel, to determine on appeal to

D9O7SOUC

1    the Second Circuit whether or not we satisfied that standard.

2              (Continued on next page)

D9O0APAC2                          Conference

 1              THE COURT:  What standard.

 2              MR. HAUSFELD:  The standard of whether or not, for

 3    extraterritoriality, you can overcome the presumption if the

 4    defendant is a U.S. citizen.

 5              THE COURT:  Yeah, no, I got that.  But the problem is,

 6    the Second Circuit, unlike the Supreme Court, has decided the

 7    question.  Now, if you are saying the complaint, as amended,

 8    would somehow change that, or have a theoretical chance of

 9    changing that, I understand your point.  But the Second Circuit

10    went ahead and decided a motion that they sent back to be

11    decided.  That's how I read their opinion.

12              The only question I have was they said something about

13    you can make a motion on the remaining claims, are there any

14    claims that are not ATS left?  Maybe that's what they were

15    sending back.  If they foreclosed the ATS claim.  But they used

16    the phrase *remaining claim*.  I just reviewed that.  Yeah, it

17    says:  In these circumstances, the interest of judicial economy

18    and of the parties are best served when holding punitive appeal

19    under collateral order docket in abeyance and, enabling the

20    District Court to consider a motion for judgement on the

21    pleadings and dismiss the plaintiff's remaining claims.

22              I thought, well, maybe, they have already dismissed

23    the ATS claim, and there is some other claim remaining, is

24    there?

25              MR. HAUSFELD:  No.

 1          THE COURT:  It's only ATS that's left.

 2          MR. HAUSFELD:  Yes.

 3          THE COURT:  Well, I don't know what -- I don't know

 4  quite what they are talking about, because they slammed the

 5  door on the ATS claims as far as I can tell.

 6          So anyway, your real suggestion is, that despite all

 7  of these good lawyers coming down this afternoon, you think we

 8  should do nothing today, wait for the rehearing en banc to

 9  either be granted or denied or reconvened.  That's your

10  suggestion?

11          MR. HAUSFELD:  Yes.

12          THE COURT:  My goodness, somebody came from

13  California, I saw.  There you go.  I know I saw someone who

14  signed in.  Flew all of the way for that?  I'm sorry.

15          MR. KEMNER:  It's indeed a pleasure to be here in

16  September, your Honor.

17          THE COURT:  That's a compliment to the City of New

18  York, not to me, so I accept the comment on behalf of the City

19  of New York.

20          What's the defense view of that subject?

21          MR. HUMMEL:  Your Honor, Keith Hummel for IBM, and

22  really speaking on behalf of the other defendants.

23          THE COURT:  Right.

24          MR. HUMMEL:  So we fully agree with your Honor's

25  suggestion to, obviously, to dismiss the case or grant us

1   judgment on the pleadings based on the Kiobel decision.

2          THE COURT:  No, based on the Second Circuit

3   interpretation of Kiobel.  I might have read it differently,

4   but it's not my business, because I'm bound by the Second

5   Circuit.

6          MR. HUMMEL:  My mouth is getting ahead of my brain.

7          THE COURT:  That's possible.

8          MR. HUMMEL:  Yeah.  I would also suggest, your Honor,

9   given the fact that the Second Circuit opinion in Kiobel was

10  not overturned by the Supreme Court, the finding that there can

11  be no corporate liability under ATS, as your Honor also entered

12  judgment on that ground, as well.

13         THE COURT:  When I do it.  But, really, ask you to

14  respond to the suggestion that we all wait, despite the long

15  flight from California, that we all wait until the Second

16  Circuit decides whether they will take the case for a rehearing

17  en banc.

18         MR. HUMMEL:  Yeah, I have spoken to all of the

19  defendants about that.  We would not like your Honor to do

20  that.  We believe that whatever happens in the Second

21  Circuit -- and you're right, it's very, very rare that

22  rehearing en banc is granted.

23         THE COURT:  But, occasionally they do.

24         MR. HUMMEL:  Occasionally they do, and they may well

25  here.  But even if there is a rehearing en banc, it does not

D9O0APAC2                         Conference

 1  change the fact that under the Second Circuit Kiobel decision,

 2  these defendants are all corporations and, therefore, they

 3  cannot -- plaintiffs, no matter what happens on any rehearing

 4  en banc, are not able to maintain a lawsuit under the ATS

 5  against these defendants.  And we have now been subject to this

 6  lawsuit for 11 years.  I have been here from the very

 7  beginning.  This is my Jaundeis vs. Jaundeis.  And this case

 8  really should come to a close.

 9            THE COURT:  Well, if you want me to rule just on that

10  ground and ignore all of the other grounds, that could be done.

11            MR. AARON:  Briefly, on behalf of Daimler.

12            The plaintiff's rehearing petition with respect to

13  Daimler, I think, kind of makes the point why Daimler should be

14  dismissed.  They say at page 9 of the petition:  Kiobel barred

15  ATS claims involving exclusively foreign conduct with no

16  connection to the US committed by foreign corporate defendants

17  against foreign plaintiffs.

18            That's their interpretation.

19            THE COURT:  Right.

20            MR. AARON:  And that's correct.  And, therefore,

21  Daimler should be dismissed.

22            Foreign plaintiffs, foreign defendants, foreign

23  conduct.  In addition to the reasons stated by Mr. Hummel with

24  which we agreed wholeheartedly --

25            THE COURT:  Again, you're saying even if there was

1   reconsideration en banc, it wouldn't affect your client --

2              MR. AARON:  Exactly, our client is just like shell in

3   Kiobel.

4              THE COURT:  Yeah.

5              MR. AARON:  Thank you, your Honor.

6              MR. ZIMET:  Your Honor, for Rheinmetall, what he said,

7   applies to us, as well.

8              Thank you.

9              MR. HAUSFELD:  There are times in litigation, your

10  Honor, that you grasp whatever straw you can.  But what was

11  interesting, and what was just proposed is the enigma of the

12  Supreme Court's decision this Kiobel.  If corporate citizenship

13  was so definitive, they could have dismissed the case on

14  corporations, where they clearly left that issue open and, in

15  essence, implicitly --

16             THE COURT:  They may have left it open, but that

17  doesn't speak to what the Second Circuit did.  The Second

18  Circuit law still again controls this Court.  So it may not yet

19  be decided in the Supreme Court.  And the best way to get it up

20  there is for me to follow Second Circuit law, dismiss the case,

21  put in all of the defendants or corporations, you can appeal

22  that through the process back to the Supreme Court and maybe

23  they'll speak about corporate liability.  Because you are

24  right, they left it open, but the Second Circuit closed that

25  door.  And I don't think the defense even would say the Supreme

1    Court decided that question.  They didn't touch the question,

2    so the Second Circuit decision remains the law.

3          MR. HAUSFELD:  And so if your Honor is not inclined to

4    wait for any guidance, if any such guidance comes from the --

5          THE COURT:  No, I would wait on the so-called Kiobel

6    issue, or extraterritorial issue, be happy to wait.  But what

7    Mr. Hummel is saying is no waiting is gonna help on the

8    corporate question the corporate liability issue, which the

9    Second Circuit has foreclosed long ago.  What am I going to do

10   with that.  Nothing on the rehearing en banc is going to touch

11   that.  You didn't ask for rehearing en banc on the corporate

12   issue, did you?

13         EURBGS:  No, your Honor.  But this is the one case

14   that is so significant within the area of human rights, it

15   would make sense to present those issues to the Second Circuit

16   in single appeal.  So if we're going to have a decision on a

17   motion to dismiss that goes up, we would appreciate if your

18   Honor would consider all of those reasons, so that they all can

19   go up to the Second Circuit, be decided there.  And if you know

20   there is a petition for cert granted, the Supreme Court would

21   be able to rule on all of them, as opposed the piecemeal

22   opinions.

23         THE COURT:  Right.  Let me think about -- let me think

24   about what you just said.

25         The corporate issue, really, wouldn't be any appeal to

1    the Second Circuit, because the Second Circuit has ruled on

2    that, they just -- the defense just needs me to apply it, I

3    suppose in two lines and say given the decision dated A, B, C,

4    all defendants are dismissed because they're all corporations,

5    And the Second Circuit has already held no corporate liability.

6            MR. HAUSFELD:  The Second Circuit interpreted Kiobel.

7    Kiobel left open the question of corporate liability, but

8    clearly implied that the ATS, in appropriate circumstances, may

9    apply to U.S. citizens.

10           THE COURT:  No, I understand that part.

11           MR. HAUSFELD:  And so --

12           THE COURT:  The Supreme Court was silent on corporate

13   liability, right?

14           MR. HAUSFELD:  Yes.  Well, other than to indicate that

15   mere corporate presence was insufficient.

16           THE COURT:  Right.

17           MR. HAUSFELD:  Which is an indication, at least we

18   believe, a fair reading that corporations may have some

19   liability, but presence alone is insufficient to establish it.

20           THE COURT:  Let me just ask, this is a hypothetical.

21   If I were to decide the corporate question separately -- and I

22   know you don't advocate that.  But if I were, would that be

23   appealable to the Second Circuit or, essentially that they have

24   already decided that.

25           MR. HAUSFELD:  I think any decision that your Honor

1    would make would be appealable.  Maybe, you know, the subject

2    of a perfunctory decision by the Second Circuit which we could

3    take up immediately.  But, again, for purposes of efficiency

4    and as counsel, one of counsel for defense said, you know, to

5    bring these issues to closure with respect to those that are

6    embedded in this litigation, it would seem best to include all

7    of those issues, which are at least presently raised by either

8    silence, or expressly by the Supreme Court's decision in

9    Kiobel, to place them in one decision.

10            THE COURT:  Where are you up to in the request for

11   rehearing en banc process.  Is it fully before the Circuit

12   already.

13            MR. HAUSFELD:  We have filed.

14            THE COURT:  Still being briefed?  Or where is it.

15            MR. HAUSFELD:  We have filed our petition for

16   rehearing.  There has been no reply yet.

17            THE COURT:  Is there a schedule for that, or do they

18   have to call for that?

19            MR. HAUSFELD:  I think they call for it.

20            THE COURT:  So if they don't ask for it, there is

21   never a response; right or wrong?

22            MR. HUMMEL:  Your Honor, the Second Circuit has asked

23   us for a response.

24            THE COURT:  Oh, they have asked for a response.

25            MR. HUMMEL:  Yes, it's due on Friday.

1          THE COURT:  Oh, this Friday.

2          MR. HUMMEL:  This Friday.

3          THE COURT:  And then you get to reply?

4          MR. HAUSFELD:  I hope so.

5          THE COURT:  But do you know?  I mean is that

6     automatically so?

7          MR. HAUSFELD:  It's been rare that petitions are

8     filed, so it's been rarer that I would have experienced it.

9     But I recall the rules.

10          THE COURT:  Two or three defense counsel started

11     shaking their head *no*, as if they have experience with it.

12          MR. HUMMEL:  I don't believe the rules permit.  I

13     suppose they could always seek leave, your Honor.

14          THE COURT:  Right.  As far as you know, the rules

15     don't envision --

16          MR. HUMMEL:  That's the best of my understanding, your

17     Honor.

18          THE COURT:  So this petition might be fully submitted

19     as early as this Friday.

20          You know, Mr. Hummel, the 11-year argument cuts both

21     ways.  You have waited 11 years, so you'll wait 12.  I mean,

22     you know, I understand your point, but once you're in double

23     digits with one litigation, it doesn't much matter.  I hope we

24     all survive this litigation, but I do see Mr. Hausfeld's point

25     about one omnibus decision, even if it is rather short and it

1    says on the corporate issue, have to follow the Second Circuit.

2    And it says on the extraterritorial issue, depending on the

3    rehearing point, I have to follow the Second Circuit, so it's a

4    pretty short opinion, and up it goes.  And we can try to get

5    cert again before the Supreme Court.  I understand his desire

6    to get it up on all issues at once.

7           So I think, again, despite the long flight, that it

8    may be best to see what the Circuit does with the rehearing en

9    banc, so I can do all issues at once.  But when I get to it, I

10   don't see very extensive briefings, since the Circuit has

11   already dictated the opinion on extraterritoriality and

12   corporate liability.  There isn't much to say, on either issue,

13   given their position, at the moment, subject to rehearing.

14          MR. HAUSFELD:  Thank you, your Honor.

15          THE COURT:  So I apologize for calling you in.  But I

16   was trying to move this 11 year old case along.

17          But, now, I suppose we should wait for the decision on

18   the rehearing en banc.

19          Please let me know the minute you get a response from

20   the Circuit, so we can reconvene and set up a schedule for the

21   motion.

22          MR. HAUSFELD:  Yes, your Honor.

23          THE COURT:  Keep in mind, you now know my views pretty

24   much on the outcome.  If things stay the way they are now and

25   they deny that, it's a pretty short motion and pretty short

D9O0APAC2                    Conference

1    decision.

2              Okay.

3              MR. HAUSFELD:  Okay.

4              THE COURT:  Thank you.

5              ALL:  Thank you, your Honor.

6              (Adjourned)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------ X

IN RE SOUTH AFRICAN APARTHEID                    **ORDER**
LITIGATION
                                                 **02 MDL 1499 (SAS)**

------------------------------------------------ X

This Document Relates to:

------------------------------------------------ X

LUNGISILE NTSEBEZA, *et al.*,

               Plaintiffs,

    - against -                           **02 Civ. 4712 (SAS)**
                                                 **02 Civ. 6218 (SAS)**
DAIMLER AG, *et al.*,                            **03 Civ. 1024 (SAS)**

               Defendants.

------------------------------------------------ X

SAKEWE BALINTULO, *et al.*,

               Plaintiffs,

    - against -                           **03 Civ. 4524 (SAS)**

DAIMLER AG, *et al.*,

               Defendants.

------------------------------------------------ X

SHIRA A. SCHEINDLIN, U.S.D.J.:

-1-

Following the Second Circuit's November 7, 2013 order denying plaintiffs' petition for panel rehearing and rehearing en banc, the parties in this multi-district litigation have submitted a number of letters to this Court with respect to what actions, if any, should now be taken by the District Court. I will briefly summarize these submissions.

- November 13 letter from defendants IBM and Ford Motor Company ("Ford") requesting that the Court now enter judgement in favor of defendants because the relevant conduct alleged in the complaint occurred abroad, the defendants are corporations, and plaintiffs have failed to allege facts satisfying the mens rea required for aiding and abetting liability under the Alien Tort Statute, 28 U.S.C. § 1350, ("ATS").

- November 13 letter from defendant Daimler AG ("Daimler") requesting dismissal on the same grounds as those submitted by IBM and Ford and on the additional ground that Daimler is a foreign corporation sued by foreign plaintiffs for conduct that occurred abroad.

- November 14 letter from defendant Rheinmattal AG ("Rheinmatall") requesting dismissal on the same grounds as those submitted by IBM, Ford, and Daimler.[1]

- November 26 letter from the *Balintulo* and *Ntsebeza* plaintiffs opposing defendants' request for dismissal. Plaintiffs first argue that the question of whether corporations can be liable under the ATS remains an open question because the Supreme Court did not address the issue in *Kiobel v. Royal Dutch Petroleum Co.*,[2] deciding the case instead on the issue of whether the statute covers extraterritorial conduct. Plaintiffs argue that "[i]f corporate liability was an issue of subject matter jurisdiction, the Supreme Court

---

[1]     Counsel is directed to submit the November 14 letter for docketing via ECF.

[2]     133 S. Ct. 1659 (2013).

-2-

would have had to answer that predicate issue before addressing extraterritoriality. By addressing the latter issue without explicitly addressing corporate liability, the Court implicitly overruled the Second Circuit's decision that there is no corporate liability under the ATS." Plaintiffs also note that in *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,[3] a Second Circuit panel remanded the issue of corporate liability under the ATS to the District Court, notwithstanding the panel decision in *Kiobel v. Royal Dutch Petroleum Co.*,[4] the decision on which defendants rely. Plaintiffs next argue that the Second Circuit's recent decision in this case was based on the current pleading, which was drafted prior to the Supreme Court's decision in *Kiobel*. As a result, plaintiffs urge that if the Court finds that corporate liability is permitted under the ATS, they be permitted to file an amended complaint to allege additional facts that might show that some of the alleged wrongful conduct might "touch and concern" the United States with "sufficient force" to overcome the presumption against imposing liability for extraterritorial conduct. Finally, plaintiffs note that at the time this Court addressed aiding and abetting liability the Second Circuit had not yet issued its opinion clarifying that a plaintiff must prove "purpose" in order to sustain an aiding and abetting claim.[5] Now that this standard is controlling in this Circuit, plaintiffs argue that they should be permitted to brief the issue or whether their extant Complaint satisfied this standard; or, in the alternative, be permitted to file an amended complaint in order to plead facts that would satisfy this standard.

● November 27 letter from Rheinmattal in response to plaintiffs' November 26 letter arguing that (1) the *Licci* case is distinguishable from the instant case; (2) plaintiffs have not pointed to any facts that would show that the actions of Rheinmattal could possibly "touch and concern" the United States with "sufficient force" to overcome the presumption against the extraterritorial application of the ATS, particularly with respect to a foreign corporation; and (3) plaintiffs have failed to satisfy the "purpose" standard

---

[3]   732 F.3d 161 (2d Cir. 2013).

[4]   621 F.3d 111 (2d Cir. 2010).

[5]   *See Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244 (2d Cir. 2010).

-3-

for aiding and abetting liability and have not pointed to any facts that show that they could meet the "purpose" standard.

Based on the arguments submitted in the letters summarized above, I conclude that it is appropriate to provide plaintiffs an opportunity to brief the issue of whether a corporation may be liable for a violation of the ATS. I reach this conclusion based on the Second Circuit's recent decision in *Licci* to refer the issue of corporate liability under the ATS to the district court, despite the Second Circuit's 2010 decision in *Kiobel*.[6] Because I also conclude that plaintiffs have failed to show that they could plausibly plead that the actions of Daimler or Rhinematall – the foreign defendants – touch and concern the United States with sufficient force to rebut the presumption against the extraterritorial reach of the ATS, these defendants are hereby DISMISSED.

If this Court determines that corporations may be liable under the ATS, the plaintiffs may move for leave to file an amended complaint against the remaining defendants. In that motion plaintiffs must make a preliminary showing that they can plausibly plead that those defendants engaged in actions that touch

---

[6]     The Second Circuit's decision in *Licci* was issued on October 18, 2013, approximately two months after the Second Circuit's opinion in the instant case on August 21, 2013. The August 21 opinion did not substantively discuss corporate liability under the ATS, other than to say that the Supreme Court affirmed the Second Circuit's prior decision in *Kiobel* "on different grounds." *Balintulo v. Daimler AG*, 727 F.3d 174, 185 (2d Cir. 2013). The court could not have addressed the subsequent *Licci* opinion.

-4-

and concern the United States with sufficient force to overcome the presumption against the extraterritorial reach of the ATS, and that those defendants acted not only with knowledge but with the purpose to aid and abet the South African regime's tortious conduct as alleged in these complaints. If this Court determines that corporations cannot be held liable under the ATS, then judgment will be granted in favor of all remaining defendants.

Plaintiffs' motion and supporting papers on corporate liability under the ATS shall be served no later than January 24, 2014, defendants' response shall be served by February 14, 2014, and plaintiffs' reply shall be served by February 28, 2014.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:     New York, New York
           December 26, 2013

-5-

## - Appearances -

**For Plaintiffs Ntsebeza** *et al.***:**

Bruce Heller Nagel, Esq.
Jay J. Rice, Esq.
Diane E. Sammons, Esq.
Nagel Rice LLP
103 Eisenhower Parkway
Roseland, New Jersey 07068
(973) 618-0400

Tyler R. Giannini, Esq.
International Human Rights Clinic
Harvard Law School
Pound Hall Room 401
1563 Massachusetts Avenue
Cambridge, Massachusetts 02138
(617) 495-9362

Linda P. Nussbaum, Esq.
Grant & Eisenhofer
485 Lexington Avenue
New York, New York, 10017
(646) 722-8504

Paul L. Hoffman, Esq.
Schonbrun DeSimone Seplow Harris
    & Hoffman
723 Ocean Front Walk
Venice, California 90291
(310) 396-0731

Judith Brown Chomsky, Esq.
Law Offices of Judith Brown
    Chomsky
Post Office Box 29726
Elkins Park, Pennsylvania 19027
(215) 782-8367

Michael F. Osborne, Esq.
56 Keerom Street
Cape Town 08001
South Africa
558-7221

**For Plaintiffs Balintulo *et al.*:**

Michael D. Hausfeld, Esq.
Hausfeld LLP
1700 K Street, NW, Suite 650
Washington, DC 20006
(202) 579-1089

Carroll H. Ingram, Esq.
Ingram Wilkinson
P.O. Box 15039
Hattiesburg, Mississippi 39404
(601) 261-1385

**For Defendant International Business Machines Corp.:**

Keith R. Hummel, Esq.
Cravath, Swaine & Moore LLP
825 Eighth Avenue
New York, New York 10019
(212) 474-1000

**For Defendant General Motors Corp.:**

Jayant W. Tambe, Esq.
Jones Day
222 East 41st Street
New York, New York 10017
(212) 326-3939

**For Defendant Ford Motor Company:**

Jonathan Hacker, Esq.
O'Melveny & Myers LLP
1625 I Street, NW
Washington, DC 20006
(202) 383-5300

**For Defendant Rheinmatall AG:**

Robert E. Zimet, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, New York 10036
(212) 735-3000

**For Defendant Daimler AG:**

Stewart D. Aaron, Esq.
Arnold & Porter LLP
399 Park Ave.
New York, New York 10022
(212) 715-1114

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4/17/14

———————————————————————X

IN RE SOUTH AFRICAN APARTHEID
LITIGATION

———————————————————————X

This Document Relates to:

———————————————————————X

LUNGISILE NTSEBEZA, *et al.*,

        Plaintiffs,

   - against -

FORD MOTOR COMPANY, and
INTERNATIONAL BUSINESS
MACHINES CORPORATION,

       Defendants.

———————————————————————X

SAKEWE BALINTULO, *et al.*,

        Plaintiffs,

   - against -

FORD MOTOR COMPANY, and
INTERNATIONAL MACHINES
CORPORATION,

       Defendants.

———————————————————————X

**OPINION AND ORDER**

02 MDL 1499 (SAS)

02 Civ. 4712 (SAS)
02 Civ. 6218 (SAS)
03 Civ. 1024 (SAS)

03 Civ. 4524 (SAS)

1

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

"*Given that the law of every jurisdiction in the United States and of every civilized nation, and the law of numerous international treaties, provide that corporations are responsible for their torts, it would create a bizarre anomaly to immunize corporations from liability for the conduct of their agents in lawsuits brought for shockingly egregious violations of universally recognized principles of international law.*" – Judge Judith W. Rogers, D.C. Circuit[1]

"*It is neither surprising nor significant that corporate liability hasn't figured in prosecutions of war criminals and other violators of customary international law. That doesn't mean that corporations are exempt from that law.*" – Judge Richard Posner, Seventh Circuit[2]

## I.    INTRODUCTION

This case arises out of allegations that various corporations aided and abetted violations of customary international law committed by the South African apartheid regime.[3]   The remaining plaintiffs are members of two putative classes of black South Africans who were victims of apartheid-era violence and discrimination.   Plaintiffs seek relief under the Alien Tort Statute ("ATS"), which

---

[1]      *Doe v. Exxon Mobil Corp.,* 654 F.3d 11, 57 (D.C. Cir. 2011), *vacated on other grounds*, 527 Fed. Appx. 7 (D.C. Cir. 2013) (quotations omitted).

[2]      *Flomo v. Firestone Natural Rubber Co.*, 643 F.3d 1013, 1019 (7th Cir. 2011).

[3]      The lengthy and complicated factual and procedural history of this action, which started with more than a dozen distinct cases of which two still remain, is summarized in *In re South African Apartheid Litig.*, 617 F. Supp. 2d 228, 241-45  (S.D.N.Y. 2009) and *Balintulo v. Daimler AG*, 727 F.3d 174, 182-85 (2d Cir. 2013).

2

confers federal jurisdiction over "any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."[4] The remaining defendants – Ford Motor Company ("Ford") and International Business Machines Corporation ("IBM") – are American corporations accused of aiding and abetting violations of the ATS by manufacturing military vehicles and computers for South African security forces.

## II. BACKGROUND

On April 8, 2009, I granted several defendants' motions to dismiss, but ruled that plaintiffs may proceed against the other defendants named above, as well as Rheimattal AG and Daimler AG (the "April 8 Opinion and Order"). On August 14, 2009, defendants sought a writ of mandamus in the United States Court of Appeals for the Second Circuit to obtain interlocutory review of certain issues in the April 8 Opinion and Order.

On September 17, 2010, while the Second Circuit's decision in this case was pending, another panel of the Second Circuit issued a split decision in *Kiobel v. Royal Dutch Petroleum Co.* ("*Kiobel I*"). In the majority opinion written by Judge Jose Cabranes, the court held that the ATS does not confer jurisdiction over claims against corporations, and dismissed the ATS claims of Nigerian

---

[4]     28 U.S.C. § 1350.

3

nationals who alleged that various corporations aided and abetted customary law violations in Nigeria.[5]

On February 28, 2012, the United States Supreme Court granted certiorari on the question of corporate liability under the ATS and heard oral arguments.[6] After oral arguments, the Court directed the parties to file supplemental briefing on a second question – "whether and under what circumstances the ATS allows courts to recognize a cause of action for violations of the law of nations occurring" outside the United States.[7] On October 1, 2012, the Court heard oral arguments again. On April 17, 2013, the Supreme Court issued an opinion affirming the Second Circuit's judgment ("*Kiobel II*"). However, it decided the case "based on . . . the second question" and ruled that the "presumption against extraterritoriality applies to claims under the ATS."[8] The Court did not address the issue of corporate liability under the ATS.

The present case remained unresolved in the Second Circuit while the

---

[5]    *See* 621 F.3d 111, 148 (2d Cir. 2010) ("*Kiobel I*") (Cabranes, J. and Jacobs, C.J.) (Leval, J. concurring in the judgment of the court to dismiss the complaint but filing separate opinion accepting corporate liability under the ATS).

[6]    *See* 132 S. Ct. 472 (2011).

[7]    132 S. Ct. 1738 (2012).

[8]    *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659, 1663 (2012) ("*Kiobel II*").

4

Supreme Court's decision in *Kiobel II* was pending.  On April 19, 2013, two days after *Kiobel II*, the Second Circuit directed the parties in this case to provide supplemental briefing on the impact of the Supreme Court's decision.  On August 21, 2013, the court denied defendants' request for a writ of mandamus and remanded to the district court.  The court stated that because "[t]he opinion of the Supreme Court in *Kiobel* [*II*] plainly bar[red] common-law suits like this one, alleging violations of customary international law based solely on conduct occurring abroad, . . . defendants will be able to obtain . . . dismissal of all claims . . . through a motion for judgment on the pleadings."[9] On November 7, 2013, the court denied plaintiffs' petition for panel rehearing and rehearing en banc.

Following denial of en banc review, the parties submitted several letters to this court.[10]  Defendants asked the court to enter judgment in their favor based on the Second Circuit's directive, and based on their view that there is no corporate liability for ATS claims in the Second Circuit after *Kiobel I*.  Plaintiffs sought leave to amend their complaint, arguing that the Second Circuit's decision was based on a complaint drafted before *Kiobel II* and that plaintiffs are entitled to an opportunity to allege additional facts that might show that some of the alleged

---

[9]        *Balintulo*, 727 F.3d at 182.

[10]        These letters are summarized in *In re South African Apartheid Litig.,* No. 02 MDL 1499, 2013 WL 6813877, at *1-2 (Dec. 26, 2013).

wrongful conduct "'touch[es] and concern[s]'" the United States with "'sufficient force'" to overcome the presumption against extraterritorial application of the ATS.[11]  Plaintiffs also maintained that corporations are proper defendants because the Supreme Court's decision in *Kiobel II* implicitly overturned the Second Circuit's decision in *Kiobel I* finding no corporate liability under the ATS.[12]

On December 26, 2013, I dismissed the remaining foreign defendants – Rheimattal AG and Daimler AG – because "plaintiffs have failed to show that they could plausibly plead that the[ir] actions . . . touch and concern the United States with sufficient force to rebut the presumption against the extraterritorial reach of the ATS."[13]  I ordered the remaining parties to fully brief the question of whether corporations can be held liable under the ATS following the Supreme Court's decision in *Kiobel II*.[14]  That issue is the subject of this Opinion and Order.

## III. DISCUSSION

### A. The Question of Corporate Liability for ATS Claims Remains Open in the Second Circuit

---

[11]     11/26/13 Letter from Diane E. Sammons, counsel for plaintiffs to the Court, at 2 (quoting *Kiobel II*, 133 S. Ct. at 1669).

[12]     *See id.* at 1-2.

[13]     *Id*. at 2.

[14]     *See id*.

6

The Supreme Court did not reach the issue of corporate liability in *Kiobel II*. The parties strongly disagree about whether *Kiobel I* remains binding law. Plaintiffs argue that the Supreme Court's decision in *Kiobel II* "directly conflicts" with and "casts serious doubts on the viability" of *Kiobel I*.[15] Plaintiffs maintain that "in reaching the merits issue of extraterritoriality . . . the Supreme Court took subject matter jurisdiction over the corporate defendant . . . which disregarded and contradicted the core holding of *Kiobel I*."[16] Plaintiffs further contend that *Kiobel II* "elucidates its intention to allow claims against corporations to proceed" by stating in dicta that "mere corporate presence" cannot suffice to overcome the presumption against extraterritoriality, suggesting that corporations *can* be liable under the ATS upon a showing sufficient to overcome the presumption against extraterritoriality.[17]

Defendants disagree with plaintiffs' argument that the Supreme Court decided extraterritoriality as a merits question. In sum, defendants contend that

---

[15]    1/24/14 Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion for an Order Finding Corporate Liability Under the Alien Tort Statute ("Pl. Mem."), at 5.

[16]    *Id*.

[17]    2/28/14 Plaintiffs' Reply Memorandum of Law in Support of Plaintiffs' Motion for an Order Finding Corporate Liability Under the Alien Tort Statute, at 5.

7

"[t]he Supreme Court's express refusal to reach [the] issue [of corporate liability] cannot cast doubt on the lower court's ruling on that issue."[18]  Rather, "the Court's decision to affirm on alternative grounds leaves the unaddressed holding intact."[19]

### 1.    *Kiobel II*

Although the Supreme Court initially granted certiorari and heard oral argument on the issue of corporate liability, *Kiobel II* makes no mention of the issue.  Rather, the Court "conclude[d] that the presumption against extraterritor[ial] [application of American laws] applies to claims under the ATS" and is not rebutted by the text, history or purposes of the statute.[20]  The Court ruled that the presumption against extraterritorial application is so weighty that "even where [ATS] claims touch and concern the territory of the United States, they must do so with sufficient force to displace [it]."[21]  The Court clarified that because "[c]orporations are often present in many countries, . . . it would reach too far to say that mere corporate presence suffices" to overcome the presumption.[22]

---

[18]    2/14/14 Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for an Order Finding Corporate Liability Under the Alien Tort Statute ("Def. Opp."), at 7.

[19]    *Id.*

[20]    *See Kiobel II*, 133 S. Ct. at 1669.

[21]    *Id*.

[22]    *Id*.

8

### 2.    Subsequent Case Law

#### a.    Supreme Court

On January 14, 2014, the Supreme Court issued an opinion in *Daimler AG v. Bauman*, an ATS case arising from allegations that Daimler "collaborated with state security forces to kidnap, detain, torture, and kill" plaintiffs or plaintiffs' families during Argentina's "Dirty War" of the late 1970s and early 1980s.[23]  The Court concluded that Daimler's contacts with California were insufficient to subject it to personal jurisdiction under California's long-arm statute, because a corporation's "'affiliations with the State' must be 'so continuous and systematic' as to render [it] essentially at home in the forum State."[24]  While *Daimler* noted that plaintiffs' ATS claims were "infirm" in light of *Kiobel II*'s holding on extraterritoriality, the Court made no reference to corporate liability, despite addressing the question of personal jurisdiction over a corporation in an ATS case.[25]

#### b.    Second Circuit

The Second Circuit has addressed *Kiobel II*'s impact on corporate

---

[23]    134 S. Ct. 746, 751 (2014).

[24]    *Id*. at 761 (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2851 (2011)(other quotations omitted)).

[25]    *Id*. at 763.

9

liability under the ATS on two occasions.  On October 18, 2013, Judge Robert

Sack noted in *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL* that the court

had anticipated "'affirm[ing] the dismissal of [plaintiffs'] ATS claims' based on

our conclusion in *Kiobel* [*I*] that the ATS does not provide subject matter

jurisdiction over corporate defendants for violations of customary international

law."[26]  However, because the Supreme Court "affirmed [*Kiobel*] . . . on different

grounds . . . . [and] did not directly address the question of corporate liability under

the ATS," the *Licci* court instead remanded to "the district court to address this

issue in the first instance."[27]

 On February 10, 2014, the Second Circuit issued a decision in

*Chowdhury v. Worldtel Bangladesh Holding, Ltd.* dismissing plaintiffs' ATS

claims against the defendant corporation because "the claims alleged . . .

involve[d] conduct that took place entirely in Bangladesh."[28]  In footnote 6 of the

majority opinion written by Judge Cabranes, the author of *Kiobel I*, the court

remarked that "[p]laintiff's claims under the ATS . . . encounter a second obstacle

[because] the Supreme Court's decision in *Kiobel* did not disturb the precedent of

---

[26]     732 F.3d 161, 174 (2d Cir. 2013) (quoting *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F. 3d 50, 73 (2d Cir. 2012)).

[27]     *Id.*

[28]     No. 09-4483, 2014 WL 503037, at *12 (2d Cir. Feb. 10, 2014).

10

this Circuit that corporate liability is not . . . currently actionable under the ATS."[29]

But in footnote 2 of the concurring opinion, Judge Rosemary Pooler clarified that

footnote 6 "is not pertinent to our decision and thus is dicta."[30]  Judge Pooler

further noted that "[a]t least one sister circuit has determined that, by not passing

on the question of corporate liability and by making reference to 'mere corporate

presence' in its opinion, the Supreme Court established definitively the possibility

of corporate liability under the ATS."[31]

### c.    Other Federal Courts

Prior to *Kiobel II*, the Seventh, Ninth, Eleventh and D.C. Circuits had

each held that corporations can be found liable under the ATS.[32]  Three of the four

courts of appeal reached their decision *after Kiobel I*, and each vigorously

disagreed with its reasoning.  As Judge Pooler noted in *Chowdhury*, the Ninth

Circuit, the only court of appeals to explicitly address the issue of corporate

---

[29]     *Id*. at *5, n. 6 (citations omitted).

[30]     *Id*. at *10, n. 2 (Pooler, J., concurring).

[31]     *Id*. (citing *Doe I v. Nestle U.S.A., Inc.*, 738 F.3d 1048, 1049 (9th Cir. 2013)).

[32]     *See Flomo*, 643 F.3d at 1021; *Sarei v. Rio Tinto, PLC*, 671 F.3d 736, 764-65 (9th Cir. 2011) (en banc), *vacated on other grounds*, 133 S.Ct. 1995 (2013)*; Exxon,* 654 F.3d at 57; *Romero v. Drummond Co., Inc.*, 552 F.3d 1303, 1315 (11th Cir. 2008).

11

liability under the ATS after *Kiobel II*, again concluded "that corporations can face liability for claims brought under the Alien Tort Statute."[33]  The court cited *Kiobel II*, noting that the Supreme Court "suggest[ed] in dicta that corporations may be liable under the ATS so long as [the] presumption against extraterritorial application is overcome."[34]

Two other district courts have recently weighed in on this issue.  On August 28, 2013, before the Second Circuit's decisions in *Licci* and *Chowdhury*, a court in the Southern District of New York dismissed plaintiffs' ATS claims against a Ukrainian bank, citing *Kiobel I* as binding law.[35]  In that case, the court rejected plaintiffs' argument that "because the Supreme Court did not expressly foreclose corporate liability, their ATS claim against [the] bank may proceed."[36]  On February 24, 2014, a court in the District of Maryland noted that it "harbors doubt that corporations are immune under the ATS [following *Kiobel II*]" but "refrain[ed] from addressing the issue" because there were other grounds for

---

[33]     *Nestle*, 738 F.3d at 1049.

[34]     *Id*.

[35]     *See Tymoshenko v. Firtash*, No. 11 Civ. 2794, 2013 WL 4564646, at *3 (S.D.N.Y. Aug. 28, 2013).

[36]     *Id*.

12

dismissal.[37]

### 3.  Impact of Intervening Case Law

Lower courts are bound by Second Circuit precedent "unless it is expressly or implicitly overruled" by the Supreme Court or an en banc panel of the Second Circuit.[38]  Courts have interpreted this to mean that a decision of the Second Circuit is binding "'unless it has been called into question by an intervening Supreme Court decision or by one of [the Second Circuit] sitting *in banc*'" or "'unless and until its rationale is overruled, implicitly or expressly, by the Supreme Court, or [the Second Circuit] court *in banc*.'"[39]

The Supreme Court's opinions in *Kiobel II* and *Daimler* directly undermine the central holding of *Kiobel I* – that corporations cannot be held liable for claims brought under the ATS.  The opinions explicitly recognize that

---

[37]  *Du Daobin v. Cisco Systems, Inc.*, No. 11 Civ. 1538, 2014 WL 769095, at *8 (D. Md. Feb. 24, 2014).

[38]  *World Wrestling Entm't. Inc. v. Jakks Pac., Inc.*, 425 F. Supp. 2d 484, 499 (S.D.N.Y. 2006).  The "law of the case" doctrine is not at issue here because the Second Circuit's August 21, 2013 order made no reference to corporate liability.  Instead, it concluded that after *Kiobel II*, "claims under the ATS cannot be brought for violations of the law of nations occurring within the territory of a sovereign other than the United States."  *Balintulo*, 727 F.3d at 189.

[39]  *United States v. Agrawal*, 726 F3d 235, 269 (2d Cir. 2013) (quoting *United States v. Santiago*, 268 F.3d 151, 154 (2d Cir. 2001) and *In re Sokolowski*, 205 F.3d 532, 535 (2d Cir. 2000)).

13

corporate presence alone is insufficient to overcome the presumption against extraterritoriality or to permit a court to exercise personal jurisdiction over a defendant in an ATS case, respectively. By necessity, that recognition implies that corporate presence *plus* additional factors can suffice under either holding.

The standards laid out in *Kiobel* and *Daimler* for overcoming the presumption against territoriality and exercising personal jurisdiction under a long-arm statute are stringent. They may be difficult to meet in all but the most extraordinary cases.[40] But the Supreme Court has now written two opinions contemplating that certain factors in combination with corporate presence could overcome the presumption against extraterritoriality or permit a court to exercise personal jurisdiction over a foreign corporation in an ATS case. This language makes no sense if a corporation is immune from ATS suits as a matter of law. The Supreme Court's opinions in *Kiobel II* and *Daimler* cannot be squared with *Kiobel I*'s rationale.

The Second Circuit panel in *Licci* and Judge Pooler's concurrence in

---

[40]     "'The presumption against extraterritorial application would be a craven watchdog indeed if it retreated to its kennel whenever *some* domestic activity is involved in the case.'" *Kiobel II*, 133 S. Ct. at 1670 (Alito, J., concurring) (quoting *Morrison v. National Australia Bank Ltd.*, 130 S. Ct. 2869, 2884 (2010)) (emphasis in original). Justice Alito further proposed that a defendant's domestic conduct must itself "violate an international law norm" in order to overcome the presumption against extraterritoriality.

14

*Chowdhury* recognized the possibility that *Kiobel II* has left the issue of corporate liability open in the Second Circuit. Defendants argue that the *Licci* court remanded the question of corporate liability "because the issue had not been briefed on appeal, and because dismissing the ATS claim would not have disposed of the case . . . since other non-ATS claims would remain."[41] But *Kiobel I* is clear and unambiguous as to the question of corporate liability. If the *Licci* panel found *Kiobel I* binding, it would have resolved the question immediately without further briefing. The argument that the Second Circuit would remand issues governed by controlling law because other non-ATS claims remained defies logic. The court's decision in *Licci* only makes sense if that panel no longer considered *Kiobel I* to be binding law.[42]

      While the district court in *Tymoshenko* treated *Kiobel I* as binding law, that decision was reached before *Licci* and before Judge Pooler's concurrence in *Chowdhury* suggested that the Supreme Court has embraced corporate liability under the ATS. The Ninth Circuit reached the same conclusion in *Doe I v.*

---

[41]     Def. Mem. at 13.

[42]     The issue has yet to be remanded to the district court because plaintiffs' motions to sever claims against one of the defendants, and for en banc reconsideration of the Second Circuit's holding on an unrelated choice of law question, remain pending in the Second Circuit.

15

*Nestle*.[43]  For these reasons, I conclude that corporate liability for claims brought under the ATS is an open question in the Second Circuit and I will address the issue in the first instance.

### B.    Corporations Are Liable Under the ATS

In my April 8 Opinion and Order, I concluded that "corporations are liable in the same manner as natural persons for torts in violation of the law of nations" based on the fact that "[o]n at least nine separate occasions, the Second Circuit has addressed AT[S] cases against corporations without ever hinting –

---

[43]    Plaintiffs have also argued that because the Supreme Court considered extraterritoriality a merits issue in *Morrison*, it must have considered extraterritoriality a merits issue in *Kiobel II* as well.  Therefore, the Court must have accepted jurisdiction over the corporate defendants in order to reach the merits question of extraterritoriality.  *See* Pl. Mem. at 8-11.  But the complex statutory scheme at issue in *Morrison* – the Securities Exchange Act of 1934 – is entirely different from the ATS, which merely confers federal jurisdiction over certain tort claims committed in violation of "the law of nations" or a "treaty of the United States."  Nothing in *Morrison* suggests that the Supreme Court intended extraterritoriality to be a merits question in every statutory scheme, especially for statutes like the ATS which the Court has repeatedly characterized as "strictly jurisdictional."  *Sosa v. Alvarez-Machain*, 542 U.S. 692, 713 (2004).  Further, *Kiobel II* affirmed, though on alternate grounds, the Second Circuit's judgment that federal courts had no subject-matter jurisdiction over the ATS claim.  This is strong evidence that the Supreme Court considered extraterritoriality to be a jurisdictional issue under the ATS.  But because I conclude that corporate liability under the ATS remains an open question in this Circuit for other reasons, I need not determine whether extraterritoriality is a merits issue for purposes of the ATS.

16

much less holding – that such cases are barred."[44]

Nonetheless, and despite the unbroken line of controlling precedent, the Second Circuit reached the opposite conclusion just eighteen months later in *Kiobel I*. But *Kiobel I* is a stark outlier. It is the only opinion by a federal court of appeals, before and after *Kiobel II*, to determine that there is no corporate liability under the ATS. As discussed above, *Kiobel II* either implicitly accepts corporate liability under the ATS or, at the very least, undercuts *Kiobel I*'s rationale and re-opens the question in this Circuit. For the following reasons, I find that corporations may be held liable for claims brought under the ATS.

The ATS, enacted as part of the Judiciary Act of 1789, confers federal jurisdiction over "any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." "[B]y its terms [the ATS] does not distinguish among classes of defendants."[45]

---

[44] *In re South African Apartheid Litig.*, 617 F. Supp. 2d at 254 (citations omitted).

[45] *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 438 (1989). As plaintiffs stress, "other sections of the First Judiciary Act . . . did restrict the universe of defendants." Pl. Mem. at 14 (citing An Act to Establish the Judicial Courts of the United States, ch. 20, § 9, 1 Stat. 73, 76-77 (1789) (limiting defendants to "consuls or vice-consuls")). Courts have noted that the Judiciary Act read as a whole "evidences that the First Congress knew how to limit, or deny altogether, subject matter jurisdiction over a class of claims." *Exxon,* 654 F.3d at 46.

17

In *Sosa v. Alvarez-Machain*, the Supreme Court set forth the standard by which federal courts should analyze whether to exercise jurisdiction over a potential claim under the ATS:

> [F]ederal courts should not recognize private claims under federal common law for violations of any international law norm with less definite content and acceptance among civilized nations than the historical paradigms familiar when [the ATS] was enacted. . . . 'Actionable violations of international law must be of a norm that is specific, universal, and obligatory.' And the determination whether a norm is sufficiently definite to support a cause of action should (and, indeed, inevitably must) involve an element of judgment about the practical consequences of making that cause available to litigants in the federal courts."[46]

In *Kiobel I*, the Second Circuit concluded that because the ATS "does not specify who is liable . . . for a 'violation of the law of nations,' it leaves the question of the nature and scope of liability – who is liable for what – to customary international law."[47] The court concluded that because no corporation has ever been held liable, in either a civil or criminal case, for violations of international norms, customary international law "has not to date recognized liability for corporations that violate its norms."[48] Thus, the court held that the scope of

---

[46] *Sosa*, 542 U.S. at 732-33 (quoting *In re Estate of Marcos Human Rights Litig.*, 25 F.3d 1467, 1475 (9th Cir. 1994)).

[47] *Kiobel I*, 621 F.3d 111, 133 (2010).

[48] *Id.* at 125.

18

liability under the ATS does not encompass corporations "for now, and for the foreseeable future."[49]

But *Kiobel I* misses a key "distinction between a principle of [a] law . . . and the means of enforcing it."[50]  Courts look to customary international law to determine whether the alleged conduct violates a definite and universal international norm necessary to sustain an ATS action after *Sosa*.  However, the question of *who* can be held liable for a violation of a norm requires a determination of the means of enforcement – or the remedy – for that violation, rather than the substantive obligations established by the norm.  This is an issue governed by federal common law.  "By way of example, in legal parlance one does not refer to the tort of 'corporate battery' as a cause of action.  The cause of action is battery; agency law determines whether a principal will pay damages for the battery committed by the principal's agent."[51]  In other words, "[i]nternational law imposes substantive obligations and the individual nations decide how to enforce them," including whether, for example, to hold a corporation responsible for the

---

[49]     *Id*. at 149.

[50]     *Flomo*, 643 F.3d at 1019.

[51]     *Exxon*, 654 F.3d at 41.

19

conduct of its agents.[52]

The majority in *Kiobel I* relies heavily on footnote 20 of the Supreme Court's opinion in *Sosa* as support for its conclusion that the Supreme Court intended the issue of corporate liability to be determined by customary international law. But that reliance is misplaced. Footnote 20 states in full:

> A related consideration [to determining whether there is a viable cause of action under the ATS] is whether international law extends the scope of liability for a violation of a given norm to the perpetrator being sued, if the defendant is a private actor such as a corporation or individual. *Compare Tel–Oren v. Libyan Arab Republic*, 726 F.2d 774, 791–795 (D.C. Cir. 1984) (Edwards, J., concurring) (insufficient consensus in 1984 that torture by private actors violates international law), with *Kadic v. Karadzíc*, 70 F.3d 232, 239–241 (2d Cir. 1995) (sufficient consensus in 1995 that genocide by private actors violates international law).[53]

At first glance, footnote 20 appears to suggest that corporate or individual liability is a substantive element of an international norm. But the citations in footnote 20 make clear that the Supreme Court is referring to the possibility that customary international law may consider some norms to be actionable only when violated by the state, as opposed to private actors. As Judge Pierre Leval noted in his concurring opinion in *Kiobel I*, "the *Sosa* footnote refers to the concern . . . that some forms of noxious conduct are violations of the law of

---

[52]    *Flomo*, 643 F.3d at 1020.

[53]    *Sosa*, 542 U.S. at 733, n.20.

20

nations when done by or on behalf of a State, but not when done by a private actor independently of a state. . . ."[54] "Far from implying that natural persons and corporations are treated *differently* for purposes of civil liability under the ATS, the intended inference of the footnote is that they are treated *identically*."[55]

"*Sosa* instructs that the *substantive content* of the common law causes of action that courts recognize in ATS cases must have its source in customary international law."[56] Whether conduct requires state action in order to violate the law of nations is one such substantive question to be determined by customary international law under *Sosa*. But customary international law only establishes norms of conduct, not the available *remedies* for violations of those norms in domestic courts.[57] By passing the ATS, Congress created an action in tort for violations of the law of nations. A federal court deciding a case under the ATS must decide whether corporations are liable for the tortious conduct of their agents

---

[54]    *Kiobel I*, 621 F.3d at 165 (Leval, J., concurring).

[55]    *Id*. (emphasis in original).

[56]    *Exxon*, 654 F.3d at 41 (emphasis added).

[57]    *See id*. at 42 ("The fact that the law of nations provides no private right of action to sue corporations addresses the wrong question and does not demonstrate that corporations are immune from liability under the ATS. There is no right to sue under the law of nations; no right to sue natural persons, juridical entities, or states. There is no right to sue under the law of nations; no right to sue natural persons, juridical entities, or states.")

21

"by reference to federal common law" governing tort remedies.[58]

The answer to that question is obvious. "[B]y 1789, corporate liability in tort was an accepted principle of tort law in the United States."[59] "Domestic law [continues to] abide[] no distinction between corporate and individual tort liability, and this rule is just as clear in the ATS context as in any other."[60] "[I]n the United States the liability of a corporation for torts committed by its employees in the course of their employment is strict."[61] Even the *Kiobel I* majority admits that "corporations are generally liable in tort under our domestic law."[62]

Defendants concede that "corporations often are subject to tort liability under positive law and state common law," but argue that "they are not subject to liability in the federal common law context[s] most analogous to implied ATS actions," such as actions brought under *Bivens v. Six Unknown Fed. Narcotics Agents*[63] to redress constitutional violations by federal agents, or actions brought

---

[58]     *Id*. at 41.

[59]     *Id.* at 47 (collecting sources).

[60]     *Sarei*, 671 F.3d at 771 (Reinhardt, J., concurring).

[61]     *Flomo*, 643 F.3d at 1020.

[62]     *Kiobel I*, 621 F.3d at 117.

[63]     403 U.S. 388 (1971).

22

under the Torture Victim Protection Act of 1991 ("TVPA").[64]  Neither analogy is persuasive.

*First*, the Supreme Court held in *Correctional Services Corp. v. Malesko* that corporations are not subject to *Bivens* liability because the core purpose of *Bivens* is to *deter individual officers* from committing constitutional violations.[65]  There is no evidence of such a purpose in the text or history of the ATS.

*Second*, the text and history of the TVPA are relevant but do not support defendants' position.  The TVPA creates an express cause of action under the ATS against "*an individual* who, under actual or apparent authority, or color of law, of any foreign nation . . . subjects an individual to torture [or extrajudicial killing] shall, in a civil action, be liable for damages . . . ."[66]  While the Supreme Court did not affirm that "individual" refers only to natural persons until 2012, the text of the TVPA demonstrates an intent to so limit the universe of defendants.[67]  Yet Congress made no effort to "amend the ATS to preclude corporate liability

---

[64]     Def. Opp. at 16-19.

[65]     *See* 534 U.S. 61, 70 (2001).

[66]     28 U.S.C. § 1350, note § 2(a) (emphasis added).

[67]     *See Mohamad v. Palestinian Authority*, 132 S. Ct. 1702 (2012).  The Supreme Court's opinion was largely a textual analysis.

23

when it enacted the TVPA's clear restriction to natural person defendants" in 1992, or at any time in the two decades since.[68]  Defendants correctly note that this results in an odd outcome – aliens are "allowed to sue U.S. corporations for alleged acts of torture under the ATS, while U.S. citizens [cannot] sue foreign or U.S. corporations under either statute for the exact same conduct."[69]  This may well be an "inexplicable and indefensible policy result," but it is a result created by Congress, not the courts.[70]

Nothing in the text, history or purposes of the ATS indicates that corporations are immune from liability on the basis of federal common law. However, even if the majority in *Kiobel I* correctly held that the source of corporate liability must be found in customary international law, the court's conclusion that customary international law does not recognize such liability is factually and legally incorrect.

As Judge Richard Posner of the Seventh Circuit noted, "the factual premise of the majority opinion in *Kiobel* [*I*]" – that no corporation has ever been held liable in a civil or criminal case for violations of customary international law

---

[68]     *Sarei*, 671 F. 3d at 785 (McKeown, J., concurring in part and dissenting in part).

[69]     Def. Opp. at 18-19.

[70]     *Id*. at 19.

norms – "is incorrect."[71] "At the end of the Second World War the allied powers

dissolved German corporations that had assisted the Nazi war effort . . . and did so

on the authority of customary international law."[72] The Allied Control Council

found that one of these corporations, I.G. Farben, "'knowingly and prominently

engaged in building up and maintaining the German war potential,' and [the

Control Council] ordered the seizure of all [of I.G. Farben's] assets and that some

of them be made 'available for reparations.'"[73]

Even if there have been few civil or criminal cases against

corporations for violations of international norms since then, the conclusion that

there is no norm establishing corporate liability for violations such as genocide or

torture does not follow.[74] "No principle of domestic or international law supports

the . . . conclusion that the norms enforceable through the ATS – such as the

---

[71]    *Flomo*, 643 F.3d at 1017.

[72]    *Id.* (citing Control Council Law No. 2, "Providing for the Termination
and Liquidation of the Nazi Organizations," Oct. 10, 1945, reprinted in 1
Enactments and Approved Papers of the Control Council and Coordinating
Committee 131 (1945); Control Council Law No. 9, "Providing for the Seizure of
Property Owned by I.G. Farbenindustrie and the Control Thereof," Nov. 30, 1945,
reprinted in 1 Enactments and Approved Papers of the Control Council and
Coordinating Committee 225,
www.loc.gov/rr/frd/Military_Law/enactments-home.html (visited June 24, 2011)).

[73]    *Id.* (quoting Control Council Law No. 9).

[74]    *See id.* at 1017-18.

25

prohibition by international law of genocide, slavery, war crimes, piracy etc. –
apply only to natural persons and not to corporations."[75] "[T]he implication that an
actor may avoid liability merely by incorporating is inconsistent with the universal
and absolute nature of the" prohibitions established by international norms.[76]
"There is always a first time for litigation to enforce a norm; there has to be."[77]

There could be many reasons for the lack of actions against
corporations brought before international tribunals. By way of analogy, there are
many criminal statutes under which corporations are rarely, if ever, prosecuted.[78]
This does not mean that corporations do not fall within the scope of liability.
Similarly, "[t]hat an international tribunal has not yet held a corporation criminally
liable does not mean that an international tribunal could not or would not hold a
corporation criminally liable under customary international law."[79] Enforcement

---

[75]     *Kiobel I*, 621 F.3d at 153 (Leval J., concurring).

[76]     *Sarei*, 671 F.3d at 760.

[77]     *Flomo*, 643 F.3d at 1017.

[78]     *See, e.g.*, David M. Uhlmann, *Deferred Prosecution and Non-
Prosecution Agreements and the Erosion of Corporate Criminal Liability*, 72 Md.
L. Rev. 1295 (2013) (discussing lack of corporate prosecutions for work-place
accidents and deaths); Pamela H. Bucy, *Why Punish? Trends in Corporate
Criminal Prosecutions*, 44 Am. Crim. L. Rev. 1287 (2007) (discussing increased
use of deferred and non-prosecution agreements and civil fines as a response to
perception that corporate indictments are "overkill").

[79]     *Sarei*, 671 F.3d at 761.

26

history does not govern the scope of liability.  "International law admits to corporate liability, as does domestic law."[80]

## IV.    CONCLUSION

For the foregoing reasons, plaintiffs' motion for an order finding that corporations may be held liable under the ATS is GRANTED.  Plaintiffs may move for leave to file an amended complaint against the remaining American defendants.  In that motion plaintiffs must make a preliminary showing that they can plausibly plead that those defendants engaged in actions that "touch and concern" the United States with sufficient force to overcome the presumption against the extraterritorial reach of the ATS, and that those defendants acted not only with knowledge but with the purpose to aid and abet the South African regime's tortious conduct as alleged in these complaints.

Plaintiffs' motion and supporting papers must be served no later than May 15, 2014, defendants' response shall be served by June 12, 2014, and plaintiffs' reply shall be served by June 26, 2014. The Clerk of the Court is directed to close this motion (Dkt. Nos. 263 and 264).

---

[80]     *Id.* at 784 (McKeown, J., concurring in part and dissenting in part).

27

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:     New York, New York
            April 17, 2014

## - Appearances -

**For Plaintiffs Ntsebeza *et al.*:**

Bruce Heller Nagel, Esq.
Jay J. Rice, Esq.
Diane E. Sammons, Esq.
Nagel Rice LLP
103 Eisenhower Parkway
Roseland, New Jersey 07068
(973) 618-0400

Tyler R. Giannini, Esq.
International Human Rights Clinic
Harvard Law School
Pound Hall Room 401
1563 Massachusetts Avenue
Cambridge, Massachusetts 02138
(617) 495-9362

Linda P. Nussbaum, Esq.
Grant & Eisenhofer
485 Lexington Avenue
New York, New York, 10017
(646) 722-8504

Paul L. Hoffman, Esq.
Schonbrun DeSimone Seplow Harris
& Hoffman
723 Ocean Front Walk
Venice, California 90291
(310) 396-0731

Judith Brown Chomsky, Esq.
Law Offices of Judith Brown
Chomsky
Post Office Box 29726
Elkins Park, Pennsylvania 19027

(215) 782-8367

Michael F. Osborne, Esq.
56 Keerom Street
Cape Town 08001
South Africa
558-7221

**For Plaintiffs Balintulo *et al.*:**
Michael D. Hausfeld, Esq.
Hausfeld LLP
1700 K Street, NW, Suite 650
Washington, DC 20006
(202) 579-1089

Carroll H. Ingram, Esq.
Ingram Wilkinson
P.O. Box 15039
Hattiesburg, Mississippi 39404
(601) 261-1385

**For Defendant International
Business Machines Corp.:**

Keith R. Hummel, Esq.
Cravath, Swaine & Moore LLP
825 Eighth Avenue
New York, New York 10019
(212) 474-1000

29



**HAUSFELD**LLP

202.540.7200 ph
202.540.7201 fax

1700 K Street, NW
Suite 650
Washington, DC 20006

Kristen Ward
kward@hausfeldllp.com

August 8, 2014

**VIA ECF**

The Honorable Judge Scheindlin
Southern District of New York
500 Pearl Street, Room 1620
New York, NY 10007

     Re: *In re South African Apartheid Litigation*, 02-MD-01499 (SAS) (S.D.N.Y)

Dear Judge Scheindlin:

     Per your request of Friday, July 18, 2014, please find enclosed Balintulo Plaintiffs' Proposed Third Amended Complaint. We are filing this in connection with Dkt. 273, Plaintiffs' Motion for Leave to File Amended Complaints.

              Sincerely,

              Kristen M. Ward

              Kristen M. Ward

cc:    All counsel of record *via* ECF

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SAKWE BALINTULO as personal representative of SABA BALINTULO, TONY BRUTUS as personal representative of DENNIS VINCENT FREDERICK BRUTUS, MARK FRANSCH as personal representative of ANTON FRANSCH, ELSIE GISHI, LESIBA KEKANA, ARCHINGTON MADONDO as personal representative of MANDLA MADONDO, MPHO ALFRED MASEMOLA, VIMBA WISEMAN MBELE as personal representative of MICHAEL MBELE, MAMOSADI CATHERINE MLANGENI, REUBEN MPHELA, THULANI NUNU, THANDIWE SHEZI, and THOBILE SIKANI, | **MDL No. 02-md-1499 (SAS)**<br>**02 Civ. 4712 (SAS)**<br>**02 Civ. 6218 (SAS)**<br>**02 Civ. 1024 (SAS)**<br>**03 Civ. 4524 (SAS)**<br><br><br>**[PROPOSED] THIRD AMENDED COMPLAINT**<br>**JURY TRIAL DEMANDED**<br><br>**CLASS ACTION** |
| Plaintiffs, | |
| v. | |
| FORD MOTOR COMPANY AND INTERNATIONAL BUSINESS MACHINES CORPORATION, | |
| Defendants. | |

Plaintiffs, on behalf of themselves and all other individuals similarly situated, for their Third Amended Complaint state as follows:

## I.     NATURE OF THE CASE

1.      Plaintiffs bring this class action under the Alien Tort Claims Act, 28 U.S.C. § 1350, against United States corporations that aided and abetted the South African security forces, as defined herein, for the specific purpose of facilitating and participating in a joint criminal enterprise in furtherance of the crimes of apartheid; extrajudicial killing; torture; prolonged unlawful detention; denationalization; and cruel, inhuman, and degrading treatment in

violation of international law.  Class Plaintiffs are the personal representatives of victims, or were themselves direct victims, of the aforementioned crimes perpetrated by the security forces of the apartheid regime between 1960 and 1994.

2.     Defendants are United States companies that provided not only practical assistance to the South African security forces, but also material, logistical, and other practical support in the form of specialized military vehicles, technology, and computer equipment, which purposely facilitated the commission of said crimes.  Defendants collaborated with the security forces of South Africa's apartheid regime, resulting in the abuses that Plaintiffs suffered.  In return, Defendants benefited from apartheid and, consequently, the violence and terror that was used to maintain and enforce it at the expense of Plaintiffs and the putative class members discussed herein.

3.     Defendants are United States corporations which directed and controlled the operations of their subsidiaries and agents around the world and in South Africa, particularly by making critical decisions in the United States related to Plaintiffs' claims.  Defendants intentionally and knowingly facilitated and enabled the commission of crimes in violation of customary international law by the apartheid security forces (including military and police) through sales and lease of technology and specialized vehicles, as well as with management, technical advice, maintenance, and expertise to enforce the human rights abuses of Apartheid. This practical assistance facilitated effective enforcement of apartheid, including denationalization and the torture and killings of certain Plaintiffs and Class Members.

4.     Defendants knew that the actions of the South African security forces constituted violations of international norms toward Plaintiffs and the classes and violations of the United States interest in embargoing the trading of goods and services to the Apartheid Security forces,

but nevertheless acted to aid and abet the South African security forces with the purpose of facilitating those crimes. In fact, Defendants vigorously opposed United States efforts to prevent them from providing support and goods from the United States to Apartheid South Africa, and acted to circumvent United States sanctions.

5.      Beginning in 1950, the world community and the United States condemned apartheid and the acts of violence and terror committed by the South African security forces to enforce and maintain apartheid as crimes in violation of fundamental, internationally-recognized human rights. The world community and the United States specifically identified the manufacturers of vehicles and the technology corporations that designed and supported the racial passbook systems, as closely connected to the South African security forces and their violent acts. Defendants' involvement violated international law and constituted purposeful participation in and/or aiding and abetting of the crimes of apartheid; extrajudicial killing; torture; prolonged unlawful detention; denationalization; and cruel, inhuman, and degrading treatment.

## II.    JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1350, the Alien Tort Claims Act ("ATCA"), and 28 U.S.C. § 1367 for any additional claims not otherwise covered by the ATCA.

7.      This matter was originally brought in the Eastern District of New York, where venue was proper pursuant to 28 U.S.C. § 1391.

8.      The matter was consolidated for pretrial proceedings by the Judicial Panel on Multidistrict Litigation and was transferred to the Southern District of New York.

## III.    DEFINITIONS

9.      Apartheid literally means "separateness."[1]  Apartheid is defined by the Rome Statute of the International Criminal Court as "inhumane acts . . . committed in the context of an institutionalized regime of systematic oppression and domination by one racial group over any other racial group or groups and committed with the intention of maintaining that regime."[2] Article II of the International Convention on the Suppression and Punishment of the Crime of Apartheid defines apartheid as a system that includes murder; the infliction of serious bodily or mental harm; torture or cruel, inhuman, and degrading treatment; and the institution of measures calculated to prevent a racial group from participation in the political, social, economic and cultural life of a country, in particular by denying the group or groups basic human rights or freedoms.[3]  Apartheid is a variant of genocide.

10.      "Apartheid regime" refers to the country of South Africa during the period 1948 to 1994, when that country was ruled by the National Party.

11.      "Bantustan" refers to the barren, rural areas where Blacks were restricted or forcibly resettled.  These areas were also called "homelands" or rural reserves.  "Bantustan" comes from the word "Bantu," an isiXhosa and isiZulu word that was co-opted during apartheid and used by some white South Africans as a derogatory term to refer to Black Africans.[4]

---

[1]   Robert Ross, *A Concise History of South Africa* 115 (Cambridge University Press: 1999).

[2]   Rome Statute of the International Criminal Court, art. 7(1)(j), July 17, 1998, 2187 U.N.T.S. 90, 37 I.L.M. 999.

[3]   International Convention on the Suppression and Punishment of the Crime of Apartheid, 1015 U.N.T.S. 243, art. II.

[4]   Kevin Danaher, *In Whose Interest? A Guide to U.S. – South Africa Relations* (Washington, DC:  Institute for Policy Studies, 1985) at 107.

12.     "Black" refers to all African, Indian, and "Coloured" South Africans unless otherwise indicated.

13.      "Coloured" is used as a synonym for "mixed race."

14.     "Genocide" is defined, in part, as "deliberately inflicting on the group conditions of life calculated to bring about its physical destruction in whole or in part."[5]

15.     "Plaintiffs" includes all named class representatives.

16.     "SAP" refers to the South African Police.

17.     "SADF" refers to the South African Defense Force.

18.     "Security forces" includes the South African military, paramilitary, police, special operations, intelligence anti-riot, and other security units.

## IV.    PARTIES

### A.     Plaintiffs

19.     **Sakwe Balintulo** is the personal representative and brother of **Saba Balintulo**, who was murdered by the SAP on March 15, 1973.  On that day, Mr. Balintulo and fifteen friends were walking in the road, when the SAP opened fire on them. Mr. Balintulo was first shot in the leg and then shot three more times in the torso.  The gun shots killed Mr. Balintulo as well as his fifteen friends.

20.     **Tony Brutus** is the personal representative and son of **Dennis Vincent Frederick Brutus** who was detained and shot by the SAP.  The recipient of a doctoral degree and numerous honorary doctorates, in 1961, Dr. Brutus was banned from teaching, publishing poetry, and attending gatherings.  In 1963, Dr. Brutus was arrested in Johannesburg while on his way to

---

[5]   Convention on the Prevention and Punishment of the Crime of Genocide Art. 2(c), Dec. 9. 1948, 78 U.N.T.S. 277.

attend a meeting of the South African Non-Racial Olympic Committee, of which he was president. The police transported him to a prison in a security vehicle. When released on bail, Dr. Brutus fled to Swaziland and Mozambique, was arrested by the Portugese secret police, and was turned over to the SAP. In September 1963, Dr. Brutus attempted to escape but was shot through his back by the South African Secret Police. He was hospitalized in Fort Prison Hospital until December 1963. Dr. Brutus was sentenced to eighteen months hard labor in Leeuwkop Prison in January 1964, was transferred to Robben Island Prison in March 1965, and in July 1965 was placed under house arrest until July 1966. Additionally, Dr. Brutus was denied South African citizenship because of racial classification as a black person. Dr. Brutus, who served on the faculties of the University of Denver, Northwestern University, and the University of Pittsburgh, testified three times before United Nations ("UN") committees on apartheid issues. Dr. Brutus passed away in December 2009.

21. **Mark Fransch** is the personal representative and brother of **Anton Fransch**, who was murdered by the SAP and the SADF in September 1989, when he was 20 years old. Mr. Fransch was a member of the African National Congress ("ANC"). SAP and SADF officers said that Mr. Fransch was a "dog" and that they would kill him. When Mr. Fransch was staying at a house on Church Street in Crawford, thirty to forty officers, some of whom arrived in a Casspir vehicle, repeatedly shot into the house, killing Mr. Fransch and leaving flesh and hair on the wall.

22. **Elsie Gishi** was shot by the SAP on December 26, 1976. On that day, as Ms. Gishi returned from work, she found a group of youths protesting in her township. There was a heavy police and military presence. The officers kicked in the door of her house and one soldier shot Ms. Gishi from a Casspir vehicle. Multiple bullets entered her back and remain lodged in

her chest and arms. One bullet lodged in her throat. Another bullet is lodged inside a bone in

her left arm and, as a result, she can no longer lift her left arm and the entire left side of her body

is lame. She can no longer bathe herself or do other washing. The three remaining bullets cause

her respiratory dysfunction and kidney problems. Ms. Gishi is permanently disabled and

continues to suffer as a result of the shooting. She is currently bedridden.

23.     **Lesiba Kekana** was tear gassed during numerous student gatherings in 1985 and

1986. Mr. Kekana was unlawfully arrested by soldiers driving a Casspir vehicle. He was

fingerprinted and detained without trial from June 1986 to February 1987. During his detention,

he was tortured. Additionally, Mr. Kekana was denied South African citizenship because of

racial classification as a black person. Mr. Kekana still suffers from the torture and abuse.

24.     **Archington Madondo** is the personal representative and father of **Mandla**

**Madondo**, who was murdered by the SADF on July 10, 1986. Mandla Madondo was sent by his

father to buy some bread. While he was standing with friends outside the shop, he was shot to

death by South African soldiers who were driving down the street in a Casspir vehicle. Mandla

Madondo was just 16 years old when he died. His twin brother, Thamsanqa, was arrested shortly

after Mandla's murder and was imprisoned for one year without a trial.

25.     **Mpho Alfred Masemola** was arrested and detained without trial for two months

in 1982 for not having a passbook. Between 1982 and 1984, Mr. Masemola was monitored and

under 24-hour surveillance because of his involvement organizing boycotts and with a banned

organization. Mr. Masemola was then imprisoned on Robben Island from August 11, 1985 to

1990. During his time in detention, Mr. Masemola was beaten so badly that his arm was broken

and had to be in a plaster cast for one year. He was also hit with iron bars while in detention for

passbook violations. Mr. Masemola was tear gassed at school, during riots, and in his prison

cell.  Mr. Masemola spent one year in solitary confinement without treatment for his broken arm.

The police also shot Mr. Masemola.  He still has bullet fragments lodged in his head that cause

severe headaches.  The bullet fragments cannot be removed.  Additionally, Mr. Masemola was

denied South African citizenship because of racial classification as a black person. Mr.

Masemola still suffers from the torture.

      26.    **Vimba Wiseman Mbele** is the personal representative of **Michael Mbele**, born

on October 31, 1944, was politically active in a union as a shop steward and was also a United

Democratic Front member.  Mr. Mbele was arrested twice for passbook violations after moving

from the Transkei region of South Africa to KwaZulu Natal in 1973 without appropriate

authorization.  Then, in 1986, the Special Security Police detained Mr. Mbele, transported him

by a security vehicle to prison, and tortured him on account of his political activities.  For three

straight days police beat and shocked Mr. Mbele with electric pipes, then choked him with a

rubber tire.  As a result of his torture, Mr. Mbele lost his hearing.  Mr. Mbele's suffering

continued for eleven more months as police placed him in solitary confinement.  Additionally,

Mr. Mbele was denied South African citizenship because of racial classification as a black

person.  Mr. Mbele recently passed away.

      27.    **Mamosadi Catherine Mlangeni** was arrested, detained, and fined for not having

a passbook on as many as eight different occasions.  Each time, she would be transported to

prison by a security vehicle, detained for a period of days, and forced to pay 200 rand to be

released.  There was never a trial for any of these violations.  On many of these occasions Ms.

Mlangeni was also beaten by the security forces.  Ms. Mlangeni believes she was monitored.

The police would stop her and say things that indicated they knew who she was.  Sometimes,

only a day after she was released from jail, the police would re-arrest her.  Sometimes it was the

same police officers, while at other times it was their colleagues. Ms. Mlangeni was even stopped and told by the police that they were going to get her or her son, Bheki Mlangeni. In 1984 and again in 1986, Ms. Mlangeni was placed under house arrest for two to three months due to her son's status as an enemy of the state. Ms. Mlangeni was constantly harassed by police, who were trying to capture Bheki Mlangeni. The Security Branch came to her home once, asking for her son, then hit and kicked her and destroyed her property when she told them that Bheki Mlangeni was not there. Bheki Mlangeni was murdered in front of his family by a parcel bomb that was planted in the earphones of a walkman on February 15, 1991. Additionally, Ms. Mlangeni was denied South African citizenship because of racial classification as a black person. Ms. Mlangeni still suffers from these abuses.

28. **Reuben Mphela** was detained and transported by security vehicle to a prison several times between 1976 and 1982 for failing to produce a passbook. On these occasions, the SAP came to arrest him at work. He was beaten, kicked, and made to jump like a frog. Mr. Mphela's family was traumatized by his imprisonment. He still suffers as the result of his injuries.

29. **Thulani Nunu** was shot by the SAP in 1985 when he was just six years old and living in the Nyanga Bush. It was night time and the SAP was raiding houses and shooting at youth with tear gas and live ammunition from Hippo military vehicles and vans. Panicked by the noise and the tear gas that filled his house, Mr. Nunu ran outside. The police fired at him from a Hippo vehicle and struck him in the head and hand. As a result of his injuries, Mr. Nunu lost 60% of the use of his hand. Because of his head wound, Mr. Nunu has permanent visual and hearing impairment. He still suffers from these injuries.

30.     **Thandiwe Shezi** was tortured and raped by the Security Police.  On September 8, 1988, the police stormed into Ms. Shezi's home and beat and strangled her in front of her daughter.  They then took Ms. Shezi in a security vehicle to the Alexander Police Station where they tortured her further.  She was handcuffed and a wet sack was tied over her head.  She was then taken to a room where she was electrocuted for twenty minutes.  Next she was raped repeatedly by four police officers.  In addition to physical torture, the police also psychologically tortured Ms. Shezi.  The police forced Ms. Shezi to watch as they smashed another prisoner's penis in a drawer.  When the prisoner screamed out in pain they wanted Ms. Shezi to laugh.  On one occasion, the police took Ms. Shezi outside, stripped her naked and tied her to a tree.  They smeared her legs with butter, opened them wide, and threw ants all over her.  The ants crawled into her vagina.  On at least one occasion, while Ms. Shezi was being electrocuted, acid was poured over her head.  Because of the torture, Ms. Shezi could not eat solid food for almost a month.  Additionally, Ms. Shezi was denied South African citizenship because of racial classification as a black person.  She still suffers from the physical and mental effects of the torture and sexual assault.

31.     **Thobile Sikani** was repeatedly detained, tortured, and shot by the SAP.  The police shot Mr. Sikani in 1983, while he was attending a funeral for four of his friends.  Without warning, the SAP opened fire on the funeral procession.  Mr. Sikani was carrying the coffin of one of his friends when he was shot in the back and the left leg by the SAP.  In 1986, the SAP transported Mr. Sikani by a security vehicle and fingerprinted and detained him at the Bishop Lavis Police Station because he was chairperson of the ANC Youth League.  The SAP officers beat Mr. Sikani for hours and placed his scrotum and testicles in a machine that caused excruciating pain and made Mr. Sikani pass out.  The SAP transferred Mr. Sikani in a security

vehicle to other facilities where the torture continued. At Bellville-South Police Station, an SAP officer inserted needles under Mr. Sikani's finger nails to coerce Mr. Sikani into talking about the ANC, but Mr. Sikani refused. Mr. Sikani was then taken to the hospital and treated for his injuries. After his treatment, the SAP took him back to the Wynberg Police Station where he was detained for five months without trial. In 1987, Mr. Sikani was again detained at the Wynberg Police Station for two months and tortured. At one or more times during his detentions, Mr. Sikani was transported in a Casspir military vehicle. In 1988, Mr. Sikani was attending a welcome home rally for the ANC leadership when the police shot tear gas with a pumpgun into Mr. Sikani's face. Additionally, Mr. Sikani was denied South African citizenship because of racial classification as a black person. Mr. Sikani's stomach swelled up and he was rushed to the hospital. Mr. Sikani still suffers from the torture and abuse.

**B. Defendants**

32. Defendant **Ford Motor Company** ("Ford"), an international automobile giant, is organized and incorporated under the laws of Delaware. Headquartered in Dearborn, Michigan, Ford does business in New York State and has offices in New York State.

33. Defendant **International Business Machines Corporation** ("IBM") is a global leader in manufacturing computer systems, software, networking systems, storage devices, and microelectronics. IBM is headquartered in New York State and does business in New York State.

**V. CLASS ACTION ALLEGATIONS**

34. Class Plaintiffs bring this action pursuant to Rules 23(a), (b), and (c) of the Federal Rules of Civil Procedure. Plaintiffs seek certification of the following distinct classes:

a. Extrajudicial Killing Class: All persons who are the surviving personal representatives—including parents, spouses, children, siblings, and dependents— of persons who were subject to extrajudicial killing by South African security

forces during the period from 1960 to 1994. Class representatives: Sakwe Balintulo, personal representative of Saba Balintulo; Mark Fransch, personal representative of Anton Fransch; and Archington Madondo, personal representative of Mandla Madono;

b.      Torture Class:  All persons who were themselves and/or who are the personal representatives of persons who were subject to torture and rape by South African security forces during the period from 1960 to 1994.  Class representatives:  Lesiba Kekana, Mpho Alfred Masemola, Vimba Wiseman Mbele personal representative of Michael Mbele, Mamosadi Catherine Mlangeni, Thandiwe Shezi, and Thobile Sikani;

c.      Detention Class:  All persons who were themselves and/or who are the personal representatives of persons who were subject to prolonged unlawful detention for pass violations or other alleged Apartheid offenses by South African security forces during the period from 1960 to 1994.  Class representatives: Tony Brutus personal representative of Dennis Vincent Frederick Brutus, Lesiba Kekana, Mpho Alfred Masemola, Vimba Wiseman Mbele personal representative of Michael Mbele, Mamosadi Catherine Mlangeni, Thandiwe Shezi, and Thobile Sikani;

d.      Cruel Treatment Class:  All persons who were themselves and/or who are the personal representatives of persons who were subject to cruel, inhuman, and degrading treatment by South African security forces during the period from 1960 to 1994.  Class representatives: Elsie Gishi, Lesiba Kekana, Mpho Alfred Masemola, Vimba Wiseman Mbele personal representative of Michael Mbele,

Mamosadi Catherine Mlangeni, Reuben Mphela, Thulani Nunu, Thandiwe Shezi, and Thobile Sikani;

e.      Denationalization Class:  All persons who were themselves and/or who are the personal representatives of persons who were stripped of their South African nationality and/or citizenship by South African security forces during the period from 1960 to 1994.  Class Representatives: Tony Brutus personal representative of Dennis Vincent Frederick Brutus, Lesiba Kekana, Mpho Alfred Masemola, Vimba Wiseman Mbele personal representative of Michael Mbele, Mamosadi Catherine Mlangeni, Thandiwe Shezi, and Thobile Sikani.

35.      The members of each of these classes are so numerous that joinder of all members is impractical.  The exact number and identities of all class members is not currently known, but Plaintiffs believe that each proposed class numbers in the thousands.  For example, according to the ANC, the South African security forces were responsible for over 12,000 civilian deaths and 20,000 civilian injuries in the period from 1990 to late 1993 alone.[6]  Between 1960 and 1990, over 80,000 opponents of apartheid were detained for up to three years without trial, including approximately 10,000 women and at least 15,000 children under the age of 15.[7]  A 1988 report noted:

> Anti-apartheid and human rights groups, such as the Detainee Parents Support Committee (DPSC), have accused the security forces of widespread brutality, including torture of detainees, assaults, killings and rape, as well as, on occasion, the wanton destruction of property.  More than 3,000 blacks reportedly have died in the violence of the last three

---

[6]   African National Congress First Submission to the Truth and Reconciliation Commission, Aug. 1996, at 25 [heareinafter *First Submission*].

[7]   Kenneth Christie, *The South African Truth Commission* 21-22 (St. Martin's Press, Inc., 2000). Max Coleman (ed.), *A Crime Against Humanity: Analysing the Repression of the Apartheid State* xi-xii (Mayibube Books, 1998).

years, many of them in confrontations with the security forces. More than 20,000 political opponents of the white regime have been imprisoned, including several thousand children.[8]

36.     There are questions of law and fact that are common to members of each distinct class or to members of all classes, including, but not limited to:

(a) whether and to what extent United States Defendants provided practical assistance to the South African security forces for the purpose of facilitating the crimes of apartheid;

(b) whether and to what extent United States Defendants purposefully substantially assisted the South African security forces in maintaining and enforcing apartheid through campaigns of violence and terror, including committing the crimes of extrajudicial killing; torture; prolonged unlawful detention; denationalization; and cruel, inhuman, and degrading treatment;

(c) whether and to what extent Defendants knew of the violence and terror perpetrated by the South African security forces, benefited from the system of apartheid and the crimes with and by which it was maintained and enforced, and continued to provide practical assistance for the purpose of facilitating the commission of those crimes;

(d) whether and to what extent Defendants aided and abetted or otherwise participated in or were liable for the crimes committed by the South African security forces;

(e) whether the system of apartheid enforced by the South African security forces is actionable under the Alien Tort Claims Act as a tort in violation of international law;

(f) whether the conduct of the South African security forces constituted extrajudicial killing, torture, prolonged unlawful detention, denationalization, and/or cruel, inhuman, and

---

[8]   Investor Responsibility Research Center, Inc., Social Issue Service, Proxy Issue Report, *Sales to Strategic Entities in South Africa* (Feb. 23, 1988), at G-10.

degrading treatment and is actionable under the Alien Tort Claims Act as a violation of international law;

(g) whether each plaintiff class is entitled to compensatory and/or punitive damages and/or equitable relief, and the proper measure thereof;

(h) whether these actions against the class members were committed by the apartheid state with the complicity of Defendants, either by aiding and abetting or purposely participating in a joint criminal enterprise; and

(i) whether and to what extent Plaintiffs' claims against U.S. corporations providing material assistance to South African security forces in contravention of U.S. foreign policy touch and concern the territory of the United States.

37.    Plaintiffs' claims are typical of those of their respective class(es) in that they (and/or the decedents they represent) were civilians who suffered extrajudicial killing, torture, prolonged unlawful detention, denationalization, and/or cruel, inhuman, and degrading treatment by reason of the conduct of the South African security forces during the time period in which Defendants provided assistance to those forces.

38.    Class Plaintiffs will fairly represent the interests of their respective class(es) because it is in their best interest to prosecute the claims alleged herein to obtain full compensation due to them for the conduct of which they complain.  Class Plaintiffs have no interests that conflict with or are contrary to the interests of other class members.

39.    Class Plaintiffs will adequately represent their respective class(es) in that they are represented by counsel with extensive experience in international human rights and class action litigation.

40.     Pursuant to Fed. R. Civ. P. 23(b)(3), questions of law and fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

41.     In the alternative, certification of particular issues pursuant to Fed. R. Civ. P. 23(c)(4) is appropriate with respect to those issues identified in paragraph 36 and/or other significant common issues as resolution of these issues would significantly and materially advance this litigation, reduce the range of issues in dispute, and promote judicial economy.

## VI.     BACKGROUND FACTS APPLICABLE TO ALL COUNTS

42.     In 1948, the National Party won control of the South African government, using apartheid as its primary electoral platform.[9]  The National Party then passed a series of laws to implement and institutionalize apartheid.

### A.     Apartheid-Era Laws

43.     Apartheid is a crime against humanity.[10]  It is a system of "inhumane acts . . . committed in the context of an institutionalized regime of systematic oppression and domination by one racial group over any other racial group or groups and committed with the intention of maintaining that regime."[11]  It is a system that depends on systematic violence and acts of terror, including murder; the infliction of serious bodily or mental harm; torture; or cruel, inhuman, and

---

[9]   Steven Debroey, *South Africa: Under the Curse of Apartheid* 188, 191 (University Press of America, Inc., 1990).

[10]   Rome Statute of the International Criminal Court, art. 7(1)(j), July 17, 1998, 2187 U.N.T.S. 90, 37 I.L.M. 999.

[11]   *Id.* at art. 7(2)(h).

degrading treatment; as well as institutional methods of disenfranchisement and segregation, for its maintenance and enforcement.[12]

44.     Apartheid-era laws classified all South Africans according to one of four races—white, "Coloured," Asiatic (Indian), and Native (African)[13]—and then designated specific residential and business areas for the sole use of particular racial groups.  The majority of the land was reserved for whites.  As a result, non-whites were forcibly removed from their homes.

45.     The Bantu Authorities Act of 1951 provided for the establishment of separate rural areas or homelands called "Bantustans" for most Africans to live according to their often bureaucratically-imposed tribal identity.[14]  "[T]he dilemma of Bantustan policy in the final analysis was one in which the contradiction of the apartheid attempt to confine black settlement to rural homelands along with the need to secure black, cheap labour power in the cities, created the repression, the hatred and the patterns which would lead to spiraling violence in later years."[15]

46.     The government required all Africans over the age of 16 to carry passbooks, which included their Population Registration identity card, their fingerprints, and pages for any history of government opposition, labor control, and employer signatures.[16]  These regulations

---

[12]  International Convention on the Suppression and Punishment of the Crime of Apartheid, 1015 U.N.T.S. 243, art. II.

[13]  Nigel Worden, *The Making of Modern South Africa, Third Edition* 108 (Blackwell Publishers Ltd., 2000).

[14]  Christie, *supra* note 7, at 20.

[15]  *Id.* at 25.

[16]  *Id.* at 5 "Natives Act."

were referred to as "pass laws." Without the proper documentation, no African could legally enter or remain in an urban area.[17]

47.     These laws restricted the freedom of movement of Africans so as to channel workers where employers need cheap labor, facilitated the policing of workers, allowed the "weeding out" of the unemployed and "troublemakers," confined and barricaded the "surplus population" in the rural slums of the Bantustans, and stripped Plaintiffs and Class Members of their nationality and citizenship.[18]

48.     The pass laws were an instrument of coercion and control dating to the prior century "to have a hold on the native whom we have brought to the mines … a most excellent law … which should enable us to have complete control of the Kaffirs."[19]

49.     In addition to controlling movement and access to urban areas, the apartheid laws zoned residential and business districts on a racial basis.[20] Amenities—including cinemas, restaurants, sports facilities, and public vehicles—were also officially segregated.

50.     Job reservation laws excluded Africans from better paid, more skilled categories of work.[21] Master and Servant laws made it a crime—punishable by imprisonment—for Black

---

[17]  Bentley J. Anderson, *The Restoration of the South African Citizenship Act:  An Exercise in Statutory Obfuscation*, 9 Conn. J. Int'l L. 295, 310.

[18]  Robert Davies, Dan O'Meara and Sipho Dlamini, *The Struggle for South Africa* 171 (Zed Books, 1985).

[19]  African National Congress Submission to Special Truth and Reconciliation Commission on the Role of Business, Nov. 1997, at 2 (quoting the President of the Chamber of Mines at the end of the last century) [hereinafter *Role of Business*].  "Kaffir" is a derogatory term for Africans.

[20]  Davies, et al., *supra* note 18, at 172.

[21]  *Id.* at 174; *see, e.g.* Native Building Workers Act (1951), Industrial Conciliation Act (1956).

workers to break an employment contract by, *inter alia*, desertion, insubordination, or refusing to carry out an employer's command.[22]

51.     Laws banned relations between races.[23]  The Immorality Amendment Act, barring intercourse between the races,[24] led to the jailing of over 6,000 people between 1950 and 1966.[25] The government also prohibited interracial marriages in 1949.

52.     The apartheid government also enacted laws to suppress dissent.  In 1956, the Riotous Assemblies Act was passed, granting the Minister of Justice wide powers to control public gatherings and to prohibit a gathering if he deemed that it posed a threat to the peace.[26] The Act further allowed the police to disperse with force any gathering that took place in violation of its prohibition.[27]

53.     In 1960, the Prime Minister gained power under the Unlawful Organizations Act to ban the ANC and the Pan-Africanist Congress.[28] Other African organizations later were

---

[22]  *Role of Business, supra* note 19, at 2.  The laws remained on the books until 1977.

[23]  *See* Worden, *supra* note 13, at 107. An Amendment to the Prohibition of Mixed Marriages Act was passed in 1968 to make void any illegal marriage by a South African, even if it took place outside of South Africa.

[24]  The ban on intercourse between whites and Africans already was in place prior to this Act, which extended the ban to all non-whites. The Act was further tightened in 1967. Brian Bunting, *The Rise of the South African Reich*, Chapter Nine: South Africa's Nuremberg Laws 21 (Penguin Africa Library, 1969).

[25]  *Id.* at 3 (discussing statistics of Minister of Justice in Parliament).

[26]  Other related legislation included the Internal Security Act of 1950, the Gatherings and Demonstrations Act of 1973, and the Dangerous Weapons Act of 1968.  *See* Janine Rauch and David Storey, *Policing of Public Gatherings and Demonstrations in South Africa 1964-1994*.

[27]  *Id.* at 9.

[28]  Bunting, *supra* note 24, at 14.  The Unlawful Organizations Act also increased the fines and physical punishment under the Riotous Assemblies Act.

banned under the Affected Organizations Act[29] and the Internal Security Act, which also banned all political meetings during April 1, 1986 – March 31, 1987 as part of a State of Emergency.[30]

### B.    The Violence and Terror of Apartheid

54.    "What was involved (in apartheid) was far more than simply the implementation of what the world regarded as a criminal policy.  What was of even greater significance was the use of criminal means to defend apartheid.  The massive powers given to the state to control people's lives and deny them their basic rights were not enough.  They were supplemented by every species of common law crime, including systematic and organized murder, fraud, kidnapping and torture."[31]

55.    "Some 16.5 million South Africans were criminalised and harassed under the pass laws . . . .  Four million people were forcibly removed from their homes and land during the heyday of apartheid social engineering.  Three hundred apartheid laws were put on the statute books to control and disadvantage black South Africans from the cradle to the grave."[32]

56.    Under the pass laws, failure to produce a passbook on demand was an arrestable offense regardless of how legally and how long one may have been living in an urban area.  In 1976 alone, 250,000 Africans were arrested under the pass laws and related influx control laws, according to the Africa Fund.

---

[29]  David Webster and Maggie Friedman, *Repression and the State of Emergency: June 1987 – March 1989.* Glenn Moss and I. Obery (eds.), *State and Politics* 26-27 (Ravan Press Ltd., 1989).

[30]  *Id*. at 163.  For a list of banned organizations, *see* Webster and Friedman, *supra* note 29 at 26-27.

[31]  This quote was taken from the foreword to the Idasa "Truth and Reconciliation in South Africa" 1994 conference proceedings.  *See* Christie, *supra* note 7, at 15.

[32]  Paul Connerton, *How Societies Remember* 1-4 (Cambridge University Press, 1989); *see, e.g.,* Christie, *supra* note 7, at 13.

57.     According to the apartheid government's own statistics, 2,419,675 people were arrested or prosecuted under the pass laws between 1974 and 1985.[33]

58.     The emergence of rural resistance was met with banishment—62 individuals were removed from where they lived and relocated across the country to areas where they knew no-one and were prevented from any kind of employment.

59.     It has been estimated that 12 million Blacks were unlawfully arrested and convicted in summary trials between 1948 and 1985 for pass violations.[34]

60.     Resistance to apartheid reached a turning point in 1960.  On March 21, 1960, a crowd of between 7,000 and 20,000 gathered in Sharpeville to protest against the pass laws.  The demonstrators marched to the municipal police station to turn in their pass books.  The police opened fire on the crowd, using machine guns and automatic weapons.  Sixty-nine people were killed and 186 wounded, many of them women and children and most shot in the back as they ran from the gunfire.[35]

61.     That same day, police fired on a crowd of 10,000 demonstrators in Langa, killing two people and wounding 49 others.[36]

62.     Following Sharpeville, the state called its first State of Emergency.  In the three months following the March 1960 State of Emergency declaration, police detained over 10,000 people and arrested a further 10,000, primarily on the charges of pass violations.[37]

---

[33]  International Defense and Aid Fund for Southern Africa, *Apartheid:  The Facts* 48-49 (1991).

[34]  Kevin Hopkins, *Assessing The World's Response To Apartheid*, 10 U. Miami Int'l & Comp. L. Rev. 241, 247 (2001-2002).

[35]  Christie, *supra* note 7, at 27-28; Steve Clark (ed.) *Nelson Mandela Speaks: Forging a Democratic, Nonracial South Africa* 275 (Pathfinder, 1993).

[36]  *Id*.

[37]  Webster and Friedman, *supra* note 29, at 141.

63.     The ANC described the resistance that began in the 1970s as follows:

The early 1970s witnessed a slowdown in the economy and increased privations among the black population.  Spontaneous as well as organized mass resistance began to surface for the first time in a decade. . . .

Faced with internal mass upsurge, the response of the regime was brute force:  detention, closure of institutions, brutal suppression of demonstrations and strikes; and in 1976, cold-blooded shooting of unarmed pupils.  The actions of the regime on 16 June 1976, and in the 18 months following this eruption, brought out in bold relief the determination of the apartheid regime to deny human rights at all costs.

Notes taken during a Cabinet meeting by Jimmy Kruger, at the time Minister of Police, reveal an extraordinary level of self-delusion, or the deliberate denial of reality in order to justify murder:

> "10.8.76.
>         Unrest in Soweto still continues.  The children of Soweto are well-trained. (…)  The pupils/students have established student councils.  The basic danger is a growing black consciousness, and the inability to prevent incidents, what with the military precision with which they act.  The Minister proposes that this movement must be broken and thinks that police should perhaps act a bit more drastically and heavy-handedly which will entail more deaths.
> Approved.

As the decade came to a close, there was an attempt on the part of the state to employ a new approach grounded in "total strategy", an explicit commitment to mobilize military, economic, physical and psychological resources in defense of the existing order.  It brought senior police, Defense Force and intelligence officers directly into the formulation and implementation of government policy, through the State Security Council and the National Security Management System….[38]

---

[38]  African National Congress document, *The National Party and the Anatomy of Repression in South Africa, 1984 – 1994* at 4.6 found at http://www.anc.org.za/ancdocs/misc/trc04.html (last visited Sept. 30, 2008)

64.    In response to the Sharpeville massacre and the growing trend of government resistance, the SAP instituted Divisional Anti-Riot Units to deal with crowd control.[39]  In 1975, the Divisional Anti-Riot Units gave way to new counter-insurgency units, dedicated to crowd and riot control.[40]

65.    Before 1984, the SAP were primarily responsible for controlling the resistance. But as the unrest spread from the townships around Johannesburg to the rest of the country, SADF troops were deployed.  In July 1985, a State of Emergency was declared in riot torn targeted areas.[41]

66.    After 1985, the SADF, supplemented by the SAP, was deployed in most Black townships.  The SADF was responsible for enforcing emergency regulations which included a ban on protest gatherings.  The SADF was also deployed to force Black students who were boycotting classes back to school.[42]

67.    On June 12, 1986, Minister of Law and Order Louis La Grange imposed yet another State of Emergency.  By June 1987, 26,000 people had been detained, equaling the total detained under all previous emergencies and legislation for the past 26 years.[43]

---

[39]  Rauch and Storey, *supra* note 26.  Furthermore, in 1964, the Defence Amendment Act provided for the SAP to call upon the Citizen Force and Commandos in the event the police needed support in suppression of civil unrest. As of 1967, all white 17-year olds would serve in the Citizen Force or Commandos.

[40]  *Id*.

[41]  Investor Responsibility Research Center Inc., *supra* note 5, at G-10.

[42]  *Id*.

[43]  Webster and Friedman, *supra* note 29, at 142.

68.     In 1991, the Internal Stability Division, a division of the SAP mobilized to handle racial unrest, was introduced under the government of President Frederick William de Klerk.  By the 1990s, a total of 72 riot units existed, 30 of them dedicated to the homelands.[44]

69.     These special Internal Stability Division riot units used offensive tactics and heavy weaponry, such as batons, teargas, automatic weapons, shotguns, and handguns.[45]  They relied heavily on armored vehicles for crowd control.[46] According to a report of the TRC, "the training and equipment of riot police, and the deployment ratios of these policemen relative to the size of the crowds that they confronted, were all based on the assumption that crowds would be controlled and dispersed through the use of force."[47]

70.     The riot units viewed the use of lethal force as an acceptable and routine means of crowd control, and were responsible for most of the apartheid-era killings.[48]  "As the external environment in which they operated took on the character of a low-intensity civil war, their training, equipment, and methodology became increasingly militarized."[49]  The TRC report noted that the riot policing function "was in direct contrast to reforms being made to public order policing methods elsewhere in the democratic world at this time."[50]

71.     A panel of doctors from the National Medical and Dental Association who treated detainees after their release found that 83 percent of released detainees exhibited signs of

---

[44]  Rauch and Storey, *supra* note 27.

[45]  Description of Weapons from CSVR, s*ee* Rauch and Storey, *supra* note 27, at 15–17, Exhibit G.

[46]  Rauch and Storey, *supra* note 27.

[47]  *Id*.

[48]  *Id*. at 1.

[49]  *Id*.

[50]  *Id*. at 4.

physical abuse, and 25 percent of the released detainees alleged sexual abuse. Of those examined (ranging in age from 14 to 45), 95 percent showed symptoms of post-traumatic stress disorder. Detention time ranged from 4 hours to 315 days.[51]

72.     Evidence from court records and lawyers indicates that the practice of torture to secure admission of guilt was common.[52]

73.     The torture of detainees was the result of training and indoctrination, not the work of aberrant individuals. Many women detainees suffered sexual abuse. The families and friends of detainees were frequently subjected to sustained harassment and surveillance.[53]

74.     The violent, criminal acts committed by the apartheid regime were intended to cause death or serious bodily injury to civilians and the purpose of such acts was to intimidate and coerce the civilian population.

75.     Systematic violence, including extrajudicial killing, torture, prolonged unlawful detention, denationalization, and cruel, inhuman, and degrading treatment, was an integral and indispensable element of apartheid employed by the security forces to maintain and enforce the system.

---

[51] *See* Webster and Friedman, *supra* note 29, at 167-68. Webster further notes that the DPSC (Detainee Parents Support Commission, which was renamed the Human Rights Committee of South Africa in 1995), the organization that created these reports, distinguishes between police custody and detention. Detention referring to those people held under security or state of emergency legislation, while police custody refers to people held under criminal legislation even if the motive for custody ostensibly is for political arrest. *Id.* at 168.

[52] *Controls on Exports to South Africa: Hearings Before the Subcommittees on International Economic Policy and Trade and on Africa of the H. Comm. on Foreign Affairs*, 97th Cong, 2d Sess. Feb. 9 and Dec. 2, 1982 at 21 (statement of Goler Teal Butcher on Behalf of the Lawyers' Committee for Civil Rights Under Law).

[53] *First Submission, supra* note 6, at 2-3.

76.     Between 1990 and the end of 1993, over 12,000 civilians were killed and at least 20,000 injured by the security forces of apartheid South Africa.  Many of the victims were women and children.  The numbers of assassinations of anti-apartheid leaders also increased, from 28 in 1990, to 60 in 1991 and 97 in 1993.[54]

77.     In 1993, negotiations led to an agreement on the date for non-racial elections, and Nelson Mandela, as leader of the ANC, called for the lifting of economic sanctions.

78.     Apartheid officially ended in 1994 with the first universal suffrage general election and the election of Nelson Mandela.

C.     **Truth and Reconciliation Commission Findings**

79.     The South African TRC was set up by the Government of National Unity under the Promotion of National Unity and Reconciliation Act to assess and begin to heal the damage inflicted by apartheid.  Led by Archbishop Desmond Tutu, the TRC had a multiracial staff of more than 60, which pursued its mandate through three committees:  the Amnesty Committee, the Reparation and Rehabilitation (R&R) Committee, and the Human Rights Violations Committee.  The TRC began its hearings on April 15, 1996 through 2002, although the Amnesty Committee continued to decide cases after that date.  The Final Report was released in March 2003.

80.     The TRC specifically found that "Certain businesses were involved in helping to design and implement apartheid policies.  Other businesses benefited from cooperating with the security structures of the former state."[55]

---

[54]  *Id.* at 25.

[55]  Vol. 4, Ch. 2 of TRC "Institutional Hearing: Business and Labor," Findings Arising out of Business Sector Hearings, ¶ 161.

81.    The TRC also found that "Business failed in the hearings to take responsibility for its involvement in state security initiatives specifically designed to sustain apartheid rule.  This included involvement in the National Security Management System.  Several businesses, in turn, benefited directly from their involvement in the complex web that constituted the military industry."[56]

82.    The TRC identified as participants in apartheid "businesses that made their money by engaging directly in activities that promoted state repression,"[57]  such as companies that "provided armored vehicles to the police during the mid-1980s,"[58] as would companies in the armaments industry:  "the moral case against the armaments industry is essentially that business willingly (and for profit) involved itself in manufacturing products that it knew would be used to facilitate human rights abuses. . . ."[59]

83.    In September 2009, the South African Government sent a letter to the Honorable Judge Shira A. Scheindlin indicating that it does not object to the litigation of Plaintiffs' claims against U.S. companies supplying goods and/or services to Apartheid security forces in U.S. courts.[60]

---

[56]  *Id.* at ¶ 166

[57]  *Id.* at ¶ 26.

[58]  *Id.*

[59]  *Id.* at ¶ 75.

[60]  *See* Letter from J.T. Radebe, MP, Minister of Justice and Constitutional Development to U.S. District Ct. Judge Shira A. Scheindlin, Sept. 1, 2009.

VII.    **UNITED STATES AND INTERNATIONAL ANTI-APARTHEID POLICIES PROVIDED DEFENDANTS WITH NOTICE AND KNOWLEDGE OF THE ACTIVITIES OF THE APARTHEID SECURITY FORCES**

84.     Beginning in 1950, the world community and the United States condemned apartheid as a crime against humanity and instituted a variety of sanctions against South Africa. United Nations resolutions reflected this emerging consensus among civilized societies. Individual nations passed laws in response to the resolutions and in conformity with their objectives. Private and transnational organizations took similar steps to implement the objectives of the resolutions.

85.     These actions over a span of 40 years explicitly placed businesses involved in the financial and economic support of the security forces' abuses of the apartheid government on notice that their involvement violated international law and constituted purposeful participation in a crime against humanity.

86.     For example, in 1960, the U.N. Security Council issued a Resolution deploring "the situation arising out of the large-scale killings of unarmed and peaceful demonstrators against racial discrimination and segregation in the Union of South Africa," and called upon South Africa to abandon apartheid.[61]

87.     On November 6, 1962, the General Assembly called on member states to refrain from exporting arms and ammunition to South Africa, which would be used to increase "ruthlessness involving violence and bloodshed."[62]

88.     Less than one year later, on August 7, 1963, the Security Council adopted Resolution 181 condemning the arms build-up in South Africa and calling on all States and their

---

[61]  S.C. Res. 134, U.N. Doc. S/RES/134  (Apr. 1, 1960).

[62]  G.A. Res. 1761, U.N. Doc. A/Res/1761(XVII) (Nov. 6, 1962).

domestic corporations to "cease forthwith the sale and shipment of arms, ammunition of all types and military vehicles to South Africa."[63]

89. In 1968, the General Assembly declared apartheid to be a crime against humanity:

*Reiterates* its condemnation of the policies of apartheid practiced by the Government of South Africa as a crime against humanity; ….
*Expresses its grave concern* over the ruthless persecution of opponents of apartheid under arbitrary laws . . . .[64]

90. The General Assembly specifically "condemn[ed]"

the main trading partners of South Africa, and the activities of those foreign financial and other interests, all of which, through their political, economic and military collaboration with the Government of South Africa and contrary to the relevant General Assembly and Security Council resolutions, are encouraging that Government to persist in its racial policies.[65]

91. In 1972, The Security Council passed a Resolution urging Member States to observe the arms embargo against South Africa.[66]

92. The International Conference of Experts for the Support of Victims of Colonialism and Apartheid in South Africa met in Oslo, Norway, in 1973. The Conference adopted the following program of action:

---

[63] The Security Council reaffirmed this Resolution in December 1963 and included all shipments of any materials that might be used to build arms or ammunition. The Resolution again was strengthened in July 1970. Security Council Resolution, *Question Relating to the Policies of Apartheid of the Government of the Republic of South Africa, See* S.C. Res. 181, U.N. Doc. S/RES/181 (Aug. 7, 1963); S.C. Res.,182 U.N. Doc. S/RES/182 (Dec. 4, 1963); S.C. Res. 282, U.N. Doc. S/RES/282 (July 23, 1970).

[64] G.A. Res. 2396, U.N. Doc. A/RES/2396 (XXIII) (Dec. 2, 1968).

[65] *Id.*

[66] S.C. Res. 311, U.N. Doc. S/RES/311 (Feb. 4, 1972). Also in 1972, the General Assembly declared that "the United Nations has a vital interest in securing the speedy elimination of apartheid." *See* G.A. Res. 2923, U.N. Doc. A/RES/2923 E (XXVII) (Nov. 15, 1972).

(68) The international arms embargo should be fully implemented by all States, and the Security Council should expose those States which violate it, especially France, and secure their compliance. The Security Council should take further action to prevent the importation or arms from South Africa by other States. The Security Council should also examine all other forms of military co-operation with South Africa and take appropriate action.[67]

93.     Following discussions relating to the Conference's findings, the General Assembly adopted the International Convention on the Suppression and Punishment of the Crime of Apartheid.[68]  The Convention declared apartheid a crime against humanity, and all participants in apartheid as criminals, whether they were organizations, institutions, or individuals.  Article II of the Convention defined apartheid as:

[s]imilar policies and practices of racial segregation and discrimination as practiced in southern Africa, shall apply to the following inhuman acts committed for the purpose of establishing and maintaining domination by one racial group of persons over any other racial group of persons and systematically oppressing them:

a.  Denial to a member or members of a racial group or groups of the right to life and liberty of person:

1.  By murder of members of a racial group or groups;

2.  By the infliction upon the members of a racial group or groups of serious bodily or mental harm, by the infringement of their freedom or dignity, or by subjecting them to torture or to cruel, inhuman or degrading treatment or punishment;

3.  By arbitrary arrest and illegal imprisonment of the members of a racial group or groups; . . .

b.  Persecution of organizations and persons, by depriving them of fundamental rights and freedoms, because they oppose apartheid.

---

[67]  The Programme of Action Adopted by the International Conference of Experts for the Support of Victims of Colonialism and Apartheid in South Africa (Oslo, April 9-14, 1973), G.A. Res. 9061, U.N. Doc. A/RES/9061 (May 7, 1973).

[68]  International Convention on the Suppression and Punishment of the Crime of Apartheid, 1015 U.N.T.S. 243.

94.     Article III of the Convention described who would be held responsible for committing the acts outlined in Article II.

> International criminal responsibility shall apply, irrespective of the motive involved, to individuals, members of organizations and institutions and representatives of the State, whether residing in the territory of the State in which the acts are perpetrated or in some other State, whenever they:
>
> a.      Commit, participate in, directly incite or conspire in the commission of the acts mentioned in article II of the present Convention;
>
> b.      *Directly abet, encourage or cooperate* in the commission of the crime of apartheid.[69]

95.     Following the submission of the Preliminary Report of July 14, 1976, by the Special Rapporteur to the Special Committee against Apartheid, the General Assembly adopted a Resolution condemning "the collaboration of … those foreign economic interests which maintain and/or continue to increase their collaboration with the racist regimes in southern Africa, especially in the economic, military and nuclear fields."[70]

96.     In 1976 and again in 1977, the Security Council by Resolution condemned apartheid and specifically the South African Government for "its resort to massive violence against and killings of the African people, including schoolchildren and students and others opposing racial discrimination."[71]  The Security Council demanded an end to the violence against and repression of Black people and to release all political prisoners.[72]

---

[69]  International Convention on the Suppression and Punishment of the Crime of Apartheid, 1015 U.N.T.S. 243, art. III (emphasis added).

[70]  G.A. Res. 31/33, U.N. Doc. A/RES/31/33 (Nov. 30, 1976).

[71]  S.C. Res. 392, U.N. Doc. S/RES/392 (June 19, 1976).

[72]  S.C. Res. 417, U.N. Doc. S/RES/417 (Oct. 31, 1977).

97. In 1977, the Security Council once again called for an arms embargo against South Africa, but this time made it mandatory by invoking Chapter VII of the U.N. Charter.[73]

98. In November 1979, the United Nations Special Committee Against Apartheid in South Africa co-sponsored an International Seminar on the Role of Transnational Corporations in South Africa. The Seminar expressed the view that "transnational corporations bear a major share of responsibility for the maintenance of the system of apartheid, for strengthening the repressive and military power of the racist regime and for the undermining of international action to promote freedom and human dignity in South Africa."[74]

99. Following acts of police violence against student demonstrators, the Security Council adopted a Resolution supporting the arms embargo and condemning the violence in South Africa:

> 1. *Strongly condemn*[ed] the racist régime of South Africa for further aggravating the situation and its massive repression against all opponents of *apartheid*, for killings of peaceful demonstrators and political detainees and for its defiance of General Assembly and Security Council resolutions . . .

> 3. *Reaffirm*[ed] that the policy of *apartheid* is a crime against the conscience and dignity of mankind and is incompatible with the rights and dignity of man, the Charter of the United Nations and the Universal Declaration of Human Rights and seriously disturbs international peace and security; . . .

> 11. *Request*[ed] the Security Council Committee . . . to redouble its efforts to secure full implementation of the arms embargo against South Africa by recommending by 15 September 1980 measures to close all loop-holes in the arms embargo, reinforce and make it more comprehensive.[75]

100. The U.N. General Assembly declared by Resolution that:

---

[73] S.C. Res. 418, U.N. Doc. S/RES/418 (Nov. 4, 1977).

[74] Charles Peter Abrahams, *The Doctrine of Odious Debts* (Rijks Universiteit Leiden, Aug. 2000) at 79 (citing Transnational Corporations in South Africa and Namibia, The Review – International Commission of Jurists, No. 36-39 (1986-87), at 34).

[75] S.C. Res. 473, U.N. Doc. S/RES/473 (June 13, 1980).

> *continuing* political economic and military collaboration of certain
> Western states and their transnational corporations with the racist regime
> of South Africa encourages its persistent intransigence and defiance of the
> international community and constitutes a major obstacle to the
> elimination of the inhuman and criminal system of apartheid in South
> Africa. . . .[76]

101.    The General Assembly adopted a Resolution in December 1983 "reaffirming that

apartheid is a crime against humanity" and strongly condemning the apartheid regime for its

repression and brutal acts of torture, murder, and terror.  The Resolution specifically criticized

"transnational corporations and financial institutions that have increased political, economic and

military collaboration with the racist minority regime of South Africa despite repeated appeals

by the General Assembly. . . ."[77]

102.    In 1984, the General Assembly adopted another Resolution "vigorously"

condemning

> transnational corporations and other organizations which maintain or
> continue to increase their *collaboration* with the racist regime of South
> Africa, especially in the political, economic, military and nuclear fields,
> thus encouraging that regime to persist in its inhuman and criminal policy
> of brutal oppression of the peoples of southern Africa and denial of their
> human rights.[78]

---

[76]  General Assembly Resolution, *Policies of Apartheid of the Government of South Africa:
Situation in South Africa*, G.A. Res. 36/172 A, U.N. Doc. A/RES/36/172 A (Dec. 17, 1981).
Further, the United Nations General Assembly proclaimed the year 1982 as International Year of
Mobilization for Sanctions Against South Africa.  General Assembly Resolution, *Policies of
Apartheid of the Government of South Africa, International Year of Mobilization for Sanctions
Against South Africa, see also* G.A. Res. 36/172 B, U.N. Doc. A/RES/36/172 B (Dec. 17, 1981).

[77]  G.A. Res, 38/39, U.N. Doc. A/RES/38/39 A (Dec. 5, 1983).

[78]  G.A. Res. 39/15, U.N. Doc. A/RES/39/15 (Nov. 23, 1984).

103.    The Security Council further condemned apartheid as "a system characterized as a crime against humanity" including the "continued massacres of the oppressed people, as well as the arbitrary arrest and detention of leaders and activists of mass organizations…."[79]

104.    In 1984, the General Assembly again condemned the increasing violence of the Apartheid regime.[80]

105.    In 1985, the Security Council urged states to prohibit "all sales of computer equipment that may be used by the South African army and police."[81]

106.    In 1986, the Security Council urged:

> States to take steps to ensure that components of embargoed items do not reach the South African military establishment and police through third countries; . . .
>
> all States to prohibit the export to South Africa of items which they have reason to believe are destined for the military and/or police forces of South Africa, have a military capacity and are intended for military purposes, namely, aircraft, aircraft engines, aircraft parts, electronic and telecommunication equipment, computers and four-wheel drive vehicles.[82]

107.    The General Assembly in 1989 adopted another Resolution regarding the supportive ties of international corporations with South Africa, noting that "the maintenance of the apartheid economy and the expansion of military and police expenditures substantially

---

[79]  S.C. Res. 556, U.N. Doc. S/RES/556 (Oct. 23, 1984).

[80]  General Assembly Resolution, *Policies of Apartheid of the Government of South Africa: Comprehensive Sanctions against the apartheid regime and support to the liberation struggle in South Africa*, G.A. Res. 39/72 A, U.N. Doc. A/RES/39/72 A (Dec. 13 1984). These voluntary sanctions were renewed in 1985. General Assembly Resolution, *Policies of Apartheid of the Government of South Africa: Comprehensive Sanctions against the apartheid regime and support to the liberation struggle in South Africa*, G.A. Res. 40/64 A, U.N. Doc. A/RES/40/64 A (Dec. 10, 1985).

[81]  S.C. Res. 569, U.N. Doc. S/RES/569 (July 26, 1985).

[82]  S.C. Res. 591, U.N. Doc. S/RES/591 (Nov. 28, 1986).

depend on the supply of further credits and loans by the international financial community . . . ."[83]

108.    These United Nations resolutions as well as the accompanying domestic legislation of individual states singled out the manufacturers vehicles and the technology corporations that designed and supported the passbook systems to enforce racial segregation and the suppression of dissent, and provided specific forewarnings that their assistance to the security forces of the South African apartheid regime knowingly and intentionally aided and abetted torts in violation of international law.

109.    The United States adopted numerous export regulations to reduce the supply of strategic goods, technologies, and financing to the security forces of the apartheid regime.

110.    In 1963, the United States adopted an arms embargo against South Africa, except for existing contracts.

111.    In 1971, the Department of Commerce enacted regulations stating: "In conformity with the United Nations Security Council Resolution of 1963, the United States has imposed an embargo on shipments to the Republic of South Africa of arms, munitions, military equipment, and materials for their manufacture and maintenance."[84]

112.    This ban remained in effect until 1978, when it was expanded to cover a broader range of goods and technologies destined for use by the apartheid security forces.  The revised regulations stated:

> An embargo is in effect on the export or re-export to the Republic of South Africa or Namibia *of any commodity*, including commodities that may be exported to any destination in Country Group V under a general license, where the exporter or reexporter knows or has reason to know that the

---

[83]  G.A. Res. 44/27, U.N. Doc. A/RES/44/27 (Nov. 22, 1989).

[84]  15 C.F.R. § 385.4 (1971).

commodity will be sold to or used by or for military or police entities in these destinations or used to service equipment owned, controlled or used by or for such military or police entities.[85]

113.　Under the U.S. regulations, "A validated export license [was] required for the export to the Republic of South Africa and Namibia of any instrument and equipment particularly useful in crime control and detection . . . ."[86]

114.　In 1981, the list of commodities subject to the U.S. embargo specifically included

vehicles specially designed for military purposes, such as military mobile repair shops; all other specially designed military vehicles; engines, including those modified for military use; pneumatic type casings (tires) constructed to be bullet proof or to run when deflated; specially designed components and parts to the foregoing; [and] pressure refuellers.[87]

115.　Likewise, the embargo applied to "Specialized machinery, equipment, gear, and specially designed parts and accessories therefore specially designed for the examination, manufacture, testing, and checking of the arms, ammunition, appliances, machines, and implements of war; components and parts for ammunition; nonmilitary shotguns, barrel length 18 inches and over; [and] nonmilitary arms, discharge type."[88]

116.　In the technology sector, the Export Administration Regulations of 1982 provided that

An embargo is in effect on the export or reexport to the Republic of South Africa or Namibia of technical data . . . where the exporter or reexporter has reason to know that the technical data is for delivery to or use by or for the military or policy entities.　In addition, users in the Republic of South Africa of technical data must be informed in writing at the time of export or reexport that the data may not be sold or otherwise made available,

---

[85]　15 C.F.R. § 385.4 (1979) (emphasis added).

[86]　15 C.F.R. § 385.4 (1979).

[87]　15 C.F.R. § 379 (1981).

[88]　*Id.*

directly or indirectly, to the military or police entities in these destinations.[89]

117.  Export licenses were required under United States regulations for any computer exported to government consignees.  Licenses were awarded "on a case by case basis for the export of computers which would not be used to support the South African policy of apartheid."[90]

118.  U.S. law also regulated the role of the banking sector in supporting apartheid.  In 1978, the Export-Import Bank Act of 1945 was amended to state:

> In no event shall the Bank guarantee, insure, or extend credit or participate in the extension of credit (a) in support of any export which would contribute to enabling the Government of the Republic of South Africa to maintain or enforce apartheid; (b) in support of any export to the Government of the Republic of South Africa or its agencies unless the President determines that significant progress toward the elimination of apartheid has been made . . . . or (c) in support of any export to other purchasers in the Republic of South Africa unless the United States Secretary of State certifies that the purchaser has endorsed and has proceeded toward the [elimination of apartheid].[91]

119.  The United States strongly condemned apartheid and restricted exports, from financing to commodities, that would substantially assist the South African government in maintaining or enforcing apartheid.  As the 1983 Export Administration Regulations succinctly stated: "Authorizations for exports, reexports, sales to or for use by or for military or police entities in the Republic of South Africa will be denied except for medical supplies and similar goods."[92]

---

[89]  15 C.F.R. § 385.4 (1982).

[90]  *Id*.

[91]  Pub. L. No. 95-630, 1978 HR 14279 (1978) (codified at 12 U.S.C. 635(b) (1978)).

[92]  15 C.F.R. § 385.4 (1983).

120. To ensure the embargo's efficacy, the Department of Commerce adopted a broad definition of the term "military or police entities." Commerce declared that "It is the Department's position that the following are police or military entities: ARMSCOR, Department of Prisons, Bureau of State Security, South African Railways Police Force, and certain municipal and provincial law enforcement officials such as traffic inspectors and highway patrolmen."[93]

121. The United States maintained broad export restrictions against South Africa until 1994, the year South Africa held its first universal suffrage general elections.

122. During the relevant period, Defendants were on notice that the security forces of the apartheid regime in South Africa were abusing the Black South African population.

123. Defendants, with the purpose of facilitating these abuses, provided substantial assistance to the security forces of the apartheid regime of South Africa.

## VIII. AIDING AND ABETTING: PURPOSE, INTENT, AND SUBSTANTIAL ASSISTANCE

### A. The Apartheid Security Forces Relied on United States Corporations to Carry Out the Violence of Apartheid

124. The security forces of the apartheid regime enlisted the aid of United States corporations, including Defendants, to provide the means and methods to carry out the violence and terror necessary to maintain and enforce apartheid.

125. Apartheid was "more than the programme of one political party."[94] Business interests were

> active participants and initiators in constructing a political and economic system which, in the end, was classified in international law as a crime against humanity. . . . The period of extreme repression, from 1960 onwards, was intended to save the system that protected privilege based on

---

[93] 15 C.F.R. § 385 (1981).

[94] *Role of Business*, *supra* note 19, at 1.

race, thereby continuing to guarantee business its exclusive place in the South African economy and society.[95]

126.    The South African security forces depended on foreign sources for advanced technology, materials, goods, and services in four strategic sectors—banking, armaments, technology, and transportation—that substantially assisted the regime to perpetuate apartheid and commit systematic acts of violence and terror against Plaintiffs and members of the classes, including extrajudicial killing; torture; prolonged unlawful detention; denationalization; and cruel, inhuman, and degrading treatment.

127.    Certain businesses, including Defendants, played an important role in South Africa's defense of Apartheid from "civil unrest," cooperating closely with and providing financial, logistical and other material support to the security forces of the apartheid regime.

128.    In 1977, P.W. Botha, then Minister of Defense, discussed the National Security Management System in a Defense White Paper:  "The resolution of the conflict in the times in which we now live demands interdependent and coordinated action in all fields: military, psychological, economic, political, sociological, technological, diplomatic, ideological, cultural, etcetera."[96]

129.    In May 1980, South African Prime Minister P.W. Botha appointed business leaders to a Defense Advisory Board.  Botha told the House of Assembly that the Defense Force had succeeded in obtaining the goodwill and cooperation of business leaders and said:

>       [W]e have obtained some of the top business leaders in South Africa to serve on the Defense Advisory Board in order to advise me from the inside, not only about the armaments industry, but also about the best methods to be applied within the Defense Force … *I want to unite the*

---

[95]    *Id.* The ANC noted that several core measures of apartheid were actively promoted by important business groups.

[96]    *First Submission*, *supra* note 6, at 9.

> *business leaders of South Africa, representative as they are, behind the South African Defense Force.* I think I have succeeded in doing so.[97]

130. The South African security forces performed the wrongful acts of apartheid; extrajudicial killing; torture; prolonged unlawful detention; denationalization; and cruel, inhuman, and degrading treatment that caused Plaintiffs' injuries.

131. From the time of the Sharpeville Massacre in 1960 until the fall of apartheid in 1994, it was common knowledge that the security forces of the regime were engaged in violent, criminal acts; that these acts were intended to cause death or serious bodily injury to civilians; and that the purpose of such acts was to intimidate and coerce the civilian population.

132. U.S. corporations, including Defendants in South Africa used loopholes to undermine the goals of the U.S. arms embargo and assist the South African security forces with the purpose of facilitating these violations of international law. As the U.S. mission in Pretoria to the State Department acknowledged: "It is our understanding that most U.S. firms have been able to continue sales by shifting to non-U.S. sources for components,' cabled an official to the State Department."[98] Defendants were part of an overall criminal enterprise at the time they provided assistance.

133. Defendants' assistance to the apartheid security forces' acts of violence and terror spanned several decades. During this time, Defendants, acting from their respective headquarters in the United States, provided various forms of practical support to the security forces in a consistent and repeated manner—they made regular deliveries of equipment from the United States to South Africa and provided long-term design and maintenance services. Defendants persisted in this course of conduct to purposely facilitate the violent ends to which

---

[97] Abrahams, note 74, at 65 (emphasis added).

[98] *Automating Apartheid* at 65.

their assistance was put, fully cognizant of the well-publicized and universally-condemned atrocities committed by the security forces in South Africa.

**B.    IBM**

134.    IBM's complicity in implementing and perpetuating apartheid and denationalization in South Africa and the Bantustans, including Bophuthatswana, was directed from the United States; machinery and technology, as well as technical support, came from the United States for these purposes; IBM was intent on supplying hardware and software to South Africa, including to support denationalization, as demonstrated by IBM first trying to prevent U.S. sanctions on the apartheid regime and later trying to circumvent the U.S. embargo; IBM's support for apartheid contradicted U.S. foreign policy at the time; and IBM's effort to portray its equipment as dual-use was misleading, as the company supplied hardware and software with the intent to violate international law and for the purpose of denationalizing black South Africans.[99]

> **i.    IBM Directed and Controlled its South African Policies from the United States, Exported Supplies from the United States, and Acted to Circumvent the United States Sanctions Regime**

135.    IBM is a global leader in manufacturing computer systems, software, networking systems, storage devices, and microelectronics.  IBM Corp. is headquartered in New York State and does business in New York State.  The South African subsidiary, IBM-SA, operated as the agent and/or alter ego of IBM Corp. at all times relevant to this complaint.

---

[99] Sources of information in this memorandum of law are based on public sources, which are cited, or interviews, which are not cited just as they would not be in a complaint.

136.    IBM is and was a centralized corporation,[100] directed from U.S. headquarters.[101] Its Board of Directors, which meets in the United States, is responsible for supervising the company's overall affairs.

137.    At all relevant times, the code of business conduct, standards, and values for IBM directors, executive officers, and employees globally were set by IBM in the United States.

138.    IBM headquarters provided personnel policies for employees throughout the company, including in South Africa.[102]  Adoption of the Sullivan Principles is a specific example of how IBM's United States headquarters controlled and directed its South African policy.[103]

139.    For a significant time period, IBM controlled nearly half of the South African computer industry[104]—it was the largest computer supplier in South Africa, with total annual sales estimated at 300 million rand.

140.    IBM's relationship with the apartheid regime began in 1952, when IBM-SA received its first order for an "electronic tabulator."  This tabulator was the first step in the

---

[100]*See* Thomas W. Malone, *Making the Decision to Decentralize*, WORKING KNOWLEDGE (Mar. 29, 2004), available at http://hbswk.hbs.edu/archive/4020.html#1 (citing Louis V. Gerstner Jr., *Who Says Elephants Can't Dance? Inside IBM's Historic Turnaround* (New York: HarperBusiness, 2002), 12-13, 57-62, 68-70).

[101] Implicit in IBM's public claim that it applied the Sullivan Principles in South Africa is that it could direct the personnel and policies of its operations there.  Ranjay Gulati, REORGANIZE FOR RESILIENCE. (Harvard Business School Publishing Corporation, 2009).  *See also* IBM Highlights, 1885-1969, available at http://www-03.ibm.com/ibm/history/documents/pdf/1885-1969.pdf.

[102] IBM Highlights, 1885-1969 (discussing expansion of nondiscrimination policy in 1961).

[103] As of 1979 both IBM and IBM South Africa had signed the Sullivan Principles.  Elizabeth Schmidt, DECODING CORPORATE CAMOUFLAGE, 61 (Institute for Policy Studies, 1980) Appendix I "Signatories to the Sullivan Principles".

[104] Paul N. Edwards & Gabrielle Hecht, *History and the Technopolitics of Identity: The Case of Apartheid South Africa*, 36 J. S. AFR. STUD. 630 (2010).

automation and expansion of the population control program, which became increasingly sophisticated until the collapse of the apartheid regime.

141.    IBM did not have research and development or manufacturing facilities in South Africa but directed and controlled its operations in South Africa from the United States.  Indeed, between 1960 and 1980, South Africa had no indigenous domestic computer industry and was entirely dependent on outside sources for all computerized operations.[105]

142.    IBM's export from the United States to South Africa of equipment, expertise, and training on how to use and maintain its technology substantially assisted apartheid.[106]

143.    Rep. Howard Berman, the sponsor of legislation to ban computer sales to South Africa, testified in 1985 that:

> Computers are essential to the South African government's pervasive control over every aspect of existence for every black individual.  From the age of sixteen, all Africans must carry passbooks indicating where they have permission to live and work and whether they are allowed to live with their families . . . .  Computers help in the collection, retrieval and use of this information . . . .  As the South African economy and population grew, political leaders became concerned that a growing white manpower shortage would inhibit the implementation of apartheid.  Computers have helped solve that problem.  Moreover computers have enabled the South African government to strengthen its grip on the population and intensify apartheid enforcement over recent years. Pass law arrests doubled between 1980 and 1982.  Political detentions have increased sharply . . . .  Armed with more thorough and more readily available information on black residents, the government has accelerated forced removals of whole communities from so-called 'black-spots'—areas where black families

---

[105] Lawrence Litvak et al., SOUTH AFRICA: FOREIGN INVESTMENT AND APARTHEID, 50 (Institute for Policy Studies 1978), *see also* Edwards and Hecht, at 619, 630-31 (2010) ("In 1975, Management magazine surveyed the entire computer inventory of S.A., tallying 1,119 machines and guessing the true total at about 1,500.").

[106] NARMIC/AMERICAN FRIENDS SERVICE COMMITTEE, AUTOMATING APARTHEID: U.S. COMPUTER EXPORTS TO SOUTH AFRICA AND THE ARMS EMBARGO, 10-12 (1982) ("*Automating Apartheid*").  Even if some sales did not technically violate the embargo, some sales specifically were designed to denationalize and help enforce apartheid.

have lived for generations, but which the government has declared 'white'.[107]

144.    "South Africa really needs U.S. companies in certain industries, particularly high tech industries and computers," IBM's representative told investigators from the House Subcommittee on Africa in 1984.[108]

145.    A "lack of access to foreign technology could cripple South Africa, as [U.S. government] cable point[ed] out.  The incapacitation of a single computer would necessitate 'having to find hundreds of bookkeepers who are not available on [the] labor market.'"[109]

146.    As of 1986, South Africa relied on imported mainframe computers.[110]  As a computer industry official in South Africa explained: "We're entirely dependent on the United States.  The economy would grind to a halt without access to the computer technology of the West."[111]

147.    The South African government, including its security forces, recognized the importance of the computer support as well; it developed ways to get around sanctions regimes and also sought to develop more self-sufficiency over time.

---

[107] *Testimony of U.S. Rep. Howard Berman Before the H. Comm. on Foreign Affairs,* 99th Cong. (reprinted in Cong. Rec. Apr. 18, 1985).

[108] Richard Knight, *U.S. Computers in South Africa*, The Africa Fund, 1986, available at http://richardknight.homestead.com/files/uscomputers.htm.

[109] *Automating Apartheid* at 9.

[110] Some personal computers were assembled locally, the parts were imported.  *See* Knight, *U.S. Computers in South Africa*.

[111] Interview with C. Cotton, Managing Director, Burroughs South Africa, in Johannesburg, South Africa (Mar. 3, 1971), at 3.

148.    This dependency on foreign technology companies made IBM's U.S.-based decisions about its South African policy all the more important.[112]

149.    In the United States, IBM opposed shareholder resolutions related to divestment[113] and advocated for a sanctions regime that would allow it to support the South African government's implementation and enforcement of apartheid, thereby interfering with U.S. foreign policy.[114]

---

[112] Edwards and Hecht at 630-31 (noting also that monitoring such U.S. exports and restrictions could be done with relative ease).

[113] Edwards and Hecht at 630-31 ("From 1972 on, activist minority shareholders introduced disinvestment resolutions at every annual IBM stockholder meeting.").  For example, in 1975, church-related stockholders asked IBM to stop selling computers to South Africa, contending that the computers helped the government implement the pass system.  Kevin Danaher, IN WHOSE INTEREST? A GUIDE TO U.S.-SOUTH AFRICA RELATIONS 116 (1984).

At its 1987 annual meeting—the year that IBM "divested" from South Africa, *see infra* Part IV.C, IBM also overwhelming voted down a resolution sponsored by anti-apartheid activists that would have banned the sale of IBM products.  *See* John Pickles and Jeff Woods, "Undermining Disinvestment: From a Marginal Propensity to Invest to a Propensity to Invest in the Margins," Africa Today, Vol. 37, No. 2, *Dismantling Apartheid: Problems and Possibilities* (2nd Qtr., 1990), at 72.

[114] In November, 1977 following the passage of a mandatory arms embargo resolution by the UN Security Council, the Carter administration announced new curbs affecting computer sales to South Africa, that prohibited, in furtherance of the administration's policies "supporting human rights," the sale, direct or indirect,  of *any* U.S. commodities or technical data to military or police entities in South Africa.  *See* Knight, *U.S. Computers in South Africa*.  During the early years of the Reagan administration, the sanctions were loosened.  *See Automating Apartheid* at 61-62.  When the Export Administration Act became law in July 1985, it contained a clause that enacted the controls that had been in effect under President Reagan also issued an executive order in September 1985 banning computer sales to the military, police, prison system and national security agencies.  In 1986, Congress passed the Comprehensive Anti-Apartheid Act, prohibited the export of computers, software, and other technology for the use of South Africa government entities associated with apartheid and the extension of new loans or credit to such entities.  *See* Pub. L. No. 99-440, 100 Stat. 1086, §§ 301-23 (1986).

150.   IBM decided to maintain maximum flexibility for continued sales to the apartheid government despite the fact that its operations supported unlawful behavior that the U.S. government sought to prevent.[115]

151.   For example, after the adoption of the 1978 regulations that would have curbed sales to South Africa, IBM pushed for a system that lacked enforcement and interpreted flexibility in the sanctions regime.[116]

152.   Senior officials in the United States from the home offices of IBM registered their opposition to the 1978 sanctions and asked that the ban be lifted.[117]

153.   IBM sought to help the apartheid structures "adjust to the threat posed by trade sanctions" and elude the goals of the embargo, for example, by making plans to switch to non-U.S. supply stocks and pledging to help the South African government overcome shortages of strategic goods by deceptive means.[118]

154.   In 1978, a year after the UN Resolution imposing a mandatory arms embargo on South Africa, IBM's South African sales jumped 250%.

---

[115] *Automating Apartheid* at 7-8 (discussing lack of direct presence but continuous and conscious effort to pursue sales in South Africa); *id*. at 9-12 (discussing concerted effort to oppose 1978 sanctions so as to allow sales to South African military and police).

[116] *Id.* at 62.

[117] *Id.* at 9-10; *id.* at 10 (new regulations allowed computer sales that did not "contribute significantly to security operations"); *id.* (U.S. components could be sold to "security forces from foreign countries" if "they are incorporated in a larger system and make up no more than twenty percent of it"); *id.* (re-export and re-sale of "insubstantial portions" of goods also allowed "if the commodities would not play a major role in security operations"); *id*. (computer and similar products generally "considered favorably for export unless they would be used to enforce apartheid.").

[118] *Id.* at 71.

155.    The practical effort of the opposition to restrictions was that U.S. corporations—like IBM—were "setting the actual operating parameters of the embargo."[119]

156.    This "left enough of South Africa's supply conduits intact so as to insure that the Pretoria regime will have continued access to computers, communications gear, electronics and security equipment."[120]

157.    IBM repeatedly misled the U.S. government and its own shareholders about the true nature of its activities in South Africa to circumvent domestic criticism.

158.    The Chairman of IBM, Frank Cary, noted at IBM's 1977 annual meeting: "I have said time and again that we have investigated each instance brought to our attention where there was any reason to believe IBM computers might be used for repressive purposes, and we have found no such use."[121]  However, at the same meeting, IBM confirmed that its machines stored the data of colored, Asian, and white South Africans.[122]

159.    On another occasion, IBM stated that it would continue to service computers in the South African Department of Defense.[123]  Jack Clark, head of IBM South Africa, said that it would do so by using parts already in South Africa.[124]  IBM was therefore able to continue to support apartheid while giving the appearance of compliance with the U.S.-imposed embargo.

---

[119] *Id.*

[120] *Id.* at 62.

[121] Richard Leonard, *Computers in South Africa: A Survey of U.S. Companies,* at 4.

[122] *Id.*

[123] E. Drake Lundell, Jr., *Churches Hit IBM Inaction on Rights in South Africa,* COMPUTERWORLD, May 29, 1978; *see also* Richard Leonard, *IBM Update: Still Computing Apartheid,* 16 ICCR Brief 3A (1987), available at http://kora.matrix.msu.edu/files/50/304/32-130-1363-84-cic%20No5-87%20opt.pdf (quoting Jack F. Clark, former manager of IBM South Africa, as stating "There will be no change in the supply of IBM products.").

[124] *Id.*

160.    In an advertisement in a software catalog published in South Africa in 1980, IBM's General Systems Division marketed a "Law Enforcement System."  In response to inquiries about the package, an IBM spokesperson did not deny that the police system was available in South Africa but said that it marketed this product via "direct proposals" as opposed to "passive" advertising in publications.[125]

161.    This admission caused a scandal and IBM subsequently denied placing the ad or selling the software.[126]  Only after the existence of the package was publicly disclosed did IBM begin to insist that it was not available in South Africa.  The company was unwilling or unable to say how the law enforcement software appeared in the South African computer publication.[127]

162.    IBM made many arguments in the United States defending its support of apartheid.

163.    IBM asserted that South African government agencies used IBM computers only for "administration" and not for repressive use.[128]  This claim ignored the nature both of the government and the tasks it performed, such as denationalization of an entire ethnic group.

---

[125] *Automating Apartheid*, at 9-10 (providing citations to cables).  Victor R. Macdonald, IBM vice president, omitted this key fact from his letter.  IBM originally leased this system to the Interior Department.  The South African government may have subsequently purchased it outright, but it would still have needed spare parts from IBM.

[126] *Testimony from the American Friends Service Committee Concerning U.S. Controls on Exports to South Africa: Hearing Before the Subcomm. on Afr. and the Subcomm. On Int'l Econ. Policy & Trade of the H. Comm. on Foreign Affairs*, 97th Cong. (1982) (statement of Thomas Conrad, Staff Researcher, American Friends Service Committee), available at http://kora.matrix.msu.edu/files/50/304/32-130-1A83-84-AFSC_SA_Testimony_feb9_1982_opt.pdf.

[127] *Id.*

[128] Barnaby J. Feder, "IBM Is Shedding South Africa Unit; Pressure Is Cited," The New York Times, Oct. 22, 1986.

164. In 1985, Chairman Akers explained: "If we elect to leave it will be a business decision. What other kind of decision would it be? We are not in business to conduct moral activity, we are not in business to conduct socially responsible action. We are in business to conduct business."[129]

165. IBM also asserted that its equipment was not essential or significant and that legitimate purposes overshadowed any risk of harm, even while IBM acknowledged that its equipment facilitated racial separation and denationalization.[130] In fact, IBM was determined to circumvent the United States sanctions regime and made plans to camouflage its operations through deceptions arranged with affiliates in other countries.[131]

166. IBM acknowledged that it intended to use overseas subsidiaries to supply embargoed goods and services to the South African security forces and that it supplied non-U.S.-made parts to some embargoed South African agencies that were not permitted to receive U.S. equipment.

---

[129] David Sanger, "South African Prospects Leave I.B.M. Chief Glum," New York Times, April 1986.

[130] *Automating Apartheid* at 15 ("When questioned about IBM's role in the expansion of [the pass] system, an IBM official replied, 'We feel that the fact that it is being done with computers hasn't any appreciable overall effects on the apartheid situation. This pass system could be done in many other ways besides computers."). *Id.* at 45 (discussing Infoplan, and IBM sales to it, which IBM maintained were legal and did not support military projects). *Id.* at 52-55 (discussing IBM's deep connections with the military-industrial complex in South Africa, including "top explosives manufacturers"). *Id.* at 66 (discussing IBM training facility in Johannesburg, which includes training for Infoplan and CSIR (which is part of the military-industrial complex). Since much of computer technology is about know-how, this efforts supports apartheid as much as equipment sales.

[131] *Id.* at 9, 63-65.

167.   *Computer Weekly* reported IBM's statement that it would continue to supply spare parts and service to any affected South African military or police computers as long as supplies lasted.[132]   IBM justified these transactions by arguing that U.S. regulations did not restrict them.

168.   In 1987, Akers said that IBM had sold its assets in South Africa and that IBM's South Africa representative no longer sold directly to the police or military.[133]  Implicit in Akers' assertion is that, even after IBM's sale of assets to a newly created company, that company still followed U.S.-directed policies.

169.   This interpretation is consistent with the statement of the former head of IBM South Africa, who became head of the newly formed company:

> The former manager of IBM South Africa, Jack F. Clarke will be managing director of the new independent company.  In full page advertisements in major South African papers, Clarke has gone out of his way to reassure IBM's South African customers that they will still be able to buy IBM computers and other products.  "The new company will hold the sole franchise for IBM in South Africa, and has a supply and service contract with IBM. . . . There will be no change in the supply of IBM products," he wrote in a personally signed letter.  Annual sales are estimated at over $200 million, the largest by far of any computer company in South Africa.  IBM computers will continue to dominate the South African market.[134]

170.   Years of IBM's actions make evident that IBM pursued business in a manner directly contrary to the intent of the U.S. embargo and sanctions regime, and IBM's own public statements indicate that decisions about its South African operations, including business with

---

[132] Computer Weekly, United Kingdom, March 31, 1978.

[133] William Howard, *South Africa Resolution is Defeated*, PALM BEACH POST, Apr. 26, 1988, at 6B, available at
http://news.google.com/newspapers?nid=1964&dat=19880426&id=4iMjAAAAIBAJ&sjid=js4F
AAAAIBAJ&pg=2658,4149529.

[134] Knight, *U.S. Computers in South Africa*.

institutions involved in implementing apartheid and denationalization, were made in the United States.

> ### ii. IBM Participated in a Criminal Enterprise by Providing Practical Assistance to the Apartheid Security Forces With the Purpose of Facilitating the Perpetration of Apartheid Human Rights Abuses

171. Despite sanctions and international condemnation of supplying technology to the South African security forces and government, Defendant **IBM** and its subsidiary and alter ego, International Business Machines South Africa Limited ("IBM-SA"), made policy, management, investment, sales, and operational decisions that purposefully supported and facilitated sales, leases, and services to advance the goals of apartheid. By providing computer technology, systems, software, hardware, and training, IBM participated in a criminal enterprise to sustain the apartheid regime and facilitate the apartheid security forces' control and repression of the black population.

172. IBM sought contracts that would achieve these ends and then executed those contracts in order to maintain its business in South Africa as well as to accomplish the goals of apartheid.

173. The South African security forces used computers supplied by IBM to restrict Black people's movements within the country, to track non-whites and political dissidents, and to target individuals for the purpose of repressing the Black population and perpetuating the apartheid system.

174. IBM purposefully assisted in the implementation of apartheid by producing race-based identity documents used to: (1) strip Plaintiffs of their nationality and citizenship; (2) restrict their travel in and out of South Africa; and (3) facilitate discrimination and the geographic separation and segregation of the races into impoverished and isolated tribal areas known as homelands or "Bantustans."

### a.    Book of Life

175.    South African law required citizens to carry either a passbook or a "Book of Life," depending on the person's racial classification.  These books were used in conjunction with specially-designed, state-of-the-art electronic databases that stored information on the individual's race, employment status, criminal history, and residence.

176.    By the late 1970s, the South Africa National Intelligence Service maintained extensive computer files on government opponents.  Through IBM systems, these computer files could be accessed instantaneously for research or reference purposes related to government dissidents.

177.    In the early 1980s, an average of more than 70 people were arrested each day for pass law violations.  IBM's computer systems and software substantially assisted the unlawful detention, torture, rape, and cruel, degrading treatment of many South African citizens, including class members.

178.    IBM claimed that it would not knowingly sell equipment to customers who would use it to further repression, but, in fact, IBM pursued contracts with the purpose of supporting the implementation of apartheid, including the "Book of Life" and the Bantustan identity documents. Although IBM was outbid for the contract to provide technology to produce the African passbook in 1965,[135] IBM hardware served as the electronic memory bank for a large part of South Africa's national identity system.

179.    IBM provided the South African Department of the Interior ("DOI") with a specially-designed, computerized population registry.  IBM supplied the software and database

---

[135] Litvak at 52.

design as well as the hardware to run the system on two IBM mainframes that stored details on seven million citizens.[136]

180.  The "Book of Life" enabled authorities to classify individuals as coloured, Asian, Indian, or other, to determine their rights in accordance with their movement, employment, and other status, and also had to be carried at all times.[137]  The Group Areas Act, which controlled the movements of coloureds and Asians and allowed the government to suppress them, could not have been enforced without the Book of Life.[138]

181.  IBM knew that the Book of Life had no legitimate purpose other than to restrict the movement of black South Africans, facilitate discrimination and segregation, and strip Plaintiffs and Class Members of their nationality and citizenship.

182.  Thomas Conrad of the American Friends Service Committee, an authority on corporate involvement in apartheid, testified that

> for several years IBM has knowingly rented a Model 370 computer system to the South African Department of the Interior which is used for the regime's national identity system.  The IBM machine stores files on seven million people the regime has designated as coloreds, Asians, and whites. . . . Since IBM owns the equipment and leases it to the government, it could withdraw from the arrangement, but has declined to do so.[139]

---

[136] At least one-third of IBM's business was with the government, including the use of an IBM computer by the Department of Prisons and two IBM systems used in the population registration system known as the Book of Life. The newsletter quotes IBM Chairman Frank Cary. IBM Workers United, *IBM: Speak Up! The Truth about the Company in South Africa* (Johnson City, New York, 1979), available at http://africanactivist.msu.edu/document_metadata.php?objectid=32-130-14BA.

[137] Litvak at 52.

[138] Litvak at 52 (citing n.80).

[139] *Controls on Exports to South Africa: Hearings before the Subcomms. on International Economic Policy and Trade and on Africa of the H. Comm. on Foreign Affairs*, 97th Cong. 72 (1982) (statement of Thomas Conrad, American Friends Service Comm.); *see also Economic Sanctions and their potential Impact on U.S. Corporate Involvement in South Africa: Hearing before the Subcomm. on Africa of the H. Comm. on Foreign Affairs*, 99th Cong. 22 (1985)

183.    During the 1970s, new computers and peripheral equipment were added to expand
and upgrade the system's capability.  IBM supplied multiple Model 370/158 mainframe
computers to the DOI.  The DOI used the IBM system to process and store a vast quantity of
information about the designated population, including identity numbers, racial classification,
residence, and place of work.  The system also contained a history of government opposition.
The same IBM computer served as the basis for the "Book of Life," an identity document issued
to all those covered by the database.  The IBM system was used to track racial classifications and
movement for security purposes.

184.    The IBM computerized population registry was specially designed for the South
African security forces.  Its function was to provide practical assistance to the South African
security forces in implementing and enforcing the racial pass laws and other structural
underpinnings of the apartheid system, such as the suppression of political dissent.  IBM custom-
tailored this product to perform that function at the highest level for the apartheid regime.

185.    As of 1976, at least one third of IBM business in South Africa was done directly
with the South African government.  IBM computers were used by the Department of Defense,
the Department of the Interior, and the Bantu Administration Boards, the local administrators of
apartheid.  The apartheid government was IBM's largest single customer in South Africa.[140]

186.    IBM's 370 computer was used by many South African government agencies,
including the Department of the Prime Minister, the Department of Statistics, and the
Department of Prisons, which was widely known to hold and torture political prisoners without

---

(statement of Dr. Jean Sindab, Executive Director, Washington Office on Africa) (testifying that
an IBM computer was used by the regime to maintain the pass system for the "Colored"
population).

[140] *Automating Apartheid*, at 6.

trial.  These agencies, which were a significant component of the apartheid state apparatus, relied on IBM computers for their administration.

187.    The Bantustans represented the ultimate goal of apartheid: the creation of a white majority South Africa through denationalization of the black majority, who were forced to become citizens of "independent" homelands (Bantustans) comprising 13% of the undesirable rural land that had been a part of South Africa.  The administrations of at least one Bantustan— Bophuthatswana—relied on IBM System 3/10 computers.[141]

188.    Bophuthatswana was accorded nominal independence, as a putatively sovereign state, in 1977, and established some indicia of statehood, including the capacity to have "citizens".  This status was forced upon black South Africans of Tswana descent as part of the exercise of denationalization that was both the foundation and goal of Grand Apartheid—the permanent physical separation of the races.  The Bophuthatswana government imposed identity documents and passports on those who were denationalized.

189.    For this purpose, the Bophuthatswana government used IBM computers and systems, including both hardware and software.  Bophuthatswana government employees working with IBM computers and systems were trained in an IBM-specific programming language.

190.    IBM ran training courses for government employees in Johannesburg and Bophuthatswana.  The courses also covered the proper use and maintenance of IBM machines. Programmers who attended these courses were government employees.

---

[141] *Id.* (also discussing use of same computer in Gazankulu, though that Bantustan never attained full "independence.").

191.   Some computer programs run by the Bophuthatswana government on IBM machines were developed and written in-house with the assistance of IBM employees.  When government employees encountered difficulty with their machines or programs, IBM employees assisted in troubleshooting and repairing problems.

192.   By 1978, IBM actively participated in creating a new identity book for the Bophuthatswana government by developing a sub-system to produce the identity book.  IBM developed both the hardware and software, used to create the Bophuthatswana identity document.

193.   Once IBM had developed the system, it was transferred to the Bophuthatswana government for implementation.  IBM employees trained Bophuthatswana government employees to use the IBM machine and program to produce identity documents.  IBM was contacted when problems arose with the identity book system and IBM employees would fix problems.

194.   The identity documents produced for the Bophuthatswana government contained the name, sex, racial classification, ethnic origin, and residential and/or postal address of the individual.  Bophuthatswana residents were required to carry the Bophuthatswana identity documents produced by the Bophuthatswana government with the active and intentional participation of IBM.

195.   In addition to effecting denationalization, the Bantustan system that IBM helped to establish resulted in other violations against black South Africans, including deprivation of property, education, and employment, division of families, restrictions on travel, and restrictions on political activities.

196.    Other homeland governments, including, but not limited to, Gazankulu, KwaZulu, Lebowa, Transkei, Ciskei, and Venda also used IBM hardware and software to produce identity documents.

197.    IBM officials in the United States maintained that the Interior Department installation for the Book of Life was not objectionable because it did not cover the black population; this assertion was intended to obscure the fact that IBM's hardware played a key role in facilitating the very system of racial classification that made apartheid possible.[142]  Moreover, the implication is clear that the origin of the machinery was the United States.

198.    In a 1982 letter to the State Department, IBM admitted its machines were used for the national identity system maintained by South Africa's Interior Department.  This system was the basis for the "Book of Life" which, along with the passbook, facilitated the racial classifications that made apartheid possible.[143]

199.    IBM purposely facilitated the implementation of apartheid by producing race-based identity documents and sorting and storing information in databases used to strip Plaintiffs of their South African nationality and citizenship and force upon them citizenship in "independent" Bantustans—impoverished and isolated tribal areas—created for the very purpose of isolating and suppressing the black population, as well as to restrict Plaintiffs' travel in, out, and within South Africa.  The Bantustan system facilitated discrimination and the geographic separation of the races in South Africa on a massive scale, depriving blacks of their South African citizenship and associated rights, including participation in the South African economy.

---

[142] Litvak at 52.

[143] *See* Thomas Conrad, Letter to the Editor, *Machines that Help Make Apartheid Run*, N.Y. TIMES, May 18, 1985, available at http://www.nytimes.com/1985/05/18/opinion/l-machines-that-help-make-apartheid-run-249678.html.

No foreign government ever accorded diplomatic recognition to any Bantustan. By supporting and implementing this fictitious administrative separation, IBM purposely facilitated denationalization, including the forced relocation of blacks to inhospitable areas, separation of families, and severe restrictions on food, medicine, educational, and employment opportunities, by improving the effectiveness and efficiency of race separation.

200. IBM intentionally facilitated the denationalization of Plaintiffs and Class Members. Plaintiffs were stripped of their South African nationality and citizenship, restricted in their ability to travel in to, out of, and around South Africa, and discriminated against by being forcibly geographically separated and segregated into homelands on the basis of race.

201. IBM knew that the normal market for these technologies was the security forces or government agencies utilizing security forces services. Any sales or agreements IBM entered into with general government entities were done with the intention that all equipment and technology linked to the passbook and Book of Life systems would ultimately be used by the security forces to enforce the oppressive laws of apartheid, often through violent means. In persisting with voluminous and repetitious sales of computer equipment and technologies linked to the passbook and Book of Life systems to the apartheid regime, IBM intentionally facilitated ongoing atrocities in South Africa.

**b.    IBM Support to South African Defence Force ("SADF")**

202. In order to facilitate the government's ability to procure strategic equipment for the security forces after the mandatory embargo took effect, the apartheid government resorted to the use of a "dummy" front organization to procure sensitive equipment for the security forces. Infoplan, a Pretoria-based data processing corporation offered hardware, software, computer training and services, acted as such a conduit.

203.  After the imposition of the mandatory embargoes in 1977 and 1978, IBM shifted much of its business with the South African government to Infoplan.  While IBM supplied Infoplan with parts, services, education and technical data which were not covered by the U.S. embargo, Infoplan in turn transferred this equipment and expertise to the SADF.

204.  Directly and indirectly, IBM was a top supplier for the SADF.   The SADF inventory of IBM computers included model 360s (for instance, a model 360 was installed at the Simontown Naval Installation) and model 370s.

205.  IBM rented at least seven computers to Leyland-South Africa, a firm that produced Land Rovers for the security forces and the police.  IBM also rented several computers to a explosives manufacturer, the African Explosives and Chemical Industries, Ltd. ("AECI"). AECI reportedly had specialized in the manufacture of riot control gas, napalm, and nerve gas that were used against Plaintiffs and class members.  At least four AECI installations use IBM hardware.  For instance, AECI employs an IBM computer at its Modderfontein facility, where the company reportedly made the tear gas used against demonstrators at the Soweto massacre.

206.  For much of the equipment leased to the South Africans, IBM provided maintenance and service on the equipment over the term of the lease.  IBM's regular servicing of the apartheid government's computer systems, in addition to its custom design of certain products, demonstrates how closely IBM collaborated with the South African government in implementing and improving the enforcement of the racial pass laws and sustaining the apartheid system.

207.  IBM's services were performed according to manuals originated in, created by, and distributed from IBM in the United States.

208.    IBM conceded that the equipment and services it supplied to South Africa may be used for repressive purposes, noting that "It's not really our policy to tell our customers how to conduct themselves."[144]

209.    IBM was fully aware of Infoplan's relationship to the South African security forces when it supplied equipment and services to Infoplan after the imposition of the 1978 embargo.

210.    The South African government also used computers supplied by IBM in defense research and arms manufacture.

211.    The South African government used computers supplied by IBM to supply ammunition and supplies to military units.  For instance, beginning in 1977, the SADF operated an automated military logistics system—using IBM equipment—to supply ammunition and other military supplies to military units.

212.    In South Africa, the Armaments Development and Production ("ARMSCOR") state enterprise was developed by the apartheid regime in the late 1960s to "promote and co-ordinate the development, manufacture, standardisation, maintenance, acquisition, or supply of armaments."[145]

213.    Due to the secrecy of these activities, not all facts are presently known.  However, it is known that ARMSCOR worked closely with private companies, to ensure that the security forces of the apartheid regime acquired the armaments and military equipment it needed to

---

[144] Erin MacLellan, *U.S. Business Debates South Africa Ties Limits on Computer Exports are Difficult to Enforce*, Washington Post, Aug. 25, 1985.

[145]  Armaments Development and Production Act 57 of 1968.

suppress dissent and control the population despite the international arms embargoes. The businesses linked to ARMSCOR also included Defendant IBM.[146]

214. The ANC noted that many of the companies working with ARMSCOR were foreign: "many of the local private sector corporations were not involved in the genuine development of these war materials. They were more often useful conduits for foreign technologies, helping the apartheid state to evade the UN arms embargo."[147]

215. The influx of armaments and related equipment, services, and expertise to ARMSCOR and the rest of the apartheid regime substantially assisted the suppression of dissent, the control and manipulation of the African population, and systematic violence against dissidents and non-whites in violation of international law.

216. IBM made profits which they knew could only come from their encouragement of the security forces' illicit operations through the sale of computer equipment and technologies designed to implement and enforce the oppressive policies of apartheid. By reaping these profits, IBM acquired a stake in the criminal venture of the apartheid regime.

217. IBM provided the South African security forces with the technology and services to enforce apartheid by force; extrajudicial killing; torture; prolonged unlawful detention; denationalization; and cruel, inhuman, and degrading treatment against Plaintiffs and members of the classes intending that the technology and those services would be (or only could be) used in connection with that purpose.

---

[146] COSATU Submission to the Truth and Reconciliation Commission Hearings on Business and Apartheid at 17.

[147] *Role of Business*, *supra* note 19, at 8.

### iii. IBM Camouflaged its Continued Assistance of the Apartheid Security Forces in Order to Avoid Sanctions

218.    IBM pursued business in South Africa in a manner directly contrary to the intent of the U.S. embargo and sanctions regime.  IBM directed IBM offices elsewhere in the world to continue to provide the same services, including those that facilitated denationalization and separation of the races.  IBM engaged in subterfuges to disguise its violations of international and U.S. sanctions so that it could continue to assist the apartheid regime and continue to profit from that collaboration.  In so doing, it embraced the goals and purposes of the South African security forces to advance apartheid, including the separation of the races.

219.    Although IBM formally withdrew from South Africa in 1987, it intentionally continued to support the security forces' repressive enforcement of apartheid and denationalization.

220.    In 1986, IBM announced its intention to sell its South African holdings, although it would continue to license and distribute its products in the country.  IBM said that it would sell its subsidiary, which it operated for 34 years, in 1987 for an undisclosed price to a new company established "for the benefit of the employees of IBM South Africa."[148]  Company spokespersons said this was done so that the newly independent company could fulfill IBM South Africa's existing contractual responsibilities.

221.    While IBM itself would no longer have assets, capital, or employees in South Africa, the new company signed multi-year contracts to import and sell IBM products, services,

---

[148] South Africa History Online, *The Company, IBM, re-forms in South Africa*, (Oct. 21, 1986), available at http://www.sahistory.org.za/dated-event/company-ibm-re-forms-south-africa.

and technologies.[149]  The same IBM employee, Jack Clarke, who headed IBM South Africa, headed the new company.[150]

222.    After divestment, IBM ensured that its West German subsidiary and the Japanese company Hitachi could supply parts to service embargoed IBM equipment.[151]

223.    Although IBM claimed to "sell" its South African subsidiary, IBM stated that it would provide a loan allowing local investors to buy the subsidiary. IBM retained a buy-back option to the new company as a term of the sale. The new entity was run by the person who was the general manager of IBM South Africa prior to the sale.  IBM continued to sell its products, parts and services through the new company and continued to be the top supplier of computers to South Africa after the "divestiture."  Around 1992, IBM purchased a 24% stake in the local distributor of IBM products.

224.    After IBM publicly announced it was leaving South Africa, a letter was sent to customers by the Managing Director of IBM South Africa stating that "there will be no change to the supply of IBM products."[152]  As one IBM dealer explained at the time, "Nothing has really changed except that IBM no longer has to account for its presence in South Africa."[153]

---

[149] IBM also would profit from interest on loans it made to the South African buyers of the subsidiary.  *Id.*

[150] Wall Street Journal, August 24, 1987.

[151] Rita Arditti, et al., SCIENCE AND LIBERATION 204 (1980), available at http://books.google.com/books?id=rE4SnULjDgQC&pg=PA204&lpg=PA204&dq=ibm+west+g erman+subsidiary+hitachi+south+africa+embargo&source=bl&ots=V1YBG79BUc&sig=8sY5u mobUsRtMd9CGAaa31Dt-NY&hl=en&sa=X&ei=DMeIU_qmDeHEsATRx4C4Dw&ved=0CCgQ6AEwAA#v=onepage&q =ibm%20west%20german%20subsidiary%20hitachi%20south%20africa%20embargo&f=false.

[152] Letter of J.F. Clarke, Managing Director, IBM South Africa, entitled "Notice to the Customers and Associates of IBM Throughout South Africa."

[153] ICCR Brief Vol. 16 No. 5p. 3A 1987.  "According to a management letter leaked to *The Financial Times*, IBM operations would continue as normal through the creation of a locally-

225.     Newspapers reported that "[a] letter leaked from IBM's Johannesburg offices reveals that IBM's pull-out from South Africa is not all it seems.  Users are being reassured that IBM products and services will be freely available from the company established as a result of IBM selling off its subsidiary.  And the letter boasts that the lack of restrictions will leave it free from international pressure . . . .  This has been interpreted as evidence that IBM's withdrawal was aimed at dodging international disapproval and as a means of taking political heat off IBM in the US."[154]

226.     These arrangements violated the letter and spirit of U.S government restrictions, since parts would be made under IBM patents registered in the United States.  It is clear that IBM intended—as it had for years—to continue, uninterrupted, its supply of goods and services to the South African security forces, contrary to the intent and policy of U.S. regulations and U.N Declarations.

### C.    FORD

227.     Ford was not merely a passive investor in South Africa but rather provided vehicles to purposely support specific unlawful violence against black South Africans, including Plaintiffs and those similarly situated.  Ford provided such support knowing that the international community and the United States viewed vehicle and vehicle parts sales to the security forces as critically linked to the enforcement of apartheid and violence against black South Africans.

---

owned company to handle IBM's business; the letter also claimed: '[T]he new company will be able to respond with greater flexibility than a wholly-owned IBM subsidiary.  In the current international climate such flexibility will clearly be to our customer's advantage.'"  Pickles and Woods, at 72.

[154] *IBM Leak Reveals No Change in SA*, Datalink, Jan 29, 1987; Philip Basset, *Unions claim IBM Operations Still Continuing in South Africa*, Financial Times, Jan 14, 1987 (IBM "has in practice not withdrawn from its South African operations, in spite of its decision last October to disinvest in the country").

228. Ford U.S.'s complicity in implementing and perpetuating apartheid in South Africa was directed from the United States; management, machinery, and technology came from the United States for the purpose of supporting the apartheid security apparatus in its repression of black South Africans and anti-apartheid activities; Ford's conduct contradicted U.S. foreign policy at the time; and Ford intentionally sought to circumvent U.S. law.

> **i.** **Ford Directed and Controlled its South African Policies from the United States, Exported Equipment from the United States, and Acted to Circumvent the United States Sanctions Regime**

229. Defendant **Ford Motor Company** ("Ford") and is an American multinational automaker based in Dearborn, Michigan, near Detroit, whose Michigan headquarters at all relevant times has directed the operations of its subsidiaries globally; it includes a global automotive group with a single president, who was also an executive vice-president from the headquarters.[155]

230. Ford supplied vehicles, parts, and other equipment to the apartheid security forces. This equipment was specifically designed for the purposes of, and was in fact used for, transporting, arming, and protecting military personnel in offensive actions against Plaintiffs and Class Members. The equipment was used to patrol townships to target political opponents, repress the African population, quell public displays of dissent, and brutalize and kill many citizens as described herein.

231. At all relevant times, Ford vehicles and components were developed and produced wherever it was best equipped to do so.[156]

---

[155] *See, e.g.*, 1987 Annual Report, at 5, 8.

[156] *Id.* at 8.

232.     Ford controlled its South African operations through Ford Motor Company of South Africa (Pty) Ltd. ("Ford South Africa"), which was formed in 1933.  It was a wholly-owned subsidiary of Ford Motor Company of Canada, Ltd. ("Ford Canada"), which was itself 76% owned by Ford.

233.     In 1985, Ford merged a subsidiary of Ford Canada with Amcar Motor Holdings, a unit of the Anglo American Corporation, to form the South African Motor Corporation (SAMCOR).

234.     After the merger, Ford had a 42% stake in SAMCOR, with the rest held by Anglo American.[157]  In November 1987, Ford announced that it would dispose of its share in SAMCOR by selling it to Anglo American and creating a trust for SAMCOR employees.[158]

235.     Although Ford was formally divested of its stake in SAMCOR, Ford allowed SAMCOR to continue "to use its trade name and . . . provide[d] parts, vehicles and management assistance."[159]  Ford transferred tens of millions from the payment it received from the sale directly to SAMCOR.

236.     Ford became the major shareholder again in 2000 and then renamed SAMCOR, Ford of South Africa.[160]

---

[157] John Battersby, *South Africa Sale by Ford Will Give Blacks Big* Stake, N.Y. Times, June 15, 1987.

[158] *Id.*

[159] *Ford to dispose of its stake in South Africa's Samcor*, The Wall Street Journal Europe, Nov. 25, 1987 WSJ (emphasis added).

[160] Deon Sonnekus, *Samcor becomes Ford of Southern Africa*, News24, Aug. 21, 2000, available at*:* http://www.news24.com/xArchive/Archive/Samcor-becomes-Ford-of-Southern-Africa-20000821.

237.    Foreign companies, including Ford, historically dominated the auto industry in South Africa, and by the late 1970s, of the ten auto companies in South Africa, only one was South African owned.[161]

238.    In 1978, Ford's sales in South Africa were estimated at $288 million and its investments were valued at $119 million.[162]  At that time, with the auto industry in a downturn and the South Africa government seeking to minimize companies in the industry to ones that could be more stable and profitable, "GM and Ford [were] two of the best-capitalized car manufacturers, possessing the resources to sit out a transition and emerge strong."[163]

239.    During all relevant times, key decisions about investments, policy, and operations in South Africa were made by Ford in the United States.

240.    Thus, despite the tightening of U.S. trade sanctions in February 1978, Ford U.S. still announced a "large infusion[] of capital into its South African subsidiary.  Ford injected $8 million for upkeep and retooling."[164]

241.    Ford U.S. made policy, management, investment, sales, and operational decisions with the purpose of supporting the apartheid security forces, including with sales of specialized vehicles designed for controlling by force the black population of South Africa.[165]

---

[161] Kenneth Propp and Desaix Myers III, "The Motor Industry in South Africa," South Africa Review Service: Industry Sector Report (February 1979) by the Investor Responsibility Research Center (IRRC), at 2-4, 6.  Ford built the first assembly plant in the country in 1923 and was the market leader in 1977 and second in 1978.  *Id.* at 7.  In 1978, Ford's sales in South Africa were estimated at $288 million and its investments were valued at $119 million.  *Id.*

[162] *Id.*

[163] *Id.* at 10.

[164] *Id.* at 20 (noting also that "company has been constrained to inject foreign capital into operations that now do not return much on their already large assets.").

[165] *Id.* at 18 ("Disclosures by GM and Ford about the volume of their sales to the police and military indicate that even if these sales [to the defense and police] do not represent a large

242.    At all times, both Ford South Africa's and SAMCOR's business activities were directed by Ford in Michigan.[166]  Ford adopted the Sullivan Principles, for example, regarding operations in South Africa.[167]

243.    Ford regularly sent U.S. delegations to South African facilities and provided experts for work on new installations there.  Ford also sent employees to deal with Human Resource issues and to establish HR programs such as "Zero Defects."

244.    Management personnel were transferred from one part of Ford to another.  For example, the general manger of Ford South Africa was appointed and sent from Ford in Detroit and went on to other jobs in Ford outside South Africa.

245.    Similarly, Lewis Booth, the general manager of SAMCOR, started in 1978 with Ford of Europe, went to Dearborn, Michigan from 1993 to 1996, then to SAMCOR, and

---

proportion of the companies' aggregate sales, both the automakers and the government consider them important.  Obviously, motor vehicles and tires are central to the maintenance of a prepared defense and police establishment.  GM especially has been anxious to preserve its supplier relationship with the government, as have the major tire manufacturers, despite current restrictions on such sales imposed by the U.S. government.  The companies appear to believe that the government's perception of whether they are willing to cooperate in car and truck sales outweighs the actual volume of sales.").

[166] Ford Motor Co. (1989) Form 10-K 1989 (stating Ford operates in South Africa though SAMCOR).

[167] "The Motor Industry in South Africa," at 14.  Ford executives also implicitly acknowledged direction from the headquarters for its activities in South Africa.  In a July 1979 meeting with a religious taskforce, Ford officials, including William Broderick, the Vice President for international and government affairs for Ford in the United States, explained the company's actions in South Africa.  Ford officials said that the loss of police and military contracts would lead to layoffs and potentially a consumer boycott of Ford.  Broderick further stated that UN Security Council Resolutions did not prohibit the sale of non-military vehicles or equipment. *See* Renate Pratt, IN GOOD FAITH: CANADIAN CHURCHES AGAINST APARTHEID 43 (Canadian Corporation for Studies in Religion, 1997), available at http://books.google.com/books?id=KlI0T9N7NzcC&pg=PA42&lpg=PA42&dq=ford+apartheid&source=bl&ots=ZTidIy_iZV&sig=S9I1B0YFO6csH5tZ8GUXSoVXlI4&hl=en&sa=X&ei=inN_U5XhLs6osASGtICgAQ&ved=0CC0Q6AEwAThu#v=onepage&q=ford%20apartheid&f=false

subsequently became president of Asia Pacific and Africa Operations for Ford as of January 1, 2000.[168]

246.    Ford acknowledged that it was able to and did impose policies on its operations globally.  In addition to claims about its implementation of the Sullivan Principles of non-discrimination, Ford controlled its major global policies, including it employment policies, ethical business policies and code of conduct.[169]

247.    Ford U.S.'s involvement in specific South African employee matters demonstrates its involvement from the United States.  Plaintiff Thozamile Botha, a former SAMCOR employee, was banned in South Africa. [170]

248.    While in exile, a Ford lawyer who liaised with Ford South Africa took Botha to Ford Headquarters in Michigan.  She was a lawyer representing Ford and interviewed Botha over two days.  She showed him a letter from Ford South Africa to Ford headquarters referring to Botha, which read, "[v]ery intelligent, hard working, if he could be on our side."

249.    The author of the letter was the Head of Personnel/Human Resources in South Africa, Fred Ferreira, who was also a member of the Broederbond.  Although she only showed Botha one letter, Ford had a file on him in the United States that included other documents.

---

[168] Biography of Lewis Booth, Ford Motor Co., U.S. Dept. of State, available at http://2001-2009.state.gov/e/eeb/ace/2001/80311.htm.

[169] Ford Motor Co. (1989) Annual Report 1986, at Unnumbered "Centers of Excellence", 10, 20, 41; Ford Motor Co. (2012) Sustainability Report: Environmental Management 2012, available at http://corporate.ford.com/microsites/sustainability-report-2011-12/blueprint-governance-management-environmental; Ford Motor Co. (2012) Sustainability Report: Ethical Business Practices 2012, available at http://corporate.ford.com/microsites/sustainability-report-2011-12/blueprint-governance-sustainability-ethical. *See also* Penske Corp., *Case Study: Ford Motor Company* (2010), available at http://www.penskelogistics.com/pdfs/01_ford_case_study_updated.pdf (describing Ford's structure).

[170] *See* Pratt, IN GOOD FAITH CANADIAN CHURCHES AGAINST APARTHEID.

250. The files and communications kept in the Michigan headquarters about Plaintiff Botha reveal that Ford monitored specific employees inside the plant, which indicates a tight level of control over its operations in South Africa.

> **ii.** **Ford Participated in a Criminal Enterprise by Providing Practical Assistance to the Apartheid Security Forces With the Purpose of Facilitating Perpetration of Apartheid Human Rights Abuses**

251. Defendant **Ford** had a long record of strategic vehicle and parts sales to the South African security forces during apartheid. Ford's vehicles were used by the South African security forces to patrol African townships, homelands, and other areas, as well as to arrest, detain, and assault suspected dissidents, violators of pass laws, and other civilians.

252. Ford knew that its role in South Africa was significant to the continued operations of Ford South Africa and its successors. Ford specifically supported the military and police, which one U.S. official noted in discussing the purposes of the embargo were, "the instruments most directly concerned with the enforcement of apartheid."[171]

253. Because of their strategic importance, some industries were designated as National Key Points, and as such, there was a particularly close relationship between these corporations and South African security forces. Defendant Ford, as an automobile manufacturer, would have been designated as a National Key Point.

---

[171] "The Motor Industry of South Africa," at 19. *See also id* at 6 (noting that *the Financial Mail* arms and armaments were not only goods of importance to South African Department of Defence as "motor vehicles . . . are among the strategic materials produced by foreign-controlled firms."). *See also id.* at 18.

254.    Ford support was significant: "[B]etween 1973 and 1977 [Ford] sold 128 cars and 683 trucks directly to the South African Ministry of Defense and 646 cars and 1,473 trucks to the South African police."[172]  Ford sold at least 1,582 F series U.S.-origin trucks to the police.[173]

255.    Ford explicitly acknowledged that its support for the South African police and military was essential to Ford's broader business interests in South Africa.[174]  Ford continued to supply "parts to the military and policy despite the 1978 Commerce Department regulations that prohibit the sale of any American commodity to the South African police or military."[175]

256.    In February 1978, the United States Department of Commerce issued regulations that prohibited Ford from supplying passenger vehicles to the South African security forces, because some of Ford's passenger vehicles contained U.S.-made parts.[176]

257.    The 1978 sanctions regime was created to eliminate "gray areas" and ensure that American supplies were not flowing to vehicles used by, or increasing the "operational capacity of," the South African security forces.[177]

---

[172] *Id.* at 4.

[173]  *Id.*

[174] *Id.* at 18.

[175] Elizabeth Schmidt, *Decoding Corporate Camouflage*, at 61.

[176] 15 C.F.R. § 385.4 (1979); *see supra* ¶ 112.

[177] "The Motor Industry in South Africa," at 12 ("At the same time, the administration has sought to ensure, in the words of one official, that 'the United States should act in no way to increase the operational capacity of the South African military and police.' Responding to South Africa's arrests and bannings in October 1977, the Commerce Department on Feb. 16, 1978, issued its regulations designed to curb sales of products and technology to the South African policy and military. . . . The intent of the 1978 restrictions is to tighten up 'grey area' sales to South Africa. 'Grey area' items encompass materials of a non-military nature that could be converted on short notice to military or police use such as light airplanes, specialized computer systems, certain electronic components and strategic spare parts.").

258.     Despite the prohibitions, Ford continued to supply vehicles to the South African security forces with the purpose of facilitating apartheid crimes.  Ford denied that its continued sales to the South African security forces ran counter to the U.S. prohibitions, on the basis that the vehicles did not contain parts or technical data of U.S. origin.[178]

259.     From its own statements, Ford acknowledged that it controlled the South African plant from the United States, including supply chain policy and sales to South African forces.[179] Ford intended to continue this supply and support to maintain relations and business, even to the extent that these activities purposefully facilitated oppression.

260.     Ford claims that it lost some sales to certain South African security forces as a result of the February 1978 regulations, but the effects of those losses were minimal.[180]  Ford's sales to the South African security forces continued.[181]

261.     Occasionally these sales were temporarily halted by sanctions imposed by foreign governments.  For example:

> In the mid-1960s, Ford bid on a contract to supply four-wheel drive vehicles to the government.  But the Canadian government refused to issue an export permit to Ford's Canadian subsidiary, which was to supply the vehicles, on the grounds that the items might violate the then non-mandatory UN arms embargo against South Africa.[182]

262.     In 1986, as justification for its continued sales to the South African security forces, Ford explained that if it refused to supply military vehicles to the security forces, it could

---

[178] Letter from Sidney Kelly to Shareholder (May 8, 1980) ("Kelly Letter") at 1.

[179] *Id.* at 15.

[180] Karen Rothmeyer, *U.S. Motor Industry in South Africa: Ford, General Motors and Chrysler*, The Africa Fund 1979, p. 8.

[181]     Kelly Letter, *supra* note 178, at 1 ("FSA sells a small number of non-US origin civilian vehicles to the Police and Military").

[182] Rothmeyer, *supra* note 180, at 12.

lose all government sales in South Africa, which could in turn render the company economically unviable in South Africa.[183]  Ford catered to the security forces' demands in order to protect its other profitable operations with other branches of the apartheid regime.

263.    Ford sold its products to the South African security forces through a central government purchasing authority.  The central authority purchased vehicles for use by the security forces.

264.    The Comprehensive Anti-Apartheid Act of 1986 prohibited any U.S. entity from engaging in any form of cooperation with the South African security forces except for activities that were reasonably designed to facilitate collection of necessary intelligence.[184]

265.    Despite the 1986 Act, Ford, in addition to supplying strategic security-force equipment, assisted with its repair and maintenance.  Ford's cooperation with and practical assistance to the South African security forces for the servicing of military vehicles demonstrates its close collaboration with the apartheid regime in maintaining and enforcing apartheid.

266.    In addition to vehicles, parts, and maintenance, Ford supplied the South African security forces with the necessary technology and skills to design and improve security force vehicles.  This purposeful support for the apartheid regime was clear from its specialization of vehicles for the South African police.

267.    Notably, into the 1980s, Ford sold vehicles that did not need to be "converted" by the apartheid government for military or police use but were already specialized before leaving the plant in South Africa.  Tags on cars being produced on the line in South Africa would

---

[183] Rothmeyer, *supra* note 180, at 13; Richard Knight, "Sanctions, Disinvestment, and U.S. Corporations in South Africa," in *Sanctioning Apartheid* (1990, Robert E. Edgar, ed.).

[184]  White Wheels of Fortune: *Ford and GM in South Africa*, Interfaith Center on Corporate Responsibility, Vol. 8 No. 6 1989, at 3A.

indicate which cars were intended for the South African police or government. The engines in some of these models were more powerful than in other cars, and they were only made for the police or the government.

268. In particular, Ford built a limited number of XR6 model Cortinas known as "interceptors" that were sold almost exclusively to the police. The XR6 was special because it had three Weber model double carburetors, as opposed to all other Cortinas that had only one double carburetor.

269. Boxes of parts including nuts, bolts, and carburetors to be used in the specialized vehicles would arrive from overseas, mainly from Ford, and receive expedited treatment to get them to the plant.[185]

270. Ford continued to assist the apartheid regime intending that their equipment and technology was being used to commit violations of international law.

271. Ford's support for the security forces of the apartheid regime extended beyond the mere supply of specialized military vehicles.

272. The military vehicles, equipment, and services that Ford supplied to the South African security forces were intentionally designed to practically enable the security forces to track and attack civilians, patrol communities, and terrorize the Black population with the purpose of perpetuating the oppressive apartheid regime. In the hands of the apartheid security forces, the equipment supplied by Ford had an inherent capacity for harm and was particularly susceptible to harmful and illegal use under international law.

---

[185] "The Motor Industry in South Africa," at 15 (discussing import of carburetors).

273.    Ford knew that the normal market for these vehicles was the security forces.  The vehicles were deliberately pre-equipped with armor and military fixtures and designed for easy modification by the security forces to add additional defensive and offensive features.

274.    Ford entered into agreements with the apartheid regime with the intention that this equipment would ultimately be used by the security forces to enforce the oppressive laws of apartheid, often through violent means.  Ford persisted with voluminous and repetitious sales of such equipment and service agreements despite their knowledge that such sales and services provided practical assistance to the South African security forces which had a substantial effect on perpetrating ongoing atrocities in South Africa.

275.    Ford also worked in deliberate cooperation with security forces to repress anti-apartheid and union activists.  South African police and military regularly visited and entered industrial plants.

276.    Employees in the South African plants were disciplined by Ford for anti-apartheid activities outside of work, and employees active in workplace organizing were arrested by the police and security forces, questioned about their activities based on information supplied by Ford, and tortured and imprisoned.

277.    Ford, thus, purposely supported the repression of anti-apartheid activists and cooperated with and benefited from government repression of blacks who supported unions.

278.    Ford vehicles provided substantial assistance to the apartheid security forces in Soweto.  The student-led Soweto Uprising on June 16, 1976, to protest mandatory Afrikaans language instruction in schools, led to violent suppression by the security forces.  Women and children were shot and killed.  Ford military trucks were used as part of the military protocols in Soweto.

279.    Ford vehicles were used in other security force operations across South Africa.  In August 1985, the funeral of Mrs. Victoria Mxenge, a human rights attorney whose husband was a slain human rights lawyer, precipitated confrontations in Duncan Village.  The security forces' violent response to anti-apartheid unrest lasted through the month of August and became known as the Duncan Village Massacre.  During that time, security forces shot and killed at least nineteen Duncan Village residents, and injured many more.  Ford vehicles were critical to the coordination, monitoring of gatherings, collecting intelligence, and information to advance the crackdown and violence in Duncan Village.

280.    At times during the massacre, entrances to the Duncan Village township were sealed off and security forces in vehicles manufactured by Ford patrolled the area.

281.    At a mass burial service for victims of the massacre held later in August, security forces once again opened fire on attendees resulting in additional injuries and deaths.  Security forces continued to perpetrate violence against Duncan Village residents at least through 1986.  Security forces relied on vehicles manufactured by Ford for coordination, monitoring the black population's activities, gathering information, and transportation throughout this time period.

282.    The Langa Massacre occurred in Uitenhage, near Port Elizabeth, on March 21, 1985.  A group of people from the area peacefully assembled that morning to march to a funeral.  The police blocked the road in the center of Uitenhage with armored vehicles and ordered the crowd to disperse.  When the crowd did not immediately respond, the police opened fire, fatally shooting 36 and injuring many others.  The TRC later conducted an investigation of the event and concluded that the South African Police "resorted to grossly excessive means to achieve this, using unjustified deadly force, and that they are accountable for the gross human rights

violations."  Security forces active at this time relied on vehicles manufactured by Defendant Ford for coordination, monitoring activities, intelligence gathering, transport, and protection.

283.    By making profits which they knew could only come from their encouragement of the security forces' illicit operations through the sale of vehicles, parts, designs, and services, Ford acquired a stake in the criminal enterprise that was the apartheid regime.

284.    Ford provided the South African security forces with vehicles and services for the purpose of assisting enforcement of apartheid by force; extrajudicial killing; torture; prolonged unlawful detention; denationalization; and cruel, inhuman, and degrading treatment against Plaintiffs and members of the classes.

### iii.    Ford Camouflaged its Continued Assistance of the Apartheid Security Forces in Order to Avoid Sanctions

285.    As set forth above, the general manger of Ford South Africa became the head of SAMCOR.

286.    After SAMCOR was created, Ford continued its seamless operation in South Africa through SAMCOR.

287.     Ford created the fiction of this formally separate company to use its trade name and provided SAMCOR with parts, vehicles, managerial assistance, and capital derived from Ford's sale of its interests.  Nothing changed except the names and stamps on boxes.

288.    As Ford spokesman William J. Goodell, speaking from Detroit, said in 1987, "Samcor needs Ford's participation to be a viable company…They produce Ford-designed vehicles. They need the Ford name on vehicles to sell them."[186]

---

[186] Ralph Vartabedian and Michael Parks, Ford Discussing Plans to Divest in South Africa: Firm Would Give 24% Stake to Workers, But Maintain a Presence, June 15, 1987.

289.    Even after Ford announced it was "withdrawing" from South Africa, Ford continued to sell components to SAMCOR and allowed SAMCOR to use its trade name.[187] "[W]e are committed to supporting [SAMCOR's] continued operation and the employment of its people," said Ken Brown, spokesman for Ford.[188]

290.    When apartheid ended, Ford voided the fiction and stepped back into the place it claimed to have left by buying a 45 percent stake in SAMCOR following the demise of apartheid. These maneuvers revealed Ford's maintenance and control of its business activities, including its purposeful support for and imposition of apartheid, while circumventing and undermining U.S. policy.

## IX.    EQUITABLE TOLLING

291.    Equitable tolling applies to all of Plaintiffs' claims not within the applicable statute of limitations because there was no practical, safe, or effective way for Plaintiffs to bring these claims without risk of retaliation by the apartheid state prior to 1994. In addition, Defendants' refusal to cooperate with the TRC and provide a full accounting of their connection to the violations alleged in this complaint tolls the running of the statute of limitations with respect to Plaintiffs' claims.

292.    There were and are no effective domestic remedies for Plaintiffs to exhaust in South Africa against these Defendants for these claims.

## X.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### (APARTHEID AS A CRIME AGAINST HUMANITY)

---

[187] Janet Braunstein, Ford Leaving South Africa But Not Abandoning SAMCOR, Associated Press, Nov. 25, 1987.

[188] *Id.*

**(AGAINST BOTH DEFENANTS)**

293.    The allegations set forth in the above paragraphs are realleged and reincorporated by reference as if fully set forth below.

294.    Plaintiffs, all members of the proposed Extrajudicial Killing Class, all members of the proposed Torture Class, all members of the proposed Detention Class, all members of the proposed Cruel Treatment Class, and all members of the proposed Denationalization Class seek relief from crimes against humanity committed by the apartheid state with the complicity of Defendants, either directly and/or through their agents and alter egos, either by aiding and abetting or participating in a joint criminal enterprise with the South African security forces.

295.    The acts described herein constitute the crime of apartheid and offenses committed in furtherance of or ancillary to that crime in violation of the Alien Tort Claims Act (28 U.S.C. § 1350), international law, and the common law of the United States.

296.    The crimes against humanity for which Defendants are liable are intentional acts that were purposely committed as part of widespread or systematic attacks directed against a civilian population.

297.    The acts which form the basis of Defendants' liability for crimes against humanity include apartheid itself as well as murder, deportation or forcible transfer of population, revocation of nationality, imprisonment or other severe deprivation of physical liberty in violation of international law, torture, the persecution against any identifiable group or collectivity on political, racial, national, or ethnic grounds, and/or other inhumane acts of a similar character intentionally causing great suffering or serious injury to body or to mental or physical health.

298.     Each single act constitutes a crime against humanity because it was committed within the context of widespread or systematic attacks against a civilian population.  In addition, apartheid itself has been long recognized as a crime against humanity.

299.     Defendants provided assistance to the South African security forces through material, logistical, financial, and/or other means of practical support, to purposely facilitate violations of international norms toward the Plaintiffs and the classes.

300.     Defendants' practical assistance to the South African security forces had a substantial effect on the perpetration of its criminal and tortious activities and was provided with the purpose of facilitating those activities.

301.     Plaintiffs and the members of the classes they represent suffered injuries as a result of Defendants' actions.

302.     The Defendants' actions were committed with knowing and reckless disregard for Plaintiffs' rights.  As a result, Plaintiffs are entitled to an award of punitive damages against each Defendant.

## SECOND CLAIM FOR RELIEF
### (DENIAL OF THE RIGHT TO A NATIONALITY)
### (AGAINST DEFENDANT IBM)

303.     The allegations set forth in the above paragraphs are realleged and reincorporated by reference as if fully set forth below.

304.     Denationalization Plaintiffs, on behalf of themselves and the Denationalization Class they represent seek relief from the denial of the right to a nationality committed against him by the apartheid state with the complicity of Defendant IBM acting either directly and/or through their agents and alter egos, and either by aiding and abetting or engaging in a conspiracy or joint criminal enterprise.  Defendant IBM conspired with the apartheid security forces.

305. Denationalization Plaintiffs the Denationalization Class they represent were stripped of their South African nationality and citizenship, were restricted in their ability to travel in to, out of and around South Africa, and were discriminated against by being forcibly geographically separated and segregated into homelands on the basis of race.

306. Defendant provided assistance to the South African security forces through material, logistical, financial, and/or other means of practical support, to purposely facilitate violations of international norms toward the Plaintiffs and the classes.

307. Defendant's practical assistance to the South African security forces had a substantial effect on the perpetration of its criminal and tortious activities and was provided with the purpose of facilitating those activities.

308. Denationalization Plaintiffs the Denationalization Class suffered injuries as a result of Defendant IBM's actions.

309. Defendant IBM's actions were committed with knowing and reckless disregard for Plaintiffs' rights. As a result, Plaintiffs are entitled to an award of punitive damages against Defendant IBM.

### THIRD CLAIM FOR RELIEF
### (EXTRAJUDICIAL KILLING)
### (AGAINST DEFENDANT FORD)

310. The allegations set forth in the above paragraphs are realleged and reincorporated by reference as if fully set forth below.

311. Extrajudicial Killing Plaintiffs on behalf of themselves and the Extrajudicial Killing class they represent, seek relief from extrajudicial killings committed against them by the apartheid state with the intentional complicity of Defendant acting either directly and/or through

their agents and alter egos, and, either by aiding and abetting or engaging in a conspiracy or joint criminal enterprise. Defendant conspired with the apartheid security forces.

312.    Defendant provided assistance to the South African security forces through material, logistical, financial, and/or other means of practical support, to purposely facilitate violations of international norms toward the Plaintiffs and the classes.

313.    Defendant's practical assistance to the South African security forces had a substantial effect on the perpetration of its criminal and tortious activities and was provided with the purpose of facilitating those activities.

314.    These Plaintiffs and the Extrajudicial Killing class they represent suffered injuries as a result of these Defendant's actions.

315.    Defendant's actions were committed with knowing and reckless disregard for Plaintiffs' rights.  As a result, Plaintiffs are entitled to an award of punitive damages against Defendant.

**FOURTH CLAIM FOR RELIEF**
**(TORTURE)**
**(AGAINST DEFENDANT FORD)**

316.    The allegations set forth in the above paragraphs are realleged and reincorporated by reference as if fully set forth below.

317.    Torture Plaintiffs, on behalf of themselves and the Torture Class they represent, seek relief from torture committed against them by the apartheid state with the intentional complicity of Defendant Ford, acting either directly and/or through its agents and alter egos, and either by aiding and abetting or engaging in a conspiracy or joint criminal enterprise.  Defendant conspired with apartheid security forces.

318.     The tortures described herein were inflicted deliberately and intentionally for purposes that included, among others, punishing the victims or intimidating the victim or third persons.

319.     Defendant provided practical assistance to the South African security forces through material, logistical, financial, and/or other means of practical support, to purposely facilitate violations of international norms toward the Plaintiffs and the classes.

320.     Defendant's practical assistance to the South African security forces had a substantial effect on the perpetration of its criminal and tortious activities and was provided with the purpose of facilitating those activities.

321.     Plaintiffs and the class they represent suffered severe mental and physical injuries as a result of these Defendant's actions.

322.     Defendant's actions were committed with knowing and reckless disregard for Plaintiffs' rights.  As a result, Plaintiffs are entitled to an award of punitive damages against Defendant.


### FIFTH CLAIM FOR RELIEF
### (CRUEL, INHUMAN OR DEGRADING TREATMENT)
### (AGAINST BOTH DEFENDANTS)

323.     The allegations set forth in the above paragraphs are realleged and reincorporated by reference as if fully set forth below.

324.     Cruel Treatment Plaintiffs and the Cruel Treatment Class they represent suffered injuries as a result of Defendants' actions that constitute cruel, inhuman or degrading treatment (CIDT).

325. The acts described herein had the intent and the effect of grossly humiliating and debasing the Plaintiffs, forcing them to act against their will and conscience, inciting fear and anguish, and/or breaking their physical or moral resistance.

326. The acts described herein constitute CIDT committed against the Plaintiffs by the apartheid state with the complicity of Defendants, acting either directly and/or through their agents and alter egos, and, either by aiding and abetting or engaging in a conspiracy or joint criminal enterprise; or committed directly by the Defendants themselves. Each Defendant conspired with the apartheid security forces.

327. Defendants provided assistance to the South African security forces through material, logistical, financial, and/or other means of practical support, to purposely facilitate violations of international norms toward the Plaintiffs and the classes.

328. Defendants' practical assistance to the South African security forces had a substantial effect on the perpetration of its criminal and tortious activities and was provided with the purpose of facilitating those activities.

329. All Plaintiffs and the classes they represent suffered injuries as a result of Defendants' actions.

330. The Defendants' actions were committed with knowing and reckless disregard for Plaintiffs' rights. As a result, Plaintiffs are entitled to an award of punitive damages against each Defendant.

## XI. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that judgment be entered against the Defendants as follows:

(a)     Granting Class Plaintiffs class action certification;

(b)     Declaring that Defendants aided and abetted the commission of a tort in violation

of international law enforceable in this court as federal common law and the law

of nations;

(c)     Awarding Class Plaintiffs compensatory and punitive damages arising out of the

unlawful behavior of Defendants;

(d)     Disgorging Defendants' profits;

(e)     Awarding the costs of bringing this action; and

(f)     Granting such other further relief as shall seem just to the Court.

## XII.  JURY DEMAND

Plaintiffs hereby demand a jury trial on all issues so triable.

Dated: August 8, 2014

> */s/ Michael D. Hausfeld*
> Michael D. Hausfeld
> mhausfeld@hausfeldllp.com
> Kristen M. Ward
> kward@hausfeldllp.com
> Hausfeld LLP
> 1700 K St. N.W. Suite 650
> Washington, D.C. 20006
> (202) 540-7200
>
> Jeannine M. Kenney
> jkenney@hausfeldllp.com
> Hausfeld LLP
> 1604 Locust St., 2nd Floor
> Philadelphia, PA 19103
> (215) 985-3270
>
> *Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I, Kristen M. Ward, hereby certify that on August 8, 2014, a copy of Plaintiffs' Proposed

Third Amended Complaint was filed and served on all parties of record by way of CM/ECF.


*/s/ Kristen M. Ward*
Kristen M. Ward